UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PORTLAND PIPE LINE CORPORATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:15-cv-00054-JAW |
| CITY OF SOUTH PORTLAND, et al., | ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON DEFENDANTS' MOTION TO DISMISS**

South Portland enacted an Ordinance prohibiting the loading of crude oil in Portland Harbor.  The Ordinance's practical effect is to prevent Portland Pipe Line from using its infrastructure to transport oil by pipeline from north to south, i.e., from Canada to South Portland.  Portland Pipe Line brought suit seeking declaratory and injunctive relief, and South Portland moved to dismiss the suit on the justiciability grounds that the suit was unripe, that Portland Pipe Line lacked standing, and that the Court must not render an advisory opinion.  The Court, however, finds the dispute to be ripe because Portland Pipe Line has expressed its intention to import oil and cannot do so as long as the Ordinance remains in place.  Other approvals may be required, but Portland Pipe Line has won these approvals in the past and should not be made to pursue them again while the question of the Ordinance's legality remains unanswered.  The Defendants' standing and advisory opinion claims are similarly unavailing.  The Court denies South Portland's motion to dismiss.

I.      BACKGROUND

A.      Procedural History

On February 6, 2015, Portland Pipe Line Corporation (PPLC) and The American Waterways Operators (AWO) filed a nine-count complaint in this Court against the city of South Portland (South Portland or City) and Patricia Doucette (Doucette), South Portland's Code Enforcement Officer.  The Complaint contains nine counts: (1) Supremacy Clause preemption of the Ordinance by the Pipeline Safety Act (PSA), 49 U.S.C. §§ 60101 *et seq*.; (2) Supremacy Clause preemption of the Ordinance under the President's foreign affairs power; (3) Supremacy Clause preemption of the Ordinance by the Ports and Waterways Safety Act, 33 U.S.C. Ch. 25 and 46 U.S.C. Ch. 37; (4) preemption of the Ordinance under Article III, Section 2 of the United States Constitution and the Constitution's embedded principle of federal maritime governance; (5) violation of the Commerce Clause of the Constitution; (6) violation of the Due Process and Equal Protection Clauses; (7) deprivation of rights under the Civil Rights Act, 42 U.S.C. § 1983; (8) inconsistency of the Ordinance with South Portland's comprehensive plan under Maine law, 30-A M.R.S. § 4352; and (9) preemption of the Ordinance by Maine's Oil Discharge Prevention Law, 38 M.R.S. § 556.  *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*).

On March 31, 2015, South Portland and Ms. Doucette filed a motion to dismiss the Complaint.  *Defs.' Mot. to Dismiss the Compl. Pursuant to Rule 12(b)(1)* (ECF No. 16); *Mem. of Law in Supp. Of Defs.' Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 17) (*Defs.' Mot.*).  The Plaintiffs responded on April 21, 2015.  *Pls.' Opp'n to Defs.'*

2

*Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 18) (*Pls.' Opp'n*). The Defendants replied on May 5, 2015. *Reply Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 19) (*Defs.' Reply*). On May 12, 2015, the Plaintiffs filed an unopposed motion for oral argument, *Pls.' Req. for Oral Argument* (ECF No. 20), which the Court granted on May 14, 2015. *Order Granting Without Obj. Mot. for Oral Argument / Hr'g* (ECF No. 21).

On January 21, 2016, the Court held oral argument on the motion to dismiss. *Min. Entry* (ECF No. 24). At oral argument, the Plaintiffs brought to the Court's attention a case the First Circuit decided after the parties submitted their written argument: *Town of Barnstable v. O'Connor*, 786 F.3d 130 (1st Cir. 2015). The Court asked the parties to brief *Barnstable*. The Defendants filed a memorandum on *Barnstable* on January 28, 2016, *Post-Hr'g Mem. in Supp. of Defs.' Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 25) (*Defs.' Post-Hr'g Mem.*), and the Plaintiffs did so on February 2, 2016. *Pls.' Resp. to Defs.' Post-Hr'g Mem. in Supp. of Defs.' Mot. to Dismiss Pursuant to Rule 12b(1)* (*Pls.' Post-Hr'g Mem.*).

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and pendant jurisdiction over the Maine law claims pursuant to 28 U.S.C. § 1367.

## II.    THE FACTUAL ALLEGATIONS OF THE COMPLAINT

### A.    The Parties

PPLC is a Maine corporation with its principal place of business in South Portland. *Compl.* ¶ 3. It is a wholly-owned subsidiary of Montreal Pipe Line Limited,

a privately-held corporation located in Canada, and is engaged in the international transportation of hydrocarbons via pipeline and associated facilities located in a continuous transportation corridor running from the harbor in South Portland, Maine, through three states, across the Canadian border, to facilities located in Montreal, Quebec.[1] *Id.*

PPLC owns and operates the United States portion of a transportation system that includes, without limitation, 12-inch diameter, 18-inch diameter, and 24-inch diameter pipelines and associated facilities extending from South Portland, Maine to Montreal, Quebec. *Id.* ¶ 11. PPLC's transportation system was first established with the construction of the 12-inch diameter pipeline in 1941 during World War II for national security purposes to transport crude oil by pipeline as an alternative to direct international marine shipments by crude oil tankers. *Id.* ¶ 16. The 18-inch diameter pipeline, built in 1950, transported oil until 1986, when it converted to natural gas transmission, importing gas from Canada to the United States pursuant to Executive Order 10485 (Sept. 3, 1953) and Executive Order 12038 (Feb. 3, 1978). *Id.* In 1999, the 18-inch diameter pipeline converted back to oil transportation, as authorized by a Presidential Permit issued in accordance with Executive Order 11423 (August 16, 1968), Executive Order 12847 (May 17, 1993), and Department of State ("State Department") Delegation of Authority No. 118-1 (April 11, 1973). *Id.* The 24-inch diameter pipeline was built pursuant to a Presidential Permit issued January

---

[1]     Montreal Pipe Line Limited is owned by four entities: McColl-Frontenac Petroleum, Inc.; Imperial Oil Limited; Suncor Energy, Inc.; and Shell Canada Limited—all Canadian corporations. *Id.* ¶ 4. Each of these entities, directly or through affiliates, produces, transports by pipeline, and refines crude oil in Canada, including crude oil derived from oil sands, which includes bitumen. *Id.*

13, 1965. *Id.* PPLC's Presidential Permits and approvals were issued as an exercise of the President's authority over foreign affairs and as Commander in Chief, and are consistent with, advance, and are issued as an exercise of United States foreign policy and to facilitate the cross-border trade in hydrocarbons between Canada and the United States. *Id.* ¶ 17.

Currently, approximately forty-eight ships offload at PPLC annually, and PPLC transports crude oil to Quebec via pipeline and associated facilities at a rate of approximately 2.4 million barrels of oil per month. *Id.* ¶ 11. PPLC holds submerged land leases with the state of Maine upon which are located two piers it owns at the harbor in South Portland. *Id.* ¶ 12. PPLC's pipeline transportation system includes, without limitation, one of the two piers (Pier 2), tanks located both at the waterfront and at a tank farm within South Portland, as well as the pipes, additional infrastructure, and facilities needed to transport petroleum products from tankers berthing at Pier 2 to their ultimate cross-border destination. *Id.*

AWO is a national trade association for the nation's inland and coastal tugboat, towboat, and barge industry. *Id.* ¶ 5. The industry employs more than 33,000 American seamen and owns and operates over 4,000 tugboats and towboats and more than 27,000 barges throughout the country. *Id.* AWO represents the largest segment of the U.S.-flag domestic fleet. *Id.* Its 350 member companies carry more than 800 million tons of domestic cargo every year, operating vessels on the inland rivers, Atlantic Ocean, Pacific Ocean, the Gulf Coast, the Great Lakes, and in ports and harbors around the country, including the Portland Harbor, incorporating the harbor

in South Portland. *Id.* AWO's member companies operate numerous vessels licensed by the United States Coast Guard to engage in coastwise trade, such as the transportation of crude oil products. *Id.* AWO has consistently supported federal control over harbor-related activities, noting that to move critical cargo in interstate and international commerce safely and efficiently, the maritime industry needs uniform safety and environmental standards established by one engaged and experienced federal agency, the United States Coast Guard, and that subjecting vessel operators to duplicative or conflicting federal and state standards creates confusion, adds inefficiency, and increases costs to shippers who rely on water transportation. *Id.* By prohibiting the loading of crude oil at the harbor in South Portland, the Ordinance interferes and conflicts with its members' federal licenses; eliminates a market for its member vessels' services in transporting such products from the harbor; and sets a precedent for inconsistent local harbor regulation that could cripple import and export activities nationally and invite reciprocal commerce curtailment from other nations. *Id.*

The city of South Portland is a municipality located in Cumberland County, Maine, on Portland Harbor. *Id.* ¶ 6. Portland Harbor is the second largest oil port on the east coast of the United States, serving as a key center for shipping by both land and sea. *Id.* The Harbor has the capability of handling some of the largest and deepest draft marine tankers on the east coast, with up to fifty-two feet of draft and 170,000 deadweight tons of cargo. *Id.* ¶ 10.

Patricia Doucette, is South Portland's code enforcement director, and is charged under South Portland Code Sec. 27-131 with enforcing the City's ordinances, including the Ordinance at issue in this case. *Id.* ¶ 7.

## B. The Harbor and its Role in Regional and International Commerce

The petroleum-handling facilities and operations on South Portland's waterfront constitute a vital hub for the interstate and international delivery of petroleum products, providing the interstate region with a reliable supply of products necessary for heating homes and businesses, among other uses. *Id.* ¶ 36. By curtailing oil-handling activities at the South Portland waterfront, and by permitting the importation but prohibiting the exportation of petroleum products, contrary to market conditions, the Ordinance cripples the commercial activities not only of the named plaintiffs but of all harbor-related actors. *Id.* By purposely and effectively legislating that crude oil may be imported but may not be exported, the Ordinance, as intended, precludes any such exportation commerce in the harbor and affects petroleum-based commerce outside South Portland, outside Maine, across the interstate region, and across the United States-Canada border, and, if copied in other United States harbor municipalities, would have profound adverse precedential impacts. *Id.*

A recent economic report provided that the total impact of commercial petroleum-handling activities on just South Portland and its regional economy amounts to over $64 million in sales, supporting 335 jobs earning over $20 million in pay and benefits, and that the oil terminal industry serves as the anchor for the entire

Port of Portland, accounting for 84% of the port's cargo vessels and 94% of its total cargo. *Id.* ¶ 35.

### C. Cross-Border Oil Transportation and Transboundary Management

Oil cargo is transferred from a tank vessel to the pipeline and is overseen by the Coast Guard's Captain of the Port (COTP). *Id.* ¶ 14. This process entails hydraulically connecting pipeline equipment at a flange on the ship, with the oil pumped from the ship. *Id.*

The tank and pipeline equipment used is tested and inspected by the Coast Guard, must adhere to Coast Guard regulations, and the transfer operations and activities are regulated and overseen by the Coast Guard. *Id.* The same regulatory framework applies to loading a tank vessel as applies to unloading; Coast Guard regulations apply to cargo "transfer," i.e., loading and unloading, and adjustments to operations and equipment with respect to the transfer would be overseen and regulated by the Coast Guard. *Id.* ¶ 15.

Next, the oil is pumped using pump stations located along the route from South Portland to Montreal, spaced twenty-five to forty miles apart. *Id.* ¶ 13. These six pump stations are located in South Portland, Raymond, and North Waterford, Maine; Shelburne and Lancaster, New Hampshire; and Sutton, Vermont. *Id.*

In a Transit Pipe-lines Agreement (TPA) between the United States and Canada, effective October 1, 1977, 28 UST 7449, TIAS 8720, both governments agreed to measures designed to ensure the uninterrupted transmission of hydrocarbons, including crude oil, by pipeline through the territory of one country for delivery to the

8

territory of the other. *Id.* ¶ 18.  In Article II of the TPA, the two countries expressly promised: "No public authority in the territory of either [country] shall institute any measures, other than those provided for in Article V [relating to emergencies], which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." *Id.* ¶ 19.

At a subsequent summit in Quebec, the President and the Canadian Prime Minister signed Joint Canada-United States Declarations on Trade and International Security, dated March 18, 1985, agreeing to strengthen Canada-United States energy trade "by reducing restrictions, particularly those on petroleum imports and exports, and by maintaining and extending open access to each other's energy markets, including oil." *Id.* ¶ 20.  The President further entered findings confirming "the objective of liberalizing energy trade, including crude oil, between the United States and Canada. *Id.*  Both Governments recognized that substantial benefits would ensue from broadened crude oil transfers and exchanges between these two historic trading partners and allies. *Id.*  These benefits would include increased availability of reliable energy sources, economic efficiencies, and material enhancements to the energy security of both countries." *Id.*

### D.   Changing Market Conditions and PPLC's Request to Reverse the Flow of the Pipeline

No crude oil is produced within the state of Maine. *Id.* ¶ 23.  Currently, PPLC uses its 24-inch diameter pipeline, with a capacity of 410,000 barrels a day, to transport crude oil unloaded from oil tankers at the harbor in South Portland north to Canada in far smaller amounts than its capacity can serve. *Id.*  PPLC's pipelines

are currently underutilized due to market conditions that favor the transportation of oil south from Canada to the United States and other international markets, instead of from Portland Harbor north to Canada. *Id.* For example, the 18-inch diameter pipeline is currently idle and being maintained to protect the integrity of the pipeline in a condition that allows PPLC to return the line to service when market demands so warrant. *Id.*

In 2008, PPLC requested authorization from the State Department to reverse the flow of the 18-inch diameter international pipeline, in order to transport oil south from Canada to be loaded onto tankers in Portland Harbor, instead of transporting oil north to Canada, as had occurred since the conversion from natural gas back to oil in 1999. *Id.* ¶ 21. The State Department responded that PPLC's 1999 Presidential Permit was sufficient, so that no further approvals or amendments were needed, and the State Department has continued thereafter to monitor PPLC's pipeline activities. *Id.* Recent correspondence from the State Department asks that PPLC keep the department informed as to PPLC's pipeline operations, noting that such information "will assist the Department in carrying out its policies, as they relate to pipeline permitting, including with regard to energy, environmental, and safety considerations." *Id.* ¶ 22.

As the historical use of PPLC's pipelines reflect, in order to react promptly to international and national market conditions in the cross-border trade of hydrocarbons, the type of and the direction in which hydrocarbons may flow through PPLC's pipelines changes, as overseen by the President implementing his foreign

10

affairs powers given, inter alia, national strategic interests surrounding the cross-border flow of hydrocarbons.  *Id.* ¶ 24.  The Ordinance's interference with these foreign affairs powers and with the exclusive federal authority over the flow of hydrocarbons through its pipelines adversely affects PPLC's ability to respond to market conditions and to facilitate the cross-border flow of hydrocarbons as supported by international treaty and presidential findings.  *Id.*

By limiting the direction in which bulk oil may flow through PPLC's pipelines, the Ordinance immediately and currently reduces the current market value of PPLC's pipelines and hinders its ability to engage in interstate and international commerce.  *Id.* ¶ 25.  The Ordinance purposefully and effectively prohibits all use of PPLC pipelines for the transportation of oil from Canada to the United States, to the detriment of PPLC's ability to offer its transportation services to the national and international export market.  *Id.*

PPLC's shareholders actively market their crude oil to markets in the United States and other countries.  *Id.* ¶ 26.  The Ordinance prohibits them from transporting its product to market through the harbor in South Portland and via PPLC's pipelines, which could handle hundreds of thousands of barrels of their products a day.  *Id.*  By prohibiting the loading of oil onto marine vessels in South Portland, the Ordinance further forecloses the Harbor as a means of export for their product, however that product arrives, whether by pipeline, ship, or rail.  *Id.*  The inability to use the Harbor and existing commerce avenues has a depressive impact on the value of these shippers' crude oil, and the precedential impact of the

Ordinance, if copied in other U.S. harbor municipalities, would have a profound impact on shippers' ability to engage in international commerce.  *Id.*

The current transportation of tankers into the Harbor is threatened by the lack of economics in transporting crude oil from south to north.  *Id.* ¶ 27.  Conversely, PPLC's unused capacity is such that, if oil could be transported from Canada through PPLC's pipelines and loaded onto ships in the harbor in South Portland at an economically rational cost, the commercial activities of the AWO and its members stand to benefit from increased traffic and shipping opportunities.  *Id.*  Allowing the import of oil, but not its export, through the Harbor restricts the ability of AWO's members from engaging in interstate and international commerce.  More broadly, the precedential impact of the Ordinance, if copied in other United States harbor municipalities, would have a profound impact on the ability of marine vessels to engage in international commerce and undermines the uniformity of international and national vessel regulation, to the detriment of AWO members' interests.  *Id.*

### E.    MARPOL and its Regulatory Scheme

The United States has adopted the International Convention for the Prevention of Pollution from Ships (MARPOL), including Annex VI and Regulation 15 thereto.  *Id.* ¶ 28.  Regulation 15 applies to the emissions of volatile organic compounds (VOCs) in cargo transfer operations between tankers and port facilities—the purported concern of the Ordinance.  *Id.* ¶ 29.  The first paragraph of Regulation 15 provides: "If the emissions of VOCs from a tanker are to be regulated in a port or ports or a terminal or terminals under the jurisdiction of a Party, they shall be

regulated in accordance with the provisions of this regulation." *Id*. ¶ 30. The remainder of Regulation 15 obligates parties to MARPOL to notify the International Maritime Organization ("IMO"), an agency of the United Nations, before the party imposes vapor emission control requirements, and to take into account safety guidance developed by the IMO in doing so. *Id*.

In forwarding MARPOL to the Senate for approval on May 15, 2003, the President noted that ratification of the Convention and Annex VI "will demonstrate U.S. commitment to an international solution" for air emissions from tankers. *Id*. ¶ 31. In the Secretary of State's Letter of Submittal of MARPOL, submitted to the Senate in 2003 during the ratification process, the Secretary of State explained that:

> [T]he United States has basic and enduring national interests related to the oceans and U.S. port regions, and has consistently taken the position that the full range of these interests is best protected through a widely accepted international framework governing uses of the sea. A workable international regime for the prevention of air pollution from ships is in the best interests of all States because it will subject international shipping to a uniform standard that is environmentally protective.

*Id*. Consistent with its treaty adoption of MARPOL, the United States has adopted VOCs emission control regulations for tanker loading operations and requires vapor emission control systems, and pursuant to Regulation 15.6 and consistent with IMO Resolution MEPC 185(59), tankers follow VOC management plans required under Regulation 15. *Id*. ¶ 32.

Canada and the United States act cooperatively consistent with MARPOL regulation and the United States' goal of acting on an international level in regulating tanker activity and emissions, VOCs and otherwise. *Id*. ¶ 33. One illustrative

example is these two countries' joint proposal to the IMO pursuant to MARPOL Annex VI, Appendix III of a North American Emission Control Area surrounding their coastlines, subsequently adopted by the IMO to reduce SOx, NOx, and particulate matter emissions. *Id*. In proposing this Emission Control Area, the two countries noted that they "have an obvious common interest in addressing emissions from ships operating off their coasts given their geographic proximity and the nature of their markets." *Id*.

AWO members comply with MARPOL and the federal regulations adopted consistent with MARPOL. *Id*. ¶ 34. The Ordinance's attempt to add another layer of regulation and to ban loading altogether impairs their ability to engage in transportation activities in the harbor in South Portland, and the precedential impact of the Ordinance, if copied in other United States harbor municipalities, would have a profound impact on tankers' ability to engage in national and international commerce by eliminating the uniformity of international maritime regulation sought by the United States in its federal treaties and statutes. *Id*.

## F.   The History and Development of the Ordinance

### 1.   The Waterfront Protection Ordinance

The first incarnation of the Ordinance emerged as a citizen initiative in 2013 referred to as the Waterfront Protection Ordinance (WPO). *Id*. ¶ 40. Proponents of the WPO articulated that the main objective of the WPO was to prevent the transportation of Canadian oil through PPLC's pipelines due to perceived dangers from products derived from oil-sands-derived crude oil. *Id*. ¶ 41. An organization

14

called "Protect South Portland" collected the signatures to place the WPO on the ballot. *Id*. ¶ 42.  Before the 2013 vote on the WPO, Protect South Portland posted fact sheets on its website stating that an ordinance was needed to protect "Casco Bay from spills of toxic tar sands from tankers" and exhorted the electorate to "Vote for the Waterfront Protection Ordinance to stop out-of-state big oil companies from building a tar sands export terminal in South Portland." *Id*.  Proponents of the WPO attended a July 23, 2013 meeting of the South Portland Planning Board, in which they advocated for ordinance enactment, arguing that: (1) the transport of oil derived from tar sands "isn't consistent with sustainability"; (2) the WPO will "help us protect the earth" and "help us protect our children and our grandchildren"; (3) asserting that there were "catastrophic risks involved with tar sands oil"; (4) "we cannot afford to have a spill in South Portland"; (5) citizens had been "alerted to unacceptable risks involved in carrying tar sands through our community"; (6) tar sands "create[] lakes of toxic waste"; (7) there is "no place to put the waste in Canada"; (8) tar sands are "destroying the land"; and (9) "our whole way of life and our economy is in jeopardy." *Id*. ¶ 43.  They stated that they "ask nothing but to prevent tar sands from being pumped from Canada to South Portland." *Id*.

At an August 13, 2013 meeting of the South Portland Planning Board, proponents of the Ordinance argued that tar sands will "poison our school, children, and teachers" and will be pumped through "very old pipes that are unmapped," and that PPLC wanted to "pump tar sands into our community." *Id*. ¶ 44.

At an August 19, 2013 meeting of the South Portland City Council, David Lourie, an attorney for Concerned Citizens of South Portland (the predecessor to Protect South Portland) and the original drafter of the WPO, stated that "South Portland has a unique ability to stop the flow of tar sands into the state of Maine." *Id.* ¶ 45. Proponents of the Ordinance argued that it would "protect our community from multiple threats," including "fouling our drinking water"; that "with a 64 year old pipeline that is used to supporting crude oil, it is only a matter of time before it leaks"; and that the "[WPO] will prevent our community from becoming the North American tar sands oil shipping point." *Id.* One proponent said that "the core intent of the [WPO] is to prevent tar sands from flowing from Canada to our community and being exported around the world," noting "South Portland's unique proximity to Canada," and that "Alberta, Canada is the beginning of our connection to tar sands." *Id.* Another proponent explained, "[w]e do not want to pollute the working waterfront with out of state interests." *Id.* Another stated that "if tar sands is so safe, let Canada export it through its own shores." *Id.* Proponents argued that PPLC wanted "to expand operations in Alberta to include tar sands and they need the pipeline in South Portland to transport to places like China," and that an ordinance was needed because PPLC wants to "facilitate the flow of tar sands from Canada to South Portland and out to the greater world." *Id.*

Shortly before the vote on the WPO, an opinion piece published in the *Bangor Daily News* entitled "Climate Change is here; now what will Maine do about it?" advocated for passage of the WPO because "tar sands are terrible for the climate, with

16

significantly higher emissions of the pollution that causes global warming than conventional oil. Big Oil's push for tar sands is a national issue that touches us right here in Maine, and we can do something about that." *Id.* ¶ 46.

In addition to language prohibiting the unloading of petroleum products, the WPO included broader language freezing existing petroleum-related operations in South Portland. *Id.* ¶ 47.

At the November 2013 election, voters rejected the WPO 51% to 49%. *Id.* ¶ 48. Ordinance proponents attributed the WPO's defeat to the broader provision freezing existing petroleum-related operations, and immediately vowed to re-draft the ordinance to more narrowly target the importation of oil from Canada. *Id.* ¶ 49. The spokesperson for Protect South Portland stated that the organization was "more committed than ever to keeping tar sands out of South Portland." *Id.*

### 2.    Strategy Following Defeat of the WPO and Creation of a Draft Ordinance Committee

After the defeat of the WPO, the strategy to prohibit importation of oil from Canada into the United States included circumvention of the electorate via ordinance initiation not by citizen initiative as with the WPO, but rather enactment through a vote of the City Council alone. *Id.* ¶ 50. City Councilor and Mayor Gerard Jalbert stated that "[p]eople's feelings are clear" that "[t]hey don't want to be known as the tar sands capital of the United States." *Id.* City Councilor Tom Blake stated that having a South Portland committee draft the ordinance banning the flow of oil derived from oil sands through PPLC pipelines would protect the City, and that he was assured that all councilors opposed tar sands coming into the City. *Id.*

17

Within hours of the WPO's defeat at the ballot box, City officials introduced and held a workshop on a moratorium to prevent the transportation of "oil sands/tar sand products" onto vessels in Portland Harbor, applicable as of that day, and subjecting any person engaged in "the loading of oil sands/tar sands products onto marine tank vessels docking in South Portland" to immediate fines and penalties. *Id*. ¶ 51.

While the moratorium was in place, the City appointed a Draft Ordinance Committee (DOC) charged with drafting an ordinance to stop the flow of "tar sands" oil through South Portland.  *Id*. ¶ 52.  South Portland repeatedly and publicly acknowledged that this was the DOC's charge.  *Id*.  The City's public written solicitation for members for the DOC stated that "[t]he committee has a City Council charge of exploring the development of ordinance language to address development proposals involving oil sands/tar sands production."  *Id*.

Ordinance proponents again publicly noted their goal of blocking export venues for petroleum products derived from Canadian oil sands, and said that preventing PPLC from reversing its flow would empower local resistance to "tar sands" worldwide.  *Id*. ¶ 53.  Media reports are replete with citations confirming the universal understanding that the Ordinance was written "to target tar sands oil from Canada."  *Id*.  PPLC asked to be a member of the DOC, but the City Council rejected its request.  *Id*.  Instead, the City appointed a three-member DOC that included a litigation attorney, Russell Pierce, who represents the environmental organization the National Resource Council of Maine (NRCM), which vigorously supported the

WPO. *Id.* Mr. Pierce's law firm newsletter described his task at the time of the appointment to the DOC as "to serve as one of three members of a special Draft Ordinance Committee to propose ordinance language for waterfront protection and land use planning in the context of a petroleum pipeline project transporting tar sands oil from western Canada to Portland Harbor." *Id.* ¶ 54. Mr. Pierce thereafter engaged in multiple extended ex parte communications with the NRCM and another environmental group, the Conservation Law Foundation ("CLF"), when drafting the Ordinance. *Id.* ¶ 53.

During the debate over the WPO, opponents warned that the measure violated numerous federal and state constitutional and statutory provisions. *Id.* ¶ 54. Those warnings were renewed before the City Council during its deliberations over the Ordinance. *Id.* At a January 13, 2014 workshop, legal counsel for the City stated that the charge to the DOC would provide it with "maximum flexibility" to reach its objective, given that this stated intent of "banning tar sands" would likely face "legal obstacles." *Id.*

Tasked with the mission of crafting an anti-"tar sands" ordinance that would pass legal scrutiny while banning the export of Canadian petroleum products derived from oil sands through the harbor in South Portland, the DOC issued requests for information, including questions such as "[W]hat are the physical capacities (average and peak flow-rates) of the Portland Pipe Line Corporation's pipelines for carrying unrefined oil products, including diluted bitumen, from Montreal to South Portland?"

*Id*. ¶ 55.  The City also sought responses as to the "boundaries between local, state and federal authorities/jurisdictions."  *Id*.

Summary notes from the DOC's meetings indicate that its goals included having language that "stands up to any legal challenges".  *Id*. ¶ 56.  In a March 24, 2014 workshop, Jeffrey Edelstein, the facilitator working with the DOC, told the City Council that because the City could not legally ban oil derived from oil sands, the DOC was working to "thread the needle" to withstand a legal challenge while accomplishing the goal of preventing the flow of such oil through PPLC's pipeline.  *Id*. The Council responded positively, with one Councilor stating that she liked the DOC's methodology, as "[i]t gets us where we need to be."  *Id*.

Ultimately, in an attempt to evade legal limitations, the DOC, supported by submissions and communications from NRCM and CLF, labeled the Ordinance a "Clear Skies" ordinance, and included a very long preamble to the Ordinance reciting purported zoning and air concerns about the loading (yet not unloading) of petroleum products onto marine vessels in the Harbor.  *Id*. ¶ 57.  The express charge of the DOC to enact an anti-"tar sands" ordinance is nowhere mentioned in the Ordinance, as noted with puzzlement by one Councilor.  *Id*.  One public commentator in a communication dated June 3, 2014 similarly stated: "I am probably not the only one to point out what might have been an oversight in the draft ordinance: that the term 'tar sands' is conspicuously absent from the document altogether," observing that the DOC's charge "is wrapped up in the term 'tar sands' under the aegis of a moratorium that is also centered on 'tar sands' prohibition."  *Id*.  The City's legal counsel also

noted in a written memorandum that the unusually long (ten-page) preamble of "findings" was not normally a part of a Maine ordinance.  *Id*.

At a June 25, 2014 workshop, Mr. Edelstein again candidly explained that the committee put an air emissions spin on what it did because "one of the places where the city is permitted to act is in the regulation of air emissions."  *Id*. ¶ 58.  As to the lengthy findings, Mr. Pierce stated that "we can't predict whether all of this will survive a challenge and so we felt let's put as much belt and suspenders on here as we can."  *Id*.  Natalie West, the attorney representing "Protect South Portland," explained in a July 1, 2014 email to the City legal counsel that the findings were "legal strategy."  *Id*.  Michael Conathan, another committee member chosen by the City, and the Director of Ocean Policy at the Center for American Progress, which had previously characterized Canadian extraction from oil sands as "polluting" and "destructive," said that the DOC's charge was to "address the potential throughput of tar sands or oil sands through the City of South Portland."  *Id*.  When presenting the draft Ordinance publicly, Mr. Pierce stated that "federal preemption and the dormant commerce clause were part of our thinking throughout this process."  *Id*. ¶ 59.

In other statements, City Councilors further confirmed that the purposes of the Ordinance were to address health and safety concerns about pipeline transportation, and to have an extraterritorial impact to stop the global transportation and delivery of oil from Canada.  *Id*. ¶ 60.  For example, Mayor Jalbert noted that PPLC's pipelines passed through the Sebago Lake watershed, where the City obtains its drinking water, and Councilor Cohen stated that he did not want tar

sands in South Portland.  *Id*.  Councilor Smith stated that the committee came up with a compromise to thread the needle that would "protect the health and safety of our residents and potentially the health and safety of global residents."  *Id*.  Councilor Linscott stated: "This ordinance is a lot bigger than us."  *Id*.  In a recorded interview, Mayor Jalbert explained that the Ordinance was "in essence [to] prevent the flow of Canadian tar sands crude oil through South Portland as an export."  *Id*.

Anticipating legal difficulties, the City has approved the establishment of a legal defense fund to solicit to provide financial resources to defend the Ordinance. *Id*. ¶ 61.  A spokesperson for Protect South Portland stated: "We may be a small city, but, boy, we've done a big thing."  *Id*.

In so enacting the Ordinance, the City rejected the position of the Alberta representative in the Canadian Embassy, who spoke against the Ordinance before the City Council, noting, among other things, that one-third of the oil imported into the United States comes from Canada, that Canada respects the environment and existing regulations are in place, and that the Ordinance reflects a misunderstanding of Canada's oil sands product.  *Id*. ¶ 62.

The text of the Ordinance prohibits all "bulk loading" of crude oil at the harbor in South Portland and prohibits the installation, construction, reconstruction, modification, or alteration of new or existing facilities, structures, or equipment for the purpose of bulk loading of crude oil onto any marine tank vessel in the harbor in South Portland, thus precluding the use of PPLC's pipelines or other means for the importation of oil to be loaded at the harbor in South Portland for further

transportation in national and international commerce, and thus prohibiting all activities related to the importation of such oil by pipeline or other transportation methods for export.  *Id.* ¶ 38.

The history of the Ordinance reflects that both the purpose and the effect of the Ordinance is to regulate interstate and international commerce so as to preclude the importation of Canadian products derived from oil sands.  *Id.* ¶ 39.  The Ordinance is based on purported safety concerns as to the transportation of such products via pipelines and otherwise, and on the objective of affecting United States foreign policy as to the importation of Canadian products derived from oil sands.  *Id.*

## III.   THE CLAIMS IN THE COMPLAINT

### A.   Count One

Citing the Supremacy Clause, U.S. CONST. art VI, cl. 2, the Plaintiffs claim the Pipeline Safety Act (PSA), 49 U.S.C. §§ 60101-60140, "preempt[s] the entire field of interstate pipe[]line safety for exclusively federal regulation.  The Ordinance attempts to regulate pipeline safety in purpose and effect and intrudes into the federally preempted field of interstate pipeline safety.  The Ordinance is preempted under the PSA and associated federal regulations."  *Id.* ¶ 69-71.

### B.   Count Two

The Plaintiffs rely on Article II, Sections 2 and 3 of the U.S. Constitution as "provid[ing] broad and exclusive power to the President and federal authorities over foreign affairs."  *Id.* ¶ 73.  They argue the "Ordinance's design and intent—to impose a policy against the development and exportation of products from Canada and to

become an exemplar for other localities to do the same—intrudes into the exclusively federal field of foreign affairs and policy. The Ordinance is preempted under the President's foreign affairs policy." *Id.* ¶ 82-83.

### C.    Count Three

Again citing on the Supremacy Clause, U.S. CONST. art VI, cl. 2, the Plaintiffs claim Title I of the Ports and Waterways Safety Act (PWSA), 33 U.S.C. §§ 1221-1236, authorizes the Secretary of Homeland Security to regulate oil transportation matters, and that it "preempts all state or local regulations that conflict with federal regulations or which the Secretary [of Homeland Security] has concluded should not be the subject of federal regulations" except for "state or local regulations . . . based on the peculiarities of local waters . . . ." *Id.* ¶ 86, 88. The Plaintiffs further claim Title II of PWSA, 46 U.S.C. §§ 3701-3719, "create[s] uniform national tanker standards . . . , and leave[s] no room for the states to impose different or stricter requirements than those which Congress has enacted." *Id.* ¶ 89. Accordingly, the Plaintiffs argue the Ordinance's prohibition on loading crude oil and on adding or altering facilities related to loading operations "impermissibly conflict[s]" with Titles I and II of PWSA and regulations without qualifying for an exception. *Id.* ¶ 92.

### D.    Count Four

Relying on an array of authorities, chiefly Article III, Section 2 of the U.S. Constitution, the Plaintiffs state that "federal judicial power extends to all cases of admiralty and maritime jurisdiction" and that "uniformity" is a constitutional requirement in this area of law. *Id.* ¶ 98. They also point to federal licensing

24

provisions for "vessels engaged in coastwise trade" that "preclude[] state and local government authorities from banning such trade." *Id.* ¶ 102 (citing 46 U.S.C. § 9101; 46 C.F.R. § 154.1800-154.1872). Thus, they argue the Ordinance is "preempted under Art. III, Section 2 of the Constitution and the Constitution's embedded principal of federal maritime governance." *Id.* ¶ 106.

### E.   Count Five

The Plaintiffs argue the Ordinance violates the Commerce Clause, U.S. CONST. art. I, § 18, cl. 3, in several ways, including, inter alia, "impermissibly discriminat[ing] against and/or excessively burden[ing] foreign commerce between the United States and Canada," "impermissibly discriminating against and/or excessively burden[ing] interstate commerce among the states," and "attempt[ing] to regulate in a sphere of commerce requiring a uniform national rule." *Id.* ¶ 112-13, 115.

### F.   Count Six

The Plaintiffs point out that "bulk loading," which the Ordinance prohibits, is left undefined. *Id.* ¶ 121-22. They argue the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101-5128, regulates "bulk package[s]" and thus preempts the Ordinance to the extent that the terms "bulk package" and "bulk loading" amount to the same thing. *Id.* ¶ 124. They contend that the Ordinance violates the Due Process Clause, U.S. CONST. amend. XIV, § 1, "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Id.* ¶ 125. Citing the Maine Constitution, ME. CONST. art. III, §§ 1-2, they challenge the Ordinance as an excessive delegation because it lacks "standards sufficient to guide

administrative action." *Id.* ¶ 126.  Moreover, they maintain that the Ordinance violates the Equal Protection Clause, U.S. CONST. amend. XIV, § 1, as "there is no rational basis to permit unloading but not loading of oil . . . ." *Id.* ¶ 130-31.

### G.   Count Seven

Re-alleging earlier facts and legal claims, the Plaintiffs assert a deprivation of their federal constitutional rights under color of state law.  *Id.* ¶ 134 (citing 42 U.S.C. § 1983).

### H.   Count Eight

The Plaintiffs allege South Portland's Comprehensive Plan and the Ordinance conflict with each other, which they claim violates a state statute requiring consistency between municipal comprehensive plans and municipal ordinances.  *Id.* ¶ 136-39 (citing 30-A M.R.S. § 4352).

### I.   Count Nine

The Plaintiffs point to the Maine Oil Discharge Prevention Law, 38 M.R.S. § 556, which allows for municipal ordinances in furtherance of—while at the same time preempting ordinances in direct conflict with—actions taken pursuant to the law.  *Id.* ¶ 141.  Given the Maine Department of Environmental Protection (MDEP) issued a license to PPLC that approved loading and unloading of crude oil, and the Ordinance prohibits loading, the Plaintiffs allege the Ordinance is preempted.  *Id.* ¶ 143.

## IV.   THE PARTIES' POSITIONS

### A.   The Defendants' Motion to Dismiss

#### 1.   Facts

26

The Defendants emphasize the Plaintiffs may not reverse the pipeline flow and bulk crude oil in South Portland "without first acquiring an assortment of government approvals under the terms of its existing permits and a variety of federal, state and local laws regulating its operations." *Defs.' Mot.* at 4.  For instance, according to the Defendants, the Plaintiffs would require State Department approval for "any meaningful change in operations," MDEP approval for the construction of "large new vapor combustion units (with two 70-foot high smokestacks)," City Planning Board and Building Instructor approval for other constructions that would be necessary (e.g., "pump buildings, new storage tanks"), and—using catch-all language—"a host of studies, applications, submissions, and permits likely requiring prior approval by the U.S. Department of Homeland Security, U.S. Department of Transportation, the State Department, the U.S. Coast Guard, the U.S. Environmental Protection Agency . . . , and/or the South Portland Harbor Commission." *Id.* at 5-6.  The Defendants further note the Plaintiffs went so far as to obtain three such necessary approvals only to let them lapse.  *Id.* at 7-8.

### 2.    Argument

The Defendants assert the Plaintiffs' claim is unripe.  To determine ripeness, courts examine "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* at 10 (citing *City of Fall River v. FERC*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99 (1997)).  Regarding the first ripeness prong, the Defendants argue "Plaintiffs' claims are not

fit for judicial review because they rest on a chain of contingencies, including whether PPLC ever decides to bulk load crude oil in the City and whether it initiates a process for federal, state and local approvals that may conflict with the Ordinance." *Id.* at 11. Regarding the second, the Defendants argue "[t]he Ordinance has had no present effect on Plaintiffs, other than a threadbare claim of an economic uncertainty that is inherent in any matter requiring complex permitting, and thus they have suffered no hardship." *Id.* at 14.

The Defendants similarly argue that the Plaintiffs lack standing and request an advisory opinion. Standing and ripeness have a "close affinity" and may even "overlap" with each other. *Id.* at 17 (citations omitted). On standing, the Defendants state: "Plaintiffs have not alleged an actual and imminent injury sufficient to demonstrate Article III standing where they have no plans to engage in any conduct implicated by the Ordinance." *Id.* at 17. On the purportedly advisory nature of the relief sought, the Defendants state: "Plaintiffs' allegation of generalized and potential future harm does not constitute a sufficiently live controversy." *Id.* at 18.

Finally, the Defendants argue the Plaintiffs' claims based on international treaties are not justiciable, *id.* at 19, and if those federal claims were dismissed, there could be no pendent jurisdiction over state-law claims. *Id.* at 20.

### B.    The Plaintiffs' Opposition

#### 1.    Facts

The Plaintiffs stress that there is "nothing particularly complicated about reversing the direction that oil goes through a pipeline," and that "similarly . . . it is

not difficult to obtain any properly required approvals." *Pls.' Opp'n* at 5.  Moreover, they assert that they are "ready, willing and able to use [their] existing infrastructure to meet current market conditions and to pursue its plan to market its pipeline infrastructure for north-to-south transportation." *Id.* at 6.

### 2.   Argument

The Plaintiffs argue their claim is ripe.  In applying the two-part *Abbott Labs.* test, they focus on the fitness factor and treat the hardship factor as prudential.  *Id.* at 7 (citing *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003)).  The Plaintiffs put forth the view that "it is immaterial for justiciability purposes whether a plaintiff must obtain additional approvals.  It is enough if, as here, eliminating the Ordinance would remove one obstacle." *Id.* (citing *Mass. Delivery Ass'n v. Coakley,* 769 F.3d 11, 17 (1st Cir. 2014); *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310 (1st Cir. 2012); *Weaver's Cove Energy, LLC v R.I. Coastal Res. Mgmt. Council,* 589 F.3d 458, 467 (1st Cir. 2009)).  The Plaintiffs perceive a "Catch-22" aspect to the notion their claim is unripe due to their failure to allege they have a contract to ship oil in the precise way proscribed by the Ordinance.  *Id.* at 8 (citing *Riva v. Massachusetts*, 61 F.3d 1003, 1010-11 (1st Cir. 1995)), and they argue, to the contrary, that their claim is "particularly well suited for decision . . . because . . . they present legal questions unrelated to any further factual development," *id.* (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 200 (1983); *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1237-39 (10th Cir. 2004); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1171 (9th Cir. 2001), *overruled on other*

*grounds by Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571 (9th Cir. 2008)).  On hardship, the Plaintiffs argue that "under the City's argument, no one could ever challenge this Ordinance—the Ordinance prevents PPLC from obtaining contracts to ship oil north-to-south, and, according to the City, PPLC cannot challenge the Ordinance until it obtains a contract to ship oil north-to-south." *Id.* at 9.

The Plaintiffs argue they have standing.  Their arguments for standing resemble their arguments for ripeness, as they assert that "[i]f a challenged ordinance is a factor in causing plaintiff's injury, this is enough to obtain standing." *Id.* at 10 (citing *Weaver's Cove*, 589 F.3d at 469).  Moreover, the Plaintiffs make several other arguments for standing: that their "interests lie in not being regulated locally in the area of pipeline safety and port operations at all"; that "under the commerce clause," they are "barred from responding to current market demand"; and that their standing is underscored by "the fact that this Ordinance was enacted for the very purpose of preventing [them from] reversing the flow of [their] pipeline." *Id.* at 10-12.

The Plaintiffs believe the Defendants misconstrue their reliance on international treaties, which the Defendants cast as non-justiciable, as Plaintiffs "do[] not assert a private right of action under any treaty," rather they "allege[] that the Ordinance is federally preempted . . . ." *Id.* at 16 (citation omitted).

## C.    The Defendants' Reply

The Defendants state "the opposition confirms that [Plaintiffs] ha[ve] no present plans to bulk load crude oil." *Defs.' Reply* at 2.  Though they concede there may exist a "gray area" regarding how far plans must progress before achieving

ripeness, they present this as an easy case: "[Plaintiffs] must have at least taken some affirmative step toward the bulk loading of crude oil." *Id.*

The Defendants also state "the lack of physical plans render[s] Plaintiffs' claims incapable of judicial review." *Id.* at 4. In particular, the Defendants point to the Commerce Clause and preemption claims as areas requiring facts in order to apply properly the relevant legal tests. *Id.* at 4-5.

Finally, the Defendants contend that "Plaintiffs conflate ripeness and standing, but under either standard, their claims are not justiciable because bulk loading of crude oil is not imminent." *Id.* at 6.

### D.   The Defendants' Post-Hearing Memorandum

In their post-hearing memorandum, the Defendants assert that *Barnstable* "reinforces the rigor of the first prong of the First Circuit's ripeness test": fitness. *Defs.' Post-Hr'g Mem.* at 1. Fitness "holds that a case is not 'fit for review' if it 'involves uncertain and contingent events that may not occur as anticipated or may not occur at all,'" *id.* (quoting *Barnstable*, 786 F.3d at 143), and the Defendants identify what they consider to be three such events: (1) the State Department requiring changes "to the 2008 iteration of the project that render it uneconomical, or could prohibit it entirely"; (2) amendments to the Clean Air Act's New Source Review Regulations "requir[ing] PPLC to make substantial physical modifications or mak[ing] it more difficult to receive an air emissions permit from the Maine Department of Environmental Protection"; (3) market conditions "render[ing] the

project infeasible." *Id.* at 2-3. Thus, the Defendants conclude that the Plaintiffs have not met the "threshold constitutional requirement" of ripeness doctrine. *Id.* at 4.

### E.   The Plaintiffs' Post-Hearing Memorandum

Meanwhile, the Plaintiffs take from *Barnstable* "the principle that a matter is ripe if the suit removes one barrier, although other barriers may exist in achieving the plaintiff's goal." *Pls.' Post-Hr'g Mem.* at 1 (quoting *Barnstable*, 786 F3d at 143). They also believe that the Defendants have implicitly acknowledged hardship, and with regard to fitness, they argue that as in *Barnstable* the resolution of their legal claim hinges upon "an assessment of events that have already occurred"—here, the enactment of the Ordinance. *Id.* at 2-3 (quoting *Barnstable*, 786 F3d at 143). Of the Defendants' three "uncertain and contingent events" that make the claim unfit, the Plaintiffs argue that "[n]one of this speculation relates to a contingent event affecting the viability of the claims asserted in this action." *Id.* at 3. In addition to addressing the relevance of *Barnstable*, the Plaintiffs took the opportunity to remind the Court of several "updates" they discussed at oral argument. *Id.* at 3-4.

## V.   DISCUSSION

### A.   Standard of Review

Under Rule 12(b)(1), a court must dismiss a case over which it lacks subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). The plaintiff, as the party asserting subject matter jurisdiction, has the burden of demonstrating its existence. *Aversa v. United States,* 99 F.3d 1200, 1209 (1st Cir. 1996). Here, the Plaintiffs bear the burden of establishing both standing and ripeness. *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 561 (1992) (standing); *R.I. Ass'n of Relators v. Whitehouse*, 199 F.3d 26, 30 (1st Cir. 1999) ("The burden of establishing standing rests with the party who invokes federal jurisdiction"); *id.* at 33 ("[T]he plaintiff must adduce facts sufficient to establish both fitness and hardship").  In determining whether jurisdiction is proper, a court must construe the alleged facts in the plaintiff's favor, and it may consider extrinsic materials.  *Aversa* at 1209-10 ("In ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff.  In addition, the court may consider whatever evidence has been submitted . . . ." (citations omitted).

In ruling on this motion, the Court considered the allegations in the Complaint, the four attachments to the Defendants' motion, and the Declaration of Thomas A. Hardison, Vice President of PPLC, that the Plaintiffs attached to their response. *Compl.*; *Defs' Mot.* Attachs. 1-4 (ECF No. 16); *Pls.' Resp.* Attach. 1 *Decl. of Thomas A. Hardison* (ECF No. 18) (*Hardison Decl.*).

### B.    Ripeness

#### 1.    General Principles

"If standing is a question of who, then ripeness—which shares standing's constitutional and prudential pedigree—is a question of when." *Whitehouse*, 199 F.3d at 33 (citations omitted).  The United States Supreme Court has explained that the basic function of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*,

387 U.S. at 148. "While the doctrine has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995) (citing U.S. CONST. art. III, § 2; *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242-45 (1952)).

"To determine whether a case is ripe for review, a federal court must evaluate the fitness of the issue presented and the hardship that withholding immediate judicial consideration will work." *Whitehouse*, 199 F.3d at 33 (citing *Abbott Labs.*, 387 U.S. at 149). The First Circuit has observed that fitness and hardship "are related but distinct." *Id.* (citing *Ernst & Young*, 45 F.3d at 535). Fitness, the First Circuit has written, "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Ernst & Young*, 45 F.3d at 535 (citing *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992)). Hardship "typically turns on whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* (quoting *W.R. Grace*, 959 F.2d at 360).

### 2. Fitness

Preliminarily, there is no dispute among the parties that the South Portland Ordinance at issue effectively abrogates PPLC's right to reverse the flow of crude oil in the pipeline that runs from South Portland to Montreal and export crude oil from South Portland. Indeed, the history of the Ordinance set forth in the Complaint suggests that the City's motive in enacting the Ordinance was to do just that. In

other words, if today PPLC were to reverse the pipeline flow and begin unloading crude oil onto tankers in South Portland for export, PPLC would be violating the provisions of the Ordinance.  In some ripeness cases, the parties disagree about whether the future event, if it occurs, constitutes an actual case or controversy. Indeed, the First Circuit has written that fitness "centers upon 'whether the claim involves uncertain and contingent events that may or may not occur as anticipated or may not occur at all.'"  *Barnstable*, 786 F.3d at 143 (quoting *Ernst & Young*, 45 F.3d at 536).  In the case at hand, the Plaintiffs challenge an Ordinance that has already been enacted and that presently stands as a barrier to the north-to-south operation of their pipeline infrastructure.

The narrow questions before the Court are (1) whether PPLC has presented sufficient evidence for the Court to conclude that it intends to proceed with acts that would violate the Ordinance, namely the reversal of the flow of the pipeline and offloading onto vessels in South Portland; and (2) assuming PPLC has demonstrated that it intends to proceed, whether other hurdles make the likelihood that it will ever obtain the necessary approvals so remote that the enforceability of the South Portland Ordinance will never realistically be tested.

### a.    Finality, Definitiveness, and Sufficiently Developed

In their motion, the Defendants assert that the Plaintiffs have made clear in their Complaint that PPLC "has no current or specific plans capable of evaluation." *Defs.' Mot.* at 4 (citing *Compl.* Attach. 4 *Letter from Robert F. Cekuta, Principal Deputy Assistant Sec'y, Bureau of Energy Res. to David H. Coburn, Att'y, Steptoe &*

*Johnson (Aug. 13, 2013)*, at 1 (ECF No. 1) ("no current plans"); *Mot.* Attach. 1 *PPLC Air Emissions License A-197-77-M*, at 5 (ECF No. 17) ("no plans")).  By contrast, in their response, the Plaintiffs assert that PPLC "would very much like to serve this market *right now*, and would be taking steps *right now* to respond to existing market demand were the service PPLC seeks to market not illegal under the Ordinance." *Pls.' Opp'n* at 8 (emphasis in original).

On this issue, the Court concludes that the Plaintiffs have the better argument. First, in making this determination, the Court must view the facts in the light most favorable to the Plaintiffs, not the Defendants.  *Benjamin v. Aroostook Med. Ctr.*, 57 F.3d 101, 104 (1st Cir. 1995) (in evaluating standing, courts must "employ[] an approach that, in practice, differs little from that used to review motions to dismiss under Fed. R. Civ. P. 12(b)(6)") (citing *United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1990)).

The sworn declaration of Mr. Hardison of PPLC confirms that the extraction of oil in Canada has changed the market.  Mr. Hardison observes that the "extraction of domestic Canadian oil has increased significantly in recent years" and "the need to import oil to Canada for use in Canadian refineries in Montreal, generally, and doing so via PPLC's pipelines, specifically, has dramatically declined."  *Hardison Decl.* ¶ 5. In fact, Mr. Hardison says that PPLC's "18-inch pipeline currently sits completely empty because there is so little need for oil shippers to transport oil north to Canada," and for the same reason, "PPLC's 24-inch pipeline currently is transporting far less oil than it is capable of transporting."  *Id.* ¶ 6.  Mr. Hardison predicts that PPLC "will

not receive any new crude oil to ship north-bound through its pipelines after July 1, 2015; it is more likely than not that this will be the case by the end of 2015; and it is a near certainty that this will be the case within the next two (2) years." *Id.* ¶ 8. Mr. Hardison further predicts that "[i]f PPLC is not legally permitted to transport crude oil from north to south, based on PPLC's current and anticipated future revenues, PPLC's existence as a going concern will be imperiled by the end of 2017." *Id.* ¶ 9. Mr. Hardison opines that "PPLC's ability to survive requires an ability for it to transport crude oil north from Canada south out the Portland Harbor in South Portland." *Id.*

Further, Mr. Hardison posits several factors that make the PPLC pipeline a cost-effective means for bringing crude oil from Canada to Maine for export. First, the South Portland location is ice-free. *Id.* ¶ 14. Second, South Portland is located "close to markets for Canadian oil in the United States, Europe, and the Canadian maritime provinces . . . ." *Id.* Third, the current pipeline has "sufficient capacity to accommodate the need to transport crude oil from north to south." *Id.* Fourth, PPLC's pipelines are "the only ones that currently operate between Canada and the eastern seaboard." *Id.* ¶ 15. To reverse the flow from north to south would require only "[m]inor modifications." *Id.* ¶ 16.

Mr. Hardison concludes by stating that absent the Ordinance, PPLC "would be ready, willing, and able to pursue its plan to market its pipeline infrastructure and to make the changes necessary to meet these current and future market demands." *Id.* ¶ 18.

37

Next, although the Defendants correctly point out that PPLC has not presented "current or specific plans capable of evaluation," *Defs.' Mot.* at 4, PPLC properly notes that as a practical matter, before presenting such detailed plans, it would be required to test the market for exported crude oil offloaded in South Portland and it is unable to market a product that South Portland has made it illegal to export. *See Pls.' Opp'n* at 6 n.5. The Court accepts PPLC's argument that the South Portland Ordinance places PPLC in a classic Catch-22[2]: South Portland demands that PPLC produce plans for the export of crude oil, but PPLC is unable to develop such plans because South Portland has made illegal the export of crude oil. *Id.* at 8. In Mr. Hardison's succinct words, "PPLC simply cannot market a service that is illegal." *Hardison Decl.* ¶ 26.

Finally, the Court observes that PPLC's stated intentions do not come from a plaintiff merely musing about trying a new venture. PPLC is now in the oil pipeline business. It owns two active pipelines that run from South Portland to Montreal. *Id.* ¶ 4. It has reversed the pipeline flow in the past, from 1987 to 1999, when oil flowed from Canada to South Portland, returning the flow from South Portland to Montreal in 1999, when market conditions changed. *Id.* ¶¶ 19-21. More recently, in 2008, it obtained the necessary permits to allow reversal but decided not to proceed due to the "world-wide economic crisis." *Id.* ¶¶ 22-24.

Based on these facts and viewing them in the light most favorable to the Plaintiffs, the Court concludes that the Plaintiffs have sufficiently demonstrated that

---

[2]     JOSEPH HELLER, CATCH-22 (1961).

but for the Ordinance, PPLC would commence plans to reverse the flow of crude oil and would begin marketing that oil to purchasers in the Canadian Maritimes, Europe, and the United States. These cumulative facts, in the Court's view, sustain PPLC's burden to demonstrate that the controversy satisfies this portion of the fitness inquiry.

### b.    Not Sufficiently Developed Facts

Another requirement for justiciability is that the Plaintiffs present a factual record sufficient to allow a court to draw legal conclusions. *Pac. Gas*, 461 U.S. at 201. South Portland cogently argues that because PPLC failed to be more specific about its plans, this Court will be unable to resolve some of the legal issues before it. *Defs.' Reply* at 4-6. Absent PPLC's "actual physical construction proposals," the Defendants maintain the Court will be without an adequate basis to analyze such issues as the dormant commerce clause and federal preemption. *Id.* at 4. The Plaintiffs see the issue completely differently. *Pls.' Opp'n* at 8 ("The claims presented in the Complaint . . . are particularly well suited for decision now under the fitness criterion because, among other things, they present legal questions unrelated to any further future factual development").

In *Ernst & Young*, the First Circuit summarized the dilemma:

> The notion that disputes which turn on purely legal questions are always ripe for judicial review is a myth. Even when the "legal" emphasis of a particular claim is sufficient to mask gaps in the factual record, a court will find ripeness lacking if the anticipated events and injury are simply too remote to justify contemporaneous adjudication.

45 F.3d at 537 (citing *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 304 (1981); *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990); *Benson v. Super. Ct. Dep't of Trial Ct.*, 663 F.2d 355, 360-61 (1st Cir. 1981)).   At this stage it remains to be seen whether PPLC will amass a set of facts sufficient for the Court to make its legal determinations, but given the current state of the record, the Court is unwilling to conclude PPLC will be unable to do so.   Unlike *Ernst & Young*, the Court does not view PPLC's challenge as presenting a hypothetical project that "depends on serendipitous events that may not occur as anticipated—or may not occur at all."   *Id.* at 538.

### 3.   Hardship

Hardship, the First Circuit has written, "turns on 'whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest.'"   *Barnstable*, 786 F.3d at 143 (quoting *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011)).

### a.   Direct and Immediate Dilemma

The hardship prong requires a "direct and immediate dilemma."   *Ernst & Young*, 45 F.3d at 535 (quoting *W.R. Grace*, 959 F.2d at 365).   To support their opposing positions, the Plaintiffs and the Defendants cite two seminal First Circuit cases: *City of Fall River v. Federal Energy Regulatory Commission*, 507 F.3d 1 (1st Cir. 2007) and *Weaver's Cove Energy v. Rhode Island Coastal Resource Management Council*, 589 F.3d 458 (1st Cir. 2009).   In the 2007 decision *City of Fall River*,

40

addressing a proposal to build a liquefied natural gas terminal in Fall River, Massachusetts, the First Circuit found no fitness for review of a challenged conditional approval for Weaver's Cove because "it [wa]s expressly conditioned on approval" by two other bodies.  507 F.3d at 7.  Two years later in *Weaver's Cove*, again addressing the liquefied natural gas terminal proposal in Fall River, the First Circuit found the case ripe because two hurdles (the Coastal Resource Management Council's consistency review and the Category B Assent requirements) "would cease to be barriers to ultimate approval of the project."  589 F.3d at 468-69.  The resolution of this motion requires a close reading of these two cases.

In *Fall River*, Weaver's Cove Energy (WCE) sought approval from the Federal Energy Regulatory Commission (FERC) to site, construct, and operate a liquefied natural gas terminal in Fall River.  507 F.3d at 3.  FERC granted conditional approval subject to "a number of stipulations, including approval of the vessel transportation plan by the United States Coast Guard and consistency with the Wild and Scenic Rivers Act, as determined by the Department of the Interior."  *Id.*  A number of plaintiffs, including the city of Fall River, filed suit seeking judicial reversal of the FERC conditional permit.  *Id.*

The First Circuit "decline[d] to review the merits of FERC's project approval because it [was] not yet ripe for review."  *Id.* at 6.  The *Fall River* Court characterized the conditions that FERC had imposed on the project's authorization as "significant hurdles."  *Id.* at 5.  The First Circuit discussed the first condition—Coast Guard approval—and observed that, according to the Coast Guard itself, WCE's plan

41

required vessels to perform "an extraordinary navigational maneuver," leaving "no margin for error." *Id.* Similarly, the First Circuit noted that the Department of the Interior had "announced new restrictions that would limit dredging of the necessary waterways to a few months a year, likely delaying the completion of the project from 2010 to 2015." *Id.* The First Circuit took a "pragmatic view of the facts in this case . . . ." *Id.* at 7. It concluded that neither the Coast Guard nor the Department of the Interior had given final approval of WCE's proposal and "each has expressed serious reservations about the project." *Id.* Because "decisive questions remain open," the First Circuit concluded that it is "wiser to allow the agencies to continue their decision-making process at least until final authorization is granted by all three agencies." *Id.* at 7-8. Until these agencies approved the project, the First Circuit concluded that its "review would be advisory, and likely irrelevant to the ultimate approvability of the project." *Id.* at 8 (citing *Nat'l Wildlife Fed'n v. Goldschmidt*, 677 F.2d 259, 263 (2d Cir. 1982)).

Two years later, WCE's liquefied natural gas terminal proposal returned to the First Circuit. *Weaver's Cove*, 589 F.3d at 461. This time the question was whether WCE had to comply with the two regulatory barriers imposed by the Rhode Island Coastal Resources Management Council (CRMC) in order to commence construction of the terminal. *Id.* WCE argued that because the CRMC had failed to act within a deadline established by the Natural Gas Act, CRMC's concurrence with WCE's dredging plans must be conclusively presumed. *Id.* at 469-72. The First Circuit found that the case was ripe because the "plaintiff's requested relief would be final." *Id.* at

469.  The First Circuit explained that "CRMC's consistency review and Category B Assent requirements would cease to be barriers to ultimate approval of the project." *Id.*  The *Weaver's Cove* Court noted that "the other relevant agencies have expressly declined to resolve the issue raised by this appeal on the grounds that they have no authority to do so."  *Id.*  Finally, the First Circuit observed that "[i]t is true that resolutions of these issues might not secure the project's ultimate approval, but it would neither be 'advisory' nor 'irrelevant.'" *Id.*

In this Court's view, the PPLC case stands closer to *Weaver's Cover* than *Fall River*.  First and most obviously, if the Court concludes that the South Portland Ordinance is enforceable, PPLC's proposal to reverse the flow is doomed.  Thus, at least under one scenario, a "subsidiary quer[y] concerning finality [and] definiteness" has been satisfied.  *Ernst & Young*, 45 F.3d at 535 (citing *W.R. Grace*, 959 F.2d at 364).  By contrast, if PPLC prevails here, it is true that PPLC will be required to obtain additional approvals, and it is possible that it will be unsuccessful in obtaining those approvals.  But, under *Weaver's Cove*, the fact that the court's resolution of the issues before it "might not secure the project's ultimate approval" does not necessarily deprive the court of the authority to resolve those issues.  589 F.3d at 469.  At the same time, if the Court dismissed the lawsuit for a lack of justiciability and PPLC obtained the other necessary approvals, the South Portland Ordinance would effectively prevent PPLC from realizing its plans and this lawsuit would then be inevitable.  Unlike *Fall River*, where the First Circuit concluded that the agencies which had not yet approved the project had "expressed serious reservations about the

43

project," 507 F.3d at 7, PPLC represents that in 2008, it "sought and obtained the necessary permits to allow it to execute a flow reversal." *Hardison Decl.* ¶ 23.  If past is prologue, PPLC will be able to secure again the necessary permits from the relevant agencies.

Finally, applying the First Circuit directive in *Fall River* to take a "pragmatic view of the facts," 507 F.3d at 3, the Court sees the resolution of this case as a critical—and perhaps the most critical step—for PPLC in securing the approvals necessary for its proposal.  As PPLC must start somewhere, it is sensible for PPLC to know whether, having gone to the expense and time of re-securing all previously obtained permits, the South Portland Ordinance would in any event bar the project. *See Pac. Gas*, 461 U.S. at 201 ("[F]or the utilities to proceed in hopes that, when the time for certification came, either the required findings would be made or the law would be struck down, requires the expenditures of millions of dollars over a number of years, without any certainty of recovery if certification were denied") (footnote omitted); *Riva*, 61 F.2d at 1010 ("And, even when the direct application of such a statute is subject to some degree of contingency, the statute may impose sufficiently serious collateral injuries that an inquiring court will deem the hardship component satisfied.  In general, collateral effects can rise to this level when a statute indirectly permits private action that causes present harm, or when a party must decide currently whether to expend substantial resources that would be largely or entirely wasted if the issue were later resolved in an unfavorable way") (citing *Pac. Gas*, 461 U.S. at 201; *Duke Power Co. v. Caroline Envtl. Study Grp., Inc.*, 438 U.S. 59, 81-82

(1978)).  As in *Barnstable*, then, if the Ordinance were declared invalid, PPLC "would undoubtedly act differently tomorrow, and be able to spend their resources with less risk of waste . . . ."  786 F.3d at 143 (citing *Weaver's Cove*, 589 F.3d at 468-69).

Again, looking at the facts in the light most favorable to the Plaintiffs, the Court concludes that the Plaintiffs have demonstrated a "'direct and immediate' dilemma" sufficient for ripeness purposes.  *Ernst & Young*, 45 F.3d at 535 (quoting *W.R. Grace*, 959 F.2d at 364).

### C.    Other Justiciability Doctrines

#### 1.    Standing

Having answered ripeness's question of "when" a lawsuit may be brought, the Court turns to standing's question of "who" may bring the lawsuit.  *Whitehouse*, 199 F.3d at 33.  "In general, standing and ripeness inquiries overlap."  *McInnis-Misenor v. Me. Med. Center*, 319 F.3d 63, 69 (1st Cir. 2003).  They are nonetheless distinct lines of inquiry, as standing is "a threshold question in every case," *id*. at 67, by which courts determine "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction . . . ."  *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  The plaintiff bears the burden of showing: (1) "a concrete and particularized injury in fact"; (2) "a causal connection that permits tracing the claimed injury to the defendant's actions"; (3) "a likelihood that prevailing in the action will afford some redress for the injury."  *Weaver's Cove*, 589 F.3d at 467 (quoting *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 92 (1st Cir. 2008)).

45

The dispute in this case focuses on injury, the doctrinal area in which the overlap between standing and ripeness is "most apparent." *McInnis-Misenor*, 319 F.3d at 69 (citing 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531.12 (2d ed. 1984)).   As the Defendants see it, "Plaintiffs present this Court with nothing more than an alleged injury based on what at best can be characterized as a future intention." *Defs. Mot.* at 18; *see Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) (injury too speculative for plaintiffs who feared their communications with foreign nationals might be intercepted pursuant to the Foreign Intelligence Surveillance Act); *Lujan*, 504 U.S. 555 (1992) (injury too conjectural for plaintiffs who announced their intention, but lacked concrete plans, to visit foreign countries to see endangered species).   Here, however, PPLC owns the pipeline and supporting infrastructure that the Ordinance directly targets.   Unlike the plaintiffs in *Clapper* who might or might not have been subject to surveillance under a specific statute, and unlike the plaintiffs in *Lujan* who might or might not have been deprived of seeing certain animals, the Plaintiffs on these facts confront— and seek to challenge—a barrier that the Defendants have erected to keep them from doing what they have otherwise resolved to do: bring oil from Canada to South Portland.   The Court finds that the Plaintiffs have suffered an injury.   Moreover, the Ordinance is the cause of the injury, and its invalidation would redress the injury. Accordingly, the Plaintiffs have standing.

### 2.   Advisory Opinions

As their final justiciability argument, the Defendants assert that a decision on the merits would constitute an unconstitutional advisory opinion. *Defs.' Mot* at 18-19. In support of their argument, the Defendants cite *Aetna Life Insurance Company v. Haworth*, 300 U.S. 227 (1937), which upheld the Declaratory Judgment Act. But the Defendants themselves concede that the ban on advisory opinions is a "lens" through which courts can view the related doctrines of ripeness and standing. *Defs.' Mot.* at 18. Indeed, Professor Chemerinsky has written that "it is because standing, ripeness, and mootness implement the policies and requirements contained in the advisory opinion doctrine that it is usually unnecessary for the Court to separately address the ban on advisory opinions." ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 2.2 (6th ed. 2012); *see also Daggett v. Devine*, 973 F. Supp. 203, 204 (D. Me. 1997) ("Ripeness and standing doctrines in the federal courts are designed to ensure justiciability—to satisfy the constitutional and prudential requirements that derive from the mandate of Article III of the Constitution that federal courts decide only 'cases or controversies'") (quoting U.S. CONST. art. III, § 2, cl. 1). Cognizant of the potential irony of writing unnecessarily on the topic of advisory opinions, the Court reiterates its finding that it has before it "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins.*, 300 U.S. at 241 (citations omitted).

## D.     International Treaty Interpretation

In their motion, the Defendants urge the Court to "dismiss any claims based on rights PPLC alleges are conferred by international treaties." *Defs.' Mot.* at 19. They cite Supreme Court and First Circuit authority to the effect that international agreements do not create rights or provide for private causes of action in domestic courts. *Medellín v. Texas*, 552 U.S. 491, 506 n.3 (2008); *United States v. Moloney (In re Price)*, 685 F.3d 1, 12 (1st Cir. 2012). The Court accepts, as it must, this teaching.

However, the Plaintiffs respond that they do not assert a private right of action under any treaty. *Pls.' Opp'n* at 16. Citing *United States v. Locke*, 529 U.S. 89, 102-03 (2000), the Plaintiffs point out that, like the United States Supreme Court in *Locke*, they have referred to the international treaties of the United States not to enforce the terms of the treaties but to establish that the federal government has preempted the area that South Portland is attempting to regulate through its Ordinance. *Pls.' Opp'n* at 16.

The Court need not resolve at this stage this issue by issuing broad declarations. Rather, it will address the significance, if any, of international treaties in the specific context of future arguments.

## VI.    CONCLUSION

The Court DENIES Defendants' Motion to Dismiss the Complaint Pursuant to Rule 12(b)(1) (ECF No. 16).

48

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of February, 2016