| | | |
|---|---|---|
| PORTLAND PIPE LINE | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:15-cv-00054-JAW |
| | ) | |
| CITY OF SOUTH PORTLAND, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION IN LIMINE

The Court denies the Defendants' motion in limine to exclude from evidence any testimony or documents concerning the volume of crude oil delivered to Montreal East from Enbridge Line 9B, but defers ruling on whether the failure to disclose was harmless and, if not harmless, whether a remedy short of exclusion is in order.

## I.  BACKGROUND

On February 6, 2015, Portland Pipe Line Corporation (PPLC) and the American Waterways Operators (AWO) (collectively, Plaintiffs) filed a nine-count complaint in this Court against the city of South Portland and its code enforcement officer (collectively, Defendants).  The Complaint challenges the validity of a municipal ordinance that prohibits the "bulk loading" of crude oil onto marine vessels in the harbor of South Portland, Maine.  *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*).  PPLC owns and operates the United States portion of a pipeline system that stretches from South Portland, Maine, to Montreal East,

Quebec. *Id.* ¶ 11. PPLC's parent company, Montreal Pipe Line Limited (MPLL), operates the portion of the pipeline system that lies within Quebec. *Pls.' Statement of Material Fact* ¶ 6 (ECF No. 89) (PSMF). At the time the Plaintiffs filed the Complaint in February 2015, PPLC and MPLL transported crude oil northward from South Portland to Montreal East at a rate of approximately 2.4 million barrels of oil per month. *Compl.* ¶ 11. The practical effect of the Ordinance is to prevent PPLC and MPLL from reversing the flow of its existing pipeline infrastructure to transport oil south from Montreal to vessels in the South Portland harbor.

On March 31, 2015, the Defendants filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing, among other things, that the Plaintiffs' claims are unripe and that the Plaintiffs lack standing. *Defs.' Mot. to Dismiss the Compl. Pursuant to Rule 12(b)(1)* (ECF No. 16); *Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 17). Specifically, the Defendants argued that the Plaintiffs have no concrete plan to reverse the flow of oil and thereby violate the Ordinance, that the present effect of the Ordinance on the Plaintiffs consists of a "threadbare claim of economic uncertainty," and that the Plaintiffs' claims rest on a "chain of contingencies, including whether PPLC ever decides to bulk load crude oil in the City and whether it initiates a process for federal, state and local approvals that may conflict with the Ordinance." *Id.* at 11–18.

On February 11, 2016, the Court issued an order denying the Defendants' Motion to Dismiss. *Order on Defs.' Mot. to Dismiss* (ECF No. 29). Viewing the facts

in the light most favorable to the Plaintiffs, the Court concluded that "but for the Ordinance, PPLC would commence plans to reverse the flow of crude oil and would begin marketing that oil." *Id.* at 38–38. However, the Court cautioned that "it remains to be seen whether PPLC will amass a set of facts sufficient for the Court to make its legal determinations [regarding justiciability] . . . ." *Id.* at 40.

Subsequent to the Court's Order, the parties engaged in discovery, and on November 17, 2016, the parties filed cross motions for summary judgment with supporting statements of material facts. *Pls.' Mot. for Summ. J.* (ECF No. 87); *PSMF* (ECF No. 89); *Defs.' Consolidated Mot. to Dismiss Pursuant to Rule 12(b)(1) and Mot. for Summ J.* (ECF No. 88) (*Defs.' Mot. for Summ. J. and to Dismiss*); *Defs.' Rule 12(b)(1) and Loc. R. 56(b) Statement of Undisputed Material Facts [Redacted Verion]* (ECF No. 95). As part of their motion for summary judgment, the Defendants also renewed their motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *Defs.' Mot. for Summ. J. and to Dismiss* at 2–3.

To support their claim that the matter is not ripe, the Defendants argue that there is not a sufficient supply of oil flowing into MPLL's facilities in Montreal East to make PPLC's flow reversal project economically feasible. *Id.* at 15–16. Here, the Defendants rely on their expert, Sarah Emerson. *See Decl. of Sarah Emerson*, Ex. 1, *Mem. for City of South Portland* at 7–9 (ECF No. 91) (*Emerson Decl.*). Ms. Emerson explains that there are two sources of crude oil currently available to supply PPLC's reversal project: railway infrastructure transporting crude oil from western Canada to Quebec, and the Enbridge Line 9 pipeline running from Sarnia, Ontario, and

terminating at MPLL's facilities in Montreal East.  *Id.*  Ms. Emerson estimates that 60,000 barrels per day would be available by railway but that the high cost of transporting crude oil by rail would make the reversal plan uneconomical given the current market conditions.  *Id.* at 9.

Focusing on the Enbridge pipeline, Ms. Emerson states that the amount of crude oil from Line 9B that would be available for PPLC to ship south from Montreal East to South Portland "is currently and should remain close to zero."  *Id.*  According to Ms. Emerson, this is because two other refineries in Quebec—Suncor and Valero— have already entered into "take or pay" commitments for ninety percent of the capacity of Line 9.  *Id.*  Ms. Emerson concludes that "as a result of the commitments by Suncor and Valero to receive crude oil from Line 9, there is little to no 'spare' crude oil from Line 9" to feed PPLC's reversal project."  *Id.* at 6.  Because there is no "spare" crude to supply the PPLC reversal project, the Defendants contend that the matter is not ripe.  *Defs.' Mot. for Summ. J. and to Dismiss* at 15–16.

In response, the Plaintiffs argue that Ms. Emerson lacks personal knowledge of the facts asserted in her declaration, and thus, the facts are inadmissible.  *Pls.' Resp. to Defs.' Statement of Material Fact* ¶ 10 (ECF No. 128).  The Plaintiffs further highlight that the Defendants "cannot point to any of the actual shipping agreements between Suncor or Valero and Enbridge [and] can only speculate as to what those agreements provide . . . ."  *Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss and for Summ. J.* at 8–9 (ECF No. 127).  Additionally, the Plaintiffs point out that even if Suncor and Valero receive "significant shipments" of oil from Enbridge Line 9, Enbridge can make

oil available for PPLC by expanding the throughput of Line 9 without significant investment. *Id.* at 9.

On May 11, 2017, the Court issued an interim order holding in abeyance the parties' motions for summary judgment and ordering further proceedings under Federal Rule of Civil Procedure 12(b)(1) to resolve whether the Court has subject matter jurisdiction. *Interim Order* at 11–12 (ECF No. 156). The Court expressed discomfort with the factual underpinnings of Ms. Emerson's opinions, but it noted that her testimony "raises substantial questions about the practical ability of the Plaintiffs to move forward with a plan to reverse the flow of their pipelines." *Id.* at 10. Rather than rule on a truncated record, the Court requested "additional assistance from the parties to clarify the factual jurisdictional disputes and to provide materials of evidentiary quality to assist the Court's determination." *Id.* at 11.

On June 8, 2017, the Court held a telephone conference in which the parties agreed to schedule a hearing to present evidence on the Court's subject matter jurisdiction. *Min. Entry* (ECF No. 159). The parties set the hearing date for August 9, 2017. *Notice of Re-Sched. Hr'g* (ECF No. 165). In anticipation of the hearing, and in accordance with the Court's request, both parties submitted witness lists and summaries of their witnesses' expected testimony. *Pls.' Witness List* (ECF No. 169); *Defs.' Witness List* (ECF No. 170); *Direct Testimony of Thomas A. Hardison* (ECF No. 171) (*Hardison Decl.*); *Defs.' Summ. of Direct Exam. Test.* (ECF No. 173).

The Plaintiffs listed Thomas A. Hardison, the president of PPLC, as their only witness and submitted an affidavit of Mr. Hardison summarizing his expected

testimony. *Pls.' Witness List* at 1; *Hardison Decl.* ¶¶ 1–70. In his affidavit, Mr. Hardison responded to Ms. Emerson's assertion that the amount of crude oil available for PPLC's reversal project from Enbridge Line 9B "is currently and should remain close to zero". *Hardison Decl.* at ¶¶ 47–55. Mr. Hardison referenced "available data" that demonstrate that "[Enbridge] Line 9B can be a sufficient source of volume for PPLC to support flow reversal under current conditions." *Id.* at ¶ 54. Mr. Hardison explains that MPLL's Montreal East facilities and Enbridge Line 9B are "physically interconnected" and that all crude oil that arrives in Montreal East through Line 9B passes into and through MPLL's facilities. *Id.* From there, MPLL can then store the oil in its tanks or direct the oil onward to the Suncor or Valero refineries. *Id.* Mr. Hardison stated that, as a result of this arrangement, Enbridge provides electronic data reflecting the volume delivered from Line 9B to the main computer that monitors and runs PPLC's pipeline infrastructure. *Id.*

According to Mr. Hardison, Line 9B has a stated "nameplate" capacity of 300,000 barrels per day. *Id.* at ¶ 55. He claimed that the data indicate that since December 2015, Line 9B has delivered a monthly average of 215,000 barrels per day to Suncor and Valero through MPLL's facilities in Montreal East, thus leaving 85,000 barrels per day available under Line 9B's nameplate capacity. *Id.* Furthermore, Mr. Hardison stated that "there have been days where Line 9B's volume has reached as high as 320,000 barrels per day"—20,000 barrels over its nameplate capacity. Accordingly, Mr. Hardison contended that "Line 9B can make available over 100,000 barrels per day in volume in addition to what Suncor and Valero currently transport

on the line." *Id.* Mr. Hardison therefore concluded that there is sufficient volume available on Line 9B to support a successful flow reversal project. *Id.*

On July 10, 2017, counsel for the Defendants sent an email to counsel for the Plaintiffs, complaining that the Plaintiffs failed to produce the data underlying Mr. Hardison's testimony. *Defs.' Mot. in Limine*, Attach. 6, *July 10, 2017 Email* at 2 (ECF No. 172). Accordingly, counsel for the Defendants demanded that the Plaintiffs produce all data that Mr. Hardison used in formulating his testimony. *Id.* at 2–3. Counsel for the Plaintiffs responded the following day. *Defs' Mot. in Limine*, Attach. 7, *July 11, 2017 Email* (ECF No. 172) (*July 11, 2017 Email*). They denied that the Defendants were entitled to the data. *Id.* at 2–3. Nevertheless, counsel for the Plaintiffs provided the Defendants with a spreadsheet showing the monthly average of barrels of crude oil per day flowing from the Enbridge Line 9 through MPLL's facilities in Montreal East. *Id.* at 5. According to counsel for the Plaintiffs, the spreadsheet "represents all of the data available to PPLC that supports Mr. Hardison's testimony about how much additional capacity on Enbridge Line 9 could be available to ship south on PPLC's pipeline." *Id.* at 4.

On July 14, 2017, the Defendants moved in limine to exclude from evidence any data or testimony concerning the volume of crude oil delivered to MPLL from Line 9B. *Defs.' Mot. in Limine* (ECF No. 172) (*Defs.' Mot.*). The Plaintiffs responded on August 2, 2017. *Pls.' Opp'n to Defs. Mot. in Limine* (ECF No. 175) (*Pls.' Opp'n*). The Defendants replied on August 4, 2017. *Reply Mem. in Supp. of Defs.' Mot. in Limine* (ECF No. 176) (*Defs.' Reply*).

## II.    PARTIES' POSITIONS

### A.    The Defendants' Motion in Limine

The Defendants move in limine under Federal Rule of Civil Procedure 37(c) and Federal Rules of Evidence 701 and 1006 to exclude from evidence any data or testimony concerning the volume of crude oil passing through MPLL's facilities in Montreal East from the Enbridge 9B pipeline. *Defs.' Mot.* at 1.

#### 1.    Federal Rule of Civil Procedure 37(c)

First, the Defendants argue that the Court should exclude the Line 9B volumetric data underlying Mr. Hardison's testimony as a sanction under Rule 37(c) because the Plaintiffs failed to produce the data during discovery. *Id.* at 3–4. The Defendants allege that they asked specifically for this data in two separate requests for production—Request #2 and Request #24. *Id.* at 2. Request #2 sought "All documents identified in Plaintiffs' Initial Disclosures." *Defs.' Mot.*, Attach. 2, *Pls. PPLC's Resp. to Defs.' First Req. for Prod. of Docs. and Things* at 2 (ECF No. 172) (*Resp. to Req. for Prod.*). The Plaintiffs' initial disclosures stated that the Plaintiffs "may use . . . documents regarding the throughput volume of oil through its pipeline facilities" in support of their claims. *Defs.' Mot.*, Attach. 3*, Pls.' Rule 26(a) Initial Disclosures* at 2 (ECF No. 172) (*Initial Disclosures*). Request #24 sought "Any and all documents, including, but not limited to, studies, reports, and analyses, whether or not commissioned by PPLC, since January 1, 2004, concerning transportation of Canadian Crude oil, including but not limited to . . . (e) The Enbridge Line 9 Project." *Resp. to Req. for Prod.* at 3.

Moreover, when the Defendants asked Mr. Hardison during his deposition whether there were "any documents at PPLC that set out the current projections for how much oil could be available from Enbridge Line 9," Mr. Hardison replied, "No, not that I'm aware of." *Defs.' Mot.* at 3 (citing *Defs.' Mot.*, Attach 5, *30(b)(6) Dep. of PPLC and Thomas A. Hardison* 81:3–7 (ECF No. 172) (*Hardison Dep.*)). The Defendants assert that there is no "substantial justification" for the nondisclosure and that the nondisclosure is not harmless. *Defs.' Mot.* at 4–7. Thus, because the Plaintiffs failed to provide the data in response to the Defendants' requests for production, the Defendants argue that the Court must exclude the data under Federal Rule of Civil Procedure 37(c).

### 2. Federal Rule of Evidence 1006

Second, the Defendants assert that the Court should exclude Mr. Hardison's testimony regarding the "monthly average" of throughput on Enbridge Line 9B. *Id.* The Defendants explain that Federal Rule of Evidence 1006 allows a party to introduce a calculation to prove the content of voluminous records but requires the proponent to make the originals available to the opposing party. *Id.* (citing FED. R. EVID. 1006). The Defendants contend that they have not had an opportunity to examine the data underlying Mr. Hardison's calculation. *Id.* The Defendants point out that the Plaintiffs merely provided them with a "one-page summary" and refused to provide the data itself and sufficient contextual information." *Id.* at 3. Therefore, the Defendants argue that the Court must exclude Mr. Hardison's testimony on the "monthly average." *Id.* at 7.

### 3. Federal Rule of Evidence 701–702

Third, the Defendants argue that Mr. Hardison's testimony is undisclosed expert opinion in the guise of lay testimony. *Id.* at 7–9. The Defendants contend that determining the "availability" of oil on Line 9 requires specialized knowledge that does not "result from a process of reasoning familiar to everyday life." *Id.* at 9 (citing *United States v. Sepulveda-Hernandez*, 752 F.3d 22, 34 (1st Cir. 2014)). Because the Plaintiffs did not designate Mr. Hardison as an expert, the Defendants contend that his testimony concerning the availability of crude oil for PPLC's reversal project is inadmissible. *Id.* at 7.

### B. The Plaintiffs' Response

### 1. Federal Rule of Civil Procedure 37(c)

The Plaintiffs respond that there can be no sanction for failing to disclose or supplement under Rule 37(c) where there was no duty to disclose in the first place. *Pls.' Opp'n* at 5. First, the Plaintiffs contend that PPLC had no duty to produce data that the City never diligently pursued in discovery. *Id.* They assert that the Defendants never specifically requested data concerning the volume shipped on Line 9 in their requests for documents. *Id.* at 6. The Plaintiffs explain that they objected to the Defendants' requests for documents as overly broad and only provided some, but not all, of the documents that the Plaintiffs requested. The Plaintiffs point out that the Defendants "appeared content" with the Plaintiffs' approach and did not seek judicial relief with respect to the Plaintiffs' objections. *Id.* Moreover, the Plaintiffs observe that the Defendants never requested the data in their interrogatories, nor

did the Defendants seek the data directly from Enbridge.  *Id.*  Additionally, the Plaintiffs assert that Mr. Hardison testified at his deposition that PPLC knew the volume "available on the Enbridge pipeline system today" but that the Defendants never sought the data.  *Id.* at 7.  Because the Plaintiffs did not diligently pursue the data in discovery, the Plaintiffs argue that they had no duty to produce the information.

Second, the Plaintiffs submit that they have no duty to produce the data because the information is offered "for the purpose of rebutting Ms. Emerson's anticipated testimony."  *Id.* at 5; *see also July 11, 2017 Email* at 2 (contending that the data constitute "rebuttal testimony for which no advance disclosure is required").

The Plaintiffs contend that even if they failed to supplement their discovery, the Court should not issue a sanction under Rule 37(c) because the failure was "substantially justified" and "harmless."  *Id.* at 7.  The Plaintiffs assert that they were justified in not providing the data because "PPLC never anticipated that the specific issue of Line 9B's capacity would become a consideration in the standing analysis" and that the "issue has been thrust on PPLC . . . ."  *Id.* at 7.  The Plaintiffs insist that the failure to supplement the discovery was harmless because the Defendants' expert has now had the opportunity to consider Mr. Hardison's testimony and is able to respond to it.  *Id.* at 7–8.

### 2.    Federal Rule of Evidence 1006

Next, the Plaintiffs contend that they have provided the Defendants with the underlying values giving rise to the monthly average data underlying Mr. Hardison's

testimony. *Id.* at 8 (citing *July 11, 2017 Email* at 5). The Plaintiffs insist that the Defendants have "had more than enough time to evaluate whether Mr. Hardison's testimony accurately states the average of the monthly volumes set forth in the underlying data," and thus, Rule 1006 provides no basis for excluding Mr. Hardison's testimony. *Id.* at 8–9.

### 3. Federal Rule of Evidence 701–702

Finally, the Plaintiffs assert that Mr. Hardison's testimony concerning the availability of oil on Enbridge Line 9B is not expert testimony. *Id.* at 9. They explain that Mr. Hardison's testimony regarding the volume of Line 9B consists of "two simple points: (a) the volume of crude oil that has shipped on Line 9B since December 2015, and (b) the unused capacity on line 9B demonstrated by its historical performance." *Id.* According to the Plaintiffs, the former reflects facts about MPLL and PPLC's operations have occurred during the time that Mr. Hardison has served as MPLL and PPLC's president and of which he has personal knowledge. *Id.* The latter, the Plaintiffs explain, flows naturally from the former. *Id.* The Plaintiffs maintain that neither statement constitutes expert testimony. *Id.*

### C. The Defendants' Reply

In reply, the Defendants argue that the Plaintiffs' objections to the Defendants requests for production do not excuse the Plaintiffs from failing to produce the data. *Defs.' Reply* at 2. Moreover, the Plaintiffs assert that they were diligent in pursing the data; they contend that they twice inquired to make sure they had received all

the materials that the Plaintiffs would use to support their case as identified in their Initial Disclosures. *Id.* at 3.

According to the Defendants, the spreadsheet showing the monthly volumes from the Enbridge Line 9B pipeline is "wholly unsatisfactory" under Federal Rule of Civil Procedure 34 and Federal Rule of Evidence 1006. *Id.* at 3. The Defendants point out that Mr. Hardison offered testimony as to the daily flows of Line 9B, but the spreadsheet does not include the daily figures. *Id.* Moreover, the Defendants explain that "whether the crude oil 'averaged' by Mr. Hardison is heavy or light commodity would have [an] impact on whether there is actually 'available' volumes of crude oil for southward transportation." *Id.* Thus, the Defendants insist that they are entitled to the complete information underlying the spreadsheet the Plaintiffs provided. *Id.* at 3–4.

## III.  DISCUSSION

### A.  Federal Rule of Civil Procedure 37(c)

Federal Rule of Civil Procedure 37 (c) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

FED. R. CIV. P. 37(c)(1). Hence, the applicability of Rule 37(c) in this case turns on whether the Plaintiffs failed to provide the data in violation of Rule 26(a) or (e) and, if so, the significance of the Plaintiffs' failure and what sanction, if any, should be imposed.

Rule 26(a) pertains to required disclosures, including initial disclosures. FED. R. CIV. P. 26(a). Rule 26(a)(1)(A)(ii) requires parties to submit "a copy–or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(ii). The Plaintiffs fulfilled this requirement with respect to the data in question. In their initial disclosures, the Plaintiffs revealed that "PPLC has the following categories of documents, which are located at its offices at 30 Hill Street, South Portland, Maine: . . . documents regarding the throughput volume of oil through its pipeline facilities . . . ." *Initial Disclosures* at 3. In sum, the Court concludes that PPLC satisfied its requirements under Rule 26(a).

Rule 26(e), relating to supplementing discovery disclosures, presents a more difficult question. The rule provides:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> > **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
> > **(B)** as ordered by the court.

Fed. R. Civ. P. 26(e).

The Defendants assert that they specifically asked for this data in two documents requests. *Defs.' Mot.* at 4. As mentioned above, the Defendants' document Request #2 asked for "All documents identified in Plaintiffs' Initial Disclosures."

*Resp. to Req. for Prod.* at 3. Request #24 sought "Any and all documents, including, but not limited to, studies, reports, and analyses, whether or not commissioned by PPLC, since January 1, 2004, concerning transportation of Canadian Crude oil, including but not limited to . . . (e) The Enbridge Line 9 Project." *Resp. to Req. for Prod.* at 4. Yet the Plaintiffs objected to these requests and ultimately turned over only a limited number of documents excluding the data in question. *Resp. to Req. for Prod.* at 3–5. There is no evidence that the Defendants pursued the discoverability of the data further, despite the plain language in the initial disclosure that PPLC possessed documents "regarding the throughput volume of oil."

The Defendants suggest that Mr. Hardison misled them as to whether PPLC possessed the data in question during his deposition. The Defendants point out that when the Defendants asked Mr. Hardison during his deposition whether there were "any documents at PPLC that set out the current projections for how much oil could be available from Enbridge Line 9," Mr. Hardison replied, "No, not that I'm aware of." *Defs.' Mot.* at 3 (citing *Hardison Dep.* 81:3–8). Yet, the deposition transcript is clear that the Defendants asked Mr. Hardison if PPLC had any documents relating to projections for how much oil would be available from Enbridge Line 9, not whether PPLC had any documents regarding the volume of oil that Enbridge Line 9 actually pumped through its facilities. In sum, nothing in the Defendants' conduct in this case prompted a duty on the part of the Plaintiffs to supplement their Rule 26(a) disclosures.

Nevertheless, the Court's Interim Order changed the landscape of the litigation. In the Interim Order, the Court wrote:

> [T]he Court is unclear on the extent to which PPLC's marketing efforts depend on crude oil flowing from west to east on the reversed Enbridge Line 9 system; whether the oil flowing west to east on the Enbridge Line 9 system is already committed to other refineries; the ramifications of the take-or-pay contracts between Enbridge Pipelines, Inc., and Suncor and Valero Jean Gaulin Refineries near Montreal, Quebec . . . .

*Interim Order* at 8–9. With the issuance of this Interim Order, the data in PPLC's possession regarding the volumetric capacity of Enbridge Line 9B became a central issue in this part of the dispute. It is no answer for PPLC to complain that it "never anticipated" that the issue of the capacity of Line 9B "would become a consideration" and that the issue had been "thrust" upon it and therefore Rule 26(e) somehow does not apply. *Pls.' Opp'n* at 7. Once the Court deemed the issue significant, whether PPLC agrees it should be or not, the issue became part of the case and should have caused PPLC to reevaluate its disclosure obligations under Rule 26(e).

PPLC suggests that it does not need to disclose the data under Rule 26(a)—and thus to supplement under Rule 26(e)—because the data serve merely as rebuttal evidence. *Pls.' Opp'n* at 2, 5; *see also July 11, 2017 Email* at 2 (contending that the data constitute "rebuttal testimony for which no advance disclosure is required"). PPLC cites no rule or caselaw that supports the notion that categorizing otherwise discoverable information as "rebuttal" shields it from disclosure. The Court is aware of no rule excepting "rebuttal evidence" from discovery. Rather, Rule 26(a) only provides an exception for information "used solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Here, based on the content of Mr. Hardison's proposed testimony,

PPLC has confirmed that it intends to use the data for more than impeachment. The Court is concerned that it will be left in the same position it was in before the evidentiary hearing: questioning the underpinnings of Ms. Emerson's testimony but bereft of any substantive evidence on PPLC's actual ability to reverse the flow of its pipeline. In short, the Court views with skepticism PPLC's excuses for failing to supplement its discovery with the underlying data after the Interim Order.

Nevertheless, this does not end the discussion because PPLC did turn over the spreadsheet and therefore, the Court turns to whether the spreadsheet that PPLC did produce satisfies its disclosure obligations. *July 11, 2017 Email* at 5. Based on this record, the Court is at a disadvantage on this issue because it is difficult to know how significant this controversy really is, especially in light of the fact that the underlying data have not been disclosed. If the underlying data, once disclosed, track the contents of the spreadsheet, it would be difficult to see how the Defendants have been prejudiced. Yet if the underlying data reveal significant flaws in Mr. Hardison's opinions, the Defendant will have been disadvantaged from PPLC's inaction.

The Court has resolved that it will not grant the Defendants' primary objective, namely to exclude Mr. Hardison's testimony to the extent his testimony relies on the underlying, non-disclosed data. This would leave the Court in precisely the same position it was in when it issued the May 11, 2017 interim order, attempting to evaluate justiciability without any testimony on the capacity of Line 9B from PPLC, deciding the case, not on the merits, but on the difficult evidentiary issue of whether the data upon which the Defendant's expert relied is admissible for the truth of the

matter, and resting its judgment on a matter of public concern on a technical legal issue and not on the merits. Accordingly, the Court will not exclude Mr. Hardison's testimony on the issue before the Court because it would be much too drastic a sanction.

All of this may become clearer during the August 9, 2017 evidentiary hearing, when Mr. Hardison testifies, both on direct and cross examination. The Court will be in a better position to determine whether this is more or less than it seems to be and whether it is necessary to impose some type of a sanction, such as requiring PPLC to immediately disclose the underlying data and allowing the Defendant to quickly depose Mr. Hardison post-hearing to present a complete record. The resolution of these issues, however, must await the upcoming hearing.

## B. Federal Rule of Evidence 1006

Mr. Hardison testified to the overall monthly average volume of oil delivered by Line 9B since December 2015. *Hardison Decl.* ¶ 55. The Defendants complain that the Plaintiffs have refused to provide any opportunity for the Defendants to examine or copy the relevant data underlying Mr. Hardison's calculation. *Defs.' Mot.* at 7. The parties' filings indicate otherwise. The Plaintiffs provided a spreadsheet containing the relevant data–namely, the overall monthly average volume (in barrels/day) of oil delivered to MPLL's facilities by Line 9B since December 2015. *July 11, 2017 Email* at 5.

The Defendants also argue that Mr. Hardison has offered testimony as to daily flows, but that the Plaintiffs have not offered these figures. *Defs.' Reply* at 3.

Testimony about the daily flows of Enbridge Line 9B does not implicate Rule 1006. Mr. Hardison is not using a "summary, chart, or calculation to prove the content of voluminous writing, recordings or photographs that cannot be conveniently examined in court." FED. R. EVID. 1006. Rather, as discussed below, Mr. Hardison is simply testifying to the flows he is personally aware of in his position as president of both MPLL and PPLC.

### C. Expert versus Lay Testimony

Mr. Hardison's testimony concerning the availability capacity of Enbridge Line 9B is not expert testimony under Rule 702. Mr. Hardison testifies that since the Enbridge Line 9B pipeline began flowing east in December 2015, "there have been days where Line 9B's volume has reached as high as 320,000 barrels per day." *Hardison Decl.* ¶ 55. Further, he testifies that since December 2015, it has delivered a monthly average of 215,000 barrels per day. *Id.* During this time period, Mr. Hardison was the president of both MPLL and PPLC. *Id.* ¶ 2. He has worked for the company for over forty years. *Id.* He explains that for nearly forty years, Enbridge Line 9B has been physically interconnected with PPLC's pipeline infrastructure. *Id.* ¶ 54. As a result of this arrangement, PPLC receives data from Enbridge about the volumetric flow of Line 9B. *Id.*

The "line between expert testimony under [Federal] Rule [of Evidence] 702 and lay opinion testimony under [Federal] Rule [of Evidence] 701 is, in practice, 'not [an] easy [one] to draw." *United States v. Valdivia*, 680 F.3d 33, 50 (1st Cir. 2012) (quoting *United States v. Colón Osorio*, 360 F.3d 48, 52–53 (1st Cir. 2004)). However, as the

First Circuit observed in *United States v. Munoz-Franco*, 487 F.3d 25 (1st Cir. 2007), courts have allowed lay witnesses to testify under Rule 701 "about a business based on the witness's own perceptions and knowledge and participation in the day-to-day affairs of the business." *Id.* at 35 (internal punctuation omitted). Here, the Court is satisfied that Mr. Hardison has the requisite competence as PPLC's president to testify about the volume of crude oil shipped on Line 9B since December 2015 and the unused capacity on Line 9B as these matters should be within his personal knowledge in his capacity as PPLC's chief executive officer.

Thus, Mr. Hardison is able to testify about the volumetric flow pumped into MPLL's facilities without qualifying as an expert. His testimony is not based on "scientific, technical, or other specialized knowledge within the scope of Rule 702"; rather, it is "rationally based on [his] perception" as the president and long-time employee of the very company with access to the volumetric flow data. FED. R. EVID. 701(a), (c).

The Defendants assert that determining the "availability" of oil on Line 9B is not within the ken of a layperson. *Defs.' Mot.* at 9. The Court disagrees. Mr. Hardison applied simple arithmetic. If the stated capacity of Line 9B is 300,000 barrels per day, and the data show that Line 9B is pumping an average of 215,000 barrels per day, then, there is an average of 85,000 barrels per day of capacity that is available to supply the PPLC project. This testimony does not require specialized knowledge within the meaning of Rule 702.

## IV. CONCLUSION

The Court DENIES the Defendants' motion in limine to exclude from evidence any testimony or documents concerning the volume of crude oil delivered to Montreal East from Enbridge Line 9B (ECF No. 172) and the Court DEFERS ruling on whether some lesser sanction is warranted, and if so, what that sanction should be, in light of Portland Pipe Line Corporation's failure to disclose the data underlying their witness's proposed testimony.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of August, 2017