UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| PORTLAND PIPE LINE CORPORATION, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 2:15-cv-00054-JAW ) |
| CITY OF SOUTH PORTLAND, et al., | ) ) ) |
| Defendants. | ) ) |

**ORDER ON DEFENDANTS' CONSOLIDATED MOTION TO DISMISS UNDER RULE 12(b)(1)**

The Court finds that if it is legally permitted to do so, Portland Pipe Line Corporation intends to and may be able to reverse the flow of oil in its South Portland to Montreal pipelines from north to south and therefore its claim challenging the legality of the city of South Portland's Clear Skies ordinance is justiciable.

I. **BACKGROUND**

In order for a federal court to hear and decide a case, there must be a real dispute. In this case, Portland Pipe Line Corporation (PPLC) has brought suit to challenge the legality of the city of South Portland's so-called Clear Skies ordinance, which prohibits all bulk loading of crude oil at South Portland harbor and the improvement of existing or the installation of new facilities for the purpose of bulk loading of crude oil into any marine tank vessel in South Portland harbor.

PPLC owns two pipelines that run from South Portland, Maine to Montreal, Quebec. Currently PPLC pumps oil south to north, beginning in South Portland and ending in Montreal, where it is brought to refineries. The premise of PPLC's lawsuit is that PPLC has concrete plans to reverse the flow of oil in its pipeline, and that the current South Portland Clear Skies ordinance prohibits the loading of oil onto ships in South Portland harbor, thereby effectively barring the pipeline reversal.

The City moved to dismiss PPLC's lawsuit under Federal Rule of Civil Procedure 12(b)(1). *Defs.' Consolidated Mot. to Dismiss Pursuant to Rule 12(b)(1) and Mot. for Summ. J.* (ECF No. 88) (*Defs.' Mot.*). Specifically, the City challenged whether PPLC will actually do what it claims it will do: whether—if given permission—PPLC will, in fact, reverse the flow of the pipeline, because in the City's view to do so would be not just non-economical, but impossible. This is true, the City said through its expert, Sarah Emerson, because the oil from the oil-producing areas in the west of Canada and in the northern mid-west of the United States has to run through the so-called Enbridge Line 9, and the pipeline capacity in Enbridge Line 9 is already spoken for. The City maintains that the available capacity in the pipeline would be insufficient to supply PPLC with enough oil to make shipping out of South Portland harbor economically feasible.

PPLC disagrees. *Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss and for Summ. J.* (ECF No. 127). It points out that the City's ordinance prevents PPLC from seeking potential shippers and while the ordinance stands, PPLC "cannot arrange its future." *Id.* at 3. It also disputes the City's contention that the reversal project is economically

unsound. *Id.* at 2–53. In reply, the City reiterates its position that PPLC's claims are nonjusticiable because PPLC had no "concrete plan to violate the Ordinance immediately or nearly so." *Reply to Pls.' Opp'n to Defs.' Consolidated Mot. to Dismiss and Mot. for Summ. J.* at 2 (ECF No. 142).

On May 11, 2017, the Court issued an interim order on the Defendants' consolidated motion to dismiss under Rule 12(b)(1), which sets forth in detail the background to this Order. *Interim Order* at 1–12 (ECF No. 156). In that Order, the Court mandated further proceedings to resolve whether it had subject matter jurisdiction in this case. *Id.* at 1, 11–12.

The Court's interim order was occasioned by the peculiar way the parties had presented the issue. The City proffered evidence in its motion through its expert Sarah Emerson that PPLC would be highly unlikely to actually be able to pursue reversal of the pipeline, even if it obtained permission to do so. In response, PPLC decided not to present countervailing evidence that it was indeed planning to reverse the flow of the pipeline, regardless of what Ms. Emerson said. Instead, PPLC raised evidentiary objections as to whether the Court should consider Ms. Emerson's opinion, since she was relying on the truth of reports prepared by other individuals in forming her own conclusions. This, PPLC maintained, violated the Rules of Evidence. The Court was dissatisfied with the state of the record and was extremely reluctant to issue a decisive order based on the application of a relatively technical niche of the Rules of Evidence. Instead, as the Interim Order stated, the Court

3

preferred to render a decision on the merits, having heard from PPLC and the City's witnesses.

The testimonial hearing on the justiciability motion was held on August 9, 2017. PPLC presented the testimony of Thomas Hardison, its President and Chief Executive Officer, and the City presented the testimony of Sarah Emerson, its expert. Mr. Hardison's entire career has been with PPLC. He started with PPLC as a casual laborer forty-three years ago and rose through the ranks until 2015, when he was named its president. Mr. Hardison described the history of the pipeline, emphasizing the impact that the infusion of tar sands oil mostly from Alberta, Canada and of shale oil mostly from North Dakota, has had on the PPLC South Portland to Montreal pipeline. He testified, for example, that in 2010, 132 vessels unloaded 275,000 barrels of oil per day in South Portland for shipping to Montreal and in 2016, only 11 vessels unloaded only 23,000 barrels per day for shipping northward. Indeed, Mr. Hardison testified that PPLC had infused nitrogen into the 18" pipeline to prevent corrosion and was restricting its minimal shipping to the 24" pipeline. Mr. Hardison presented the reversal as a matter of corporate life or death. He described PPLC as being on life support for northbound oil and he said that PPLC needed the reversal project for its very survival as a business. On cross-examination, he stood by his testimony that PPLC would commence the reversal project once it obtained permission to do so.

The City's witness, Sarah Emerson, is a true expert, extremely knowledgeable and smart about oil markets. She is the President and Managing Director of Energy Security Analysis, Inc., a business that collects data on oil markets, analyzes that

data, and prepares forecasts about the oil market. She has been working in this field for thirty years and has worked all over the world for many of the big, medium, and little players in the oil world. Like Mr. Hardison's testimony, Ms. Emerson's testimony was detailed and occasionally arcane, but she focused on two major points: first, that there would not be enough available oil for PPLC to ship to South Portland, and second, that the price differential, the spread, between the per barrel cost of PPLC oil and cheaper oil available elsewhere would not justify the cost of shipment through the pipeline.

Regarding Enbridge Line 9 capacity, Ms. Emerson testified that Enbridge Line 9 has the capacity to move 300,000 barrels per day and she stated that three Montreal refiners, Valero Energy, Suncor Energy, and Imperial Oil Company, have the right to about 275,000 of those barrels. By order of the National Energy Board of Canada, she explained the remaining 25,000 is left to operators on the spot market and, even if PPLC could somehow gain access to those barrels and transport 25,000 barrels per day, the volume would be too low to be economically justifiable. She also opined that customers in the east coast of the United States and northern Europe could get oil cheaper from the North Sea and Nigeria than the cost of oil coming out of the PPLC pipeline in South Portland. It is an understatement to say that neither PPLC nor the City accepted the other's viewpoints.

## II.  DISCUSSION

5

The issues this motion raises fall under the general rubric of justiciability.[1] ERWIN CHEMERINSKY, FED. JURIS. at 42 (6th ed. 2012) ("The justiciability doctrines determine which matters federal courts can hear and decide and which must be dismissed"). More specifically, the City claims that the PPLC lawsuit must be dismissed for lack of standing and lack of ripeness. *Defs.' Mot.* at 3. For a party to have standing, it must show that a decision in its favor "will relieve a discrete injury" to it. *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009); *Penobscot Nation v. Mills*, 861 F.3d 324, 336 (1st Cir. 2017). For a claim to be ripe, the court's review of the case must be neither "advisory" nor "irrelevant to the ultimate approvability of the project." *Weaver's Cove*, 589 F.3d at 467. (quoting *City of Fall River, Mass. v. F.E.R.C.*, 507 F.3d 1, 8 (1st Cir. 2007)); *Penobscot Nation*, 861 F.3d at 337–38 (discussing the fitness and hardship requirements for ripeness). Here, the standing and ripeness issues are grounded on the same factual dispute: whether PPLC can and will in fact reverse the flow of oil in its pipelines.

From the Court's perspective, the respective positions of PPLC and the City are like ships passing in the night. Ms. Thompson effectively opined that PPLC's reversal plan is not currently economically sound; Mr. Hardison effectively responded

---

[1] On February 11, 2016, the Court issued an order denying the Defendants' motion to dismiss, which was based on a facial challenge to the adequacy of the justiciability allegations in the Complaint. *Order on Defs.' Mot. to Dismiss* (ECF No. 29). In that order, the Court extensively addressed the City's contention that PPLC's claim is not justiciable because PPLC has not obtained other governmental approvals for the project. *Id.* at 33–48. As regards the regulatory approval issue, the current motion, which is a factual challenge, does not change the basis underlying the Court's February 11, 2016 order and therefore as regards the issue of necessary regulatory approvals only and its impact on justiciability, the Court adopts its earlier order. *Id.*

that PPLC was going to do it anyway. The Court extensively analyzed the applicable law in its February 11, 2016 Order on Defendants' Motion to Dismiss, and it serves no purpose to repeat here what was said there. *Order on Defs.' Mot. to Dismiss* (ECF No. 29).

The bottom line is that businesses, like PPLC, sometimes take risks that outside experts think are foolish, impractical, or even nearly impossible, and that fact does not deprive a federal court of jurisdiction. So long as a court is convinced that it is being presented with an actual case or controversy, it should accept jurisdiction and decide the case. *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995) (citing U.S. CONST. art. III, § 2; *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242–45) (1952) ("While the doctrine has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies"). Here, the Court accepts Mr. Hardison's testimony that if PPLC had the necessary permits and could do so legally, PPLC would immediately set about reversing the flow of oil from south to north to north to south.

It may turn out that Ms. Emerson's dire predictions about the economic viability of the reversal project come to pass. But there are a number of factors that convince the Court that Mr. Hardison was telling the truth when he said that PPLC was going to proceed anyway. First, PPLC already has pipelines in the ground. This is not an engineer's schematic or developer's fantasy. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) overruled on other grounds by *Califano v. Sanders*, 430 U.S.

7

99 (1977) (describing ripeness inquiry as ensuring that if a court acts, the "effects [will be] felt in a concrete way"). Second, PPLC previously reversed the flow of the pipeline. Because it has been done before, there is no reason to conclude, based on the record, it could not be physically done again. Third, the international oil market, as Ms. Emerson fully demonstrated, is a dynamic, extremely complex market, that is affected by a myriad of influences, including developing technology within the oil industry, developing technology outside the oil industry, intensive regulatory oversight both in the United States and Canada, unpredictable international events, political stability or instability in oil producing and consuming countries, all of which make the prediction of future price and cost changes in the oil industry a chancy and imperfect business. Fourth, the City's Clear Skies ordinance renders the reversal project illegal and, unlike the City's list of obstacles, its own obstacle to the reversal project, if valid, effectively stops the project before it starts. The United States Supreme Court has observed that when "the suit is one challenging the legality of government action or inaction," whether a plaintiff has standing "depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As the *Lujan* Court wrote, if so, there is "ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561–62.

Even if Ms. Emerson is correct that PPLC's reversal project would not be sustainable based on what is known and can reasonably be predicted today, the Court

8

finds that PPLC has decided to take those risks. In doing so, PPLC would be placing a bet that some future events will break in its favor. For example, Mr. Hardison said that TransCanada is scheduled to complete its Energy East pipeline project by 2021 and, once completed, Mr. Hardison thought it would free up volumes of oil for transport down the PPLC pipeline to South Portland. Whether this happens and whether it happens soon enough to sustain PPLC's project is a calculated business risk, and a risk PPLC is willing to take.

In addition to questioning whether PPLC truly intends to pursue the project, the City also argues that PPLC will be unable to accomplish the reversal even if does intend to pursue the project in earnest. In the City's view, PPLC faces a number of obstacles even if the ordinance were not in place: (1) finding investors for the capital projects such as reversing valves and building new pumping stations, (2) finding buyers to enter contracts to ship oil through the pipelines, (3) finding a sufficient supply for those buyers, and (4) obtaining regulatory approval for the reversal. The City also argues that each of those obstacles in turn depends on (5) the market price differentials between oil shipped through the pipeline and oil available from other sources.

PPLC points out, not unreasonably, that it is the City itself that is preventing PPLC from overcoming the City's list of obstacles because the City has effectively deemed PPLC's reversal project illegal. The Court agrees with PPLC that it can hardly be faulted, particularly by the City, for failing to obtain commitments from

9

investors or shippers for a project that is currently illegal under the Clear Skies ordinance of the city of South Portland.

Mr. Hardison testified that PPLC does see a market demand for the project, and that "[i]n the absence of the Ordinance, PPLC can and will successfully reverse the flow of its lines." *See e.g. Direct Testimony of Thomas A. Hardison* at 14 (ECF No. 171). While Ms. Emerson convincingly testified that the obstacles itemized by the City will make it "tough" for PPLC to find sufficient supply and demand for reversed flows, she also believed there were too many variables to advise a company never to pursue it. As in *Weaver's Cove*, even if a favorable outcome in this case "might not secure the project's ultimate" implementation, to resolve the validity of South Portland's Clear Skies ordinance would neither be "advisory" nor "irrelevant." *Weaver's Cove*, 589 F.3d at 469. In other words, the Court is convinced that current limits on oil supply and demand around the pipelines do not present such "significant hurdles" to implementing PPLC's reversal project as to render the case nonjusticiable. See *Fall River,* 507 F.3d at 4. There is at least a "substantial likelihood" that PPLC will be able to reverse the flow of oil if they are successful in removing the legal barrier that the Clear Skies ordinance represents. *See e.g. Theriault v. Brennan*, 641 F.2d 28, 31 (1st Cir. 1981); *Warth v. Seldin*, 422 U.S. 490, 504–05 (1975).

From the Court's viewpoint, the reason that PPLC is willing, even anxious, to take risks that Ms. Emerson deems unwise is that PPLC has no other choice. The current model of shipping oil to Montreal is like the old metaphor that warns against

shipping coals to Newcastle, a coal-exporting region of England. Whatever else is disputed, it is a fact that PPLC owns two long pipelines which run in the ground from South Portland to Montreal and its current model of shipping oil to Montreal refineries that are awash with oil from other nearer sources is unsustainable. PPLC's only alternative to shutting down its pipelines is to attempt to use them in a different way.

In sum, the Court concludes that PPLC's proposed reversal project is in fact a real project, one that PPLC would immediately undertake if not prohibited by the Clear Skies ordinance. As such, PPLC has presented a justiciable claim.

The Court DENIES Defendants' Consolidated Motion to Dismiss Pursuant to Rule 12(b)(1) (ECF No. 88).[2] The Court will next turn to the pending dispositive motions.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.

---

[2] Before, during and after the August 9, 2017 testimonial hearing, the parties became enmeshed in a furious dispute about the discoverability of the data underlying a summary sheet of oil volumes through Enbridge Line 9 that PPLC admitted into evidence at the hearing. On August 8, 2017, the Court issued an order on the City's motion in limine, concluding that PPLC should have produced the underlying data, and the Court deferred ruling until the hearing on whether PPLC should be sanctioned. *Order on Defs.' Mot. in Limine* (ECF No. 178).

Unfortunately, the Order did not resolve the dispute. The parties persisted in arguing at the hearing about whether the disclosures were adequate, and even after the hearing—despite the Court's urging to resolve the matter, the lawyers wrote the Court that they could not come to terms on the issue. *Compare Letter to Hon. John A. Woodcock, Jr. from Att'y Jonathan M. Ettinger* (Aug. 11, 2017) (ECF No. 182), *with Letter to Hon. John A. Woodcock, Jr. from Att'y John J. Aromando* (Aug. 11, 2017) (ECF No. 183).

Having listened to a full day of testimony from Mr. Hardison and Ms. Emerson and having reviewed the voluminous admitted exhibits, the Court is now convinced that the additional data underlying its summary sheet of volumes of oil through Enbridge Line 9B, which is the subject of the discovery dispute, is not discoverable under Federal Rule of Civil Procedure 26(b)(1). Accordingly, the Court DENIES Defendants' Motion in Limine (ECF No. 172).

UNITED STATES DISTRICT JUDGE

Dated this 24th day of August, 2017