UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PORTLAND PIPE LINE CORPORATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:15-cv-00054-JAW |
| CITY OF SOUTH PORTLAND, et al., | ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON DEFENDANTS' RENEWED MOTION TO DISMISS**

The city of South Portland filed another motion to dismiss this case following news that another pipeline company, TransCanada, announced that it will not pursue construction of its proposed Energy East pipeline. Despite the recent announcement, the Court still finds that if it is legally permitted to do so, Portland Pipe Line Corporation intends to and is sufficiently likely to be able to reverse the flow of oil in its South Portland to Montreal pipelines from northbound to southbound to make its claim challenging the legality of the City's Clear Skies ordinance justiciable.

I.  **BACKGROUND**

In order for a federal court to hear and decide a case, there must be a real dispute. In this case, Portland Pipe Line Corporation (PPLC) brought suit to challenge the legality of the city of South Portland's (the City) so-called Clear Skies ordinance (the Ordinance), which prohibits all bulk loading of crude oil at South Portland harbor and the improvement of existing or the installation of new facilities

for the purpose of bulk loading of crude oil onto any marine tank vessel in South Portland harbor.

PPLC owns two pipelines that run from South Portland, Maine to Montreal, Quebec. Currently PPLC pumps oil south to north, beginning in South Portland and ending in Montreal, where it is brought to refineries. The premise of PPLC's lawsuit is that it has concrete plans to reverse the flow of oil in its pipeline, and that the Ordinance prohibits the loading of oil onto ships in South Portland harbor, thereby effectively barring the pipeline reversal.

On November 17, 2016, the City moved to dismiss PPLC's lawsuit under Federal Rule of Civil Procedure 12(b)(1). *Defs.' Consolidated Mot. to Dismiss Pursuant to Rule 12(b)(1) and Mot. for Summ. J.* (ECF No. 88). Specifically, the City challenged whether PPLC will actually do what it claims it will do: whether—if the Ordinance were not an obstacle—PPLC will, in fact, reverse the flow of the pipeline, because in the City's view to do so would be not just non-economical, but impossible. This is true, the City said through its expert, Sarah Emerson, because the oil from the oil-producing areas in the west of Canada and in the northern mid-west of the United States has to run through the so-called Enbridge Line 9, and virtually all the pipeline capacity in Enbridge Line 9 is already spoken for. The City maintains that the available capacity in the pipeline would be insufficient to supply PPLC with enough oil to make shipping out of South Portland harbor economically feasible.

PPLC disagrees. On December 20, 2016, PPLC filed a response to the City's motion. *Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss and for Summ. J.* (ECF No.

127). It pointed out that the City's ordinance prevents PPLC from seeking potential shippers and while the Ordinance stands, PPLC "cannot arrange its future." *Id.* at 3. It also disputes the City's contention that the reversal project is economically unsound, given the bleak outlook PPLC faces if it continues to transport oil northbound. *Id.* at 2-53.

On May 11, 2017, the Court issued an interim order on the Defendants' consolidated motion to dismiss under Rule 12(b)(1). *Interim Order* at 1-12 (ECF No. 156). In that Order, the Court mandated further proceedings to resolve whether it had subject matter jurisdiction in this case. *Id.* at 1, 11-12. The Court held a hearing on the justiciability motion on August 9, 2017. *Min Entry* (ECF No. 179). PPLC presented the testimony of Thomas Hardison, its President and Chief Executive Officer, and the City presented the testimony of its expert, Sarah Emerson.

On August 24, 2017, the Court issued an order denying the City's motion to dismiss. *Order on Defs.' Consolidated Mot. to Dismiss Under Rule 12(b)(1)* (ECF No. 185) (*Order*). The Court concluded that the case was justiciable. *Id.* at 1. The Court credited Mr. Hardison's testimony and found that PPLC intends to pursue the reversal if its challenge to the Ordinance is successful. *Id.* at 7. It also determined that PPLC may be able to accomplish the flow reversal despite Ms. Emerson's testimony about the current unfavorable market conditions. *Id.* at 7-9. The Court pointed to at least four reasons that PPLC's project is not so unlikely to succeed as to make the case unripe. *Id.* One reason was the volatility of the oil markets and PPLC's reasonable desire to place a bet that future events will break in its favor. *Id.*

3

at 8-9. As one example of that volatility and potentially favorable future events, the Court mentioned the scheduled completion of TransCanada's Energy East pipeline. *Id.* at 9 ("For example, Mr. Hardison said that TransCanada is scheduled to complete its Energy East pipeline project by 2021 and, once completed, Mr. Hardison thought it would free up volumes of oil for transport down the PPLC pipeline to South Portland"). After concluding the case was ripe, the Court set about resolving the long-pending cross motions for summary judgment. *Id.* at 11.

On October 5, 2017, the City made an emergency filing asking the Court to stay the pending summary judgment proceedings. *Defs.' Emergency Mot. for Temporary Stay of Summ. J. Proceedings* (ECF No. 186). The City presented new evidence that TransCanada had cancelled its plans for the Energy East pipeline. *Id.* Attach 1. At a telephone conference on October 6, 2017, the City indicated that it intended to file another motion to dismiss. *Min. Entry* (ECF No. 188). The Court stated that it would allow oral arguments on that new motion to dismiss, but it denied the motion for a stay of the summary judgment proceedings. *Oral Order* (ECF No. 189).

On October 20, 2017, the City filed its renewed motion to dismiss. *Defs.' Renewed Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 194) (*Defs.' Mot.*). PPLC filed its response on November 2, 2017. *Pls.' Obj. to Defs.' Third Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 195) (*Pls.' Opp'n*). The City filed its reply on November 10, 2017. *Reply Mem. in Supp. of Defs.' Renewed Mot. to Dismiss Pursuant*

4

to Rule 12(b)(1) (ECF No. 196) (*Defs. Reply*). The Court heard oral arguments on November 21, 2017. *Min. Entry* (ECF No. 198).

## II. THE PARTIES' POSITIONS

### A. Untimely Motion to Reconsider

PPLC argues that the City's new motion to dismiss is, in truth, an untimely motion to reconsider the Court's August 24, 2017 Order on the City's old motion to dismiss. *Pls.' Opp'n* at 4. PPLC explains that the City only mentions the Energy East announcement in two paragraphs of its 20-page motion, and the balance of the document repeats the same justiciability arguments from prior motions and orders. *Id*. Citing the time-restricted provision for motions for reconsideration in the District's Local Rules, PPLC maintains that the City's new motion to dismiss is time-barred because the City filed the motion more than 14 days from the date of the contested order. *Id*. at 5 (citing D. Me. Local R. 7(g)).

The City replies that parties can challenge subject matter jurisdiction at any point during the litigation and they cannot waive the issue. *Defs. Reply* at 5-6. The City also contends that, even if the motion to dismiss were actually a motion for reconsideration under Local Rule 7(g), the 14-day deadline contains an exception for newly available material evidence like the cancellation of the Energy East pipeline. *Id*. At oral argument, the City insisted that its motion is truly a new motion to dismiss, not a motion for reconsideration dressed as a motion to dismiss.

5

B.  **Justiciability**

1.  **The City's Motion**

The City begins by restating the standards for ripeness and standing. *Defs.' Mot.* at 10-12. The City reiterates the obstacles to PPLC's accomplishing flow reversal, namely that it needs financing for the approximately $125-to-$185 million reversal project, that it needs to attract committed volumes from potential shippers to get that financing, and that there are no available uncommitted volumes from the only other pipeline in operation, Enbridge Line 9. *Id.* at 12-14. The City also argues that PPLC does not actually intend to imminently pursue the reversal project because it "resolved in June 2013 not to market any such project until the success of Enbridge Line 9 and Energy East were both 'assured'" and Energy East is now canceled. *Id.* at 14-16.

The City likens this case to *McDonough v. City of Portland*, 855 F.3d 452 (1st Cir. 2017). *Defs.' Mot.* at 16-17 (citing *McDonough*, 855 F.3d at 453-54). In *McDonough*, the First Circuit required the plaintiff to prove there was more than a "possibility" that the plaintiff would compete for the permit at issue in the case, but rather, there must be a "likelihood" that he was "able and ready" to apply for the permit. *McDonough*, 855 F.3d at 453; *Defs.' Mot.* at 16-17.

Finally, the City insists that the Court's quotation from *Weaver's Cove Energy LLC v. Rhode Island Coastal Resource Management Council*, 589 F.3d 458, 467 (1st Cir. 2009), in the August 24, 2017 Order was misplaced because it was "dicta . . . in

6

response to a very specific argument from an amicus" and that case "stood on very different facts." *Id.* at 18-19.

### 2. PPLC's Opposition

PPLC responds that "the City already argued that the Energy East pipeline was not likely to be built" and that "[t]he Court credited the City's evidence concerning the economic challenges facing PPLC's reversal project and found Plaintiffs' claims justiciable nonetheless." *Pls.' Opp'n* at 6. PPLC asserts that the Court cannot infer that the Energy East announcement changes the justiciability calculus "in light of the 'dynamic, extremely complex [nature of the oil] market, that is affected by a myriad of influences.'" *Id.* In fact, PPLC urges, the Energy East announcement is positive news because it ensures that PPLC "will continue to be the sole operator of a crude oil pipeline running to the Atlantic coast." *Id.*; *Pls.' Opp'n* Attach. 1 *Fourth Declaration of Thomas A. Hardison* (ECF No. 195).

PPLC also presents new evidence that major rail companies are preparing to increase shipments of oil by rail as congestion sets in on Canada's major export pipelines, which are operating close to capacity. *Fifth Declaration of Thomas A. Hardison* (ECF No. 197); *Canadian Pacific eyeing signs of life in crude by rail shipments*, REUTERS (Nov. 14, 2017), https://www.reuters.com/article/cp-crude/update-1-canadian-pacific-eyeing-signs-of-life-in-crude-by-rail-shipments-idUSL1N1NK1FY.

### 3. The City's Reply

The City denies PPLC's attempt to characterize the announcement as a minor fluctuation in the world energy market. *Defs. Reply* at 2. The City reiterates its argument that "the cancellation of Energy East eliminates the only source of crude oil – existing or proposed – with available volumes on which PPLC could obtain the commitments necessary for it to secure financing for a multi-million dollar project it can not otherwise afford to build." *Id.*

### C. Interlocutory Appeal

The City requests that, in the event the Court denies its motion to dismiss, the Court allow it to petition the First Circuit Court of Appeals for interlocutory review of the justiciability issue pursuant to 28 U.S.C. § 1292. *Defs.' Mot.* at 3, 19-20.

PPLC suggests that the City's request for interlocutory appeal "lays bare the City's strategy" to use these motions as "pretext for delay." *Pls.' Opp'n* at 5, 7. PPLC argues that interlocutory appeal "should be used sparingly and only in exceptional circumstances" not present here. *Id.* at 7 (quoting *Int'l Assoc. of Machinists and Aerospace Workers v. Verso Corp.*, 121 F. Supp. 3d. 201, 230 (D. Me. 2015) (quoting *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1010 n.1 (1st Cir.1988)).

The City replies that the justiciability issue is fit for interlocutory appeal because the case involves weighty constitutional issues, and the Court should not pronounce on difficult constitutional questions when its jurisdiction is uncertain. *Defs. Reply* at 6-7 (citing *Ernst & Young*, 45 F.3d at 538 (1st Cir. 2005); *United States*

8

*v. Lahey Clinic Hosp., Inc.*, 399 F.3d, 1, 7 (1st Cir. 2005); *Educ. Credit Mgmt. Corp. v. Coleman (In re Coleman),* 560 F.3d 1000, 1003 (9th Cir. 2009)).

## III. DISCUSSION

### A. Untimely Motion to Reconsider

The Court declines to engage with the parties in the debate about whether the City's motion is a motion to reconsider or a new motion to dismiss. The Court would not, in its discretion, bar a motion for reconsideration based on events that post-dated its August 24, 2017 order, especially since the Court referred to the earlier status quo in its order. More significantly, however, the result is the same under the applicable standards however the motion is characterized.

### B. Justiciability

#### 1. A New Motion to Dismiss

Following extensive briefing and a full day of evidence, including testimony from two witnesses and numerous admitted exhibits, on August 24, 2017, the Court issued a twelve-page order denying the City's motion to dismiss, which had been made on justiciability grounds. *Order* at 1-12. Unfortunately in its newest motion, the City reiterated some of the same arguments that the Court previously rejected. At oral argument, the City emphatically denied that it had filed a motion for reconsideration of the August 24, 2017 order and emphasized that it was proceeding only with a new motion to dismiss. To the extent the Court has addressed the issues the City raised in its newly-filed motion to dismiss, the Court takes the City at its

9

word and concludes that the City is not asking the Court to reconsider its earlier ruling.

### 2. TransCanada's Cancellation of the Energy East Project

What is new since August 24, 2017 is that TransCanada has cancelled its proposed Energy East project that was to link Montreal to St. John, New Brunswick by pipeline. This is newly-discovered evidence and the only proper basis for the Court to reexamine its earlier orders. During the August 9, 2017 evidentiary hearing, PPLC relied heavily on the prospect of the construction of this new pipeline to alleviate the lack of volume currently available through Enbridge Line 9, most of which appears to be under contract. During his testimony, Mr. Hardison, president and chief executive officer of PPLC, described in detail the Energy East project and the proposed repurposing of an existing gas line from Alberta to Montreal. *Tr. of Proceedings, Test. of Thomas Hardison* 41:16-44:4; 50:12-24; 75:1-13; 165:10-166:12 (ECF No. 192) (*Hardison Test.*). Mr. Hardison testified that as much as 1.1 million barrels of oil per day could have been carried on the Energy East pipeline. *Id.* 42:6-10. He said the Energy East project would "free up" the volume that was being moved on Enbridge Line 9 for shipment by PPLC to South Portland. *Id.* 43:6-12. On cross-examination, Mr. Hardison admitted that the TransCanada Energy East pipeline was "a possibility" and had not yet been approved. *Id.* 161:21-162:2. He conceded that the Energy East project was "entirely up to the [Canadian National Energy Board]." *Id.* 162:6-9.

The City's expert, Sarah Emerson, also extensively discussed the status of the Energy East project. *Tr. of Proceedings*, *Sarah Emerson Test.* 217:18-219:22; 240:18-252:7; 262:13-263:11; 274:5-23 (ECF No. 192) (*Emerson Test.*). In fact, she (correctly as it turns out) testified that she was "not convinced Energy East will be built." *Id.* 274:10.

What Mr. Hardison conceded could happen and what Ms. Emerson predicted would happen has come to pass: TransCanada decided not to proceed with the Energy East project. The City properly points out that, as a practical matter, the cancellation of the Energy East project makes PPLC's reversal proposal more difficult. This is because for PPLC to pump oil from Montreal to South Portland, there must be oil to pump. The current capacity of Enbridge Line 9 is about 300,000 barrels per day and, at least according to Ms. Emerson, about 275,000 barrels are spoken for, leaving roughly 25,000 barrels per day in so-called spot or uncommitted volumes. *Id.* 272:1-7; *see Hardison Test.* 137:13-24. Although some of the spot market oil could be available to PPLC, it could not enter into long-term contracts for even this 25,000 because the National Energy Board requires that this 25,000 barrels be reserved for the spot or uncommitted market. *Hardison Test.* 140:10-25.

Mr. Hardison testified that PPLC's target volume, once the flow was reversed, would be 80,000 barrels per day. *Hardison Test.* 109:13-17. If Ms. Emerson is correct and if PPLC is somehow able to regularly capture the 25,000 barrels of oil per day available on the spot market, this leaves a gap of at least 55,000 barrels per day for PPLC to fill in order to meet its target volume.

11

It should be noted, however, that Mr. Hardison disagreed with the City's contention that PPLC's access to oil from Enbridge Line 9 would be limited to its ability to compete for the 25,000 per day on the spot market. Mr. Hardison explained that both Valero and Suncor, the Lévis/Montreal refiners, have entered into what are called "take-or-pay" transportation shipping agreements (TSA) with PPLC in which they have agreed to pay for a certain volume of oil whether they actually take the oil or not. *Id.* 63:9-66:7. Mr. Hardison said that PPLC is part of a "vital connection" through which the oil from Enbridge 9 runs to get to Suncor and Valero. *Id.* 63:16-64:7. PPLC's TSA with Valero is for 130,000 barrels per day and with Suncor is 90,000 barrels per day. *Id.* 66:5-7. Because of its position as a vital connection, PPLC has measured the flow of oil coming from Enbridge Line 9 and he testified that the true flow per day since December 2015, has actually been 215,000 barrels per day, leaving "80,000 to maybe 100,000 barrels of oil that's available today off of Line 9 that could provide a southbound project for us." *Id.* 74:23-25.

Even so, Mr. Hardison did raise the possibility that the 1.1 million barrels of oil that TransCanada had planned to pump through its Energy East pipeline would have been an additional source of oil for PPLC to pump southward. With the cancellation of Energy East, one alternative that PPLC relied upon as a potential source of oil for the reserved pipeline has been shelved.

TransCanada's decision to scrap Energy East makes the question of whether PPLC has presented a justiciable issue a closer call. But from the Court's viewpoint, it does not eliminate its authority to decide the case. The Court remains convinced

12

that but for the Ordinance, PPLC would currently be taking active steps to reverse the flow of the pipeline. Despite the TransCanada decision, it remains true (1) that PPLC has pipelines in the ground running from South Portland to Montreal; (2) that PPLC previously reversed the flow demonstrating that the reversal project is feasible[1]; and, (3) that PPLC may not proceed with the reversal project without violating the Ordinance.

With these uncontroverted facts, the Court does not need to resolve the complicated question of whether the City is correct that the only oil even potentially available to pump southward would be the 25,000 barrels on the spot market or whether PPLC is correct that the lower actual flows of oil establish that there would be enough oil to sustain PPLC's reversal project. This is because whatever the state of the oil market today, it can be said with some confidence that it will not be the same four or so years from today.

The Court is convinced that PPLC is determined to proceed with the reversal project if it becomes legal for it to do so. Even so, it is also true that its claim against the ordinance is not justiciable unless "there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (quoting *Lake Carriers' Ass'n v. MacMullan*, 406 U.S.

---

[1] Mr. Hardison testified that PPLC reversed the flow of the pipeline in 1987 but for natural gas, not oil. *Hardison Test.* 24-20-25:8. In 1999, PPLC re-reversed the flow of the pipeline back to south to north and returned to pumping oil, not natural gas. *Id.* For purposes of accomplishing a reversal, there is no evidence in this record that it matters whether the substance being pumped is oil, not natural gas.

498, 506 (1972)). As the First Circuit explained, "[d]etermining ripeness involves a dual inquiry: evaluation of 'both fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "Both prongs of the test must be satisfied, although a strong showing on one may compensate for a weak one on the other." *Id.*

Fitness "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends on facts that may not yet be sufficiently developed." *Id.* (quoting *Stern v. U.S. Dist. Court*, 214 F.3d 4, 10 (1st Cir. 2000) (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995)). "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Id.* (quoting *Ernst & Young*, 45 F.3d at 536) (quoting *Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't.*, 973 F.2d 18, 20 (1st Cir. 1992)). Finally, "[t]he fact that an event has not occurred can be counterbalanced in this analysis by the fact that a case turns on legal issues 'not likely to be significantly affected by further factual development.'" *Id.* (quoting *Ernst & Young*, 973 F.3d at 536).

Hardship is "entirely prudential." *Id.* The hardship prong evaluates "the extent to which withholding judgment will impose hardship — an inquiry that typically turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties." *Id.* (quoting *Stern*, 214 F.3d 10 (quoting *Abbott Labs.*, 387 U.S. at 152)). "The greater the hardship, the more likely a court will be to find

14

ripeness." *Id.* (citing *Ernst & Young*, 45 F.3d at 536). "This inquiry encompasses the question of whether plaintiff is suffering any present injury from a future contemplated event." *Id.*

Turning to the fitness prong, the Court concludes that the proposed project contains an irreducible degree of uncertainty, caused by the persistent volatility and complexity of the international marketplace for oil, and caused by the delay due to this litigation, by the remaining permitting requirements, and by the time PPLC will need to complete the project, if its lawsuit against the Ordinance is successful. On the last point, Mr. Hardison testified that if the Ordinance were no longer an impediment, it would take eighteen months to two years to complete the reversal. *Hardison Test.* 62:16-22. If the time that it will take to resolve this case, including an inevitable appeal, is added to the time that it will take to complete the reversal, in its best case, PPLC will not complete the reversal project for at least another three or four years.

Three or four years is a lifetime in the oil business. For example, in 2008, PPLC contemplated reversing the pipeline and spent five million dollars toward the reversal but dropped the project in April 2010, due to the impact of the financial crisis that began in 2008-09. *Id.* 20:12-28:15. In the same vein, Ms. Emerson testified in detail about the importance of the spread between the Brent price and the Syncrude price in evaluating the practicality of the PPLC reversal project. *Emerson Test.* 191:14-195:12. She stated that the spread as of August 2017 was only one to two dollars. *Id.* 195:8-12. However, according to Ms. Emerson, the spread was a little

15

over $19 in 2012, over $12 in 2013, and $14 in 2014. *Id.* 200:1-14. Since 2014, the spread has remained under $2 on an annual average basis. *Id.* 200:15-16. Both Mr. Hardison and Ms. Emerson confirmed that the oil business is by its nature a changing and challenging market.

At one point Ms. Emerson quickly rattled off a series of factors that influenced the price of oil from 2011 to 2014: (1) surging United States shale oil production, (2) a ban on U.S. oil exports, (3) refiner issues in the Gulf Coast of the United States, (3) civil war in Libya, (4) civil war in Syria, (5) U.S. sanctions on Iran, and (6) the ramping up of Iraqi oil production following the Iraq War. *Id.* 216:17-217:13. A much longer list could be proposed for a project, like PPLC's, that is not going to be completed for three to four years.

Even so, the Court concludes that the case meets the fitness prong. First, many of the legal issues in this case, such as federal preemption, do not depend on such imponderables as the stability of the Nigerian government or the price of oil in Alberta in 2021. Next, despite the fact that the oil business is inherently chancy, oil companies continue to undertake massive capital construction projects, such as the Keystone pipeline, in the face of considerable delay and uncertainty. In the range of oil company projects, PPLC's reversal of an existing pipeline seems a surer bet than many other proposals. Third, although the economic viability of the reversal project in 2021 has an element of unpredictability, the production of oil from the Canadian oil fields is likely to continue to increase. *See Hardison Test.* 19:4-21 (one million barrels per day of production in Alberta projected to grow at five percent per year).

16

Given the increasing production of oil in Canada, PPLC's current model of shipping oil to an oil producing region is unsustainable and to continue in business, the Court finds that PPLC must reverse the flow of oil. Although the completion of the reversal project around 2021 is not guaranteed, PPLC's economic imperative is so strong that the Court is relatively comfortable in concluding that PPLC will find a way to complete the project in 2021.

Even if the fitness prong is less certain, the hardship on PPLC is undeniable. The Court has found that PPLC's current business model—shipping oil to an oil producing region—is unsustainable. To remain viable as a business, PPLC must reverse the flow of the pipeline and therefore, the challenged action, in the words of the First Circuit, presents a "direct and immediate dilemma" for PPLC because the Ordinance prohibits PPLC from doing the one thing it must do to survive as a business. *McInnis-Misenor*, 319 F.3d at 70. Here, the Court finds that the hardship to PPLC is direct, immediate and critical.

Under First Circuit guidance, the Court should balance the two prongs—fitness and hardship—and here the Court concludes that PPLC has made an especially strong showing on the hardship prong and a sufficient showing on the fitness prong to allow the Court to hear the case.

### C. Interlocutory Appeal

In its motion, the City asks the Court to certify the justiciability issue to the First Circuit Court of Appeals to allow the City to file an interlocutory appeal of the order pursuant to 28 U.S.C. § 1292. *Defs.' Mot.* at 19. However, the First Circuit

17

described the circumstances meriting an interlocutory appeal to be "hen's-teeth rare." *Camacho v. P.R. Ports Auth.*, 369 F.3d 570, 573 (1st Cir. 2004). Although in its reply, the City cited two cases that it contended supported an interlocutory appeal in this case, the cited cases involved other issues of subject matter jurisdiction under a specific statute or federal rule, not ordinary justiciability questions. *Defs.' Reply* at 7 (citing *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 7 (1st Cir. 2005); *Educ. Credit Mgmt. Corp. v. Coleman (In re Coleman)*, 560 F.3d 1000, 1003 (9th Cir. 2009)).[2] The First Circuit has cautioned that interlocutory certification under 28 U.S.C. § 1292(b) "should be used sparingly and only in exceptional circumstances, and where the proposed intermediate appeal presents one or more difficult and pivotal questions of law not settled by controlling authority." *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1010 n.1 (1st Cir. 1988) (quoting *McGillicuddy v. Clements*, 746 F.2d 76, 76 n.1 (1st Cir. 1984)). The Court concludes that the issue of justiciability does not meet these stringent standards for certification of interlocutory appeal under 28 U.S.C. § 1292(b).

## IV. CONCLUSION

The Court concludes that PPLC still intends to pursue the reversal project if its challenge to the legality of the Ordinance is successful and that TransCanada's

---

[2] *Lahey Clinic* involved a question of whether the district court lacked subject matter jurisdiction because the Medicare Act explicitly or implicitly repealed the grant of federal court jurisdiction or displaced the common law causes of action over which the federal court had jurisdiction. 399 F.3d at 4. *Coleman* involved a question of whether a bankruptcy claim by a student loan debtor was ripe despite the fact the student was still paying on the loans. 560 F.3d at 1003-04. The Ninth Circuit concluded that absent a constitutional ripeness impediment to the undue hardship determination, there was no prudential reason to delay the determination where the record was sufficiently well-developed for the bankruptcy court to undertake the analysis. Neither case strikes this Court as being helpful for resolving the justiciability issue before the Court in this case.

announcement regarding the proposed Energy East pipeline does not so reduce the likelihood that PPLC will be able to complete the project that it makes the case non-justiciable.

The Court DENIES the Defendants' Renewed Motion to Dismiss Pursuant to Rule 12(b)(1) (ECF No. 194).

SO ORDERED.

    /s/ John A. Woodcock, Jr.
    JOHN A. WOODCOCK, JR.
    UNITED STATES DISTRICT JUDGE

Dated this 12th day of December, 2017