UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PORTLAND PIPE LINE                )
CORPORATION, et al.,              )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )        2:15-cv-00054-JAW
                                  )
CITY OF SOUTH PORTLAND,           )
et al.,                           )
                                  )
            Defendants.           )

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

A pipeline operator challenges a local ordinance prohibiting loading crude oil onto tankers and new structures for that purpose on the grounds that it is preempted under numerous federal and state laws, that it violates the Commerce Clause of the United States Constitution, that it violates the business's civil rights, its due process rights, its right to avoid improper delegation, its right to equal protection under the law, and that it violates the City's own comprehensive plan.

Before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 87) and Defendants' Motion for Summary Judgment (ECF No. 88). The Court denies summary judgment as to the commerce clause issues, grants the Defendants' motion as to the federal and state preemption questions, due process, excessive delegation, and equal protection issues, civil rights claims, and questions about inconsistency with the City's comprehensive plan, and the Court denies the pipeline operators' motion for summary judgment in its entirety. In accordance with the positions of the

parties, the Court dismisses as premature the claims for attorney's fees and costs under 42 U.S.C. § 1983.

I. PROCEDURAL POSTURE

A. The Complaint, Motion to Dismiss, and Answer

On February 6, 2015, Portland Pipe Line Corporation (PPLC) and the American Waterways Operators (AWO) (collectively, Plaintiffs) filed a nine-count complaint in this Court against the city of South Portland (South Portland or City) and Patricia Doucette in her official capacity as the code enforcement officer of South Portland (collectively, Defendants). The Complaint contains nine counts: (1) Supremacy Clause preemption of the Ordinance by the Pipeline Safety Act (PSA), 49 U.S.C §§ 60101 et seq.; (2) Supremacy Clause preemption of the Ordinance under the President's foreign affairs power; (3) Supremacy Clause preemption of the Ordinance by the Ports and Waterways Safety Act, 33 U.S.C. Ch. 25 and 46 U.S.C. Ch. 37; (4) preemption of the Ordinance under Article III, Section 2 of the United States Constitution and the Constitution's embedded principle of federal maritime governance; (5) violation of the Commerce Clause of the Constitution; (6) violation of the Due Process and Equal Protection Clauses; (7) deprivation of rights under the Civil Rights Act, 42 U.S.C. § 1983; (8) inconsistency of the Ordinance with South Portland's comprehensive plan under Maine law, 30-A M.R.S. § 4352; and (9) preemption of the Ordinance by Maine's Oil Discharge Prevention Law, 38 M.R.S. § 556. *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*).[1]

---

[1]    The resolution of these motions for summary judgment has been substantially delayed by the City's repeated insistence that PPLC's lawsuit is not justiciable.  As justiciability addresses whether

On March 31, 2015, the Defendants filed a motion to dismiss the Complaint. *Defs.' Mot. to Dismiss the Compl. Pursuant to Rule 12(b)(1)* (ECF No. 16); *Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 17). The Court denied the motion to dismiss on February 11, 2016. *Order on Defs.' Mot. to Dismiss* (ECF No. 29). Accordingly, the Defendants filed an answer to the Complaint on February 29, 2016. *Answer of Defs. City of South Portland and Patricia Doucette* (ECF No. 30).

On September 8, 2016, the Plaintiffs filed a notice of intent to move for summary judgment. *Pls.' Renewed Notice of Intent to Seek Summ J. and Req. for Loc. R. 56(h) Conf.* (ECF No. 75). The following day, the Defendants likewise filed a notice of intent to move for summary judgment. *Defs.' Notice of Intent to Seek Summ. J. and Req. for Loc. R. 56(h) Conf.* (ECF No. 77). The Court held a Local Rule 56(h) conference on November 2, 2016. *Min. Entry* (ECF No. 83).

---

the Court should hear the case at all, it was necessary to resolve that issue before proceeding with the merits of the motions for summary judgment.

The Court has issued four orders on the justiciability question. After the City moved to dismiss on March 31, 2015, the Court issued its first forty-nine page order on February 11, 2016. *Defs.' Mot. to Dismiss the Compl. Pursuant to Rule 12(b)(1)* (ECF No. 16); *Order on Defs.' Mot. to Dismiss* (ECF No. 29). On November 17, 2016, along with its motion for summary judgment, the City filed another motion to dismiss on justiciability grounds. *Defs.' Consolidated Mot. to Dismiss Pursuant to Rule 12(b)(1) and Mot. for Summ. J.* (ECF No. 88). On May 11, 2017, the Court issued a second, twelve-page order on the justiciability issue, ordering an evidentiary hearing. *Interim Order* (ECF No. 156). After a full day of testimony on August 9, 2017, on August 24, 2017, the Court issued a third, twelve-page order on justiciability. *Min. Entry* (ECF No. 179); *Order on Defs.' Consolidated Mot. to Dismiss under Rule 12(b)(1)* (ECF No. 185) (*Consolidated Order*). On October 20, 2017, the City filed another motion to dismiss on justiciability grounds. *Defs.' Renewed Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 194). After oral argument on November 21, 2017, the Court issued its fourth, nineteen-page ruling on December 12, 2017 on the justiciability issue the City first raised on March 31, 2015. *Order on Defs.' Renewed Mot. to Dismiss* (ECF No. 199).

**B.    The Motions for Summary Judgment**

On November 17, 2016, the Plaintiffs filed a motion for summary judgment and a statement of undisputed material facts. *Pls.' Mot. for Summ. J.* (ECF No. 87) (*Pls.' Mot.*); *Pls.' Statement of Material Facts* (ECF No. 89) (PSMF). That same day, the Defendants filed a consolidated motion to dismiss pursuant to Rule 12(b)(1) and a cross motion for summary judgment, along with a corresponding statement of material facts. *Defs.' Consolidated Mot. to Dismiss Pursuant to Rule 12(b)(1) and Mot. for Summ J.* (ECF No. 88) (*Defs.' Mot.*); *Defs.' Rule 12(b)(1) and Loc. R. 56(b) Statement of Undisputed Material Facts [Unredacted Verion]* (ECF No. 96) (DSMF).

On December 20, 2016, the Defendants filed an opposition to the Plaintiffs' motion for summary judgment, a responsive statement of material facts, and an additional set of material facts. *Defs.' Opp'n to Pls.' Mot. for Summ. J.* (ECF No. 123) (*Defs.' Opp'n*); *Defs.' Loc. R. 56(c) Opposing Statement of Material Facts and Additional Statement of Facts* at 1-52 (ECF No. 124) (DRPSMF); *id.* at 53-85 (DSAMF). Also on December 20, 2016, the Plaintiffs filed an opposition to the Defendants' motion to dismiss and cross motion for summary judgment, a responsive statement of material facts, and an additional set of material facts. *Pls.' Mem in Opp'n to Defs.' Mot. to Dismiss and for Summ. J.* (ECF No. 127) (*Pls.' Opp'n*); *Pls.' Loc. R. 56(c) Opposing Statement of Material Facts and Additional Statement of Facts* at 1-74 (ECF No. 128) (PRDSMF); *id* at 75-85 (PSAMF).

On January 13, 2017, the Plaintiffs filed a reply memorandum and a reply statement of facts. *Pls.' Reply in Supp. of Their Mot. for Summ. J.* (ECF No. 140)

(*Pls.' Reply*); *Pls.' Reply Statement of Material Facts* (ECF No. 141) (PRDSAMF). That same day, the Defendants filed their own reply memorandum and reply statement of facts. *Reply to Pls.' Opp'n to Defs.' Consolidated Mot. to Dismiss and Mot. for Summ. J.* (ECF No. 142) (*Defs.' Reply*); *Defs.' Loc. R. 56(d) Resp. to Pls.' Additional Statement of Facts* (ECF No. 143) (DRPSAMF).

On December 12, 2017, the Court denied the Defendants' Renewed Motion to Dismiss under Rule 12(b)(1), and it is now able to turn to the cross-motions for summary judgment. *Order on Defs.' Consolidated Mot to Dismiss Under Rule 12(b)(1)* (ECF No. 185) (*Consolidated Order*).

### C.    Amici Curiae

Meanwhile, the Court received requests for leave to file amicus briefs on behalf of both the Plaintiffs and the Defendants. On January 9, 2017, the Court granted the motions of the amici curiae. *Order on Mots. to File Briefs as Amici Curiae* (ECF No. 135). On behalf of the Plaintiffs, the Chamber of Commerce of the United States filed a brief on January 9, 2017, *Brief of the Chamber of Commerce of the U.S.A. as* Amicus Curiae *in Supp. of Pls.' Mot. for Summ. J.* (ECF No. 136); the American Fuel and Petrochemical Manufacturers, the American Petroleum Institute, the Association of Oil Pipe Lines, and the International Liquid Terminals Association filed a brief on January 11, 2017, Amici Curiae *Brief of the Am. Fuel & Petrochem. Mfrs, the Am. Petro. Inst., the Ass'n of Oil Pipe Lines, and the Int'l Liquid Terminals Ass'n in Supp. of Pls.' Mot. for Summ. J.* (ECF No. 138); and Portland Pilots, Inc., the Maine Energy Marketers Association, and the Associated General Contractors of

Maine filed a brief on January 11, 2017. *Brief of* Amicus Curiae *Portland Pilots, Inc., Maine Energy Mkt'rs Ass'n, and Associated Gen. Contractors of Me. in Supp. of Pls.' Mot. for Summ. J.* (ECF No. 139). For the Defendants, the Conservation Law Foundation filed a brief on January 10, 2017. *Brief* Amicus Curiae *of the Conserv. Law Found.* (ECF No. 137).

On January 23, 2017, the Plaintiffs and the Defendants each filed a response to the amicus briefs. *Pls.' Mem. of Law in Resp. to* Amici *Briefs* (ECF No. 145); *Defs.' Resp. to Briefs* Amicus Curiae (ECF No. 146).

## II.    SUMMARY JUDGMENT FACTS[2]

### A.    The Pipelines

In 1941, PPLC and its parent company, Montreal Pipe Line Limited (MPLL), began constructing and operating a twelve-inch crude oil pipeline stretching from the harbor in South Portland, Maine, through New Hampshire and Vermont, and into Quebec, Canada, terminating at oil refineries in Montreal East. PSMF ¶¶ 1-2; DRPSMF ¶¶ 1-2; DSMF ¶ 9; PRDSMF ¶ 9. The sole owner of PPLC is MPLL; MPLL in turn is owned by three Canadian companies: Shell Canada Limited, Suncor Energy

---

[2]    Where, as here, the parties file cross-motions for summary judgment, the Court must evaluate each motion independently and "determine 'whether either of the parties deserves judgment as a matter of law on facts that are not disputed.'" *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (quoting *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)). For cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of New Hampshire v. Gardner*, 759 F. Supp. 2d 215, 212 (D.N.H. 2010), *aff'd*, 638 F.3d 6 (1st Cir. 2011). Thus, in accordance with "the conventional summary judgment praxis," with regard to the Plaintiffs' motion for summary judgment and its supporting facts, the Court recounts the facts in the light most hospitable to the City's case theories consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). In compliance with obligation, the Court recites supported facts as true even if PPLC disputes them. *Id.* Likewise, with the City's cross-motion for summary judgment and supporting facts, the Court recounts the facts in the light most hospitable to PPLC's case theories consistent with record support and recites supported facts as true even if the City disputes them. *Id.*

Inc., and Imperial Oil Limited.[3]  DSMF ¶ 7; PRDSMF ¶ 7; DSAMF ¶ 203; PRDSAMF

¶ 203.  Imperial is ExxonMobil's Canadian subsidiary.  PRDSAMF ¶ 203; PRDSMF

¶ 203.

---

[3]    In these cross-motions for summary judgment, the Court confronts a gargantuan and much disputed record.  Fearing the inevitable, at the Local Rule 56(h) conference, the Court urged the parties to consider alternatives to proceeding with traditional dispositive motions, such as submitting the case for judgment on a stipulated record or some combination of submissions and a hearing.  *See Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 11-12 (1st Cir. 1985) ("[T]o stipulate a record for decision allows the judge to decide any significant issues of material fact that he discovers . . . .").  It was rebuffed.

Instead, the parties presented the Court with a highly contentious, voluminous record.  The Court dutifully trudged through and ruled on over three hundred objections to purportedly undisputed statements of material fact.  In its initial filing, PPLC proposed 197 supposedly undisputed statements of material fact; the City admitted only twenty-six of them.  In its initial filing, the City proposed 179 supposedly undisputed statements of material fact; PPLC admitted only sixty-nine of them.  PPLC proposed sixty additional statements of supposedly undisputed fact; the City admitted twelve.  The City proposed 111 additional statements of supposedly undisputed material facts; PPLC admitted seventy.  In sum, despite Local Rule 56(b), which requires the parties to submit only facts "as to which the moving party contends there is no genuine issue of material fact to be tried," D. Me. Loc. R. 56(b), the parties submitted a total of 547 statements of supposedly undisputed material facts of which 370 are disputed.

To give a concrete example, the ownership of PPLC is a demonstrable fact, but it provoked the following exchange.  The City included a statement asserting that one of three parent companies of PPLC is Imperial Oil Limited, a subsidiary of ExxonMobil Corporation. DSAMF ¶ 203.  PPLC denied this statement as unsupported by the record.  PRDSAMF ¶ 203.  To support its paragraph, the City cited portions of the Rule 30(b)(6) deposition of PPLC.  DSAMF ¶ 203 (citing *Third Decl. of Jesse Harlan Alderman, Esq. in Support of Defs.' Opp'n to Pls.' Mot. for Summ. J.* Attach. 5 (Ex. 57), *Excerpts of PPLC* 140:3-9):

    Q.    And Imperial Oil is a subsidiary of Exxon; correct?
    A.    Correct.
    Q.    So Imperial is Exxon's Canadian subsidiary; right?
    A.    Imperial is - - I believe the correct term would be a subsidiary of ExxonMobil,
          correct.

The Court agrees with PPLC that this snippet of testimony does not support the City's assertion that Imperial is a parent of PPLC; it only supports the part of the City's paragraph that states that Imperial is ExxonMobil's Canadian subsidiary.

Even so, PPLC in its own paragraph seven states:  "MPLL is a Canadian corporation, and the sole owner of PPLC.  Three Canadian companies – Shell Canada Limited, Suncor Energy Inc., and Imperial Oil Limited – in turn are the sole owners of MPLL."  PSMF ¶ 7.  Strangely, the City denied this paragraph, stating that it "lacked specific knowledge to admit or deny PPLC's ownership," a denial which itself is improper.  DRPSMF ¶ 7.  Then, the City went on to state that it "understand[s] that the ultimate parents of PPLC are ExxonMobil Corporation, Shell, and Suncor."  *Id.*

Piecing together the statements and the supporting material in the record, the Court concludes (1) that MPLL is a Canadian corporation; (2) that MPLL, a Canadian corporation, is the sole owner of PPLC, (3) that Shell Canada Limited, Suncor Energy Inc., and Imperial Oil Limited are the sole owners of MPLL, and (4) that Imperial is the Canadian subsidiary of ExxonMobil.  To the extent that the parties object to the others' statements concerning PPLC's ownership, the Court overrules those

PPLC added to its pipeline system in 1950 by constructing and then operating an eighteen-inch pipeline.  PSMF ¶ 3; DRPSMF ¶ 3; DSMF ¶ 5; PRDSMF ¶ 5.  PPLC added to its pipeline system again in 1965 by constructing and then operating a twenty-four-inch pipeline.  PSMF ¶ 4; DRPSMF ¶ 4; DSMF ¶ 5; PRDSMF ¶ 5.  PPLC decommissioned and ceased operating the original twelve-inch line in 1982.  PSMF ¶ 10; DRPSMF ¶ 10.  PPLC now uses the twelve-inch line as a sacrificial anode to protect its 18- and twenty-four-inch lines from external corrosion.  *Id.*  The nominal capacities of the remaining 18- and twenty-four-inch lines are approximately 192,000 barrels per day and 410,000 barrels per day of crude oil, respectively.  DSMF ¶ 6; PRDSMF ¶ 6.

With a few exceptions of short distances, all three of PPLC's pipelines follow the same route, along the same rights of way, and pass largely underground between South Portland and the Montreal East oil refineries.  PSMF ¶ 5.[4]  Since the pipeline

---

objections.  Parsing through all of these objections, qualifications, and record citations, the Court was finally able to place in the statement of facts who owns the major Plaintiff in this case.

[4]     The City qualifies this statement, asserting that they lack sufficient knowledge to admit or deny the "exceptions" described in the statement or whether the pipeline passes "largely underground."  *See* DRPSMF ¶ 5.

        Local Rule 56(b) requires a party moving for summary judgment to file a statement of material facts, with a record citation supporting each separate fact.  D. ME. LOC. R. 56(b).  Local Rule 56(c) provides that a party opposing a motion for summary judgment shall admit, deny, or qualify the movant's statement of material facts and, unless a fact is admitted, "shall support each denial or qualification by a record citation as required by this rule."  D. ME. LOC. R. 56(c).  Similarly, Local Rule 56(d) provides that the movant's reply to the opposing statement of facts shall submit admit, deny, or qualify the opposing party's additional facts and "shall support each denial or qualification by a record citation[.]"  D. ME. LOC. R. 56(d).  According to Local Rule 56(f), "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  D. ME. LOC. R. 56(f).

        Here, a record citation supports the Plaintiffs' proposed statement.  *See* PSMF, Attach. 1, *Second Decl. of Thomas A. Hardison* ¶ 9 (ECF No. 89) (*Hardison Decl.*).  The City's opposing statement, however, does not provide a record citation and therefore fails to properly controvert the Plaintiff's proposed fact.  Pursuant to Local Rule 56(f), the statement is deemed admitted.  *See also Chapman v. Finnegan*, 950 F. Supp. 2d 285, 292 (D. Mass. 2013) ("A party opposing summary judgment cannot create a genuine issue of fact by denying statements, which the moving party contends are undisputed

system began operating in 1941, PPLC has operated the portion of the pipeline that lies within the United States, while MPLL has operated the portion that lies within Canada.[5] PSMF ¶ 6; DSMF ¶ 3. The only exception was a period from 1987 to 1999, when PPLC and MPLL leased the eighteen-inch line to Granite State Gas Transmission, Inc. (Granite State), which operated the line for natural gas transmission. PSMF ¶ 18; DRPSMF ¶¶ 6, 18.

In South Portland, PPLC maintains "Pier 2," an oceanfront pier located near Portland Breakwater Light on the harbor where tanker vessels historically have docked to deliver crude oil.[6] PSMF ¶ 8; DRPSMF ¶ 8; DSMF ¶ 7; PRDSMF ¶ 7. PPLC transports oil from Pier 2 to Montreal East through PPLC's above-and below ground infrastructure, including storage tanks in South Portland, utilizing six pumping stations across Maine, New Hampshire, and Vermont to move oil along the pipeline route. PSMF ¶ 9; DRPSMF ¶ 9. Specifically, the crude oil is offloaded from marine

---

and supported by sufficient evidence, on the basis that he lacks knowledge and information to admit or deny the statement").

[5] The City denies this statement, pointing out that "[f]rom 1987 to 1999, the 18-inch pipeline was operated in interstate natural gas transmission service by Granite State Gas Transmission, Inc. . . under a lease from PPLC to Granite State." PSMF ¶ 6 (quoting *Decl. of Jesse Harlan Alderman, Esq. in Supp. of Defs.' Consolidated Mot. to Dismiss Pursuant to R. 12(b)(1) and Mot. for Summ. J.* (*Alderman Decl. I*), Attach. 2, *July 15, 2008 Email from PPLC to U.S. Dep't of State* at 2 (ECF No. 90)); *see also* PSMF ¶ 18. The record supports the denial and the Court adjusts the statement to reflect that from 1987 to 1999, Granite State Gas Transmission, Inc. operated the eighteen-inch pipeline.

The City seeks to refer to PPLC and MPLL interchangeably, but PPLC denies this. DRPSMF ¶ 3. The Court refers to the two companies separately, despite MPLL's ownership of PPLC.

[6] PPLC's proposed statement asserts that tanker vessels historically have docked at Pier 2 "to deliver crude oil into PPLC's pipeline system." PSMF ¶ 8 (citing *Hardison Decl.* ¶ 10). The City denies this, contending that the tanker vessels docked at Pier 2 deliver crude oil into a "crude oil marine tank vessel unloading facility and tank farm in South Portland," and that PPLC's eighteen-inch and twenty-four-inch pipelines that cross the international boundary begin at PPLC's "Main Tank Farm" approximately 2.7 miles inland from Pier 2. DRPSMF ¶ 8 (citing *Alderman Decl. I*, Attach. 16, *App. to Amend Air Emission License* at 6, 8 (ECF No. 90)). The record supports the denial, and the Court alters the statement to reflect that the crude is transported from the tanker vessels to storage tanks in South Portland and that the pipelines connect the storage tanks to the refineries in Montreal.

tank vessels at Pier 2 and transported to crude oil storage tanks in the City, four of which are located on two parcels in close proximity to Pier 2 (the Waterfront Tanks) and nineteen of which are located at the "Main Tank Farm" on Hill Street, approximately 2.7 miles inland from Pier 2.  DSMF ¶ 8; PRDSMF ¶ 8.  PPLC's eighteen-inch and twenty-four-inch pipelines move the crude oil northward from the South Portland tank farm to refineries in Montreal.  DRPSMF ¶ 8.  Since 1999, both PPLC's eighteen-inch and twenty-four-inch pipelines have been configured primarily for the northbound transportation of crude oil from South Portland to Canada.[7]  PSMF ¶ 11.  The eighteen-inch and twenty-four-inch pipelines do not extend to Pier 2; the Main Tank Farm and Pier 2 are connected by three subsurface lines running under Broadway, and other streets, and Mill Cove in the City.  DSMF ¶ 154; PRDSMF ¶ 154.  The eighteen-inch and twenty-four-inch pipelines originate (or terminate in the case of reversal) at the Main Tank Farm.  DSMF ¶ 158; PRDSMF ¶ 158; DSAMF

---

[7]       The City denies this statement, arguing that the word "primarily" renders the statement false because none of PPLC's pipelines has ever engaged in southbound transportation of crude oil for loading onto marine tank vessels.  DRPSMF ¶ 11.  For support, the City cites the findings set forth in the introduction of the Ordinance at issue in this case.  *See Alderman Decl. I*, Attach. 28, *Ordinance #1-14/15* at 3 (ECF No. 90)).  Yet the findings of the Ordinance are not competent evidence of whether PPLC's pipelines ever transported crude oil southward for loading onto tankers, and furthermore, the findings merely state that "bulk loading crude oil onto marine tank vessels is neither a traditional marine use nor a light industrial use" and "for over 70 years the area now designated as the Shipyard District has been used for offloading crude oil from marine tank vessels[.]"  *Id.*  The Ordinance does not establish that PPLC's pipelines have never been configured to engage in southbound transportation for loading.  The Court rejects the denial.

¶ 195.[8]  According to PPLC, access to the harbor has been integral to its success and longevity.[9]  PSMF ¶ 12.

The harbor is able to accommodate ships with up to 52 feet of draft and up to 170,000 deadweight tons of cargo.  PSMF ¶ 13; DRPSMF ¶ 13.  The harbor has all-season ice free conditions, which permits shipment of cargo in and out of the harbor year round.  PSMF ¶ 14; DRPSMF ¶ 14.  As recently as 2010—the last year the eighteen-inch line was in active service—PPLC accepted 132 deliveries from tankers. PSMF ¶ 15; DRPSMF ¶ 15.  That year, PPLC transported 27,969,719 barrels of crude oil northward to Montreal East through its eighteen-inch pipeline, for an average of 76,629 barrels per day, as well as 72,231,154 barrels of crude oil northward to Montreal East through its twenty-four-inch pipeline, for an average of 197,894 barrels per day.  *Id.*  According to PPLC's president, Thomas Hardison, "PPLC has

---

[8]     The City also seeks to include several statements about the jurisdiction of the Pipeline and Hazardous Materials Safety Administration, which is tasked with regulating pipeline safety, in contrast to the Coast Guard, which regulates shoreline transfer facilities, like those extending from the main tank farm to Pier 2.  DSMF ¶¶ 155-57.  PPLC denies these statements as unsupported by the record and as legal argument, not statements of fact.  PRDSM ¶ 155-57.  The Court agrees with PPLC that these statements represent legal arguments this Court might consider for preemption purposes. Accordingly, the Court omits these statements.

[9]     The City qualifies this statement, asserting that they do not have specific knowledge to admit or deny the facts asserted.  DRPSMF ¶ 12.  For the reasons stated in footnote 4, the Court rejects the qualification.  Nevertheless, as the City is the nonmovant with respect to the proposed statement, the Court alters the statement to clarify that the assertion reflects PPLC's belief.

operated continuously since 1941 in part due to its ability to respond and adapt to changing market conditions."[10],[11] PSMF ¶ 16.

---

[10]     PPLC routinely cites the affidavit of Thomas Hardison, the president of PPLC, in support of their statements of material fact.  *See, e.g.*, DSMF ¶¶ 1-45, 80, 82, 112, 132-154.  The City denies several of these statements on the grounds that they contain expert opinions and that PPLC failed to disclose Mr. Hardison as an expert witness pursuant to Federal Rule of Civil Procedure 26(a).  Consequently, the City urges the Court to strike the offending paragraphs.  The Court will address the City's denials as they arise and will refer back to this footnote for the applicable legal standard.

As a preliminary matter,  whether a witness' testimony falls within the scope of Rule 701—governing lay witness testimony—or Rule 702—governing expert witness testimony—does not depend on the identity of the witness, but rather on the nature of the testimony itself.  FED. R. EVID. 701 advisory committee's note to 2000 amendment.  That is, "the same witness . . . may be qualified to provide both lay and expert testimony in a single case."  *United States v. Valdivia*, 680 F.3d 33, 50 (1st Cir. 2012) (internal quotation marks omitted).

Distinguishing between lay opinion testimony under Rule 701 and expert testimony under Rule 702 can be challenging.  "In its purest form, lay testimony is based on the witness' observations of the event or situation in question and amounts to little more than a shorthand rendition of facts that the witness personally observed."  WEINSTEIN'S FEDERAL EVIDENCE § 701.03 (2001) (WEINSTEIN).

"Lay opinion testimony is also admissible when the inference is a conclusion drawn from a series of personal observations over time"—in other words, when the testimony is based on the witness' own particularized knowledge.  WEINSTEIN § 701.03.  As with the "pure" form of lay testimony, this "particularized knowledge" testimony must be based on the witness' own perception.  FED. R. EVID. 701(a).  However, the meaning of "perception" takes on slightly different meanings in the two contexts of lay testimony.  In the case of "pure" lay testimony, "perception" means personal observation of the event or situation in question.  In the case of "particularized" lay testimony, by contrast, "perception" refers to "the product of a witness's process of observing patterns and drawing logical conclusions."  *United States v. Vega*, 813 F.3d 386, 395 (1st Cir. 2016).  Stated another way, the witness' inference must derive from a pattern the witness observed based on past experience.

"Particularized knowledge" testimony can be difficult to distinguish from expert testimony.  It is not always clear when a witness is testifying based on patterns of personal observation verses when a witness is testifying based on scientific, technical, or otherwise specialized knowledge.  The advisory committee and caselaw provide some guidance.  As a generalized matter, the advisory committee writes that "the distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'"  FED. R. EVID. 701 advisory committee's notes on 2000 amendment (quoting *State v. Brown*, 836 S.W.2d 530, 549 (1992)).

Moving from the general to the specific, the advisory committee states:
> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.  Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business."

FED. R. EVID. 701 advisory committee's notes to 2000 amendment.  Similarly, the advisory committee states that a heavy amphetamine user could testify that a substance was amphetamine without qualifying as an expert because such testimony would not be based on specialized knowledge within the meaning of Rule 702.  *Id.*  However, if the witness testified about the intricate workings of a narcotic distribution network, then the witness would need to qualify as an expert.  *Id.*; *see also United States v. Moon*, 802 F.3d 135, 148 (1st Cir. 2015) (officers could testify that drug dealers typically keep

## B. Geography

The City is a municipal corporation organized pursuant to the Constitution and general laws of the state of Maine. DSMF ¶ 1; PRDSMF ¶ 1. The City is governed by a City Council of seven elected members. DSMF ¶ 2; PRDSMF ¶ 2. Pier 2 is

firearms to protect themselves and their drugs without qualifying as an expert because the officers had "particularized knowledge" derived from their experience in past drug investigations.

Relevant here, the First Circuit has held that under Rule 701, a lay witnesses may express opinions about a business "based on the witness's own perceptions and knowledge and participation in the day-to-day affairs of [the] business." *United States v. Munoz-Franco*, 487 F.3d 25, 35 (1st Cir. 2007) (internal quotation marks omitted); *see also Nat'l Starch & Chem. Trading Co. v. M/V STAR INVENTANA*, No. 05-91-P-S, 2006 U.S. Dist. LEXIS 45719, at *10 (D. Me. July 5, 2006) (a corporate employee could offer lay testimony about the propriety of rejecting a shipment even though he did not personally inspect the shipment because a lay witness may testify to inferences that he could draw from his perception of a business's records, or facts or data perceived by him in his corporate capacity); *United States v. Thompson*, No. CR 16-10014-PBS, 2017 WL 4078, at *2 (D. Mass. Jan. 11, 2017) (lay witnesses may express certain opinions about business operations and industry practices so long as the testimony is based on personal knowledge).

Here, PPLC proposes: "PPLC has operated continuously since 1941 in part due to its ability to respond and adapt to changing market conditions." PSMF ¶ 16. The City contends that the statement constitutes an expert opinion because of the complex variables associated with changing market conditions is not a subject "within the common knowledge of an ordinary person." DRPSMF ¶ 16. The City relies on an outdated interpretation of Rules 701 and 702. In *United States v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989)—a case that the City cites—the First Circuit explained that "[n]o longer is lay opinion testimony limited to areas within the common knowledge of ordinary persons. Rather, the individual experience and knowledge of a lay witness may establish her competence, without qualification as an expert, to express an opinion on a particular subject outside the realm of common knowledge." 892 F.2d at 157. As the First Circuit recently observed, a witness's testimony is admissible if it is "rationally based on his experience and his first-hand perceptions and do[es] not involve 'scientific, technical, or other specialized knowledge.'" *United States v. Valbrun*, No. 16-1806, 2017 U.S. App. LEXIS 25385, at *5 (Dec. 15, 2017) (quoting FED. R. EVID. 701)).

Based on this analysis, the Court concludes that Mr. Hardison is competent to testify about the general factors underlying the success of his company. The content of the proposed statement does not require Mr. Hardison to possess specialized knowledge within the realm of an expert. That is, Mr. Hardison's testimony does not "result[] from a process of reasoning which can be mastered only by specialists in the field." FED. R. EVID. 701 advisory committee's notes to 2000 amendment. Instead, the statement is admissible because it is based on particularized knowledge of PPLC that Mr. Hardison has acquired over his long career with the company. *See United States v. Munoz-Franco*, 487 F.3d 25, 35 (1st Cir. 2007) (a lay witnesses may express opinions about a business "based on the witness's own perceptions and knowledge and participation in the day-to-day affairs of [the] business") (internal quotation marks omitted). The Court rejects the City's denial.

[11] The City also denies the statement on the grounds that it lacks foundation and is irrelevant. Mr. Hardison's affidavit provides a firm foundation for his testimony: he has been a PPLC employee for 43 years, he served in a variety of roles, including vice president and director of operations, before becoming president in 2015, and he reviewed PPLC's business records in anticipation of his testimony. *Hardison Decl.* ¶¶ 1-2. In addition, the Court concludes that the testimony is relevant because it relates to the impact of the Ordinance on PPLC's continued operations, which is of consequence in determining standing and ripeness. *See* FED. R. EVID. 401. The Court rejects the denial.

located in a district of the City zoned as Shipyard ("S") and within the City's

Shoreland Area Overlay District. DSMF ¶ 111; PRDSMF ¶ 111. The Shipyard zoning

district was established:

> to promote the Shipyard area in South Portland as a robust waterfront center for office complexes, commercial uses, marine uses, and light industrial activities. The Shipyard District S seeks to maintain the conforming status of existing businesses, to prevent residential development and associated land use conflicts, and to minimize the impacts of development on adjacent zoning districts.

DSMF ¶ 112; PRDSMF ¶ 112.

PPLC owns four above-ground floating roof oil storage tanks proximate to Pier

2 on two separate parcels (the "Waterfront Tanks"), also in the Shipyard zoning

district. DSMF ¶ 113; PRDSMF ¶ 113. Pier 2 abuts Bug Light Park, a public

waterfront park on Casco Bay.[12] DSMF ¶ 114. Bug Light Park features a lighthouse

on Casco Bay, parking facilities and green space for dog walking, children's activities

and general waterfront recreation. DSMF ¶ 115; PRDSMF ¶ 115. The Waterfront

Tanks abut residential neighborhoods, which are zoned for residential use and

designated by the City's Zoning Ordinance as Residential ("G"). DSMF ¶ 116;

PRDSMF ¶ 116. The Vapor Combustion Units (VCUs), or smokestacks, PPLC

considered constructing in 2008-2009 would have been constructed on the "approach

segment" (landward portion) of Pier 2.[13] DSMF ¶ 117.

---

[12]  PPLC offers a qualified admission and seeks to clarify that Bug Light Park contains some land leased to the City by PPLC. DRPSMF ¶ 114. The City's statement is not inconsistent with the City's additional statement. The Court rejects the qualification.

[13]  PPLC offers a qualified admission, disputing the use of the term "smokestack" because the emissions would have been colorless and odorless and, therefore, it concludes, not "smoke." PRDSMF ¶ 117. The term "smokestack" is defined as "a pipe or funnel through which smoke and gases are discharged," *Smokestack*, MERRIAM WEBSTER, www.merriam-webster.com/dictionary/smokestack, or "a pipe for the escape of the smoke or gases of combustion, as on a steamboat, locomotive, or building."

The Main Tank Farm occupies a 102-acre parcel at 30 Hill Street on which are situated 19 above-ground floating roof oil storage tanks. DSMF ¶ 118; PRDSMF ¶ 118. The Main Tank Farm is located in a district of the City zoned as Commercial "C." DSMF ¶ 119; PRDSMF ¶ 119. The Main Tank Farm is generally surrounded by residential neighborhoods, schools, day-care centers, athletic facilities, and churches that are zoned as "Residential Districts A & G." DSMF ¶ 120; PRDSMF ¶ 120. In addition to residences, the Kaler and Dyer Elementary Schools, South Portland High School, South Portland Church of the Nazarene, and the South Portland Community Center are proximate to the Main Tank Farm.[14] DSMF ¶ 121. The 23 above-ground floating roof oil storage tanks in the City were all constructed between 1941 and 1971, with 17 of them built before 1957. DSMF ¶ 122; PRDSMF ¶ 122.

## C. 1986 and 1999 Changes to the Pipeline Flow

In 1986, PPLC and MPLL reconfigured the eighteen-inch line for natural gas transmission from Canada to South Portland and leased the line to Granite State. PSMF ¶¶ 18-19; DRPSMF ¶¶ 18-19. In order to reconfigure the eighteen-inch line for natural gas, PPLC took steps to remove crude oil from the line. PSMF ¶ 17. In particular, PPLC emptied the portion of the pipeline stretching from Sutton Station, Vermont, to Montreal East, Quebec, by pumping to Montreal East any crude oil remaining in the pipeline. *Id.* From Sutton Station southward to South Portland,

---

*Smokestack*, DICTIONARY.COM, http://www.dictionary.com/browse/smokestack. The VCUs meet the definition because they are structures that funnel gases and "gases of combustion." The Court understands PPLC's reluctance to use the term, but it is accurate. The Court rejects the qualification.
[14] PPLC denies this statement on the ground that "proximate" could refer to "a range of varying distances." PRDSMF ¶ 121. The Court rejects the denial, first because the ambiguity of the term does not defeat the City's assertion and second because the distances fit within any definition of the term in the context of geography and air emissions.

however, PPLC pumped the remaining crude oil contents of the pipeline south, into the storage tanks in South Portland.[15] *Id.*  On August 10, 1987, the Federal Energy Regulatory Commission (FERC) issued a permit to Granite State authorizing the company to use the eighteen-inch pipeline to transport natural gas south from Canada to South Portland.  PSMF ¶ 19; DRPSMF ¶ 19.  In 1999, PPLC reversed the direction and production orientation of its eighteen-inch line again, such that it again would be able to transport crude oil north to Montreal East.  PSMF ¶ 20; DRPSMF ¶ 20.

Despite these line clearing operations, the City Council determined that the pipelines have never carried crude oil in the southward direction, and PPLC has never loaded crude oil onto marine tank vessels.[16]  DSMF ¶ 130.  The City Council also determined that crude oil has never been loaded onto marine tank vessels anywhere in the City.[17]  DSMF ¶ 131.

## D.  The 2008-2009 Oil Sands Proposed Project

During the approximately one-decade period beginning in 1999, when PPLC reversed the flow of its eighteen-inch line back to a northbound orientation and began again shipping crude oil in that line, through 2008, when PPLC began pursuing the flow reversal project, PPLC moved an average volume of 394,000 barrels per day

---

[15]    The City denies PSMF ¶ 17 as irrelevant.  DRPSMF ¶ 17.  However, the statement is relevant to contradict the City's assertion that PPLC's pipelines have never carried crude oil southward toward Portland.  *See* DSMF ¶ 130.

[16]    PPLC denies the City's original statement as unsupported, because the record citation is to the Ordinance itself, which is challenged in this lawsuit.  PRDSMF ¶ 130.  To resolve this issue, the Court amended the paragraph to clarify that "The City Council determined . . . ."

[17]    PPLC denies the City's original statement as unsupported, because the record citation is to the Ordinance itself, which is the subject of this lawsuit.  PRDSMF ¶ 130.  To resolve this issue, the Court amended the paragraph to clarify that "The City Council determined . . . ."

("b/d") of crude oil through its pipeline system. PSAMF ¶ 243; DRPSAMF ¶ 243. In 2007-2008, PPLC determined that demand for transportation of crude oil from the Harbor to the Montreal East refineries was likely to decline because the boom in crude oil production in Alberta's "oil sands" fields meant that Montreal East refiners would need less foreign oil.[18] PSMF ¶ 24. Crude oil derived from "oil sands" is sometimes referred to as "tar sands" or "tar sands oil." PSMF ¶ 25; DRPSMF ¶ 25. In 2007-2008, PPLC moved to reverse the flow of its eighteen-inch pipeline, but not its twenty-four-inch pipeline, in order to enable the company to transport crude oil from Montreal to the South Portland harbor and to load crude oil onto tanker vessels for shipment to both United States and international destinations.[19] PSMF ¶ 26;

---

[18]    The City denies this statement on the grounds that it lacks a proper foundation, constitutes expert opinion, and is irrelevant, and asks the Court to strike it. DRPSMF ¶ 24. For the reasons set forth in footnote 11, the Court concludes that there is a proper foundation for the testimony. The City points out that Mr. Hardison testified during his deposition that he was not "involved in any way in determining market demand" for the 2008 reversal project. *Id.* However, as the director of operations at the time PPLC determined market demand, and as the current president of PPLC, Mr. Hardison is competent to testify that PPLC determined that demand would decrease in 2008. *See Nat'l Starch*, 2006 U.S. Dist. LEXIS 45719, at *10 (a corporate employee could offer lay testimony about the propriety of rejecting a shipment even though he did not personally inspect the shipment because a lay witness may testify to inferences that he could draw from his perception of a business's records, or facts or data perceived by him in his corporate capacity). Moreover, for the reasons set forth in footnote 10, the Court concludes that the statement is properly the subject of lay testimony. Mr. Hardison is merely testifying, based on his own perception as a corporate employee, about why PPLC made a particular decision. He is not testifying about the soundness of the macroeconomic analysis underlying the decision. Finally, the City's relevancy argument is perfunctory and without support. The Court concludes that the statement provides relevant background evidence to PPLC's claims. The Court rejects the City's denial.

[19]    The City seeks to qualify the statement, arguing that the there was no plan to ship oil to international destinations because (1) PPLC never received interest from tankers to ship the crude oil from South Portland, and (2) PPLC's internal documents involved proposed delivery to refineries on the United States east coast and Gulf coast. DRPSMF ¶ 26. For the first proposition, the City cites forty-one paragraphs of their own statements of material facts. *See* DSMF ¶¶ 1-30; DSAMF ¶¶ 180-191. Perplexingly, most of these paragraphs have nothing to do with the City's proposed qualification, and the one paragraph that does fails to support the City's broad assertion that "the 2008-2009 Project did not receive shipper interest." DRPSMF ¶ 26. Rather, the paragraph alleges that "PPLC did not receive a level of firm volume commitment from crude oil shippers required to proceed with the project." DSMF ¶ 13. More generally, even if the City were correct that PPLC received no interest from tankers to ship the crude oil from South Portland, this does not contradict the Plaintiffs' assertion

DSMF ¶ 33. Leading up to and over the course of 2007 and 2008, PPLC determined that increased Canadian production would create substantial demand for transportation systems to move crude oil out of Canada.[20] PSMF ¶ 27. In 2007-2008, PPLC determined that, upon reversing the flow of its eighteen-inch pipeline, PPLC would be the only market actor of any kind capable of importing, exporting, or otherwise handling Canadian oil sands crude to South Portland.[21] PSMF ¶ 28. Moreover, PPLC determined that, upon reversing the flow of its eighteen-inch pipeline, PPLC would be the only terminal on the United States east coast capable of importing and exporting Canadian oil sands crude.[22] PSMF ¶ 29. During this period, PPLC invested substantial money and effort in advancing its flow reversal project,

that PPLC moved to reverse the flow of its eighteen-inch pipeline, presumably in the hopes that shipping interest would materialize.

For the second proposition, the City cites a 2008 report analyzing the proposed 2008-2009 plan to reverse the flow of the PPLC pipelines. *See Alderman Decl. III*, Attach. 24, *Portland Pipeline Project Report* (ECF No. 125). But the report also contemplates international trade to Europe and Canada. *See id.* at 1 ("Foreign flag shipping (Portland to Halifax, Saint John, Come-by-Chance, Rotterdam)"), 8-9. The Court rejects the City's qualification.

[20] The City denies the statement because it lacks foundation, constitutes expert testimony, and is irrelevant, and the City asks the court to strike the statement. DRPSMF ¶ 28. For the reasons stated in footnote 10, footnote 11, and footnote 18, the Court rejects the denial. The City also points out that their own expert asserts that there is no market demand for southward transportation of crude oil on PPLC's pipeline system. DRPSMF ¶ 27 (citing *Decl. of Sarah Emerson* at 7-12 (ECF No. 91) (*Emerson Decl.*). However, the opinion of the City's expert does not contradict the statement that leading up to 2007-2008, PPLC determined that there would be increased demand for transportation systems to move crude oil out of Canada.

[21] The City denies the statement because it lacks foundation, constitutes expert testimony, and is irrelevant, and the City asks the Court to strike the statement. DRPSMF ¶ 28. For the reasons stated in footnote 10, footnote 11, and footnote 18, the Court rejects the denial. The City also argues that PPLC previously considered transporting Canadian crude to South Portland via rail, and, therefore, the proposed statement is false. *Id.* (citing DSMF ¶ 73). PPLC denies that they considered transporting crude via rail, *see* PRDSMF ¶ 73, but even if the City were correct, this would not contradict the Plaintiff's proposed statement that PPLC determined that they would be the only market actor capable for transporting Canadian crude to South Portland.

[22] The City denies the statement because it lacks foundation, constitutes expert testimony, and is irrelevant, and asks the Court to strike the statement. DRPSMF ¶ 28. The qualifier "PPLC determined" resolves much of the City's grounds for denial. For the reasons stated in footnote 10, footnote 11, and footnote 18, the Court rejects the denial.

spending approximately $5 million on consultants to determine the necessary changes to its infrastructure, to model the economics, and to identify any necessary permits for the project to proceed.  PSMF ¶ 30; DRPSMF ¶ 30.

At the time of the 2008-2009 Project, Thomas Hardison, was the Director of Operations for PPLC, having previously been Loss Control Manager.  DSAMF ¶ 204; PRDSAMF ¶ 204.  He was Vice President from 2014-2015 and become President and CEO in 2015.  *Id.*  For the 2008-2009 Project, Mr. Hardison was not "involved in any way in determining market demand."  DSAMF ¶ 205; PRDSAMF ¶ 205.  Mr. Hardison "wasn't part of the decision-making" for the 2008-2009 Project.[23]  DSAMF ¶ 206.  Mr. Hardison's role in the 2008-2009 Project was "contributing, from an operations and maintenance perspective, making recommendations and providing input on the -- and review of engineering design for piping and valve installations, right-of-way access, things that would typically be associated with the operations and the maintenance of the pipeline."[24]  DSAMF ¶ 207.

## 1. Marketing the 2008-2009 Reversal Project

In 2007-2008, PPLC began implementing its flow reversal project by marketing its ability to transport oil from Canada to South Portland.  PSMF ¶ 31; DRPSMF ¶ 31.  PPLC conducted a traditional "open season" process, whereby PPLC presented the details of its pipeline capacity to interested shippers—i.e. oil companies

---

[23]     PPLC denies the original statement which read "not involved in the decision making." PRDSAMF ¶ 206.  The Court agrees with PPLC that the quote did not appear in the record citation, and substitutes the correct language from the record to resolve the denial.

[24]     PPLC denies the original statement, which read "Hardison's only role . . . " as unsupported by the citation because of the limiting term "only."  PRDSAMF ¶ 207.  The Court omits the word "only" to resolve the denial.

who wished to move their Canadian oil to the South Portland harbor—in order to secure conditional offers for committed volumes of crude oil. PSMF ¶ 32; DRPSMF ¶ 32; DSMF ¶ 12; PRDSMF ¶ 12. During the open season process, PPLC asked shippers to sign non-disclosure agreements to protect the confidentiality of PPLC's plans, and many did.[25] PSMF ¶ 33. During the open season process, numerous shippers expressed interest in PPLC's project.[26] PSMF ¶ 34. PPLC intended to obtain contractual commitments from interested shippers to move specific volumes of oil. PSMF ¶ 35. PPLC's intention, consistent with industry practice, was to use the contractual commitments to obtain financing to complete the infrastructure changes associated with reversing the flow.[27] PSMF ¶ 36.

Enbridge Pipelines, Inc. ("Enbridge") operates the Enbridge Line 9 ("Line 9") pipeline between Sarnia, Ontario and Montreal, Quebec, which between 1998 and 2015 flowed east to west.[28] DSMF ¶ 10. On September 12, 2008, Enbridge Pipelines,

---

[25]     The City qualifies the statement, alleging that it lacks specific knowledge of the procedures used during the 2008 open season. DRPSMF ¶ 33. For the reasons stated in footnote 4, the Court rejects the qualification.

[26]     The City denies the statement, arguing that it lacks a foundation because Mr. Hardison previously testified that he was not "involved in any way in determining market demand" for the 2008-2009 project. DRPSMF ¶ 34. For the reasons set forth in footnote 10, the Court concludes that Mr. Hardison is competent to testify to the response PPLC received during the open season period. Moreover, the fact that he was not involved in determining market demand does not mean that he is unable to testify to the response that PPLC ultimately received. The City also denies the statement because PPLC did not receive sufficient interest to proceed with the project. DRPSMF ¶ 34. Because the Court addresses this assertion elsewhere, and because it does not expressly contradict the proposed statement, the Court rejects the denial.

[27]     The City qualifies the statement, alleging a lack of specific knowledge to admit or deny the facts asserted. DRPSMF ¶ 36. For the reasons stated in footnote 4, the Court rejects the qualification.

[28]     PPLC denies this statement on the grounds that it is not the proper subject of expert testimony. PRDSMF ¶ 10. PPLC admits that the opinion of an expert may be admissible even if it relies on facts or data themselves not admissible, but it argues that the expert cannot be the sole proof of facts or data of which she lacks personal knowledge.

An expert may base an opinion on facts or data that the expert has been made aware of, as well as those they personally observe, and may even disclose otherwise inadmissible evidence to the

Inc., Enbridge Energy, Limited Partnership, and PPLC executed a Memorandum of

Understanding ("MOU") which:

> (a) stated the parties' mutual intent to reverse the direction of the flow of both PPLC's 18-inch pipeline and Line 9 first for one-stream operation (e.g., one type of crude oil, either "light" or "heavy") during an initial two-year period and thereafter for two stream operation (e.g., both "light" and "heavy" crude);[29] and

> (b) required PPLC to have received sufficient commercial support for the reversal of its 18-inch pipeline in the form of Conditional Offers providing for committed volumes under an Open Season and thereafter that such conditional offers be subject to execution of Transportation Services Agreements with the committed crude oil shippers in advance

---

jury if their probative value substantially outweighs the prejudicial effect. FED R. EVID. 703. The Advisory Committee note posits the following helpful example:

> Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

FED R. EVID. 703 Advisory Committee Note. As with a doctor's reiterations of family statements, reports, and x-rays, the underlying data and reports about major oil industry infrastructure may or may not be admissible on their own, but an expert can testify to their contents when they form the basis of her conclusions and the probative value outweighs the unfair prejudice. Although PPLC cites the proper standard, it does not describe what unfair prejudice will ensue if this evidence is admitted for summary judgment purposes. PRDSMF ¶ 10. It is hard to see what possible unfair prejudice there could be here.

Ms. Emerson is qualified to testify as to the general workings of the oil industry and international oil markets. Her opinions and conclusions about the availability of oil supply for a reversal project depends upon facts about major oil industry infrastructure in government disclosures and trade press. Indeed, the Court had an opportunity to evaluate Ms. Emerson during the August 9, 2017 hearing and described her as "a true expert." *Consolidated Order* at 4.

Finally, PPLC also seeks to have its own expert testify to very similar facts regarding other industrial facilities, including oil terminals in the cities and towns around South Portland. See PSAMF ¶¶ 211-22. It seeks to introduce those statements without admitting every individual document and report that its expert relied upon, and uses the expert's declaration for support instead. If Ms. Emerson's statements about other oil industry infrastructure are not permissible expert testimony, neither are Mr. North's statements about other air pollution facilities. This contradiction indicates the absence of a genuine dispute.

The Court rejects the denial.

[29] PPLC offers a qualified admission, taking issue with the simplification suggesting there are only two types of crude, "light" and "heavy" as opposed to other weights like "medium" and classifications based on sulphur content, like "sweet" or "sour." PRDSMF ¶ 11. The Court modifies the statement to use "e.g." instead of "i.e." to resolve PPLC's denial.

of a targeted in-service date of May 1, 2010 for both the Line 9 and PPLC 18-inch pipeline reversals.

DSMF ¶ 11.

In late 2008, the financial crisis that caused the Great Recession occurred, which crippled financial markets and caused worldwide economic activity to decline precipitously. PSMF ¶ 39; DRPSMF ¶ 39. PPLC halted work on the flow reversal project as a result of the financial crisis. PSMF ¶ 40; DRPSMF ¶ 40. It concluded the open season process on December 30, 2008. DSMF ¶ 12; PRDSMF ¶ 12. On December 31, 2008, PPLC sent a letter to Enbridge notifying Enbridge pursuant to the Memorandum of Understanding that PPLC did not receive a level of firm volume commitment from crude oil shippers required to proceed with the project to reverse the flow of the eighteen-inch pipeline.[30] DSMF ¶ 13. PPLC's written notice of lack of commercial support from crude oil shippers terminated the MOU with Enbridge. DSMF ¶ 14; PRDSMF ¶ 14.

### 2. Permitting the Proposed Reversal Project

In addition, PPLC began gathering necessary permits in order to implement its flow reversal project. PSMF ¶ 31; DRPSMF ¶ 31. Those permits that PPLC did receive for the 2008-2009 Project were received in 2009. DSAMF ¶ 209; PRDSAMF ¶ 209.[31]

---

[30] PPLC offers a qualification that this statement does not provide "relevant context" related to the financial crisis. PRDSMF ¶ 13. The location where the Court places the statement provides the necessary context and resolves the qualification.

[31] The City also seeks to include the following statement: "PPLC has not performed an "analysis of [its] business case options" since 2012, or earlier." DSAMF ¶ 208. PPLC denies this statement on the grounds that it is not supported by record citation because the City did not include the relevant page in its materials it submitted and cited. The Court agrees and omits the statement.

PPLC contacted the State Department concerning permits for the flow reversal project. PSMF ¶ 37; DRPSMF ¶ 37; DSMF ¶ 32. The eighteen-inch line has operated under a permit since July 29, 1999, when the United States Department of State issued PPLC a permit "Authorizing Portland Pipe Line Corporation to Convert an Existing Pipeline Crossing the International Boundary Line Between the United States and Canada from Natural Gas Service to Crude Oil Service" (Presidential Permit). PSMF ¶ 21; DRPSMF ¶ 21; DSMF ¶ 160; PRDSMF ¶ 160. The twenty-four-inch pipeline was the subject of a prior Presidential Permit issued on January 13, 1965. DSMF ¶ 159; PRDSMF ¶ 159. The President of the United States issued this Permit concerning the construction and operation of PPLC's twenty-four-inch pipeline under his authority to regulate cross-border segments.[32] PSMF ¶ 112. The Presidential Permit for the eighteen-inch pipeline states: "Permittee shall comply with all applicable Federal and State laws and regulations regarding the construction, operation, and maintenance of the United States facilities and with all applicable industrial codes. The permittee shall obtain requisite permits from Canadian authorities, as well as the relevant state and local governmental entities and relevant federal agencies." DSMF ¶ 161; PRDSMF ¶ 161. The Presidential Permit for the twenty-four-inch pipeline focuses on the pipeline segment from "the vicinity of North Troy, Vermont, to the international boundary line between the

---

[32] PPLC original statement read ". . . concerning the construction and operation of PPLC's 24-inch pipeline." The City denies this statement on the grounds that it overstates the coverage of the permit. DRPSMF ¶ 112. The Court adds a clause to reflect the more limited presidential authority and resolve the City's denial.

United States and Canada . . ." and not pipeline and its facilities south of the border crossing.[33] DSMF ¶ 162.

On July 18, 2008, the State Department responded that PPLC's pipeline reversal plan did "not constitute a substantial change from the scope of the authorization" set forth in the Presidential Permit previously issued to PPLC in 1999.[34] PSMF ¶ 37; DSMF ¶ 34; PRDSMF ¶ 34. As such, the State Department informed PPLC that is was "not required to seek a new or amended Presidential [P]ermit" in connection with the pipeline reversal project; however, the State Department reserved the right to rescind its decision if PPLC deviated significantly from the scope of its plan. *Id.*

On June 19, 2009, PPLC applied to the City's Planning Board for Site Plan and Shoreland Area zoning approval for various work associated with the 2008-2009 Project, including:

> (a)    At the Main Tank Farm, PPLC sought the City's approval to construct a new building housing a 2,400 square-foot pump station, outdoor electrical switchyard and various related infrastructure for use as a "ship loading system."
>
> (b)    At Pier 2, PPLC sought the City's approval to drive new pilings, construct concrete deck extensions and make other modifications to the pier structure in order to create a new Pier fendering system so that Pier 2 could berth smaller articulated tank barges (ATBs) and Handysize tank vessels (approximately 45,000-50,000 dead weight tons) than the larger Aframax (approximately 100,000 dead weight tons) and Suezmax

---

[33]    PPLC offers a qualification to the City's original language which said the permit "concerns only" the border crossing segment as opposed to "focuses on." PRDSMF ¶ 162. The Court modifies the statement to resolve the qualification.

[34]    PPLC proposes: "[T]he State Department responded that no approval was needed in light of the Presidential Permit that PPLC received in 1999 . . . ." PSMF ¶ 37. The City denies the statement, arguing that the State Department never informed PPLC that "no approval was needed." DRPSMF ¶ 37 (citing PSMF, Attach. 4, *July 18, 2008 State Department Letter* at 2-3 (ECF No. 89)). The Court amends the statement to more closely hew to the actual text of the State Department correspondence.

(approximately 150,000 dead weight tons) vessels that Pier 2 was designed to accommodate.

(c)     At Pier 2, PPLC also sought the City's approval to construct two new skid- mounted vapor combustion units (alternatively VCUs or smokestacks) on the approach segment of Pier 2 for the purpose of combusting volatiles contained in the vapor stream displaced from the holds of the marine tank vessels during the loading of crude oil.[35]

DSMF ¶ 40.

PPLC sought the City's approval to install the VCUs in an approximately 30 by 120 foot area enclosed by a chain-link fence that would be located approximately 125 feet west of an existing guard house on the pier approach.  DSMF ¶ 41; PRDSMF ¶ 41.  The VCUs are used to control emissions.  PSAMF ¶ 199; DRPSAMF ¶ 199.  As part of the 2009 proposed pipeline reversal project, oil would be loaded onto a marine vessel, which would cause air in the vessel's tanks to be displaced.  PSAMF ¶ 202; DRPSAMF ¶ 202.  Because the displaced air would contain petroleum vapors, regulatory agencies would require that steps be taken to remove pollutants before the displaced air is released into the atmosphere.[36]  PSAMF ¶ 203.  Some vessels have their own air emissions control equipment.  PSAMF ¶ 204; DRPSAMF ¶ 204. The combustion stacks for the VCUs at Pier 2 were to be 70 feet tall and 12 feet in diameter.  DSMF ¶ 42; PRDSMF ¶ 42.

PPLC received zoning approval from the City's Planning Board for the work at Pier 2 and the Main Tank Farm on August 25, 2009, which approval expired on

---

[35]     PPLC offers a qualified admission, disputing the use of the term "smokestack" because the emissions would have been colorless and odorless and, therefore, not "smoke."  PRDSMF ¶ 40.  For the reasons discussed in footnote 13, the Court rejects the qualification.

[36]     The City offers a qualified admission to PPLC's original statement on the grounds that there are other pollutants in addition to particulates and there are other regulatory authorities in addition to the EPA.  DRPSAMF ¶ 203.  The Court modifies the original statement to resolve the qualification

August 25, 2012.[37]  DSMF ¶ 43.  At no time during the City's processing of PPLC's application for site review approval for the pipeline flow reversal project during 2009 did City of South Portland Planning and Development Director Charles Haeuser express any concern about or objection to the VCUs proposed by PPLC as part of that project.[38]  PSAMF ¶ 207.  As part of the site planning approval process, he indicated that the VCUs could be an attraction in their own right, and said he had "no concerns" about the proposed VCUs.[39]  PSAMF ¶ 208.

---

[37]     The City also seeks to include a statement specifying that zoning approval expired "for failure to commence construction activity."  PPLC offers a qualified admission but argues that statement about the reason is unsupported.  PRDSMF ¶ 43.  The Court omits the claimed reason to resolve the qualification.

[38]     The City denies this statement as inadmissible hearsay and lacking foundation.  DRPSAMF ¶ 207.  The claim is that Mr. Haeuser never voiced any concerns to PPLC about the VCUs, so there is no hearsay in PPLC's statement.  There is no out of court assertion being offered.  Similarly, the underlying citation from Mr. Brown makes no claim about the "professional opinion" of Mr. Haeuser for which Mr. Brown might lack personal knowledge.  Mr. Brown's testimony is only that Mr. Haeuser never voiced any negative opinion to PPLC.  Mr. Brown does have a foundation for that testimony.  The Court rejects the City's denial.

[39]     PPLC seeks to include: Mr. Haeuser stated that the 70 foot tall VCUs proposed by PPLC in 2009 would enhance the South Portland waterfront as a visual attraction in their own right, and expressed 'no concerns' about them as part of the City's site planning approval process."  PSAMF ¶ 208.  The City denies this statement as inadmissible hearsay and lacking foundation.  DRPSAMF ¶ 208.

     This is a frivolous objection.  Mr. Haeuser's statement is admissible for the truth of the matter as an admission of a party opponent.  Fed. R. Evid. 801(d)(2).  "For a statement to qualify as an admission by a party-opponent, the statement must be made by a party, a person authorized by the party to make statements on its behalf concerning the subject, or the party's agent or servant acting within the scope of his or her agency or employment."  *Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 17 (1st Cir. 2007).  At the time of the statement, Mr. Haeuser was a City employee authorized to speak on the matter and acting within the scope of his employment.

     The second part of Mr. Haeuser's statement is clearly admissible for the truth of the matter because it reflects the City's position on PPLC's VCU proposal.  Even if the first part of Mr. Haeuser's statement were not admissible for the truth of the matter, PPLC is not offering Mr. Haeuser's opinion about the attractiveness of the VCUs for the truth of the matter asserted.  PPLC is not asserting that Mr. Haeuser was right or wrong about the attractiveness of the VCUs, but it is offering the statement for other purposes, including as an indication of Mr. Haeuser's state of mind during the 2009 review process, the effect the statement had on PPLC, and as impeachment of Mr. Haeuser's later testimony about the VCUs incompatibility with the City's development goals.  For all of these purposes, the statement is not hearsay.

     The Court includes the statement but also modifies it to hew more closely to Mr. Haeuser's phrasing.

Because crude oil unloading operations do not require the release of volatile hydrocarbon vapors from ship holds through VCUs, the 2008-2009 Project required a New Source Review Air Emission License and an amendment to PPLC's existing Part 70 Air Emissions License, both from Maine DEP, to permit the increase in emissions from the proposed VCUs. DSMF ¶ 44; PRDSMF ¶ 44. PPLC applied for the New Source Review Air Emission License and an amendment to PPLC's existing Part 70 Air Emissions License to permit increased air emissions from the two VCUs in February of 2009. DSMF ¶ 45; PRDSMF ¶ 45. Maine DEP issued an Air Emissions License to PPLC permitting additional air emissions from the two VCUs on August 25, 2009 (the "2009 Air License"). DSMF ¶ 46; PRDSMF ¶ 46; PSAMF ¶ 198; DRPSAMF ¶ 198. The 2009 Air License:

(a)     authorized PPLC to construct two "John Zink" brand VCUs, each approximately 12 feet in diameter and 70 feet high that would use thermal oxidization technology to combust hydrocarbon vapors.

(b)     stated that annual throughput capacity of the marine tank vessel loading terminal would be limited by the 18-inch pipeline's capacity to handle 180,000 b/d of Syncrude (a light crude) or 140,000 barrels per day of Cold Lake crude (a heavy crude).

(c)     established emissions limits by analyzing the maximum throughput volumes (180,000 b/d and 140,000 b/d respectively) of Syncrude and Cold Lake Crude and the emissions control technology of the John Zink thermal oxidization VCUs.

DSMF ¶ 47; PRDSMF ¶ 47. PPLC voluntarily surrendered and voided the 2009 Air Emissions License without commencing construction.[40] DSMF ¶ 48. Since 2009, the

_____

[40]     The City's original statement read, "failing to commence construction," rather than "without commencing construction." PPLC offers a qualified admission but disputes whether the record citation supported the claim that PPLC "failed." The Court modifies the statement to resolve the qualification.

U.S. Environmental Protection Agency (EPA), pursuant to the Clean Air Act, has adopted new Sulfur Dioxide ($SO_2$) and Nitrogen Oxides ($NO_2$) Primary National Ambient Air Quality Standards (NAAQS), which would apply to any future project that emitted $SO_2$ or $NO_2$ from the loading of crude oil onto marine tank vessels in the City.[41] DSMF ¶ 49.[42]

PPLC also identified other environmental permits it would need to acquire, including: authorization from the U.S. Army Corps of Engineers for activities that will occupy navigable waters under Section 10 of the Rivers and Harbors Act of 1899; authorization from the U.S. Army Corps of Engineers to discharge dredged or fill materials into waters of the United States under Section 404 of the Clean Water Act; approval of an amendment to PPLC's existing Oil Terminal Facility License from Maine DEP; a Natural Resources Protection Act Permit from Maine DEP; a Water Quality Certification pursuant to Section 401 of the CleanWater Act from Maine DEP; a Stormwater Management Permit, Site Law Permit and Construction General Permit from Maine DEP; an Aboveground Storage of Flammable and Combustible Liquids permit from the Maine Fire Marshall pursuant to 25 Me. Rev. Stat. § 2481; building permits and street opening permits from the City; a Rule 13 Work Permit

---

[41] The City's statement referred to "$NO_x$," and PPLC offers a qualification on the grounds that the NAAQS is for $NO_2$, not $NO_x$. PRDSMF ¶ 49. The Court modifies the statement to reflect the actual NAAQS and thereby resolves the qualification.

[42] The City seeks to include: "Quantitative dispersion modeling indicates that $SO_2$ and $NO_x$ emissions from the VCUs proposed by PPLC in the 2008-2009 Project would lead to exceedances of the newly adopted NAAQS for $SO_2$ and $NO_x$." DSMF ¶ 50. PPLC denies this statement. PRDSMF ¶ 50. There appears to be a genuine dispute about the air quality impacts of the additional emissions from the VCUs, and whether the modeling is relevant given different fuel types and technology changes since 2009. Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

from the Board of Harbor Commissioners of the Port of Portland; building permits from the Towns of Raymond and North Waterford, Maine; a Water Quality Certification pursuant to Section 401 of the of the Clean Water Act from the New Hampshire Department of Environmental Services; a Freshwater Wetlands Permit from the New Hampshire Department of Environmental Services; an Act 250 Permit from the State of Vermont pursuant to 10 Vermont Stat. Ann. § 608(1)(b); a Water Quality Certification pursuant to Section 401 of the of the Clean Water Act from the Vermont Department of Environmental Conservation; a Wetland Conditional Use Determination form the Vermont Department of Environmental Conservation; a Public Building Construction Permit from the Vermont Department of Public Safety; approval from the National Energy Board of Canada; zoning approval and building permits for a pump station in Dunham, Quebec from La Commission de protection du territoire agricole du Québec (CPTAQ); Province of Quebec environmental permits from the Ministère du Développement durable, de l'Environnement (MDDEP) in Quebec, Canada; certificate of compliance from the MDDEP; a building permit from Montreal East, Quebec; and an air permit from la Communauté métropolitaine de Montréal.[43]  DSMF ¶ 51.

The National Energy Board of Canada (NEB) is an independent federal regulatory agency that regulates pipelines, energy development and trade in the Canadian public interest with a charge to consider economic, environmental, and

---

[43]     The City's proposed statement reads "sought to obtain," and PPLC denied the statement on the grounds that it identified potential obstacles but did not actually seek all of those permits. PRDSMF ¶ 51.  The Court modifies the statement to resolve PPLC's denial.

social factors in its decision-making.  DSMF ¶ 53; PRDSMF ¶ 53.  The eighteen-inch pipeline could not have transported oil from Montreal to the Vermont border without approval from the NEB.[44]  DSMF ¶ 54.  PPLC never applied to the NEB to reverse the flow of its pipeline(s).  DSMF ¶ 55; PRDSMF ¶ 55.

PPLC's 2008-2009 Project included construction of a new pump station in Dunham Quebec (north of Vermont) to carry a dual stream of the heavy and light crudes over higher elevations south of Quebec.[45]  DSMF ¶ 56; PSAMF ¶¶ 236-37.  To construct the new pump station in Dunham, Quebec, PPLC required land use approval from the CPTAQ, which it initially received.[46]  DSMF ¶ 57.  The CPTAQ approval was appealed to the Tribunal administratif du Québec ("TAQ"), which rescinded the CPTAQ approval and remanded the matter to the CPTAQ.  DSMF ¶ 58; PRDSMF ¶ 58.  The TAQ decision rescinding CPTAQ approval was affirmed by the Court of Quebec.  DSMF ¶ 59; PRDSMF ¶ 59.  Following the TAQ decision rescinding CPTAQ approval, PPLC chose not to continue to pursue approval for the Dunham, Quebec pump station.  DSMF ¶ 60; PRDSMF ¶ 60.  At some point after June 17, 2013, PPLC released the Option Agreement it held with the owner of the

---

[44]     PPLC denies the statement on the ground that it is legal argument rather than a factual statement.  In this case the existence of a Canadian regulatory hurdle is an issue of fact, not a legal issue to be resolved and applied by this Court.  Accordingly, the Court rejects the denial.

[45]     The City's statement originally said that the Dunham pump station was "required," but PPLC denied that the station was required and argues that new projects would not require a pump station there.  PRDSMF ¶ 56; PSAMF ¶¶ 236-37.  The Court changes "required" to "included" to resolve the denial.

[46]     PPLC offers a qualified admission because it argues that the whether land use approval was "required" is a legal conclusion, and asks the Court to strike the statement.  PRDSMF ¶ 57.  The issue of a past land use approval requirement in Dunham, Quebec is an issue of fact, not a legal issue for this Court to decide. The Court rejects the qualification.

property on which PPLC proposed to build the Dunham Quebec pump station. DSMF ¶ 61; PRDSMF ¶ 61.

PPLC's 2008-2009 Project required a certificate of compliance from the MDDEP in Quebec, Canada. [47] DSMF ¶ 62. PPLC applied for a certificate of compliance from the MDDEP for the Project, but the MDDEP asked for additional information before processing the application for approval or denial. DSMF ¶ 63; PRDSMF ¶ 63. Before providing all responsive information, PPLC suspended the 2008-2009 project and advised MDDEP that it was no longer seeking a certificate of compliance. DSMF ¶ 64; PRDSMF ¶ 64.

In 2009, PPLC received a Jurisdictional Opinion from the Vermont Natural Resources Board that the construction in Vermont that was required for the 2008-2009 Project did not require a permit or review pursuant to the state's Land Use and Development Act (Act 250). DSMF ¶ 65; PRDSMF ¶ 65. In Vermont, PPLC's pipelines pass through three large tracts of public land owned by the State of Vermont (Victory State Forest, Victoria Basin Wildlife Management Area, and the Willoughby State Forest), as well as the Connecticut River, the Missisquoi River, tributaries to Crystal Lake and multiple other streams, lakes, and wetlands.[48] DSMF ¶ 66. On April 15, 2013, the Vermont Natural Resources Board issued a new Jurisdictional Opinion, #7-274 that superseded the 2009 Jurisdictional Opinion obtained by PPLC,

---

[47] PPLC denies this statement because it argues that whether approval was "required" is a legal conclusion, and asks the Court to strike the statement. PRDSMF ¶ 62. The issue of a past Canadian approval requirement is an issue of fact, not a legal conclusion. . The Court rejects the denial.

[48] The City's statement originally used "traverse" rather than "pass through." PPLC offered a qualification that the pipelines pass underground, and thus do not "traverse" the land parcels. PRDSMF ¶ 66. The Court suspects the term "traverse" could apply to underground pipes but modifies the statement out of an abundance of caution.

concluding that the work required in Vermont for the 2008-2009 project or "similar" work (e.g., valve replacements on the pipeline and "reconfiguration of valves and piping" at pump stations in Vermont) "requires an Act 250 Permit under 10 V.S.A. § 6081(b) because it is a substantial change to a pre-existing development." DSMF ¶ 67; PRDSMF ¶ 67. PPLC filed a motion for reconsideration, but the Vermont Natural Resources Board reaffirmed Jurisdictional Opinion #7-274. DSMF ¶ 68; PRDSMF ¶ 68.

PPLC applied for a Permit by Notification in 2009 to engage in construction within wetlands in Randolph, N.H. associated with the 2008-2009 Project. DSMF ¶ 69; PRDSMF ¶ 69. PPLC sought the permit in connection with a pipeline modification project necessary for PPLC to accommodate pipeline inspection tools. PSAMF ¶ 241.[49] PPLC later ceased its pursuit of the permit as a result of the financial crisis.[50] PSAMF ¶ 240. PPLC never received the permit for pipeline construction within wetlands in Randolph, N.H. for which it applied in 2009. DSMF ¶ 70; PRDSMF ¶ 70. New pipeline inspection technology is available that would allow for PPLC to inspect the pipeline without the modifications it initially pursued in Randolph, New Hampshire, and thus PPLC will not need any NHDES permit for this work in the future.[51] PSAMF ¶ 242.

---

[49] The City offers a qualified admission because it lacks knowledge to admit or deny the reasons PPLC sought the New Hampshire permit. DRPSAMF ¶ 241. For the reasons discussed in footnote 4, the Court rejects the qualification.

[50] The City offers a qualified admission because it lacks knowledge to admit or deny the reasons PPLC ceased its efforts on the New Hampshire permit. DRPSAMF ¶ 240. For the reasons discussed in footnote 4, the Court rejects the qualification.

[51] The City denies this statement as mere speculation and lacking foundation because PPLC does not have concrete plans for its reversal project. DRPSAMF ¶ 242. The lack of definition in its reversal plans has little bearing on the availability of inspection tool technology. If improved inspection

In 2009, without having obtained all of the necessary permits, PPLC suspended further permitting on the project to reverse the flow of the eighteen-inch pipeline and load crude oil onto marine tank vessels in South Portland. DSMF ¶ 52; PRDSMF ¶ 52. During the 2008-2009 process, no permitting authority denied PPLC any of the permits it sought, but it did not seek all the permits that would have been required and it did not receive approval for a pump station it proposed in Dunham, Quebec.[52] PSAMF ¶ 233. Of the 13 permits PPLC initially sought, relevant authorities granted 10 of them and PPLC voluntarily ceased its pursuit of the other 3 when PPLC halted its work on the project.[53] PSAMF ¶ 234. When PPLC first sought to reverse the flow in 2008-2009, it did not seek approval from the NEB because it ceased work on the flow reversal project before NEB approval became necessary.[54] PSAMF ¶ 235.

---

technology means the project in NH is no longer necessary, it is a matter of logical deduction, and not speculation, that the permit will not be required for an inspection modification project that will not be built. The Court rejects the denial.

[52] The City denies PPLC's original statement, which did not contain the second half of the statement specifying that PPLC did not seek some permits and did not receive approval for a pump station it sought to build. DRPSAMF ¶ 233. The Court modifies the original statement to resolve the denial.

[53] The City denies PPLC's original statement and argues that Mr. Hardison lacks a foundation for the testimony because he was not involved in the decision-making during the 2008-2009 project. DRPSAMF ¶ 234. Even though he was not involved in the decision-making, Mr. Hardison has a basis of knowledge because he was involved in the operational aspects of 2008-2009 proposal in his role at the time, and he has testified that the company has kept that process as a model for the 2012-2013 process and current reversal idea during which time he has served as the president of the company. The Court rejects the denial.

[54] The City offers a qualified admission but states that it lacks knowledge as to reasons why PPLC failed to seek NEB approval. For the reasons described in footnote 4, the Court rejects the qualification.

### E. The 2012-2013 Flow Reversal Project

As economic conditions improved in 2012 and 2013, and as PPLC determined that its prior forecasts concerning the future of Canadian oil production increasingly had proved accurate, PPLC once again began to consider reversing the flow of oil.[55] PSMF ¶ 41.

#### 1. Design Differences

In 2011 and 2012, PPLC analyzed and considered several different design and engineering characteristics of a "hypothetical potential project" to reverse the flow of either the eighteen-inch or twenty-four-inch pipeline and load crude oil onto marine tank vessels in the City. DSMF ¶ 71; PRDSMF ¶ 71. PPLC considered:

(a) using the 24-inch pipeline instead of the 18-inch pipeline for a potential future project.

(b) a project with a "single stream light line [of crude oil]," instead of a design that would be capable of carrying both heavy crude oil and light crude.

(c) developing a project that had a "low likelihood of [needing] the [Dunham] pump station" that was planned for the 2008-2009 Project and for which PPLC never obtained approval from Canadian regulatory authorities.[56]

---

[55] PPLC sought to include the statement: ". . . had proved accurate, PPLC revived its plan to reverse the flow of its 18-inch line." PSMF ¶ 41. The City denies the statement, citing significant differences between the 2008 plan and the options PPLC considered in 2011-2012, including a switch from reversing the eighteen-inch line to considering the twenty-four-inch line. DRPSMF ¶ 41. It is not clear what degree of similarity is sufficient to constitute "revival," so the court modifies the statement to reflect the undisputed aspect of PPLC's statement.

The City also denies the accuracy of PPLC's forecasts, and objects that Hardison's statement is impermissible expert testimony, irrelevant, and lacks foundation, and asks the Court to strike the statement. The Court rejects the denial for the reasons described in footnote 10, footnote 11, and footnote 18.

[56] PPLC offers a qualified admission but takes issue with the City's use of the word "required" for the Dunham pump station for the 2008-2009 project. PRDSMF ¶ 72. The Court modifies the statement to resolve the qualification.

(d) using a vapor recovery system to capture hydrocarbon vapors during the loading process, which would use different technology and have different dimensions than the formerly proposed two 70-foot-tall John Zink VCUs.

(e) developing a project for which there would be "no need to upgrade Pier 2 to handle small tankers and barges," such as the smaller ATBs or Handysize tank vessels that the 2008-2009 Project was designed to accommodate.

DSMF ¶ 72.

From "an engineering perspective," it is "feasible" to physically interconnect Rigby Yard, a large rail facility in the City, and PPLC's Main Tank Farm. DSMF ¶ 74; PRDSMF ¶ 74; DSAMF ¶ 194; PRDSAMF ¶ 194. In 2012, PPLC studied a potential project that would transport only "Bakken/other U.S. sourced crude" by rail into Rigby Yard in the City.[57] DSAMF ¶ 192. The rail proposal would have connected the Rigby Yard rail terminal with PPLC's Main Tank Farm on Hill Street by a short newly constructed pipeline on the Railroad's existing Right of Way.[58] DSAMF ¶ 193.[59] In 2013, PPLC considered transporting crude oil by rail to the Main Tank Farm and then loading crude oil onto marine tank vessels in the City.[60] DSMF ¶ 73.

---

[57] PPLC offers a qualified admission because the original statement contained additional information about the capability of the Rigby Yard facility to load and unload oil, which was not supported by the record citation. PRDSAMF ¶ 192. The Court modifies the statement to resolve the qualification.

[58] PPLC denies the original statement, which called it the "rail project" and labeled the Right of Way as belonging to PPLC, rather than the railroad. PRDSAMF ¶ 193. The Court modifies the statement to resolve the denial.

[59] The City also seeks to include a statement that PPLC could feasibly reverse either of its pipelines and import crude oil from Canada, and ship it out via Rigby Yard by rail. DSAMF ¶ 196. PPLC denies this statement because the records cited by the City was for a project shipping oil in by rail and loading on marine tankers, not shipping oil in via pipeline and out via rail. PRDSAMF ¶ 196. The issue of the feasibility of loading the oil onto rail cars rather than tankers is a matter of dispute. Accordingly, as explained in Footnote 2, the Court will view the evidence in favor of feasibility for purposes of PPLC's motion, and against feasibility for purposes of the City's motion.

[60] PPLC denies the statement on the grounds that it never elevated the idea above the concept level. PRDSMF ¶ 73. Nevertheless, PPLC admits they considered the idea. *Id.* The Court includes the City's statement with slight modification.

PPLC has not proposed any changes to pipeline or storage tank capacity or throughput as part of any flow reversal project, as compared to historical levels.[61] PSAMF ¶ 200.

## 2. Marketing the 2012-2013 Project

PPLC again began soliciting interest in its flow reversal project from potential shippers and requesting that shippers sign non-disclosure agreements concerning the flow reversal project.[62] PSMF ¶ 42. In 2011-2012, PPLC held discussions with numerous potential crude oil shippers, including Irving, Valero, Shell, Keyera, Repsol, Suncor, Global, Imperial Oil, and others, to attempt to obtain contractual volume commitments on a reversed eighteen-inch or twenty-four-inch pipeline and tracked potential interest on internal documents. DSMF ¶ 15; PRDSMF ¶ 15; PSAMF ¶ 252; DRPSAMF ¶ 252. PPLC's marketing efforts came on the heels of a potential announcement by Enbridge to reverse its Line 9 to carry oil from west to east.[63] DSMF ¶ 16. In 2011-2012, PPLC solicited interest from potential crude oil shippers for committed volumes of crude oil to be carried southward either on the

---

[61] The City offers a qualified admission to PPLC's original statement on the grounds that flow reversal would represent a major change to operations and throughput levels compared to recent years. DRPSAMF ¶ 200. The Court modifies the original statement to resolve the qualification.

[62] The City disputes the exact timing of the solicitations and denies this statement as unsupported and irrelevant. DRPSMF ¶ 42. The Court removes the statement of specific timing (whether it was 2011 and 2012, or 2012 and 2013) to reflect the undisputed portion of the statement and because the timing is not material, and rejects the rest of the denial for the reasons described in footnote 10, footnote 11, and footnote 18.

[63] The City seeks to include following original statement: "In its marketing efforts, PPLC continued to rely on the southward crude oil flow on its 18-inch or 24-inch pipelines to be carried from west to east on the Enbridge system and a reversed Enbridge Line 9." PPLC denies this statement because the record citation contains no mention of any "reliance" on Enbridge Line 9 reversal. The Court modifies this statement to resolve the denial.

eighteen-inch or the twenty-four-inch pipeline.[64]  DSMF ¶ 17.  In 2011-2012, PPLC

did not move forward with the reversal project on either the eighteen-inch or twenty-

four-inch pipeline.[65]  DSMF ¶ 18.  In 2011 and 2012, PPLC was under less pressure

to reverse the flow of its pipeline system because it still was doing enough business

shipping crude oil northbound that flow reversal had not become an urgent

necessity.[66]  PSAMF ¶ 253.

In 2013, PPLC again solicited interest from potential crude oil shippers for

committed volumes of crude oil to be carried southward on the eighteen-inch or

twenty-four-inch pipeline.[67]  DSMF ¶ 19.  In 2013, PPLC received positive indications

of interest from potential shippers, many of whom executed non-disclosure

agreements. [68]  PSMF ¶ 43.  In April of 2013, PPLC sought to "[s]ecure shareholder

endorsement for [PPLC] to seek expressions of interest from potential shippers

concurrent with the [TransCanada PipeLines Limited's] Energy East Open Season

---

[64]     PPLC offers a qualification because the record citation does not specify whether the discussions
were for the 18 or 24 inch line.  PRDSMF ¶ 17.  The City's statement specifically refers to "either" of
the lines.  The Court rejects the qualification.
[65]     The City's original statement seeks to attribute PPLC's decision not to move forward on lack
of market interest.  PPLC offers a qualification as to this attribution of cause, arguing its decision was
based on a variety of factors.  PRDSMF ¶ 18.  The Court modifies the City's statement to resolve the
qualification.
[66]     The City denies this statement as irrelevant and, therefore, inadmissible.  DRPSAMF ¶ 253.
The reasons behind PPLC's decision not to move forward in 2011 and 2012 are relevant because some
causes might make it less likely that future projects will be successful and other causes might have no
bearing on future probabilities or even make it more likely to succeed.  The Court rejects the denial.
[67]     The City also sought to include: ". . . to potentially coincide with the Open Season for
TransCanada PipeLines Limited's ("TransCanada") Energy East Project."  PRDSMF ¶ 19.  PPLC
offered a qualification as to this additional statement.  The Court agrees with PPLC that the record
citation does not adequately support this additional statement.  The Court omits that portion.
[68]     The City denies this statement as unsupported by documentary evidence to support Mr.
Hardison's testimony.  The Court rejects the denial for the reasons described in footnote 10.  DRPSMF
¶ 43.

        The City also objects that this information about past demand is irrelevant because there is
no current supply.  The Court denies this objection because it has already repeatedly ruled against the
City's impossibility arguments.  *See* Footnote 1.

currently underway.  DSAMF ¶ 183; PRDSAMF ¶ 183.  In 2013, PPLC's Board of Directors did not have interest in pursuing a formal Open Season.[69]  DSAMF ¶ 184.

PPLC did not move forward with any reversal project due to a variety of reasons, including insufficient market interest.[70]  DSMF ¶ 20; DSAMF ¶ 181.[71] Sometime after April 2013 and before June 17, 2013, PPLC decided to: "Postpone seeking commercial support [for any project to load crude oil in the City] until success of Canadian projects are assured;" "Archive learnings;" "Consider write-off of part or all of $6.5 million work-in-progress from 2008 project;" and "Apply asset impairment rules to $6.5 million Investment and Work with Audit Committee to finalize."[72]

---

[69]     The City offers a qualified admission on the ground that it does not provide adequate context. PRDSAMF ¶ 184.  The Court is aware of the context from record evidence and other statements, and accordingly, rejects the qualification.

[70]     The City seeks to include: "In 2013, there was not sufficient market interest from potential crude oil shippers or from TransCanada to move forward with any reversal project."  PPLC offers a qualified admission because it disputes the attribution of sole causation to lack of market interest, rather than, "a variety of factors."  PRDSMF ¶ 20; PRDSAMF ¶ 181.  The Court reconciles the two statements to resolve the qualifications.

     The City also seeks to include a statement about a formal decision by the Board of Directors to stop pursuing flow reversal.  DSAMF ¶¶ 185-186.  PPLC denies this statement as unsupported by the record citation, which refers to a presentation given to the board and does not contain a record of the Board's decision, and testimony that does not directly support the statement.  PRDSAMF ¶¶ 185-86.  The Court agrees and omits the statements.

[71]     The City also seeks to include: "In June of 2013, PPLC's Board of Directors considered applying "asset impairment rules" and a "write off" of its $6.5 million investment in a pipeline reversal project."  DSMF ¶ 21.  PPLC denies this statement because the City did not include the portions of the declaration it cited in its materials entered in the record.  The Court omits the statement under this paragraph but observes that a similar statement is included and is supported.  *See* DSAMF ¶ 187.

     The City also seeks to include: "Project development in both Canada and the United States related to PPLC's efforts to reverse pipeline flow and load crude oil onto marine tank vessels in the City were led and supervised by the President and other senior management of PPLC, not MPL."  DSMF ¶ 4.  PPLC denies this statement because several senior officers of PPLC are also officers for MPLL.  PRDSMF ¶ 4.  The relative contributions of the two companies appear to be genuinely disputed.  Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

[72]     PPLC offers a qualified admission on the grounds that the statement does not provide adequate context and disputes the use of the words "formally decided."  PRDSAMF ¶ 187.  The Court modifies the statement to resolve the qualification and rejects the qualification as it relates to the need for additional context contained in other factual statements.

DSAMF ¶ 187. The only portion of PPLC's initial multi-million dollar investment that it wrote off concerned an approximate $150,000 (Canadian) investment related to PPLC's work on the Dunham, Quebec pump station.[73] PSAMF ¶ 257. PPLC monitored the progress of the Enbridge Line 9 reversal project, which did not begin operating until December 2015. PSAMF ¶ 254; DRPSAMF ¶ 254.

### 3. Permitting the 2012-2013 Project

On February 26, 2012, seventeen (17) members of Congress including U.S. Rep. Chellie Pingree of Maine and then-U.S. Rep. Michael Michaud of Maine, as well as the entire Vermont Senate and House delegation, wrote a letter to the Secretary of State requesting that the State Department require a "a new Presidential Permit and conduct a comprehensive Environmental Impact Statement (EIS) pursuant to the National Environmental Policy Act should the Portland Pipe Line Corporation (PPLC) seek to transport Canadian tar sands oil through the Portland Montreal Pipe Line (PMPL) running through Maine, New Hampshire and Vermont." DSMF ¶ 36; PRDSMF ¶ 36. On February 27, 2012, a spokesman for Maine Senator Susan Collins stated "[s]hould anyone actually seek approval, Senator Collins would expect that an appropriate environmental impact review be completed."[74] DSMF ¶ 37. On March 6, 2014, Maine Senator Angus King wrote a letter to the Department of State stating "[s]hould the PPLC seek to reverse their line, and pipe diluted bitumen southward, it

---

[73]     The City offers a qualified admission because it lacks specific knowledge of the precise internal accounting of PPLC's work on the pump station. DRPSAMF ¶ 257. For the reasons described in footnote 4, the Court rejects the qualification.

[74]     The City's original statement said that Susan Collins stated "through" a spokesman. PPLC offers a qualification arguing the article did not say Susan Collins was speaking "through" the spokesman. PRDSMF ¶ 37. It is difficult to imagine how this parsing would matter, but the Court modifies the statement to resolve the qualification out of an abundance of caution.

is my request that the State Department require a new Presidential Permit and prepare a comprehensive Environmental Impact Statement pursuant to the National Environmental Policy Act." DSMF ¶ 38; PRDSMF ¶ 38. On April 18, 2014, all four members of the New Hampshire congressional delegation—including then U.S. Senator Kelly Ayotte and U.S. Senator Jeanne Shaheen—wrote a letter to the Department of State stating that "[t]he transport of diluted bitumen southward through the Portland-Montreal pipeline would be a substantial shift from the pipeline's current use. Such changes also pose risks to our constituents' health, the environment and wildlife . . . ." and requested "that a new Presidential Permit be required in order to allow for complete review of" a change in direction of the "Portland-Montreal pipeline." DSMF ¶ 39; PRDSMF ¶ 39.

On August 13, 2013, a representative of the United States Department of State sent a letter to counsel for PPLC stating that the "Department made a determination that the reversal of pipeline flow and the work necessary to implement that reversal, as described in [PPLC's] letter of July 15, 2008, may not constitute a substantial change from the scope of authorization set forth in the Presidential Permit issued [on July 29, 1999]."[75] PSMF ¶ 22A; DRPSMF ¶ 22A; DSMF ¶ 35; PRDSMF ¶ 35. Further, the letter explained that it was the State Department's "understanding that

---

[75] PPLC's proposed statement alleges that the State Department's August 2013 letter stated that PPLC's "existing Presidential Permit *is* sufficient for a reversal of the flow of the pipeline system." PSMF ¶ 22A (citing PSMF, Attach. 9, *August 13, 2013 Letter from U.S. Dep't of State* at 1 (ECF No. 89) (*State Dep't Letter*) (emphasis added). The City denies the proposed statement, pointing out that the letter states that the reversal of pipeline flow "*may not constitute a substantial change from the scope of the authorization* set forth in the Presidential Permit[.]" DRPSMF ¶ 22A (quoting *State Dep't Letter*) (emphasis added). PPLC reads a level of certainty into the State Department letter that does not exist in the actual correspondence. The Court amends the statement to use the actual content of the letter.

[PPLC] has no current plans to change the operation of either pipeline" and instructed PPLC to provide information for the Department to review and consider before executing any plans to change the operation of either pipeline. *Id.* More recently, another cross-border pipeline project, The Keystone XL Pipeline, would have transported western Canadian crude oil from Hardisty, Alberta to Steele City, Nebraska, but President Obama and the State Department rejected the Keystone proposal in part because they determined it would negatively impact foreign policy and national security.[76] DSMF ¶ 165.

On December 20, 2010, the Maine DEP issued a "Department Order" granting PPLC an "Oil Discharge Prevention and Pollution Control Act Renewal License." PSMF ¶ 22; DRPSMF ¶ 22. On September 11, 2015, the Maine DEP again issued a "Department Order" granting PPLC an "Oil Discharge Prevention and Pollution Control Act Renewal License." PSMF ¶ 23; DRPSMF ¶ 23. PPLC did not require nor seek a new or amended oil facility terminal license from Maine DEP pursuant to 38 Maine Rev. Stat. § 556, et. seq. (the Coastal Conveyance Act) prior to loading crude oil in the City because the license covers "transfer between ship and shore" and "doesn't particularly care which direction you are transferring." DSMF ¶ 179; PRDSMF ¶ 179. PPLC wrote to Maine DEP acknowledging that approval did not

---

[76] PPLC offered a qualification to the City's original statement which implied the findings on foreign policy and national security were the sole factors contributing to the decision. PRDSMF ¶ 165. The Court modifies the statement to resolve the qualification.

The extraordinarily complicated history of The Keystone Pipeline System is markedly tangential to the merits of PPLC's lawsuit. Nevertheless, even though the Court is aware that President Trump has taken a different position from President Obama concerning The Keystone Pipeline System, the parties have not updated this information for purposes of the pending motions for summary judgment.

absolve it of seeking "required licenses from all applicable federal, state, and local agencies . . . ."[77]  DSAMF ¶ 215.

PPLC ultimately ceased work on the 2012-2013 flow reversal project in 2013.[78]  PSMF ¶ 45; DRPSMF ¶ 45.

## F.  The Waterfront Protection Ordinance

In 2013, PPLC began to observe political opposition to the flow reversal project from environmental interest groups and the South Portland City Council.[79]  PSMF ¶ 44; PSAMF ¶ 244.  It became apparent to PPLC that environmental interest groups would seek a referendum in South Portland that would bar PPLC from reversing the flow of the pipeline.  PSMF ¶ 45.  Advocates opposing the flow reversal project obtained sufficient signatures to place the so-called "Waterfront Protection Ordinance" ("WPO") on the November 2013 ballot in South Portland.  PSMF ¶ 46.[80]

[77]  PPLC offered a qualification related to additional material included in the City's original statement.  PRDSAMF ¶ 215.  The Court removed the words to resolve the qualification and because the other statements in this paragraph make the omitted words superfluous.

[78]  The City objected to the causal implication of PPLC's original wording of PSMF ¶ 45.  DRPSMF ¶ 45.  The Court agrees that there is a genuine dispute about the number and weight of the causes of PPLC's decision to abandon its efforts in 2013, and has separated the two clauses of PSMF ¶ 45 to resolve the City's denial.

[79]  The City denies this statement as inaccurate, irrelevant, and lacking foundation.  DRPSMF ¶ 44.  The Court rejects the denial because there is no explanation for how it is inaccurate, as well as for the reasons described in footnote 11.

[80]  The City objects to numerous statements regarding the WPO, particularly for statements from city residents during public meetings.  PSMF ¶¶ 46-63; DRPSMF ¶¶ 46-63.  The crux of this dispute is whether the WPO and statements made about it by members of the public are admissible as legislative history for the Ordinance.  PPLC argues these statements are admissible and probative of the purpose and intent of the Ordinance.  The City argues that public comments do not represent legislative history, and the challenge here is the City Council's Ordinance, not a prior citizens' referendum. These arguments would be better resolved in a motion in limine.  For consideration of these motions only, the Court includes the information indicating there was a citizens' referendum but does not consider comments from members of the public.

As discussed below, in Part V-E, the primary purpose, intent, or motive behind the Ordinance is relevant for resolution of the dormant commerce clause issues.  The immediate dilemma is determining what types of evidence a court may consider when deciding whether a state or local law had an impermissible primary purpose.  The City argues that a court must not look to behind the

In 2013, Portland Pipe Line Corporation ("PPLC") sent an "Open Letter to the Residents of South Portland" that stated:

> Perhaps you signed a petition to get the [Waterfront Protection Ordinance ("WPO")] on the ballot, because you were told the WPO is designed to "stop tar sands" and "smokestacks". These misleading references relate to a prior proposal which was never initiated or completed, and are designed to scare you into thinking that our company has an imminent project to bring tar sands to South Portland or smokestacks to Bug Light Park. Let us be clear - there is no such project proposed, pending or imminent. In fact, recently, as a good faith measure, we took the rare step of voluntarily surrendering our final

---

unambiguous text of the Ordinance. *Defs.' Opp'n* at 20 (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005); *R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 700 (1st Cir. 1994)). This authority, however, is inapposite because it addresses the role of legislative intent for the purposes of statutory interpretation, not the issue of constitutional prohibitions on certain legislative motives.

It is true that courts were historically extremely hesitant to look behind a legislature's stated purposes. *See* CALEB NELSON, *Judicial Review of Legislative Purpose*, 83 N.Y.U. L. REV. 1784, 1795-815 (2008). But beginning at least as far back as the 1970's, courts have taken a more searching approach, beginning in the field of racial discrimination and extending to many areas of constitutional law. *Id.* at 1850-59. The seminal case is *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The Supreme Court instructed, "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. The *Arlington Heights* Court pointed to at least three types of evidence lower courts might consider: (1) "The historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes;" (2) "The specific sequence of events leading up the challenged decision;" and (3) "The legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 267-68. The First Circuit repeatedly applied this searching inquiry to the dormant commerce clause framework. *Family Winemakers of California v. Jenkins*, 592 F.3d 1, 13 (1st Cir. 2010) ("[W]e look to 'the statute as a whole' . . . including statutory text, context, and legislative history, but we also consider whether the statute was 'closely tailored to achieve the legislative purpose' the state asserted." (quoting *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 37-38 (1st Cir.2005)).

Applying these precedents, the Court finds the specific pattern of events leading to the enactment of the Ordinance are relevant to the dormant commerce issues. Therefore, the evidence concerning the WPO history and text is included in the statement of facts as background information regarding what prompted further action by the City Council. In contrast, the Court does not include the statements by members of the public. PPLC does not put forth any cases where a court relied on such statements. Individual statements from a diverse group of ordinary citizens about a prior initiative has no bearing on the ultimate primary purpose of the City Council in enacting the Ordinance.

permit relating to that prior proposal, as further reassurance to the community we care so deeply about that there is no tar sands project.[81]

DSAMF ¶ 180.

The City Council opposed the WPO by a vote of 5-1 on August 19, 2013. DSAMF ¶ 217; PRDSAMF ¶ 217. City Councilor Gerald Jalbert publicly campaigned against passage of the WPO.[82] DSAMF ¶ 219.[83]

On November 5, 2013, South Portland residents voted against passage of the WPO by a 4453 to 4261 margin, or 51.1% to 48.9%.[84] PSMF ¶ 63.

## G. The Moratorium

On November 6, 2013, the South Portland City Council held a workshop to discuss a moratorium on the importation of oil sands crude into South Portland. [85] PSMF ¶ 65.

---

[81] PPLC offers a qualified admission, arguing that the excerpt lacks context and the Court should consider the whole letter. PRDSAMF ¶ 180. The Court is aware of the context and the rest of the letter, and denies the qualification.

[82] PPLC offered a qualified admission but denied additional language in the City's original statement that referred to "other City Councilors." PRDSAMF ¶ 219. The Court agrees the language about other Councilors is not supported by the record citation and, therefore, omits that phrase.

[83] The City also seeks to include: "The City Council played no part in drafting, supporting or otherwise advocating for the citizen-initiated WPO." DSAMF ¶ 218. PPLC admits the WPO was a citizen's initiative but denies that the cited record support, minutes from a council meeting, contains any information about the role of City Councilors in drafting, supporting, or advocating for the WPO. PRDSAMF ¶ 218. The Court agrees and, therefore, omits the statement.

[84] The City offers a qualified admission because it agrees on the result, but it insists that everything about the WPO is irrelevant and therefore inadmissible. DRPSMF ¶ 44. For the limited purposes and reasons described in footnote 80, the Court rejects the qualification and includes the statement.

[85] PPLC seeks to admit numerous public statements made by several City Councilors and other officials following the WPO vote. PSMF ¶ 65-75. The City objects that these statements are inadmissible as irrelevant or hearsay. DRPSMF ¶ 64-75. The City also argues, "To the extent Plaintiffs attempt to create misleading inference of the legislative intent of the Ordinance, that inference is rebutted" by other statements. *Id.* Thus, the City does not deny that these statements were made, but rather it points to other additional evidence of legislative purpose. That is not a valid grounds for denying the fact that these statements were made. The Court will, of course, consider competing statements bearing on the issue of primary intent, purpose, or motive.

This issue is best resolved in a motion in limine. Nevertheless, for the reasons described in footnote 80, the court is tasked with considering evidence of legislative intent, purpose, or motive,

At that November 6, 2013 workshop, Councilor Melissa Linscott stated: "I don't want to see tar sands here, I'll say it."[86]  PSMF ¶ 66.  She also said: "I feel like I'm walking a fine line right now, but in my mind, the issue with the Waterfront Protection Ordinance as it was written had to do with the language and restrictions on other businesses, other activities, that we did not want to take place."[87]  *Id.*

At that November 6, 2013 workshop, Councilor Linda Cohen stated that "whether or not tar sands, oil sands, whatever it is, is coming in to this city tomorrow, next week, or next year, there's a real fear in our, in our city by at least half the people who voted yesterday."[88]  PSMF ¶ 67.  She also said, ""In the end what I want to see come out of this is a process that, or an ordinance that, makes the City of South Portland as safe as it possibly can be . . . ."[89]  PSMF ¶ 68.

At that November 6, 2013 workshop, Mayor Blake stated:

> I'm certainly in favor of a moratorium.  We've used them several times in the past, always successfully.  There's a reason why state statutes allow us this sort of activity, it's for things like this.  And the second reason that they allow it is because of the inadequate ordinances to

---

which is composed of the whole context and series of events leading up to the final enactment, including statements by members of the decision-making body.  Therefore, for purposes of these motions only, the Court will consider statements by key officials, including the City Council and members of the DOC.

[86]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 66, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[87]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 66, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[88]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 67, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[89]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 68, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

protect the health and safety of our community. And that's where I think we're at and that's why I support the moratorium. [90]

PSMF ¶ 69. He also stated, "I think we want to be specific enough to cover any tar sands product, period. No matter what stage it's in. If it comes from the Alberta tar fields, regardless of what stage, what refined position it's in." [91] PSMF ¶ 70. He also said that, for legal reasons, "we can't say tar sands in pipelines." [92],[93] PSMF ¶ 72.

At that November 6, 2013 workshop, Councilor Jalbert said:

Maybe we're missing some of the big point here. That, if there's a reversal of the flow, it's the onboarding of a ship which is really the conduit to make this all work per say. Maybe there's a way we can look at the wording of this as it deals with, with oil sands or tar sands and the onboarding. So I'll ask again for help from Corporation Counsel. We need to go to the part where it talks about the onboarding of ships. [94]

PSMF ¶ 71.

---

[90]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 69, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[91]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 70, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[92]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 72, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[93]     In paragraph 64, PPLC posits:
        In an article dated November 7, 2013, Mayor Tom Blake said that he was assured that all councilors opposed Canadian oil sands crude coming into the city and that he would favor creating a committee to create a new ordinance that completely bans the flow of oil sands crude through pipelines owned by the [PPLC]."
PSMF ¶ 64. PPLC supports this statement with a sworn declaration from Attorney Reichl, which attached a November 7, 2013 newspaper article from the Bangor Daily News. *Id.* (citing *Reichl Decl.* ¶ 11, Ex. 14 (newspaper article)). The City objects to this statement as irrelevant and based on inadmissible hearsay. PRDSMF ¶ 64. The Court overrules the City's relevance objection. However, the Court sustains the hearsay objection. The article reflects what David Harry, the newspaper reporter, says that Mayor Blake said. The statement in that form is classic hearsay.

[94]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 71, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

At that November 6, 2013 workshop, Councilor Livingston stated: "You just said a phrase there, reverse the flow. That's similar to, you know, that's what gets at what you're talking about, as far as, a little bit of refinement in Montreal, it has to be reversed to get down here." [95]  PSMF ¶ 73.

At a December 3, 2013 meeting of the South Portland Planning Board South Portland Corporation Counsel Sally Daggett stated:

> If you look at two points, number one on page 2 of the proposed ordinance, the eighth whereas clause down, there's a specific definition of the term oil sands/tar sands products. It says, 'is used in this article to describe petroleum products derived from oil sands/tar sands that are still in an unrefined state including bitumen, diluted bitumen, synthetic crude, synbit and dilsynbit.' So it's limited to those products and then it's also further limited just to development proposals involving the loading of oil sands/tar sands products onto marine vessels docking in South Portland. [96]

PSMF ¶ 74.

At that December 3, 2013 planning board meeting, South Portland Planning and Development Director Tex Haeuser stated:

> We've already, you know, in the places along the waterfront where you don't have, say, the condominiums so close, you know, to the area. We already have them. If someone came forward with a new one there'd probably have to be a planning board, likely there'd have to be a planning board hearing as an amendment to an existing plan for that to happen. For it to happen on the waterfront here in, you know, in the eastern waterfront, there would have to be a, you would think there

---

[95]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 73, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[96]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 74, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

would have to be a pipeline reversal and that's what the moratorium's going to prevent, so. I kind of, I don't know if it's that big a concern. [97]

PSMF ¶ 75.

In a manner that the City believed was consistent with Maine law, 30-A M.R.S. § 4356, on December 16, 2013, the City Council approved a "Moratorium on Development Proposals Involving the Loading of Oil Sands/Tar Sands Products onto Tank Vessels Docking in South Portland."[98], [99] PSMF ¶ 76, ¶ 220. A stated goal of the temporary Moratorium was to allow the City Council:

> time to seek: such professional advice and assistance as it deems necessary and appropriate, [to] study the Code of Ordinances to determine the land use, environmental and other regulatory implications of future proposed development proposals involving the loading of oil sands/tar sands products onto marine tank vessels docking in South Portland and consider what regulations might be appropriate for such activity.[100]

DSAMF ¶¶ 220-21.

## H.    The Draft Ordinance Committee

The South Portland City Council created a "Draft Ordinance Committee" (DOC) charged with recommending ordinance amendments to

---

[97]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 75, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[98]    The City offers a qualified admission. DRPSMF ¶ 76. It does not state any grounds for denial but merely offers additional statements about the purpose of the moratorium. These reasons are not inconsistent with the statement of fact. The Court rejects the City's qualification.

[99]    PPLC objected to the portion of the City's original statement that said the moratorium was "[c]onsistent with Maine law, 30-A M.R.S. § 4356." PRDSAMF ¶ 220. The Court agrees that, as phrased, the introductory statement is an assertion of law, not fact, and is not properly posited as a fact. The Court revised the statement to reflect that the introductory statement represents the City's belief.

[100]    PPLC offers a qualified admission but argues the City's original statement misquoted the moratorium. PRDSAMF ¶¶ 220-21. The Court modifies the quote to resolve the qualification.

protect the public health and welfare from adverse or incompatible land uses, or adverse impacts to local air, water, aesthetic, recreational, natural, or marine resources, that could result from modifications to existing storage, handling, or processing facilities, or construction or installation of new facilities or equipment intended to allow the exportation of unrefined petroleum products, including the loading of unrefined petroleum products onto marine tank vessels docking in South Portland."[101]

PSMF ¶ 79; DRPSMF ¶ 79; DSMF ¶ 146; DSAMF ¶ 223. In a Request for Qualifications the City sought "a consulting firm or individual to prepare and facilitate a committee based process to explore the development of ordinance language to address development proposals involving oil sands/tar sands products." *Id*.

David Cyr, the then-president of PPLC, sent a letter to the Mayor of the South Portland City Council asking for a representative of PPLC to be included as a member of any ordinance amendment study committee. PSMF ¶ 80; DRPSMF ¶ 80. The City appointed three individuals to be members of the DOC: including Russell Pierce, a Portland attorney and commercial litigator at Norman Hanson & DeTroy who represented the Natural Resources Council of Maine; Michael Conathan, the Director of Ocean Policy at the Center for American Progress a former staff member to Sen. Olympia Snowe and the Republican majority on the U.S. Senate Subcommittee on Oceans, Atmosphere, Fisheries, and Coast Guard within the Committee on Commerce, Science, and Transportation, and Director of Ocean Policy at the Center

---

[101]    PPLC proposes a quotation from a city document requesting consulting services that the charge of the DOC was to "address development proposals involving oil sands/tar sands products." PSMF ¶ 79 (quoting PSMF Attach 17 *Request for Qualifications* at 5). The City objects to the admission of that document and says the "charge" of the DOC is encapsulated in its mission statement. DRPSMF ¶ 79. The Court includes both the full paragraph from which PPLC excerpted its language and the formal mission statement to resolve the City's objection.

for American Progress; and David Critchfield, a financial professional, environmental compliance manager at manufacturing facilities and timber sites, and former environmental regulatory specialist for International Paper, including at the Androscoggin Mill.[102]  PSMF ¶ 81; DRPSMF ¶ 81; DSAMF ¶ 222; PRDSAMF ¶ 222.

The City did not appoint any representative of PPLC to the DOC and no PPLC representative in fact served on the DOC.[103]  PSMF ¶ 82; DRPSMF ¶ 82.  The DOC invited PPLC to participate in the hearings and to provide it with comments and relevant information, but PPLC refused "to serve as a resource for the Draft Ordinance Committee," and "engage with the Committee" because it believed the committee had prejudged the issue and their motives were pretextual.[104]  DSMF ¶ 176.

The DOC held its first meeting on February 6, 2014.  PSMF ¶ 93; DRPSMF ¶ 93.  The DOC "reconfirm[ed]" its charge from the City Council by drafting a written mission statement.  PSMF ¶ 94; DRPSMF ¶ 94.

---

[102]    PPLC and the City offer qualified admissions because they phrase the qualifications of the members slightly differently.  The Court combines their statements to resolve the qualifications.  The City also asserts that the members were hired based on their qualifications, DSAMF ¶ 222, whereas PPLC denies that motive.  PRDSAMF ¶ 222.  The motive of the Council in hiring DOC members is a matter of genuine dispute.  Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

[103]    The City offered a qualified admission on the grounds that the City's decision was based on individual experience, but that reason is not in conflict with PPLC's statement.  The Court rejects the City's qualification.

[104]    PPLC offered a qualified admission because the original statement did not include the last clause about PPLC's reasons for declining to participate.  PRDSMF ¶ 176.  The Court modifies the original statement to resolve the qualification.

At a March 4, 2014 meeting of the DOC, the DOC heard testimony from South Portland Fire Chief Kevin Guimond. [105]  PSMF ¶ 99.  Of the six oil terminals in the City, at least two—CITGO/Irving and Gulf—are designed to and do load refined oil products onto marine tank vessels.[106]  DSAMF ¶ 197.  In response to a request to participate in the proceedings of the DOC, CITGO reported to the DOC that "[t]he terminal consists of a marine dock capable of handling ships and barges, a 5 bay truck loading rack, 10 tanks, various buildings for administration, maintenance, foam house, drivers' rooms etc. and a vapor combustion system.  The dock is designed to off load or load vessels and product is delivered out of the terminal by truck."  DSAMF ¶ 198; PRDSAMF ¶ 198.  Jamie Py, the President of the Maine Energy Marketers Association, who provided information and consultation to the DOC, reported to the DOC:

> Last week I was asked by the DOC to ask Gulf if Gulf had the ability and or experience to be able to load marine vessels.  I have been told that: Gulf Oil does have the capability to load product from its South Portland waterfront terminal onto marine vessels.  We have in fact done so in the past, and we anticipate the continuing need to do so in the future.[107]

DSAMF ¶ 199.[108]

---

[105]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 99, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial, although the relevance is tenuous.

[106]    PPLC offers a qualified admission because the original statement from the city said there were five oil terminals.  The Court modifies the statement to resolve the qualification.

[107]    PPLC offers a qualified admission.  PRDSAMF ¶ 199.  They admit that Jamie Py provided the information, but "deny the remainder of the propose statement."  *Id.*  The rest of the statement, however, quotes the information provided.  The Court is not clear on the grounds for the qualification and, therefore, rejects it.

[108]    The City also seeks to include several statements about the coverage of the ordinance – what activities it does and does not cover.  DSAMF ¶¶ 200-02, 216.  PPLC denies these statements as legal arguments, not statements of fact.  PRDSAMF ¶¶ 200-02, 216.  The Court agrees and omits the statements.

In executing its fact-finding charge, the DOC considered numerous documents relating to air emissions, land use priorities, and community aesthetics, including a Report from the American Lung Association, Air Emission Inventory Reports, documents related to evaporative emissions from crude oil storage tanks, and documents from oil terminal operators in the City, environmental groups, and the Maine DEP. DSAMF ¶ 224; PRDSAMF ¶ 224. In testimony to the City Council, the American Lung Association explained that Cumberland County received a "C" air quality grade (likely a "D" if current criteria were used). DSAMF ¶ 225; PRDSAMF ¶ 225. The American Lung Association further testified to its view with regard to crude oil loading: "[w]e should be reducing the amount of air pollution in this area, not increasing it." *Id.* The American Lung Association also informed the DOC that the area already has some of the highest rates of respiratory ailments and lung disease in the state.[109] *Id.*

The first two drafts of the ordinance at issue included a recital stating that "the reversal of the [PPLC] pipeline . . . would still result in significant adverse impacts" that were "not addressed by . . . federal or state laws" and could be addressed only by "the City's exercise of its broad home rule authority." [110] PSMF ¶ 101.

---

[109]    PPLC offers a qualification on the City's original statement which indicated that "the City" had some of the highest rates, whereas the record citation referred to Cumberland County, not the City specifically. PRDSAMF ¶ 225. The Court modifies the statement to resolve the qualification.

[110]    The City denies this statement as irrelevant and inadmissible because it does not constitute legislative history. DRPSMF ¶ 101. The City argues prior drafts do not constitute legislative history and the Court should look only to the final draft and final recommendations of the DOC. Again, these arguments are best resolved in a motion in limine. The guidance on ferretting out impermissible legislative intent does not appear to be as cabined as the City indicates, as discussed in footnote 80 and footnote 85. For the purposes of these motions only, the Court rejects the denial.

### 1.    Comments by the City Councilors

At a February 3, 2014, meeting of the South Portland City Council, Councilor Linda Cohen stated:

> My understanding was that we want this committee to come up with language that will keep unrefined tar sands, is that where we are, out of the City of Portland, uhh, South Portland, Portland too, they're hoping the same thing, but that was, that was my understanding, that's what I want, I also in the meantime don't want to put businesses on the waterfront that are currently in existence out of business.  So we have to keep in mind the viability of our current businesses and economy in South Portland but I don't want oil sands in South Portland.[111]

PSMF ¶ 85.

At that February 3, 2014 council meeting, Councilor Blake stated that the City should develop a new ordinance that would "keep tar sands out completely." [112]  PSMF ¶ 86.  He also said, "Everyone knows I don't have a great deal of faith in the petroleum industry, so we need to develop something that cannot be circumvented."[113]  PSMF ¶ 87.

At that February 3, 2014 council meeting, Councilor Patricia Smith stated: "I think we do have a health and safety issue that's potential with, with tar sands coming into our community."[114]  PSMF ¶ 88.

---

[111]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 85, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[112]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 86, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[113]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 87, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[114]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 88, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

At that February 3, 2014 council meeting, Councilor Maxine Beecher stated:

> I just want to add that in fact when this ordinance is done that it has and includes federal and state law, so that we're not caught in the courts for the next hundred years, which is a huge issue for us, and I think we're talking about unrefined oil sands/tar sands, whatever that word is that gets kind of interchanged, and it's really about loading it onto ships from the harbor of South Portland versus having it come, come in any other way. I think also one of the things that I want to be sure is that when this is written, that it does not have a negative impact on the working waterfront as we see it today. [115]

PSMF ¶ 90.[116]

At that February 3, 2014 council meeting, Mayor Gerard Jalbert stated that

an ordinance drafted by the DOC might conflict with the "Interstate Commerce Act"

and the Pipeline Safety Act.[117] PSMF ¶ 91. He said:

> And for anyone at Sanibel Island they would know about this. What that involved was there was a fast food restaurant that wanted to become the first fast food restaurant on Sanibel Island and apparently the citizens weren't really happy about this particular situation. But they really couldn't basically outlaw hamburgers and so what they had to look at instead was what's so important about this business as far as its ability to operate. In that situation, it was apparently the drive-thru window. Without the drive-thru window, the economics didn't make any sense, and so they passed an ordinance in Sanibel Island, I don't know the specifics, but what it did, it basically prevented drive-thrus from occurring and therefore that particular fast food restaurant never got built. That relates here to the City of South Portland . . . [W]e need to look at the infrastructure . . . and what is the infrastructure that would be needed, and how do we provide a land use ordinance that looks at the infrastructure so that we're not gonna get hung up with these issues as

---

[115] The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 90, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[116] PPLC also seeks to include a statement from a South Portland resident. PSMF ¶ 89. The City objects that this statement is inadmissible because it is not relevant as legislative history. DRSMF ¶ 89. For the reasons discussed in footnote 80, the Court agrees with the City and does not include the statement.

[117] The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 91, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

far as the Interstate Commerce Act and the Pipeline Safety Act. Some of the other concerns of getting hung up with perhaps the EPA or Clean Water Act, whatever it might be.  So if we can avoid those conflicts, but still have something which accomplishes a certain task . . . [118]

PSMF ¶ 92.

### 2.    Comments by Russell Pierce

Less than three minutes into the first DOC meeting on February 6, 2014, DOC member Russell Pierce stated:

> [O]ne of the concerns here . . . is the federal preemption issues, and we are now engaging in a process of developing a legislative record, and if the ultimate result of this process is a recommended ordinance that's approved, one of the concerns I have is the big elephant in the room here is that whatever we do, will probably be challenged . . .[S]o with that out there, with the prospect of a challenge . . . we have to be careful in generating a legislative record that almost defeats itself, and so for that reason I think it would be helpful for us to draft the mission statement. In drawing on the Mayor's Sanibel Island . . . [a]nalogy . . . [I]t can be done and can be done in a way that . . . best avoids walking into the trap, of, of, of saying, you know we're, I mean, let's be explicit, I was brought up in the planning board session, I think on record someone said why don't you just have an ordinance that says stop tar sands?  And the answer is federal preemption problems.[119]

PSMF ¶ 95.

At a February 20, 2014 DOC meeting, DOC member Russell Pierce stated:

> But that said, if ultimately it comes to the point where the City is called upon to defend an ordinance that comes out of this process in Court, it may be helpful to be able to point to a process, a legislative process, that

---

[118]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 92, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[119]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 95, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

included them – API – and invited comment and invited participation.[120]

PSMF ¶ 97.

At an April 3, 2014 meeting, Committee member Russell Pierce queried of a presenter to the committee "when you proposed in general as one possible approach for us to look at is just the VOC emission standard, had you considered what impact that may be to other zones in the city, particularly in the industrial zone?" DSAMF ¶ 227; PRDSAMF ¶ 227. He also stated:

> We hear a lot, we've heard a lot and gotten some great proposals and the potential solutions to the problem, and we need to hear . . . we have received some guidance . . . so I would say that that is one place where I would like to . . . the whole point that Mike is making is, you know, we're gonna go, we're proposing some approaches here; it would be nice to know beforehand if this is something that the current land use and the owners do not want us to do for some particular reason.

DSAMF ¶ 230; PRDSAMF ¶ 230.

At the April 24, 2014 meeting of the DOC, committee member Russell Pierce stated:

> if one were to look at a VOC emissions approach . . . I'm not so sure it has to be part of the zoning ordinance . . . It could just be sort of a standalone ordinance . . . If it's not in Chapter 27 as a land use ordinance, does it have to be . . . do we even have to worry about it being part of the comprehensive plan, it could just be consistent with the city's own policies, because it's not a specific land use ordinance.

DSAMF ¶ 233; PRDSAMF ¶ 233. Russell Pierce also stated:

> I guess what I was saying is that . . . going through this process and the city having gone through this process just reinforces in the legislative history of the city and its implementation of the plan, it reinforces the

---

[120] The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 97, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

city's, um, adherence to the principle that there will be . . . that the vision of the city does not include expansion of the current petroleum handling, uh, uses . . . Clearly air emissions is like the ballast waters, it's no question about it, an impact that supports the regulatory land use undertaking in zoning based on loading and unloading and regulating the tank terminal. There's no question about that air emissions are a significant impact . . . that supports the legislation that we are doing . . . because we learned of significant air emissions or air pollution issues, plus that was exacerbated by the fact that you have . . . schools next to the tank farm, and other incompatible uses that are just so juxtaposed.

DSAMF ¶ 236; PRDSAMF ¶ 236.

At the April 29, 2014 meeting of the DOC, committee member Russell Pierce stated:

[F]or example, I was thinking about, you know, emissions in particular, and just not . . . if at the end of this process, we have no direct ordinance that really addresses the emissions issue as it pertains to this particular land use that we're seeking to prohibit . . . and doesn't sort of squarely address those issues, I'm just concerned . . . I'm concerned that we're not being thorough . . . I acknowledge on the VCU issue that, in isolation, yeah, technology changes . . . but it doesn't change for the short term, and if one of the concerns that has been raised are the visual aesthetics, the height restrictions and the air emissions issues of a new use, that . . . incompatible with the adjacency to the surrounding zones, the adjacency to the college, et cetera, et cetera, that . . . it's okay for us to say, yeah, technology will change, but it's not gonna change tomorrow and we are regulating a new use . . . that is a real threat.

DSAMF ¶ 237; PRDSAMF ¶ 237.

At the April 29, 2014 meeting of the DOC, committee member Russell Pierce queried:

Is it a given, though, that any reversal of the pipeline project would . . . can we say by a preponderance of the evidence, that would increase the VOC emissions at the tank farm? . . . It strikes me that the way it's zoned now with the marine industrial, is almost like because it didn't fit anywhere else . . . but ignore the fact that it's just a blatant incompatible use to the way that . . . it's no-one's fault, I mean, it's just the way historical development, it's just the way it happened . . . It's just an example of a major incompatible use that the city has that at the very

least, we want to come up with a recommendation to the city that says, somehow, stop this from any expansion.

DSAMF ¶ 239; PRDSAMF ¶ 239.

At the May 7, 2014 meeting of the DOC, committee member Russell Pierce stated:

> One was the realization that it's really the . . . the prohibition of loading and isolation, it's really the aesthetics, the change in vision from, you know, from the comprehensive plan's idea of we're going to move away from an industrialized petroleum based export city and aesthetics, and we're setting up all kinds of conflicting uses, but to steer clear of saying anything about a risk of increased oil spill or risk of marine impact because that, that really is covered by federal law.[121]

DSAMF ¶ 239. At the same meeting Russell Pierce also stated:

> All of that existing air emissions control equipment, let's say, or structures that we have are related to the handling of refined petroleum products, and so we could say, you know, I mean City of South Portland has a really bad emissions problem, we know that much, and one step, not the only step, but one step towards taking care of that is to say that there won't be any new petroleum uses, like the loading of crude onto marine tank vessels that would be, that would require new VCU control structures, whether their twenty feet high or . . . .

DSAMF ¶ 241; PRDSAMF ¶ 241. He also stated, "The concern that's left unaddressed is this air emissions issue and the tank farm's locus . . . being adjacent to now four schools, one of them a rejuvenated high school and a community center." DSAMF ¶ 243; PRDSAMF ¶ 243.

At the May 7, 2014 meeting of the DOC, committee member Russell Pierce stated:

> The idea is, if this is a lot where they could potentially put in a storage tank that's on the pipeline that could be used as part of a pipeline

---

[121] PPLC offers a qualified admission but asks the Court to consider other statements made before and after the quoted one. The Court rejects the qualification.

reversal project, that raises the same, you know, new and expanded uses, inconsistent with the city's vision and the comprehensive plan, even doubly so if you look at the particular Broadway lot, and the aesthetics and then the emissions.

DSAMF ¶ 245; PRDSAMF ¶ 245.  He also stated: "Obviously there's an emissions problem and if you embark on this outside the scope of this particular committee . . . there'd be some big gaps, there'd be some potential significant gaps that we'd want to make sure we knew and were either no problem or potential problem."[122]  DSAMF ¶ 246.  Russell Pierce also stated:

The key is we're prohibiting a use that does not exist now, that would be an expanded use inconsistent with the city's vision . . . That's the added concern, the local concern . . . We're not so sure people want to have their boats in the marina if it's next to a marine tank . . . There are still these other concerns that are local concerns that the city has that are not part of the federal regulatory scheme, and then, you know, this ordinance is intended to address those, and that's aesthetic watershed, increased use, inconsistency with the plan, air emissions.

DSAMF ¶ 248; PRDSAMF ¶ 248.

At the May 15, 2014 meeting of the DOC, committee member Russell Pierce stated:

I thought that our other recommendation would be that the Hill Street tank farm be designated a non-conforming use . . . The memo that I can do would just be to explain why that makes sense given the city's plan, and given the proximity to the schools . . . and supported by the air emissions."

DSAMF ¶ 249; PRDSAMF ¶ 249.  He also said:

What we're saying as a city, as a municipality, is, regardless of that [areas covered by federal law], or in addition to that, there are these other issues that all of the federal laws don't address that are serious

---

[122]     PPLC offers a qualified admission because it denies that all those words were spoken by Russell Pierce.  PRDSAMF ¶ 246.  The Court will consider the quote in the light most favorable to the City for purposes of PPLC's motion, and in the light most favorable to PPLC for purposes of the City's motion.

concerns that we have about the health, the safety, well the health and the welfare, and the quality of life that this kind of a project would impose on the city. It's not consistent with the city's vision.

DSAMF ¶ 250; PRDSAMF ¶ 250. Later at the same meeting, Mr. Pierce added:

And just air emissions, and the thirty-nine ton thing, to me, stands out as one of those, and so if we don't have an ordinance that addresses that head on, and says this is one of the local issues, that the problem with the this new industrialization, is, we don't think fits in with the city. It's the emissions. By saying no VCU's, we're saying no, that this kind of project is going to have air emissions that, even if it's, you know, thirty nine tons or whatever it is, that's still not, that's still too much, you know, if we can just chip away at this, at our air emissions problem anyway, that's just one added way of doing that.

*Id.*

At the May 27, 2014 meeting of the DOC, committee member Russell Pierce stated, "The height restriction goes at another local home rule power, land use, which is the ocean view obstruction." DSAMF ¶ 251; PRDSAMF ¶ 251. He also said:

What we're doing here is only what the city can do under its broad home rule power, and . . . if the city doesn't do it, no one else will do it. These are the additional impacts that are not taken care of by federal and state laws, and so the focus, our honed focus here of the whole ordinance process, is the city's exercise of home rule power only. These are the issues that won't get taken care of by all of these other state and federal laws . . . So paring down all of the environmental stuff, we don't have to have any environmental impacts, or anything like that, you know, the air emissions stuff, yes, because that's clearly within the scope of the local zoning power, but just to winnow the whereas clauses down to just being dealing with the air quality, ocean scenic views, and the land use, you know, striking the balance with the mixed use of the waterfront community, and just keeping that the focus.

DSAMF ¶ 252; PRDSAMF ¶ 252. He also stated:

What this process has done for me is really honed the ability to back to the council and say, you know, these are all of your concerns, in this process we learned that these environmental concerns, however certainly legitimate they are, are regulated by other state and federal laws . . . And now we're coming back with, these are the places where,

if the city does not act in this ordinance, these risks won't get taken care of, and that's the air quality in particular.

DSAMF ¶ 254; PRDSAMF ¶ 254.

At the May 27, 2014 meeting of the DOC, committee member Russell Pierce stated:

> The 2009 application, I think, is the point that puts it in perspective. That's what introduced this new proposed land use . . . These are how the air emissions issues and the other local zoning power issues get triggered . . . There are currently no operations for this, and it has never been done in the entire history of the city, and then, then I just went, the third page is just where I started to in broad strokes go over those, what I see are kind of the three categories: the air quality, the scenic, and just the mixed use, the balance of waterfront community use issues, which ties into the reputation of the city also.

DSAMF ¶ 256; PRDSAMF ¶ 256. He also said, "Still under even normal operations, there would remain significant adverse impacts to air quality and ocean views, and all that." DSAMF ¶ 257; PRDSAMF ¶ 257.

At the June 5, 2014 DOC meeting, DOC member Russell Pierce said:

> One place that we thought in particular called out for future attention and action was the location of the Hill Street tank farm right now in an area that's surrounded by residential, predominantly single-family residential, areas and schools, not just any schools, the high school, the high school that is undergoing significant renovation and has open fields, and also the city's new community center, relatively new community center, too.

DSAMF ¶ 260; PRDSAMF ¶ 260. He later added, "The plan, I think, in very resounding terms, talks about not expanding the shipyard working waterfront district into these developing mixed-use areas of the city." *Id.*

At the June 5, 2014 DOC meeting, DOC member Russell Pierce gave a PowerPoint slide presentation concerning the ordinance that discussed "Federal

Preemption" and the "Dormant Commerce Clause."[123]  PSMF ¶ 105.  He said, "Those

two constitutional issues, federal preemption and the dormant commerce clause, were

part of our thinking throughout this process and the legal backdrop behind it."[124]

PSMF ¶ 106.  He also said:

> It's the important paragraph [in the whereas clause of the ordinance]
> that says to the city, you know, if you look at the moratorium, we were
> thrown, as I said, we were given the kitchen sink, here are all the bad
> things, so to speak, colloquially speaking, or all the considerations about
> this reversal of the pipeline issue, and we as a committee, looked at those
> things and some were already covered by federal and state laws and
> what we're recommending are changes that can only be addressed under
> the city's broad home rule authority.

DSAMF ¶ 262; PRDSAMF ¶ 262.

At a June 18, 2014 meeting of the DOC, DOC member Russell Pierce stated:

"We need to be very cognizant of, because of case law out there, really having anything

to do with having our charge get into operational pipelines."[125]  PSMF ¶ 102.  At the

same meeting, he said "I think it creates an ambiguity if we, if we say anything about

the operation of the pipeline in the whereas clauses."[126]  PSMF ¶ 103.  Pierce also

said:

> There is a case out there where, you know, the argument was made that
> even though the facility that was being regulated was, was within the
> City, that the City was trying to prevent its operation because it was

[123]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 105, but for the
reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court
rejects the denial.
[124]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 106, but for the
reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court
rejects the denial.
[125]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 102, but for the
reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court
rejects the denial.
[126]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 103, but for the
reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court
rejects the denial.

expanding beyond the territory of the jurisdiction . . . I'll admit it was a silly argument, but the judge bought it, so I guess that's the, the only reason why, it just, kind of doesn't hurt, in a way, to make this clear that the ordinance applies to the bulk loading of crude oil onto marine tank vessels in the City of South Portland as opposed to marine tank vessels in the . . . Port of Portland. [127]

PSMF ¶ 104.

At the June 19, 2014 meeting of the DOC, committee member Russell Pierce stated:

We're not just dealing with VOCs in this whole air quality exercise; it's the HAPs, and in many ways, the hazardous air pollutants are the ones that we're really most succinctly concerned with for this particular ordinance, so I don't have a problem adding to this and emissions from the bulk loading of crude oil onto marine tank vessels would increase such precursor concentrations.

DSAMF ¶ 263; PRDSAMF ¶ 263. He later added:

We're taking emissions from bulk loading and moving that to the VOCs are precursors clause and emphasizing that the emissions would increase such precursor concentrations, and then just having the American Lung Association whereas clause just deal with what that report talks about, which is . . . C grade for ozone, air quality, and then we go to the breathing ozone can cause adverse health effects.

Id.

At the June 19, 2014 meeting of the DOC, committee member Russell Pierce stated:

The importance of the one that's not above thirty nine tons is that it emphasizes HAPs, and it emphasizes the proximity, it's in other areas of the city, including schools and residential areas already located adjacent to crude oil tank farms and their associated air quality effects, so with the recommended changes to that paragraph, I think it clarifies

---

[127] The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 104, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

the distinction that . . . there is a little bit of overlap because they both talk about air emissions, but I think they're both worth keeping.

DSAMF ¶ 264; PRDSAMF ¶ 264.  He also said:

But I think that the kind of the point I was trying to make in having this is that this first paragraph emphasizes including the 19 tank facility on Hill Street, meaning that the bulk loading of crude oil onto marine tank vessels would likely include an increased use or reusing existing unused capacity at the tank farm, which could increase HAPs, fugitive emissions, related to oil storage facilities.

DSAMF ¶ 265; PRDSAMF ¶ 265.  He also said:

So I think what I was kind of saying, you know, I don't know if I said this before, but, you know, one is there will be HAPs emissions, that's not good.  There'll be HAPs emissions from the storage facilities, that's not good.  Another reason why it's not good is that HAPS emissions from the storage facilities because the storage facilities are adjacent to schools, and residents, and all of that.

DSAMF ¶ 267; PRDSAMF ¶ 267.

At the June 19, 2014 meeting of the DOC, committee member Russell Pierce stated, "I want to specifically and expressly tie the vision to the plan . . . we need to say this is the waterfront community vision and we need to be expressly clear that this vision is tied to the eastern waterfront, and so that's why we need to quote it— make it clear."  He later added:

The plan identifies the eastern waterfront.  The eastern waterfront is divided into a number of subareas—the Ferry Village marine mixed-use area, the marine industrial area, the shipyard district, the Picket Street neighborhood, the shipyard mixed use area, and the SMCC college seashore area—that is what the plan identifies as the eastern waterfront, and this is an area where in the short term, the community vision needs to be carried forward.

DSAMF ¶ 268; PRDSAMF ¶ 268.

At the June 19, 2014 meeting of the DOC, committee member Russell Pierce commented, "I went to the maps and tried to find the neighborhood centers . . . and I said, including South Portland High School, several other schools . . . preschools and the South Portland community center, and I just want to confirm, I had schools identified, and I recall the record reflecting a preschool." DSAMF ¶ 270; PRDSAMF ¶ 270. He also said:

> There are some things that are not covered by state and federal law; those are the things we've tackled here. But, for me too, there are some overarching points that the council, I would think, needs to know . . . that are related to the policy reasons for the legislation . . . I think the city council needs to know that there is an existing hazardous air pollutant problem from the existing oil storage tank facilities and, you know, using the fugitive emissions just alone . . . we could present a very vivid picture for the councilors, for the legislators here, sort of, this is why you care about the air quality, about the HAPs; this is why you care.

DSAMF ¶ 271; PRDSAMF ¶ 271. He later added:

> If you do the calculations on the fugitive emissions, and if you calculate that, that's talking about, whatever it is, three-foot or four-foot hole on top of each tank . . . and then you add all that together, basically it's as though there has been an open barge of crude oil, and now it has been next to a school, and for the lay person, you're like, that can't be. That can't be allowed. Yes, that is what's going on right now.

*Id.*

At the June 19, 2014 meeting of the DOC, committee member Russell Pierce stated "[w]hat we are regulating is a new, nontraditional use that posed serious air quality and scenic value and land use planning issues." DSAMF ¶ 272; PRDSAMF ¶ 272. He said, "I disagree that we went to air quality because we could. We went there first because of the policy reasons and the public comment and all of the demonstrations . . . And then the legal analysis was, and that's where we could go

after we determined that that was the place." DSAMF ¶ 273; PRDSAMF ¶ 273. He characterized the Ordinance as "surgically pointed to just regulating the new non-traditional use while maintaining the working waterfront . . . consistent with the way that working waterfront is envisioned in the plan." DSAMF ¶ 275; PRDSAMF ¶ 275. He queried:

> You've been offloading crude oil for eons, to use dramatic terms, so now loading on, what's the big deal about that? The big deal about that is that that requires a 70- foot combustion stack or two or whatever, and that's twelve feet wide and seventy feet high, and that would be the tallest structure in the city on the pier . . . I'm really just raising this as a question, do we need to be driving home these points to the council?

DSAMF ¶ 276; PRDSAMF ¶ 276.

At a June 25, 2014 special workshop of the South Portland City Council, DOC member Russell Pierce stated:

> When we were looking at the issue of land use planning, what is the power of the City of South Portland to exercise its home rule authority to enact zoning ordinances, one of the places where the City is permitted to act is in the regulation of air emissions or in regulations pertaining to the installation or construction of buildings or equipment that may be part of land use activities that result in air emissions. This is one of the key places where the federal government says to the states and the local municipalities, it's okay to regulate in this area, you won't be preempted or prevented from helping the nation with air emissions control regulation, so, cognizant in our mind was the, going into this, was the prospect that because the bulk loading of crude oil involves significant air emission structures and equipment, that that would also be a place where the City of South Portland could go in to regulate. [128]

PSMF ¶ 113. He also said "We can't predict how, if any of this is challenged, whether one, more or all of this will survive a challenge or not. It's, it's, the point is this is the

---

[128] The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 113, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

best we can do, let's put as much belt and suspenders out there as we can."[129]  PSMF ¶ 114.

At a July 1, 2014 DOC meeting, DOC member Russell Pierce stated:  "I think our concern was to make sure that you have the preamble at your disposal in the event that there's a challenge to the ordinance."[130]  PSMF ¶ 116.[131]

### 3.    Comments by Michael Conathan

In Mr. Conathan's proposal to the City applying to be a DOC member, he said "I am opposed to the use of the pipeline to ship tar sands oil."[132]  PSMF ¶ 84.[133]

At a February 27, 2014 DOC meeting, the following exchange took place between DOC member Michael Conathan and Bill Sousa, a representative of the petroleum industry:

> *Michael Conathan*:  What I'm trying to get at, and it would be helpful to, you know, one of, one of the complaints that we sort of heard in the run up to the WPO vote is, you know, well the, the industry hasn't really

---

[129]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 114, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[130]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 116, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[131]    PPLC also seeks to include an excerpt of an email from a member of an advocacy group commenting on the draft ordinance.  PSMF ¶ 115.  The City denies this statement as irrelevant and inadmissible.  DRPSMF ¶ 115.  The Court agrees these statements from a member of the public do not constitute legislative history probative of the intent or purpose of the City Councilors voting on the Ordinance, and are not relevant.  This stands in contrast to statements from the Councilors and DOC members, as discussed in footnote 80 and footnote 85.

[132]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 84, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[133]    PPLC seeks admission of a paragraph stating the Center for American Progress' opposition to oil sand extraction, which it purportedly believes indicates bias on the part of Mr. Conathan.  PSMF ¶ 83.  The City objects that these statements are irrelevant and inadmissible.  DRPSMF ¶ 83.  The Court agrees these statements from a DOC member's employer do not constitute legislative history probative of the intent or purpose of the City Councilors voting on the Ordinance, and are not relevant.  This stands in contrast to statements from the Councilors and DOC members, as discussed in footnote 80 and footnote 85.

been given the opportunity to contribute to the process. Was one of the things that I want to make sure, you know, that we as a committee check the box on that. You know, what are your concerns –

*Bill Sousa*: Well, I, I –

*Michael Conathan*: And what are –

*Bill Sousa*: I can tell you, I don't think you're checking the box on that because you've, I think you all've ignored the one terminal that you're really trying to effect. You've, I think this, this process has put the cart before the horse. There was no, you know, investigating the, the overall issue that people are concerned about and you all have a charter to reach a conclusion that's already set in stone. So, ah, so now you're getting my personal opinion.

. . .

*Bill Sousa*: And so, I think the, I, I, I don't necessarily agree with this, with the whole process of, of the way this is going. [134]

PSMF ¶ 98.

At an April 3, 2014 meeting of the DOC, committee member Mike Conathan

stated:

> [G]oing back to this marine industrial use concept, what are the other heavy industrial zoning options that could be applied here and how are they different - it's not a question for Rob necessarily, but, again, it's more of a discussion point for us . . . if there were another classification for this, I don't know what that would get us, or if it would get us anywhere, frankly, but I'm just curious. It's such an anomaly and obviously it's a . . . made for the benefit of the pipeline company and may or may not be an appropriate one given the mixed uses that have grown up around the tank farm.

DSAMF ¶ 226; PRDSAMF ¶ 226.

---

[134]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 98, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

At an April 16, 2014 meeting of the DOC, committee member Mike Conathan stated:

> [T]he DEP effectively sets these standards and issues these permits, but does the city have a role in participating in that process? Does the DEP consult the city? What's the link? . . . I'm gonna try to drill down a little bit on some of these issues of where do we go with this information that we've got. So, for example, starting with air quality is great . . . I'm appalled by the monitoring alone, the air quality at these facilities, particularly around schools.

DSAMF ¶ 231; PRDSAMF ¶ 231. He also queried of a presenter to the committee

> One of the things that you brought up was the odors produced by loading, and obviously we could potentially be talking about significantly higher quantity of loading operations which would, therefore, mean a higher quantity of odor. Is there greater odor produced by loading a tanker versus unloading a tanker?[135]

DSAMF ¶ 231.

At the April 24, 2014 meeting of the DOC, committee member Mike Conathan stated:

> I would potentially put some of the air quality issues in that slot as well, and the monitoring issues in particular. You know . . . the point about monitoring air quality is a good one, but I think if the ultimate goal of the ordinance is to not have the stuff here in the first place, then hopefully there's nothing to monitor.

DSAMF ¶ 235; PRDSAMF ¶ 235.

At the May 7, 2014 meeting of the DOC, committee member Mike Conathan stated:

> Well I think part of what we may have been trying to get at was additional emissions as opposed to new sources, and so we go back to sort of the question about TI or the other emitters, you know, those are

---

[135] PPLC offers a qualified admission but seeks to clarify who Mr. Conathan was speaking with. PRDSAMF ¶ 231. The Court rejects the qualification because it is not inconsistent with the City's statement.

existing sources, and say that what we are trying to get at is to not have pipeline sources increased, regardless of whether it comes from refined or unrefined for the purposes of this particular conversation . . . The intent here is to keep emissions from increasing in a part of the city where there are not permanent at the moment, potentially.

DSAMF ¶ 244; PRDSAMF ¶ 244. He also stated:

I think this is sort of what we're getting at with the air emissions piece, and it all basically wraps into a single conversation here and we're just, the three of us, are sort of coming at this same air emissions conversation from a slightly different angle, some kind of language that focuses on regulating the function of the VCRU, that is, the VCU, that being emissions, so I think this is where ultimately we're kind of starting to direct our conversation, also addressing the general concern that we don't want to do anything that impacts new safety equipment or upgraded safety equipment, and lastly to just make a flag on the aesthetic impact issue . . . The seventy foot stack would have an impact on property value as well as general enjoyment of the waterfront views from various points in the city and beyond.

DSAMF ¶ 247; PRDSAMF ¶ 247.

At the May 27, 2014 meeting of the DOC, committee member Mike Conathan stated "[b]eing a destination, livable walkable neighborhoods, green city, obviously, waterfront community, obviously." DSAMF ¶ 255; PRDSAMF ¶ 255.

At a June 19, 2014 DOC meeting, DOC member Michael Conathan stated that he would not want "to try to make the impression that all anyone cares about is air quality" and that, "without any jurisdictional concerns . . . people would be concerned about climate change, people would be concerned about all the other things we have

heard people talk about."[136]  PSMF ¶ 107.  He also said that air quality was "the nexus between what people care about and what [the DOC] can do."[137]  PSMF ¶ 108.

### 4.    Comments by David Critchfield

At an April 3, 2014 meeting of the DOC, Committee member David Critchfield stated:

> The regulations say . . . is that for HAPs - which are defined differently from VOCs, some HAPs are a component of a volatile organic compound, but HAPs are a specific list of chemicals - and what the rules say about HAPs is, if you emit more than 10 tons of any one hazardous air pollutant, or 25 tons in the aggregate of hazardous air pollutants, then you jump into the . . . title 5 . . . regime, even if your VOCs are below 40 tons per year . . . The applicant has gotta prove that any single hazardous air pollutant or any family of air pollutants aren't greater than 10 or 10 to 25 tons per year, otherwise they jump to the varsity level of air permits.

DSAMF ¶ 228; PRDSAMF ¶ 228. He also queried, "In any of your reading, did you come onto sort of ozone non-attainment issues?" DSAMF ¶ 229; PRDSAMF ¶ 229.

At the April 17, 2014 meeting of the DOC, committee member David Critchfield stated:

> I think we can probably . . . multiple prongs, but in the discussions yesterday, we had heard from the, from Emily, that the Portland area had been given a grade of C by the American Lung Association and I think that it's our understanding that the state of Maine and EPA considers this in-attainment, so I guess I wanted to sort of square away on the facts there, what's what.

DSAMF ¶ 232; PRDSAMF ¶ 232.

---

[136]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 107, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[137]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 108, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

At the May 7, 2014 meeting of the DOC, committee member David Critchfield stated, "There might be a safety issue to this. There's an O2 concentration level that you're going to have an explosive mix if you're loading." DSAMF ¶ 242; PRDSAMF ¶ 242.

At the June 5, 2014 meeting of the DOC, committee member David Critchfield stated, "One thing that came through clear through both the oral as well as the written comments was a concern for public health due to air exposure." DSAMF ¶ 261; PRDSAMF ¶ 261.

### 5. Comments by Jeff Edelstein

At the February 6, 2014 DOC meeting, DOC Facilitator Jeff Edelstein stated:

> I did write down the language that comes out of the moratorium, that's repeated over and over and I think that the council referenced that the language over and over is new development proposals involving the loading of oil sands/tar sands products onto marine tank vessels. It was pretty clear that there are members of the council who want to see that none of these materials move through South Portland. I guess that's how I would characterize where the situation is on the charge. [138]

PSMF ¶ 96. He also stated:

> [T]o the extent that it's dealing with the oil tar sands products and that desire to not have them move through the city, I would guess that, from the council's standpoint, they probably don't care what mechanism you use, if you find that it's outside of the industrial or shipyard or, you know, that's your charge is to be the brains to figure that out. [139]

PSMF ¶ 100.

---

[138]   The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 96, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[139]   The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 100, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

At the April 24, 2015 meeting of the DOC, committee moderator Jeff Edelstein stated:

> [T]he different approaches, sort of generically . . . are to, in some ways within one district, multiple districts, zoning districts, or all zoning districts, to specifically exclude loading of marine tanker vessels as a permitted use, to have that be a non-permitted use . . . Another one is to exclude or limit vapor combustion units or vapor recovery units, and so that could be anything from height restrictions, other sorts of restrictions . . . we're excluding them also . . . .

DSAMF ¶ 234; PRDSAMF ¶ 234.

At the April 29, 2014 meeting of the DOC, committee moderator Jeff Edelstein queried "[t]he 39 point whatever tons per year of VOCs is for the VCUs at the pier. One of you brought up . . . the question of, with a different material going through the storage tanks, the question is do the calculations change?" DSAMF ¶ 238; PRDSAMF ¶ 238.

On May 2, 2014, DOC facilitator Jeff Edelstein sent an email to DOC member and attorney, Russell Pierce pointing out the Supreme Court's ruling in *Huron Portland Cement Co. v. City of Detroit*.[140] PSAMF ¶ 255.

At the May 27, 2014 meeting of the DOC, committee moderator Jeff Edelstein stated:

> You're burying the lead here, your lead is that there is existing pipeline capacity of over 700,000 barrels per day, which currently does not export any crude whatsoever, and thus you don't have those emissions associated with it. Full use of that pipeline capacity would result in on the order of 200 tons per year . . . It could result in emissions on the

---

[140] The City denies this statement as irrelevant and inadmissible, DRPSAMF ¶ 255, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

order of 200 tons per year based on the estimate of 39-40 tons for 150,000 barrels per day.

DSAMF ¶ 253; PRDSAMF ¶ 253.  He also stated:

> How incredibly unique it is to have a community college that sits on the waterfront of the jewel of Casco Bay, you know, Portland Head Light is not in South Portland, but it's spitting distance.  Does this convey to somebody that we're not just talking about any waterfront community, but we're really talking about a unique, you know, so everyone talks about recreation and tourism, but, you know, it's for real to say that this is really a unique recreation/tourism place, South Portland, Casco Bay, etc.?"

DSAMF ¶ 258; PRDSAMF ¶ 258.

At the June 5, 2014 meeting of the DOC, committee moderator Jeff Edelstein stated, "The Committee considered various factors by which to assess which of those would accomplish its charge . . . Is it consistent with the vision of South Portland that was presented by the Comprehensive Plan?"  DSAMF ¶ 259; PRDSAMF ¶ 259.

At the June 19, 2014 DOC meeting, DOC facilitator Jeff Edelstein stated:  "It comes down to, under the constitution and Congress passing the Pipeline Safety Act, the feds regulate pipelines, municipalities can regulate air emissions, that's like the crux of it."[141]  PSMF ¶ 109.  He also stated:

> And I'm not sure it matters if things are repeated, but that point is then made in the paragraph after this one that we're talking about . . . the one that says . . . Whereas the storage tank facility on Hill Street is located adjacent to, etc., and permitting the loading of crude oil onto marine tank vessels would likely require more storage of crude oil.  I mean that brings it directly to the school children and area residents.

DSAMF ¶ 266; PRDSAMF ¶ 266.  He also said:

---

[141]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 109, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

I guess what I'm saying is why do ambient concentrations bioaccumulation . . . matter? . . . Isn't that part of the adverse human health effects, not something separate? . . . The regulation of HAPs is not being done based on bioaccumulations in species simply to protect species. The regulation of HAPs is being done because of the human health effects.

DSAMF ¶ 269; PRDSAMF ¶ 269.

At the June 19, 2014 meeting of the DOC, committee moderator Jeff Edelstein stated:

> Okay we recognize that there was a lot of . . . commotion about tar sands and oil sands and all that. But when the committee started asking people, what are the issues? Why are you concerned about this? What you were hearing from the outset was we're concerned about air quality, we're concerned about, what is it, the aesthetics of this, we're concerned about the impacts on our community. And that really was what people were saying their concerns were . . . There was some people who said, you know, well how come you're not addressing spills. But that wasn't really what people were as passionate about. It was about, how is this affecting us as a community if this were to happen?

DSAMF ¶ 274; PRDSAMF ¶ 274.

## I. The City Council Considers the Clear Skies Ordinance

On July 9, 2014, the City Council held a first reading of the proposed "Clear Skies Ordinance," which was attended by the members of the DOC. PSMF ¶ 117; DRPSMF ¶ 117.

### 1. Statements by Others to the Councilors

On February 24, 2014, representatives of the Maine DEP gave a presentation to the South Portland City Council entitled "Overview of Ambient Air Monitoring and Air Quality in Maine and the South Portland Area." PSAMF ¶ 256; DRPSMF ¶ 256.

At a June 25, 2014 Special Workshop of the South Portland City Council, DOC

member Russell Pierce stated:

> Well, I think one of the most important points is that because we didn't
> want to impact existing uses on the working waterfront so that's part of
> what drove the definition of, which originally it was refined petroleum
> products versus unrefined petroleum products and that's where we got
> into an issue where we didn't want to just say to, to prohibit the bulk
> loading of one particular kind of unrefined petroleum products, and not
> others, and the reason for that is both legal and also factual. I mean, as
> a practical matter, the, the bulk loading of crude oil, at least in this day
> and age, we had, when Charlie Colgan and Bill Hastings came and
> talked to about just the sort of the global market and the transport of
> crude generally, as a practical matter, the most likely product to come
> through the pipeline for bulk loading and export to refineries would be
> the Canadi [sic], the Canada product, but not necessarily so, so, you
> know, but for a number of other legal reasons you don't want to just
> carve out one particular kind of product."[142]

PSMF ¶ 129. He also stated:

> One of the places where the city is permitted to act is in the regulation
> of air emissions or regulations pertaining to the installation or
> construction of buildings or equipment that may be part of land use
> activities that result in air emissions . . . [T]he importance here of this
> slide too, is that not only was this not a traditional land use, it was also
> a traditional land use that would involve the installation of vapor control
> systems . . . on the pier.

DSAMF ¶ 281; PRDSAMF ¶ 281.

At the June 25, 2014 Special Workshop of City Council, DOC moderator Jeff

Edelstein stated:

> The committee learned that bulk loading of crude oil onto marine tank
> vessels is neither a traditional marine use nor a traditional light
> industrial use in South Portland, and it learned that bulk loading of
> crude oil for export . . . they found it significantly different than
> offloading . . . particularly due to the emissions of air pollutants . . . also,

---

[142]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 129, but for the
reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court
rejects the denial.

on that same note, they learned that air quality and its impact on public health, that that's an existing concern that people have that they brought to the committee, and that would be exacerbated by the export of crude oil.

DSAMF ¶ 279; PRDSAMF ¶ 279.  DOC member David Critchfield stated

> [P]robably the one that is the most complex, and the one that taxes people in my business the most is the air regulations, because it is so complex; it crosses state boundaries . . . and then you're also dealing with, very much unlike water, you're dealing with sort of air sheds that have no riverbanks, if you will.  So a public concern in our community or in the state of Maine or in the state of NH can kind of be vague and . . . there's not the kind of ease of gathering data that you would have if the mission was to go out and find out if the . . . river was contaminated based on a sample from a city sewer system or an industrial site or a paper mill.

DSAMF ¶ 280; PRDSAMF ¶ 280.

At the July 9, 2014 council meeting, DOC member Michael Conathan stated that the committee had sought to "address the potential issue of throughput of crude oil through the City of South Portland."[143]  PSMF ¶ 118.  He also said that the draft "Clear Skies Ordinance" did not expressly address Canadian "tar sands," despite the City Council's prior charge that the DOC do so, because the DOC determined that it did not have jurisdiction to regulate the handling of that sort of crude oil.[144]  PSMF ¶ 121.  Jeff Edelstein, the DOC's facilitator, outlined the history and operations of PPLC's pipeline, noting that the pipeline had been "part of this discussion," and then

---

[143]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 118, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[144]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 121, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

stated: "The [DOC] really tried hard to make sure that its intent was built in legally so that there's no ambiguities in this recommended ordinance."[145]  PSMF ¶ 120.

During the July 9, 2014 meeting of the South Portland City Council, the Alberta representative in the Canadian Embassy spoke against the draft ordinance, noting, among other things, that one-third of the oil imported into the United States comes from Canada; Canada respects the environment and existing regulations are in place; and that the ordinance reflects a misunderstanding of Canada's oil sands product.[146]  PSMF ¶ 130.

At the July 21, 2014 meeting of the South Portland City Council, City Manager James Gailey stated:

> The city, under its traditional land use authority and general policing powers, as provided by law, has the authority to impose reasonable restrictions, conditions, and limitations on development for the benefit of the community's public health and welfare. Restrictions and conditions on development that could jeopardize air and water quality and scenic views can be incorporated into the city code.  The draft ordinance committee has presented a number of findings, supporting their recommendations and furthering their explanation on how air quality, water quality, and scenic views, whether through emissions, potential spills, or new infrastructure, would be impacted by the loading of crude oil here in South Portland.  The draft ordinance committee further concludes that the new and expanded land use and associated facilities for bulk loading would impact the mixed uses along the waterfront, and would be inconsistent with portion of the comprehensive plan.

DSAMF ¶ 285; PRDSAMF ¶ 285.  He then added:

---

[145]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 120, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[146]     The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 130, but the Court rejects the denial. The statements of representatives of foreign governments are relevant for the foreign affairs and dormant commerce analyses.

Under Chapter 27, Section 111, Purpose, the zoning ordinance is designed for all the purposes of the zoning embraced in Title 30A of the Maine Revised Statutes, and has been drafted as an integral part of the comprehensive plan for the city of South Portland, Maine. Among other things, it is designed to encourage the most appropriate use of land throughout the municipality. There is one assertion in this purpose statement, and that reads: To protect citizens and visitors from harmful effects caused by air pollutants, to implement part 1 of the recommendations of the city council appointed ad hoc draft ordinance committee dated July 1, 2014.

*Id.*

At the July 21, 2014 meeting of the South Portland City Council, public commenter Ed Miller, Vice President for Public Policy for the American Lung Association in Maine stated:

The air quality, as you heard, in this area is not good. We do an annual report card on air quality, and Cumberland County has received a C. Now C sounds like, you know an okay grade; it's not great. However, that C is using an air quality standard that is woefully out of date, and even the EPA's scientific advisory council has said that it needs to be changed. I guarantee you, once it's changed, that air grade in this area will be D or worse . . . We should be reducing the amount of air pollution in this area, not increasing it. We have high rates of asthma, some of the highest in the country, high rates of chronic lung disease, and high rates of lung cancer, and if you don't happen to have that disease, or any of those diseases, or have loved ones who do, you can also find yourself at risk, even without those diseases.

DSAMF ¶ 286; PRDSAMF ¶ 286.

When commenting on a draft of the "Clear Skies Ordinance" the City's Corporation Counsel remarked on the "10 pages of findings" appearing in the

ordinance and noted that such findings "are not usually part of a Zoning Ordinance."[147]  PSMF ¶ 110.

South Portland residents voiced their concerns about air quality and city aesthetics to the City Council and DOC in numerous meetings leading up to the ordinance's enactment.[148] DSAMF ¶ 291.

### 2.    Statements by Councilor Tom Blake

At the March 24, 2014 meeting of the South Portland City Council, Councilor Tom Blake stated, "And as a 27 year firefighter and paramedic for this community, my main concern always has been and always will remain health and safety.  And everything we look at is the health and safety of our citizens."  DSAMF ¶ 278; PRDSAMF ¶ 278.

At a July 9, 2014 meeting, Councilor Tom Blake criticized PPLC for its effort to bring the "world's dirtiest oil and bring it down our residential streets and our residential neighborhoods."[149]  PSMF ¶ 122.  He also stated:

> They can't say that this change is going to be more healthy.  They can't say it. They can't say it's going to help our education system.  They can't say it's aesthetically pleasing. The only thing they can say is jobs.  Well, I believe that they've really stretched that . . . What this is really about is health and safety.  I spent 27 years as a firefighter/paramedic for this community and the past seven years as your councilor at large. And I inspected all the oil companies on a regular basis.  I used to love to go up on the oil tankers and learn.  But what I learned mostly about my job

---

[147]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 110, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[148]    PPLC offers a qualification on the grounds that some of the record citations do not support the claim or are missing.  PRDSAMF ¶ 291.  The Court rejects the qualification because PPLC admits the statement is supported by the remaining citations.

[149]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 122, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

is that it's health and safety. That's why we're here. That was my job as a firefighter/paramedic was to take care of our citizenry. And every time I make a decision at the city council level, the first thing that goes through my mind is what's best for our citizens? What is best for the health and safety of our community? And then after that, what's best for all of our people? This is truly about the waters; it's about the air; it's about the soils we stand on so that we can take care of ourselves. It's about Casco Bay, which I believe is in dire jeopardy. That's what this is all about.

DSAMF ¶ 282; PRDSAMF ¶ 282.

At a July 21, 2014 meeting of the South Portland City Council, Councilor Tom Blake stated:

> Priorities change through the generations and through the decades. And this is a very important evening and I'm going to take a couple of minutes and talk about how we have changed. We started to see a change in America and in South Portland ten or twenty years ago, when [sic] the advent of climate change. We took some initial action in 2007 when we enacted the climate change, the mayoral climate change, led by Claude Morgan. That required that we think globally, act locally. That's what this ordinance is doing tonight.[150]

PSMF ¶ 123. He also said "How many Kala, Kalamazoo's do we need? How may Mayflowers do we need? How many people need to die like Lac-Mégantic? We've learned our lesson."[151] PSMF ¶ 124.

At the July 21, 2014 meeting of the City Council, Councilor Tom Blake also stated:

> In response to Councilor Pock's last-minute attempted amendment changing 'crude' in the ordinance to 'non-American crude': This is not about Canada; this is not about America. This is about the health and the safety of our community. I don't care if this crude comes from

---

[150]  The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 123, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[151]  The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 124, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

Timbuktu.  What's important to all of us, and apparently Councilor Pock has been missing the message, that this is about our people, our air, our water, the quality of our lives.  I support Canada and many things they do, Mr. Pock.  But this is very inappropriate this evening. It misses the mark.  And I have no interest in supporting this amendment.

DSAMF ¶ 287; PRDSAMF ¶ 287.  He later added:

> What gives us the right to do this?  First of all, what gives us the right to enact this ordinance tonight goes back to 1895, when the city was incorporated as a town, and then three years later, we became a city.  And in doing that, we established a city charter, and a city ordinance book . . .  The city charter gives us, as elected officials, the right, and more importantly, the responsibility, to represent the people—to take care of your welfare, your health, and your safety.  And this is where Councilor Pock is missing the boat.  We are here for your health and your safety.

*Id.*

### 3.    Statements by Councilor Linda Cohen

At a July 9, 2014 meeting of the South Portland City Council, Councilor Linda Cohen stated:

> I voted against the November ballot question.  I felt that it was too broad. I've heard from so many people who voted against the November question because they felt it was too broad.  Because it, basically, talked about any kind of petroleum product being handled on the waterfront.  Well a lot of people do that.  A lot of marinas do that, a lot of businesses.  So I voted against it.  A lot of people told me the same thing, "I voted against it, but I don't want tar sands." And I don't want tar sands in South Portland.  It scares me.  And you can't say that it's the same thing as the crude we are using because it's heavier and if there's an accident it's harder to clean up and I think that the people who've seen that happen know that that's true.[152]

---

[152]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 119, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

PSMF ¶ 119. She also said "[W]hen I read [the ordinance], I said well I guess that would take care of tar sands, because if you can't load it, why have it shipped here?"[153]

PSMF ¶ 126.  She also said:

> I think that many of us live in South Portland, and we know the risks of living here . . . I've owned four houses in this city, and almost every one of them was near some kind of a, either a tank or the railroad, where things can blow up.  It's something I accepted when I moved to South Portland. But with all of that, it's always worked.  But that does not mean we have to intensify any of the dangers of living here.  And I think as city councilors, our responsibility is to protect the citizens of the city, protect the assets of the city.  And all the assets of the city include the residents, the businesses, the homes, the land, the water around us— it's beautiful.  Why would we want to put more risk here than we already have?

DSAMF ¶ 283; PRDSAMF ¶ 283.  She later added:

> We're not making any businesses non-conforming.  Businesses that are the waterfront that are dealing with petroleum products now will be able to continue to do what they're doing.  They will be able to expand what they're doing.  They just won't be able to bulk load onto vessels. And I think that it is not unusual for a municipality or a council or a planning board to look at restricting uses that intensify the use on a property—it happens all the time, whether it's a residence or whether it's a business.

*Id.*

At a July 21, 2014 meeting, Councilor Linda Cohen stated that the City gave the DOC instructions to "keep tar sands out of South Portland."[154]  PSMF ¶ 127.

Councilor Cohen also said:

> I appreciate all of the businesses in South Portland, every single one of them.  We wouldn't be the community that we are without what we've got here.  And one of the things that I have always loved about South

---

[153]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 126, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[154]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 127, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

Portland is the mixture—the businesses at the waterfront, at the mall, all over, big and small have coexisted with the residents of this city for years and years and years, and it has just worked, but that doesn't mean that I want to intensify that use, and I think that, by the council passing this zoning ordinance, and not allowing the pumping of bulk crude onto ships, we're just making sure that we don't intensify the current use.

DSAMF ¶ 288; PRDSAMF ¶ 288.

### 4.     Statements by Councilor Gerard Jalbert

At the July 9, 2016 meeting of the South Portland City Council, Gerald Jalbert

stated

> When you're a city councilor, you don't just come to meetings, listen to debates, and vote. You also have a certain level of responsibility to the community as a whole.  And that's to look at the wellbeing of the community.  And the wellbeing of the community in South Portland bank in November of last year was not very good at all. So, this council did something very gutsy.  We started the moratorium process.  We know that was difficult for many people to accept.  But we had to take on the responsibility to prevent further referendums.  People assumed that we were trying to prevent the Pipeline Corporation from going forward with a certain application, but they had no plans to do so anyways.  We couldn't have more referendums.  It'd almost be like the Bill Murray movie, *Groundhog Day*, where you keep doing the same thing over and over and over again.  So, we had to make a fundamental change.  And that's what's brought us to tonight.

DSAMF ¶ 290; PRDSAMF ¶ 290.

### 5.     Statements by Councilor Melissa Linscott

At the July 9, 2014 meeting, Councilor Melissa Linscott stated that "tar sands

was just too high of a risk" and praised the draft ordinance for "preventing tar sands

and other crude oil products from coming into our City and being exported."[155]  PSMF

¶ 125.

### 6.        Statements by Councilor Michael Pock

At a June 25, 2014 meeting of the South Portland City Council, Councilor

Michael Pock stated:

> I vehemently object to the term clean air ordinance.  We had a City
> council workshop on February 24th and we discussed air quality, quite
> extensively, we had the Maine DEP come in here and tell us that the air
> in South Portland is not only clean, but it's cleaner than it has been in
> years, and considering the restrictions they're put upon us constantly,
> we keep beating the record so clean air, I, I, I completely object to this
> whole idea about the clean air, we are not talking about clean air, we
> are talking about tar sands.[156]

PSMF ¶ 111.

### 7.        Statements by Councilor Patti Smith

At the March 24, 2014 meeting of the South Portland City Council, Councilor

Patti Smith stated:

> The comprehensive plan, which is on, as one consideration.  I just also
> want to mention the Mayoral Climate Protection Agreement that this
> city is part of, and, although we're just here in local politics, maybe I'm
> in the wrong place, but I think it is a global issue, and it is far- reaching.
> And I think, as a city, we signed on to that agreement, and I think there's
> a lot of excellent, excellent tenets to the agreement, and I think, as a
> city, as much as we try to follow our comprehensive plan, our
> comprehensive is very broad, comprehensive plan, whereas I think the
> Mayoral Climate Protection Agreement is more in keeping with what
> we're looking at.  So, I'd ask the committee to potentially look at that as
> well.

---

[155]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 125, but for the
reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court
rejects the denial.

[156]    The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 111, but for the
reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court
rejects the denial.

DSAMF ¶ 277; PRDSAMF ¶ 277.

At the July 9, 2014 meeting of the South Portland City Council, Councilor Patti Smith stated:

> We asked them [the committee] to help protect our city. And as a city councilor, I want to protect everyone that we can—jobs and people. But of course I want to protect everyone's health and safety. Because if we don't have our health or our safety, who cares if we have a job? So that supersedes everything I think about, when I think about this ordinance.

DSAMF ¶ 284; PRDSAMF ¶ 284.

At a July 21, 2014 meeting, Councilor Patricia Smith stated, "What I see on paper is something that will protect the health and safety of our residents, and potentially, the health and safety of other global residents." DSAMF ¶ 289; PRDSAMF ¶ 289. She also said the Ordinance "thread[ed] a needle" and would have a positive effect on the "indigenous people of Alberta."[157] PSMF ¶ 128.

## J.     The Clear Skies Ordinance

Ordinance No. 1-14/15, the "Clear Skies Ordinance" passed the City Council on its first reading on July 9, 2014, by a vote of 6-1, and passed the City Council on its second reading on July 21, 2014, by a vote of 6-1. PSMF ¶ 131; DRPSMF ¶ 131.[158] The City Council made the legislative findings in the Ordinance that:

> (a) as a result of the Community Vision as set forth in the Comprehensive Plan, the City intends "to promote future development

---

[157] The City denies this statement as irrelevant and inadmissible, DRPSMF ¶ 128, but for the reasons discussed in footnote 80 and footnote 85, for the purposes of these motions only, the Court rejects the denial.

[158] The City also claims that the Ordinance was enacted "in part, on the recommendations of the Draft Ordinance Committee." DSMF ¶ 147. PPLC offers a qualified admission on the ground that the Ordinance itself does not support the proposition that the City Council enacted it "based on the recommendation of the Draft Ordinance Committee." PRDSMF ¶ 147. The Court agrees and omits the statement, but the Court has considered the rest of the legislative history, which may obviate the omission.

in harmony with the basic elements of its Community Vision – a vision that embraces a diverse mixed-use waterfront community; a green city that protects its air quality; an education community where schools and a waterfront college campus are not impacted by incompatible adjacent uses, including new or expanded sources of significant air pollution; and a city that is a desirable destination and a desirable, livable community."

(b) "[i]n the short term, the City's marine terminals and related marine industrial areas are maintained and improved while minimizing their impact on adjacent residential neighborhoods."

(c) "bulk loading crude oil onto marine tank vessels is neither a traditional marine use nor a light industrial use" because "during the entire history since inception of all of the City's commercial, shipyard, or marine industrial uses and facilities, no such uses or facilities have ever included operations for the bulk loading of crude oil onto marine tank vessels or the related installation of vapor control systems to convey hydrocarbon vapors displaced by marine tank vessel crude oil loading operations to vapor combustion units."

(d) "the proposed bulk crude oil loading operation would have constituted a new land use, which has never been a traditional land use within the City, and which would have significantly impacted future development of the City's waterfront, air quality, scenic ocean views, and land-use planning vision."

(e) "air pollutants associated with storage and bulk loading of crude oil onto marine tank vessels include particulate matter, sulfur dioxide, nitrogen oxides, carbon monoxide, hazardous air pollutants (HAPs) [including benzene, ethyl benzene, hexane, toluene, and xylenes] and volatile organic compounds (VOCs)."

(f) "HAPs include substances which are known to be, or may reasonably be anticipated to be, acutely or chronically toxic, carcinogenic, mutagenic, teratogenic, or neurotoxic; and through inhalation or other routes of exposure present, or may present, a threat of adverse environmental and ecological effects and serious human health effects, including cancer, reproductive dysfunction, or birth defects."

(g) "the bulk loading of crude oil onto marine tank vessels would likely result in an increase in emissions of HAPs and volatile organic compounds from oil storage tank facilities within the City, including the 19-tank facility on Hill Street and storage tank facilities located on

Preble Street and Front Street, that would diminish the City's air quality."

(h) the 39 tons per year of VOCs for which PPLC's bulk loading of crude oil would emit "are precursors to the formation of ground level ozone, and emissions from the bulk loading of crude oil onto marine tank vessels would increase such precursor concentrations."

(i) breathing ozone can cause adverse health effects, including asthma and other respiratory problems that particularly affect children, and that "South Portland residents, visitors, and tourists would likely be exposed to high concentrations of ground level ozone in addition to increased levels of hazardous air pollutants and volatile organic compounds associated with emissions from the bulk loading of crude oil onto marine tank vessels."

(j) PPLC's facilities are in close proximity to elementary schools, preschools, the South Portland High School and athletic fields, a community center, a large senior city housing facility, and numerous residential districts and that these areas would experience air quality impacts associated with the bulk loading of crude oil.

(k) the two proposed 70-foot VCUs to be constructed under PPLC's 2009-2009 project would "be located in close proximity to city parks with diverse recreational uses, including Bug Light Park, Willard Beach, Fisherman's Point, and the Greenbelt Walkway."

(l) the two proposed 70-foot VCUs to be constructed under PPLC's 2009-2009 project would "likely be among the tallest industrial structures on the South Portland waterfront and, due to their size and character, would negatively impact waterfront scenic values and property values."

(m) "new and expanded land use and facilities for the bulk loading of crude oil onto marine tank vessels would adversely impact the balance of mixed-uses on the waterfront – a current balance including uses arising from four marinas, a yacht club, other recreational marine uses, other commercial fishing or light industrial uses, other adjacent expanding residential or mixed-use districts, and the recreational and scenic use of the publicly-accessible beaches, parks, and open spaces that are currently a part of the City's waterfront community."

(n) "developing facilities for bulk loading of crude oil onto marine tank vessels would be inconsistent with the [Comprehensive] Plan, including the fundamental objective for the Eastern Waterfront and the City's

Community Vision, which provisions are a vital part of the City's policies and goals for future economic development."[159]

DSMF ¶ 148. Among the Ordinance's stated purposes are to "encourage the most appropriate use of land throughout the municipality;" "to protect citizens and visitors from harmful effects caused by air pollutants;" "to promote a wholesome home environment;" and "to conserve natural resources."[160] DSMF ¶ 149. The City Council stated in the Ordinance that "the City intends to protect its citizens and visitors from harmful effects caused by air pollutants."[161] DSMF ¶ 150.

The Ordinance makes the "storing and handling of petroleum and/or petroleum products" for the "bulk loading of crude oil onto any marine tank vessel" a prohibited use in the Commercial "C" and Shipyard "S" zoning districts in the City. DSMF ¶ 151; PRDSMF ¶ 151. The Ordinance further states that "there shall be no installation, construction, reconstruction, modification, or alteration of new or existing facilities, structures, or equipment, including but not limited to those with the potential to emit air pollutants, for the purpose of bulk loading of crude oil onto any marine tank vessel" in the Commercial "C" zoning district, Shipyard "S" and

---

[159]    PPLC offers a qualified admission, because it believes these findings are not sincere and merely pretextual. PRDSMF ¶ 148. Regardless of the Councilors' true intent, PPLC does not dispute they did in fact make these findings. The fact of the stated findings is not inconsistent with other hidden motives. Accordingly, the Court rejects the qualification.

[160]    The City's paragraph 149 states that "One of the Ordinance's stated purposes is . . ." and then lists the four purposes set forth above. DSMF ¶ 149. The Court corrected the language.
        PPLC offers a qualified admission, because it believes these findings are not sincere and merely pretextual. PRDSMF ¶ 149. Regardless of the Councilors' true intent, PPLC does not dispute they did in fact make these findings. The fact of the stated findings is not inconsistent with other hidden motives. The Court rejects the qualification.

[161]    PPLC offers a qualified admission, because it believes these findings are not sincere and merely pretextual. PRDSMF ¶ 150. Regardless of the Councilors' true intent, PPLC does not dispute they did in fact make these findings. The fact of the stated findings is not inconsistent with other hidden motives. The Court rejects the qualification.

Shoreland Area Overlay zoning districts in the City.  DSMF ¶ 152; PRDSMF ¶ 152.

The Ordinance further states "No building or structure shall be erected, altered,

enlarged, rebuilt, or used and no premises shall be used for the "bulk loading of crude

oil onto marine tank vessels" in the Industrial "I" and Non-Residential Industrial

"INR" zoning districts in the City.  DSMF ¶ 153; PRDSMF ¶ 153.

## K.  Current Market Conditions and the Future of the Pipeline

If PPLC cannot reverse the flow of its eighteen-inch line, it likely cannot

survive as a going concern.[162]  PSMF ¶ 132.  The recent increase in the production of

Alberta oil sands has reduced the need for some Canadian oil refiners to import crude

oil from the United States.[163]  PSMF ¶ 133.[164]  Currently, PPLC's eighteen-inch line

has been completely idle since 2011 because of the lack of demand for northbound

shipping.  PSMF ¶ 138.  When PPLC idled the eighteen-inch line, it followed the same

procedure that it used in 1987, which involved pumping the oil in the portion of the

---

[162]    PPLC also seeks to include more information about PPLC's prospects and viability in a flow reversal scenario, but the City denies those claims, citing the expert testimony of Sarah Emerson. DRPSMF ¶ 132.  The City also argues the statement is an expert opinion in the guise of lay testimony, and asks the Court to strike the statement.  PPLC's viability in a reversal scenario is heavily disputed. Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.  The Court modifies the statement to include the term "likely" to reflect inherent uncertainty, as both parties have separately argued for the unpredictability of oil markets.  For the reasons discussed in footnote 10 and footnote 18, the Court rejects the denial based on the argument about expert testimony.

[163]    PPLC also seeks to include more information characterizing the magnitude of recent market changes.  PSMF ¶ 133 (saying "substantial increase," "dramatically reduced").  The City objects to those adjectives and denies PPLC's claims that there is "substantially increase[ed] demand for reliable means to export crude oil out of Canada" citing the expert testimony of Sarah Emerson.  DRPSMF ¶ 133.  The City also argues the statement constitutes expert testimony and asks the Court to strike the statement.  The Court removes the adjectives in question and only considers the statement about market demand for Canadian exports for purposes of the City's motion, not PPLC's motion.  For the reasons discussed in footnote 10 and footnote 18, the Court rejects the denial based on the argument about expert testimony.

[164]    The City denies that PPLC's pipelines have ever operated to ship oil southbound.  DRPSMF ¶ 138.  The City does not adequately contradict PPLC's evidence that some oil in that portion of the line south of Sutton Station, Vermont, did flow southbound.  The Court includes the statement.

pipeline South of Sutton Station, Vermont southward into the PPLC's tank farm. *Id.* Although PPLC's twenty-four-inch line remains active, a mere trickle flows through it.[165] PSMF ¶ 139.

Demand for PPLC's existing use of its property (crude oil unloading) has consistently declined since January of 2010. DSMF ¶ 176; PRDSMF ¶ 176. The twenty-four-inch line has a throughput capacity of 410,000 barrels per day, it has transported only 20,750 barrels per day, less than 5.1% of its capacity, from January 1, 2016 through October 31, 2016. *Id.* The twenty-four-inch line's current usage represents an approximately 90% decrease in barrels per day shipping compared to 2010.[166] PSMF ¶ 140. The remaining shipments of crude oil currently passing through the twenty-four-inch line are chiefly comprised of the few remaining barrels of oil PPLC has stored in its tanks, but, already, fourteen of PPLC's twenty-three tanks sit completely empty.[167] PSMF ¶ 141. Over the past six months, PPLC has received only eight new shipments of crude oil via tanker delivery, significantly fewer than PPLC historically has received, with five of those eight shipments attributable to the one-off supply chain disruption caused by the recent Alberta wild fires.[168]

---

[165] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 139. For the reasons discussed in footnote 4, the Court rejects the qualification.

[166] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 140. For the reasons discussed in footnote 4, the Court rejects the qualification.

[167] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 141. For the reasons discussed in footnote 4, the Court rejects the qualification.

[168] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 142. For the reasons discussed in footnote 4, the Court rejects the qualification.

PSMF ¶ 142. The shipments PPLC has received over the past six months have contained significantly less crude oil cargo than PPLC has received in the past.[169] PSMF ¶ 143. There is no prospect of PPLC receiving significant shipments of oil in the future. PPLC is scheduled to receive only three more deliveries of crude oil in the next six months.[170] PSMF ¶ 144. As of July of 2016, PPLC had only ten of its twenty-three crude oil storage tanks in service. DSMF ¶ 129; PRDSMF ¶ 129.

Canada currently is in the midst of expanding and repurposing its pipeline infrastructure to transport crude oil from western Canada to ports on the Atlantic Ocean and Pacific Ocean. Repurposing existing pipeline is increasingly more logical and valuable as an alternative to new pipeline construction, given the substantial time and costs associated with new pipeline construction.[171] PSMF ¶ 134.

In December of 2015, Enbridge completed a project to reverse the flow of crude oil in its Line 9. DSMF ¶ 22; PRDSMF ¶ 22.[172] The reversed Line 9 has a nameplate

---

[169] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 143. For the reasons discussed in footnote 4, the Court rejects the qualification.

[170] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 144. For the reasons discussed in footnote 4, the Court rejects the qualification.

[171] The City offers a qualified admission, but merely offers more context and does not actually state grounds of dispute. DRPSMF ¶ 134. The Court rejects the qualification.

[172] The City also seeks to include the following statements:
    The reversed Line 9 carries both crude oil produced in the oil fields of Alberta, Canada, and crude oil produced in the so-called Bakken formation in North Dakota, United States . . . If PPLC were to construct a future project to reverse the flow on both or either of its pipelines and load crude oil onto marine tank vessels in the City, it would be willing to carry Bakken Crude, from North Dakota, rather than or in addition to Canadian crude oil.
DSMF ¶¶ 163-64. PPLC denies these statements as unsupported because the citations do not specifically mention whether the "Bakken" crude coming down Line 9 is US or Canadian sourced. PRDSMF ¶ 163-64. There does appear to be a genuine dispute about the source of this crude. Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

capacity to carry a maximum 300,000 b/d of crude oil from west to east.[173]  DSMF ¶ 23.  PPLC's eighteen-inch and twenty-four-inch pipelines terminate in Montreal East, Quebec, Canada, where PPLC presently delivers crude oil to two refineries in Canada via its twenty-four-inch pipeline.[174]  DSMF ¶ 24.  These refineries include the 137,000 b/d capacity Suncor Refinery in Montreal, Quebec, Canada and the 265,000 b/d capacity Valero Jean Gaulin Refinery in Levis, Quebec, Canada.[175]  DSMF ¶ 25.  The Suncor Refinery and Valero Jean Gaulin Refinery have executed binding Transportation Shipping Agreements with "take or pay commitments" for 270,000 b/d, or 90% of the nameplate capacity, of crude oil from Line 9.[176]  DSMF ¶ 26.  Under the "take or pay" commitments, if the Suncor Refinery or Valero Jean Gaulin Refinery does not take delivery of its committed share of the 270,000 b/d from Line 9, it still must pay the pipeline tariff memorialized in the Transportation Shipping Agreement

---

[173]    PPLC offers a qualified admission specifying that the number cited by the City is the "nameplate" capacity, but the actual capacity can change with minimal investment.  PRDSMF ¶ 23.  The Court inserts "nameplate" into the City's statement to resolve the objection.

PPLC also seeks to include statements indicating that Enbridge Line 9 expanded its capacity once from 240,000 to 300,000 b/d and has the ability to expand further by an additional 100,000 b/d to 200,000 b/d because pipelines can increase their capacity with minimal investment by taking steps to change the speed with which crude oil moves through the line.  PSAMF ¶ 246-47.  The City denies these statements as vague and speculative and points to its own expert testimony.  There appears to be a genuine dispute about the ultimate maximum availability of oil flowing through Line 9.  Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

[174]    PPLC offers a qualified admission because the City's original statement said PPLC presently used its eighteen-inch line, but that line has been idle since 2011.  PRDSMF ¶ 24.  The Court substitutes the twenty-four-inch pipeline to resolve the qualification.

[175]    PPLC denies this statement as unsupported by the record citation because it is not the proper subject of expert testimony.  PRDSMF ¶ 25.  For the reasons discussed in footnote 28, the Court rejects the denial.  Furthermore, the data she cites in her report comes from PPLC's own disclosures to FERC.

[176]    PPLC denies this statement as unsupported by the record citation because it is not the proper subject of expert testimony.  PRDSMF ¶ 26.  For the reasons discussed in footnote 28, the Court rejects the denial.  PPLC also disputes the original statement that 270,000 was 90% of the "maximum daily volume," as opposed to the nameplate capacity.  *Id.*  The Court modifies the statement to resolve the denial.

regardless of actual use.[177]  DSMF ¶ 27.  The "take or pay" contracts between

Enbridge and the Suncor and Valero Jean Gaulin refineries are for ten-year terms.[178]

DSMF ¶ 28. The collective daily refining capacity of Suncor Refinery and Valero Jean

Gaulin is 402,000 b/d, which exceeds the nameplate capacity of Line 9.[179]  DSMF ¶

29. PPLC concluded, prior to Line 9's reversal, that if Line 9's capacity commitments

were "substantially dedicated" to the Suncor Refinery or Valero Jean Gaulin

Refinery, that would be a "threat" to PPLC's ability to reverse the flow of the eighteen-

inch or twenty-four-inch pipelines because the "limited flow to [PPLC's pipeline(s)]

renders the project uneconomic."  DSMF ¶ 30; PRDSMF ¶ 30.[180]

Enbridge Line 9 is the only pipeline currently constructed that could feed

PPLC's pipelines.[181]  DSAMF ¶ 189.  The cost of transporting crude oil from Western

---

[177]    PPLC denies this statement as unsupported by the record citation because it is not the proper subject of expert testimony. PRDSMF ¶ 27.  For the reasons discussed in footnote 28, the Court rejects the denial.  PPLC also takes issue with the phrases "committed share" and "must pay," but the statement is supported by the record citation.

[178]    PPLC denies this statement as unsupported by the record citation because it is not the proper subject of expert testimony. PRDSMF ¶ 28.  For the reasons discussed in footnote 28, the Court rejects the denial.  PPLC also argues that the supporting documents from the National Energy Board of Canada are inadmissible hearsay.  *Id.*  The document does appear to be admissible under the Public Records exception of Fed. R. Evid. 803(8), but in any case, the statement is supported by the expert testimony, which can rely on otherwise inadmissible evidence.

[179]    PPLC denies this statement as unsupported by the record citation because it is not the proper subject of expert testimony. PRDSMF ¶ 29.  For the reasons discussed in footnote 28, the Court rejects the denial.

[180]    PPLC seeks to include: "The 'take or pay' agreements that may exist between Suncor, Valero, and Enbridge may contain terms that allow Suncor and Valero to terminate those agreements before those agreements' expiration dates."  PSAMF ¶ 245.  The City denies this statement on the grounds that it is irrelevant and unsupported speculation.  DRPSAMF ¶ 245.  Mr. Hardison's statement properly contains an indication of uncertainty in the form of the word "may."  The statement is not without foundation because he can speak to the practice of the industry in making "take or pay" agreements as an experienced executive of a pipeline company, for the reasons described in  footnote 10, footnote 11, and footnote 18.  Because there is a genuine dispute, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

[181]    PPLC denies this statement as unsupported and not the proper subject of expert testimony. PRDSAMF ¶ 189.  PPLC does not point to additional pipelines, but instead argues the citation is not sufficient.  For the reasons discussed in footnote 28, the Court rejects the denial.

Canada by rail for southward transport on one of PPLC's pipelines is too high to compete currently with marine transportation of supplies from the North Sea or West Africa. DSMF ¶ 31; PRDSMF ¶ 31.

In order of chronology, for the years that PPLC attempted to market its proposed projects, the price of Brent Crude at the end of June (June 30) was $139.83 (2008); $69.30 (2009); $75.01 (2010); $112.48 (2011); $97.80 (2012); $102.16 (2013). DSAMF ¶ 191. The price of Brent Crude on June 30, 2016, was $49.68. *Id.* On September 29, 2017, the price of Brent Crude was $57.54.[182] *Id.*

PPLC's ocean terminal in South Portland is located on an ice-free port close to markets for Canadian crude oil in the United States, Europe, and the Canadian maritime provinces.[183] PSMF ¶ 135.[184] Modifications to PPLC's existing pipeline

---

[182]   PPLC disputes one price figure, which the court modifies in the statement, and also argues that the phrase "unsuccessfully marketed" is argumentative and unsupported. PRDSAMF ¶ 191. The Court modifies the statement to "attempted to market" in order to resolve the denial. The Court also substitutes the last figure in the series for a more recent date and figure.

[183]   PPLC seeks to include:

> PPLC's pipeline assets are well-positioned to play a role in a repurposed North American pipeline system:  PPLC's ocean terminal in South Portland is located on an ice-free port close to markets for Canadian crude oil in the United States, Europe, and the Canadian maritime provinces; and PPLC's existing pipeline assets have sufficient capacity to accommodate the need to transport crude oil to South Portland for shipment to United States, Canadian, and foreign markets via tanker vessel.

PSMF ¶ 135. The City denies the first and last portions and points to the expert testimony of Sarah Emerson. DRPSMF ¶ 135. The Court includes only the undisputed information about PPLC's ocean terminal. As discussed in footnote 2, the Court only considers the disputed portion for purposes of the City's motion, but not PPLC's motion.

[184]   PPLC seeks to include: "PPLC's pipeline system is the only one that currently operates between Canada and the eastern seaboard.  PPLC is therefore uniquely positioned to ship crude oil from Canada to United States, Canadian, and foreign markets via tanker vessels." PSMF ¶ 136. The City denies these claims about the uniqueness of PPLC pipe line, arguing there is a lack of foundation for Mr. Hardison's testimony and citing a map from the Pipeline and Hazardous Materials Safety Administration showing many pipelines operating on the eastern seaboard. DRPSMF ¶ 136. The City also argues the statement is expert testimony and asks the Court to strike the statement. The Court rejects the foundation and expert testimony objections for the reasons discussed in footnote 10, footnote 11, and footnote 18. There appears to be a genuine about the exact parameters of the uniqueness of the pipeline and, therefore, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

infrastructure would be needed to reverse the direction of the flow of its pipelines, including reversing and adding valves to accommodate south-bound crude oil transportation, installing pumping facilities, and installing a vapor control system and unit(s) at the Portland Harbor.[185]  PSMF ¶ 137.[186]

If PPLC were to go out of business, the company's 28 employees would lose their jobs, in addition to numerous contract workers.[187]  PSMF ¶ 145.  If PPLC were to go out of business, the vendors with whom PPLC contracts for support services also would lose a source of revenue.[188]  PSMF ¶ 146.  If PPLC were to go out of business, the value of its pipeline assets and property would decrease significantly from the $120 million amount assigned to those assets and property by government taxation authorities along the pipeline route.[189]  PSMF ¶ 147.  South Portland alone assigns a value of $44.7 million to the pipeline assets and property currently within the City and, again, this valuation will be reduced significantly if PPLC cannot transport

---

[185]    PPLC's original statement read "minor modifications," but the City objected to the adjective "minor."  DRPSMF ¶ 137.  The Court omits the adjective to reconcile the parties' positions.

[186]    PPLC also seeks to include the following statement: "Changing the direction product flows in the pipeline, which PPLC has done successfully before, does not pose any significant challenges to PPLC."  PSAMF ¶ 201.  The City denies this statement.  DRPSAMF ¶ 201.  There is a dispute about the "significance" or magnitude of the obstacles, but the Court agrees with the City that PPLC faces barriers to successfully implementing a reversal project and, therefore, omits the statement.

[187]    The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 145.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[188]    The City objects that this statement is inadmissible because it is irrelevant, since the only legal issue implicated by the financial importance of PPLC is the *Pike* balancing test of the dormant commerce clause, which PPLC does not pursue on summary judgment.  DRPSMF ¶ 146.  The City, however, does seek summary judgment on this issue, so the Court includes these facts.

The City also denies this statement on the grounds that PPLC has done nothing since 2013 to advance a concrete reversal plan.  DRPSMF ¶ 146.  This appears to be a non sequitur, since the reliance of vendors on PPLC has nothing to do with the concreteness of its reversal plans.  The Court rejects the denial.

[189]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 147.  For the reasons discussed in footnote 188, the Court rejects the denial.

crude oil any longer.[190]  PSMF ¶ 148.  In the 2015 tax year, PPLC paid property taxes

amounting to $2 million to 27 different local municipalities located along the pipeline

route between South Portland and the Canadian border, with South Portland alone

receiving nearly $750,000.[191]  PSMF ¶ 149.  PPLC has paid substantial state and

federal income taxes over the course of its 75- year existence.  For instance, in 2010,

the last year PPLC's eighteen-inch line was in active service, the company paid

approximately $7.1 million to the federal government, $1.4 million to Maine,

$209,000 to New Hampshire, and $273,000 to Vermont.[192]  PSMF ¶ 150.  PPLC has

paid over $70 million to the Maine oil conveyance fund supporting government clean-

up and response capabilities.[193]  PSMF ¶ 151.

    The Ordinance stands as an obstacle to PPLC's efforts to obtain permits and

credibly market its services to transport crude oil from north to south.[194]  PSMF ¶¶

---

[190]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 148.
For the reasons discussed in footnote 188, the Court rejects the denial.

[191]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 149.
For the reasons discussed in footnote 188, the Court rejects the denial.

[192]    The City offers a qualified admission because it lacks specific knowledge to admit or deny the
facts.  DRPSMF ¶ 150.  For the reasons discussed in footnote 4, the Court rejects the denial.

[193]    The City offers a qualified admission because it lacks specific knowledge to admit or deny the
facts.  DRPSMF ¶ 151.  For the reasons discussed in footnote 4, the Court rejects the denial.

[194]    PPLC seeks to include the following two statements: "Unless PPLC is able to reverse the flow
if its pipelines so as to facilitate the loading of crude oil onto tankers in the Harbor, which the
Ordinance bans, PPLC will not be able to credibly market its services to transport crude oil from north
to south."  PSMF ¶ 152.  "As long as the ordinance remains in place, it would be futile for PPLC to
apply for other permits because, even if it obtained such permits, it still would not be able to reverse
the flow of its pipeline."  PSMF ¶ 153.
    The City denies these statements on the grounds that PPLC faces other greater obstacles,
namely, it has not taken steps to analyze market demand for a reversal project since 2013 and has not
developed any concrete plans it could use to apply for permits.  DRPSMF ¶¶ 152-53, DRPSAMF ¶ 232.
PPLC's statements also appear to be in tension with the City's claim that PPLC could transport oil at
the southern end of the pipeline via rail.  *See* DSAMF ¶ 194.
    The Court modifies PPLC's statements to reflect the undisputed portion and, as discussed in
footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in
favor of PPLC for purposes of the City's motion.

152-53; PSAMF ¶ 232.  Without the impediment of the Ordinance, PPLC would take immediate steps to implement its desired flow reversal.[195]  PSMF ¶ 154.

### L.    Unknown Details Regarding a New Reversal Project

PPLC testified[196] that it:

(a) does "not have a current plan to implement the 2008, 2009 18-inch pipeline reversal project."

(b) has not had a project with "defined characteristics and parameters" since the 2008-2009 project.

(c) does not have a "hypothetical potential project" "in hand," nor any "current plan."

(d) has "no project at hand" for any regulator to evaluate, nor a "specific project" for PPLC's engineers and designers "to evaluate."

(e) has "no specific engineering plans for how [it] would reverse the flow if the ordinance were rescinded."

(f) does not "have something with firm boundaries to discuss today because the ordinance doesn't provide for it right now."[197]

DSMF ¶ 75.

---

[195]    PPLC also seeks to include additional language about its "business plan."  The City repeats its denials about the other obstacles and the lack of concrete business plans, as discussed in footnote 194. DRPSMF ¶ 154.  PPLC's statements also appear to be in tension with the City's claim that PPLC could transport oil via rail.  *See* DSAMF ¶ 194.
   The Court modifies PPLC's statements to reflect the undisputed portions and the Court's earlier finding that PPLC would take steps to implement a flow reversal in the absence of the Ordinance.  *See Consolidated Order.*

[196]    This is an awkward phrasing because corporations only speak through human representatives. Here, the City is referring to a Rule 30(b)(6) deposition of Kenneth Brown as the Rule 30(b)(6) deponent for PPLC.  *See Decl. of Jesse Harlan Alderman, Esq. in Support of Defs.' Consolidated Mot. to Dismiss Pursuant to Rule 12(b)(1) and Mot. for Summ. J.*, Ex. 12 (*30(b)(6) Dep. of [PPLC] and Kenneth Brown* (ECF No. 90).  The Court included the City's phrasing because, though awkward, it is technically correct.

[197]    PPLC offers a qualified admission because they argue the City's original statement quotes PPLC out of context.  PRDSMF ¶ 75.  However, the City appends PPLC's testimony regarding their stated reason for lacking concrete plans.  PPLC also argues the City misquoted the testimony in subparagraph (c).  *Id.*  The Court includes the statement because the quotations accurately reflect the questions and answers in the cited testimony.

PPLC is certain that a future project to reverse the flow of the eighteen-inch or twenty-four-inch pipeline could be and likely would be "different from the 2008 proposal."[198]  DSMF ¶ 77.  A future project to load crude oil in the City would not necessarily use PPLC's eighteen-inch pipeline, as PPLC proposed in 2008-2009; it could use the twenty-four-inch pipeline or both pipelines.  DSMF ¶ 77; PRDSMF ¶ 77.  PPLC continues to rely on the specific plans it developed in 2008-2009 as the starting point for how it would implement any future flow reversal project.[199]  PSAMF ¶ 249.  A future project to load crude oil in the City may not use the "John Zink" brand VCUs for which it was permitted by Maine DEP in 2009.[200]  DSMF ¶ 78; PSAMF ¶¶ 205, 251.  A future project to load crude oil in the City would "reevaluate the best technology" for emissions control from crude oil loading, which may have advanced since 2009.[201]  DSMF ¶ 79; PRDSMF ¶ 79; PSAMF ¶ 206.  If PPLC is permitted to

---

[198]  PPLC denied the City's original statement, which read "would be" instead of "could be." PRDSMF ¶ 77.  The Court modifies the statement to include both terms to more accurately reflect the cited testimony and resolve the denial.

[199]  The City denies the original statement which used "blueprint" instead of "starting point." DRPSAMF ¶ 249.  The Court modifies the statement to more clearly indicate the preliminary nature of the remaining value of the 2008 plans, as opposed to the term "blueprint" which can indicate a preliminary plan or a final and concrete one.

[200]  PPLC denied the City's original statement, which read "likely would not use" rather than "may not use."  PRDSMF ¶ 78.  The Court modifies the statement to more accurately reflect the cited testimony.

  The City denies PPLC's similar statement, which said those specific VCUs "are not necessary" for a future project.  DRPSAMF ¶¶ 205, 251.  The Court's modification should resolve this denial as well, but the conflicting assertions and denials to each other's proposed statements on the very same issue of fact are perplexing.

[201]  PPLC seeks to include: "Advancements in technology since 2009 have resulted in new and different VCU designs available to PPLC for any future flow reversal project, including different architecture (more compact, less visible units, potentially including the use of vapor recovery units rather than vapor combustion units) with more efficient and effective reduction of air emissions." PSAMF ¶ 206.  The City denies this statement and objects to the testimony as lacking foundation and improper expert testimony.  DRPSAMF ¶ 206.  The City's own factual claims are similar enough to render any dispute non-genuine and, therefore, the Court reconciles the various versions of the statements.

pursue a flow reversal project, it will update its previous plans in light of new technology and customer needs.[202] PSAMF ¶ 250. If PPLC were to construct a future project to load crude oil in the City, it would be willing to "move any type of crude," light or heavy.[203] DSMF ¶ 80.

If PPLC were to construct a future project to load crude oil in the City, it "would seek a new jurisdictional opinion [under Vermont Act 250] based on the facts at hand" in the future project (e.g., the details of any construction necessary in the state of Vermont).[204] DSMF ¶ 81. PPLC has no reason to believe that it will require a pump station in Dunham, Quebec in the event of a future flow reversal project.[205] PSAMF ¶ 239. If PPLC is permitted to pursue a flow reversal project in the future, it will determine the infrastructure changes it needs to make after determining the type of crude oil that its customers would like to move as well as the speed and capacity the company seeks to achieve on its lines.[206] PSAMF ¶ 238.

PPLC has no design or engineering characteristics for any future project to reverse the flow of its pipeline(s) and load crude oil onto marine tank vessels in the

---

[202] The City denies this statement because it takes issue with the phrase "update its previous plans." DRPSAMF ¶ 250. Unlike the term "blueprint," this phrase is clear and appropriate. The Court rejects the denial.

[203] PPLC denied the City's original statement which included additional information about the US or Canadian origin. PRDSM ¶ 80. The record citation does not mention national origin, so in order to resolve the denial, the court omits that additional information from the City's statement.

[204] PPLC denies this statement on the grounds that it is legal argument, not a statement of fact, and asks the Court to strike it. PRDSMF ¶ 81. The issue of PPLC's intentions to seek approval from Vermont is not an issue of law for this Court to decide, but a question of fact that is supported by testimony of a PPLC official. The Court rejects the denial.

[205] The City denies this statement on the grounds that it lacks foundation and is "rank speculation" without concrete plans from PPLC. DRPSAMF ¶ 239. The Court rejects the denial. The statement only refers to PPLC's subjective expectations, about which Mr. Hardison is capable of attesting.

[206] The City offers a qualified admission because it lacks knowledge to admit or deny the statement. For the reasons discussed in footnote 4, the Court rejects the qualification.

City, other than its older 2008-2009 plans, and has not examined any such characteristics since 2012.[207]  DSMF ¶ 82.  PPLC has not collected the information that would be required for an Environmental Impact Statement, were one to be required by the State Department in the future as requested by a bipartisan group of federal lawmakers.[208]  DSMF ¶ 83.  Since 2012, PPLC has not had any discussions with Enbridge concerning the ability of PPLC to obtain crude oil from Line 9.[209] DSMF ¶ 84; DSAMF ¶ 182.  PPLC has never had discussions with the Department of State about reversing the flow of the twenty-four-inch pipeline.  DSMF ¶ 87; PRDSMF ¶ 87.[210]

Since 2013, PPLC has not "done anything to analyze the market demand for oil" or economic feasibility in the case of a reversal of one or both of PPLC's pipelines.[211]  DSMF ¶ 88.  Since 2013, other than filing this lawsuit, PPLC "has not done anything to activate a proposal to reverse the pipeline."[212]  DSMF ¶ 89.

---

[207]    PPLC denies this statement which originally did not include the language "other than its older 2008-2009 plans," on the ground that its earlier plans remain relevant as a starting blueprint for a new project.  PRDSMF ¶ 82.  The Court inserts the language about the 2008-2009 plans to resolve the denial.

[208]    PPLC denies this statement on the grounds that it is legal argument and speculating about what "would" be required is not a valid statement of fact.  PRDSMF ¶ 83.  The environmental data collection effort, or lack thereof, is a factual matter.  The Court rejects the denial.

[209]    PPLC offers a qualified admission to this testimony by Mr. Hardison, but says Mr. Hardison has had casual discussion with Enbridge representatives at industry gatherings.  PRDSMF ¶ 84; PRDSAMF ¶ 182.  The Court rejects the qualification.

[210]    The City seeks to include two additional statements about PPLC's contacts with the State Department since 2012.  DSMF ¶¶ 85-86.  PPLC denies these statements as not adequately supported by the record citation.  The Court agrees with PPLC and omits the statements.

[211]    PPLC offers a qualified admission on the grounds that the statement omits relevant context that the Ordinance prohibited any plans since 2014.  PRDSMF ¶ 88.  The Court is well aware of this context. The Court rejects the qualification.

[212]    PPLC denies this statement on the grounds that it has engaged in this lawsuit, and the statement omits relevant context that the Ordinance has prohibited any plans since 2014.  PRDSMF ¶ 89.  The Court added a reference to PPLC's filing of this lawsuit in order to avoid the misimpression that PPLC has done nothing at all.

## M.    Air Emissions and Health Effects

PPLC's oil storage tanks produce odors, which have resulted in complaints from City residents.  DSMF ¶ 167; PRDSMF ¶ 167.  PPLC's existing Part 70 Air Emissions License regulates emissions from PPLC's twenty-three oil storage tanks and related boilers and emergency generators and classifies it as a major stationary source of emissions.[213]  DSMF ¶ 124.[214]

Under its existing Part 70 Air Emissions License, Maine DEP authorizes PPLC to emit the following volume of pollutants 1.8 tons per year ("tpy") of Sulfur Dioxide ($SO_2$), 5.1 tpy of Nitrogen Oxides ($NO_x$) and 220 tpy of VOCs.  DSMF ¶ 125; PRDSMF ¶ 125.  Releasing hydrocarbon vapors from the holds of ships is not required for unloading crude oil from marine tank vessels, and thus, VCUs, or smokestacks, are not presently used by PPLC's unloading operation.[215]  DSMF ¶ 125.  The Air License from the 2009 project, discussed below, would have permitted PPLC to emit from the VCUs the following volume of pollutants (in addition to those emissions, including 220 tpy of VOCs, currently allowed from the twenty-three tanks) 21.0 tpy of $SO_2$, 18.7 tpy of $NO_x$, and 39.0 tpy of VOCs.  DSMF ¶ 127; PRDSMF ¶ 127.  VOCs in crude oil

---

[213]    PPLC offers a qualified admission but disputes the City's use of the word "burners" as opposed to "boilers."  PRDSMF ¶ 124.  The Court modifies the statement to resolve the qualification.

[214]    The City seeks to include: "None of PPLC's 23 tanks have modern emissions control equipment, which means that more than 15% of the total volatile organic compounds ("VOCs") in the crude oil escapes from the above-ground floating roof oil storage tanks in the City and is released into the air."  DSMF ¶ 123.  PPLC denies this statement and points to its own evidence that the tanks do have modern control equipment which blocks more than 85% of the emission.  PRDSMF ¶ 123.  There does appear to be a dispute about these facts.  Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

[215]    PPLC offers a qualified admission but disputes the use of the word "smokestacks."  PRDSMF ¶ 126.  For the reasons discussed in footnote 13, the Court rejects the qualification.

contain benzene, toluene, ethylbenzene, and other contaminants classified by the Environmental Protection Agency as "Hazardous Air Pollutants" ("HAPs").[216] DSMF ¶ 128. Any pipeline reversal project proposed by PPLC would have to demonstrate compliance with federal and state air emissions standards in effect at the time of the license application.[217] PSAMF ¶ 209.

Higher concentrations of $SO_2$, $NO_x$, and HAPs (e.g., benzene, toluene, hexane, etc.) emissions from vapor combustion would occur if PPLC constructed a crude oil loading operation in the City.[218] DSMF ¶ 168. There would be increased HAPs emissions from the intensified usage of Main Tank Farm and Waterfront Tanks over the level of emissions in recent years but not necessarily over the historic rates of emissions when the tanks were more heavily utilized.[219] *Id.*

Higher concentration of HAP emissions caused by the crude oil loading would cause increases in City residents' risks of cancer and other serious effects.[220] DSMF

---

[216] PPLC offers a qualified admission because the record citations does not specifically state that the chemicals are HAPs. The Court rejects the qualification. To the extent that there is a gap in the cited authority, the Court takes judicial notice of the air quality statutes and regulations.

[217] The City offers a qualified admission because it argues these other requirements contemplate additional local restrictions. DRPSAMF ¶ 209. Additional local authority is not inconsistent with PPLC's statement that any future project must meet other requirements. The Court rejects the qualification.

[218] PPLC offers a qualified admission because the excess emissions would still have to be below those imposed by other sources of law. PRDSMF ¶ 168. The Court rejects the qualification because this addendum is not inconsistent with the statement.

[219] PPLC denies the City's original statement which did not include the relevant time spans for comparison. PRDSMF ¶ 168. In order to resolve the denial, the Court adds the language specifying an increase over recent years but not historical levels.

[220] PPLC denies the City's statement, arguing it is based on faulty data and not the product of reliable scientific principles and methods. PRDSMF ¶ 169. This argument is better resolved in a motion in limine. PPLC does not cite its own evidence contradicting Ms. Suh's expert testimony about the health risks of VOCs.

Under Federal Rules 104(a) and 702 and under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993), the trial court has been entrusted with a gate-keeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The relaxation of the "usual requirement of firsthand knowledge or observation" is premised on "an assumption that the

¶ 169. One HAP, in particular, benzene is a known human carcinogen and is principally associated with cancers of the blood, including certain forms of leukemia.[221] *Id.* There is no safe human exposure level to benzene.[222] *Id.*

Increased VOC and HAP emissions from the VCUs and Main Tank Farm would result in increased hospital admissions and emergency department visits for City residents for asthma and upper airway inflammation.[223] *Id.* Increase in $SO_2$ and $NO_x$ emissions along the waterfront compared to existing conditions (and which would be caused by the VCUs that are required for loading crude oil, but not unloading) will cause adverse respiratory outcomes, including increased bronchoconstriction, airway hyperresponsiveness, lung function decrements, asthma

---

expert's opinion will have a reliable basis in knowledge and experience of his discipline." *Id.* at 592. In examining whether to admit an expert's testimony, a court should consider: (1) whether the theory or technique can be or has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential error rate; and, (4) the level of the theory or technique's acceptance within the relevant discipline. *Id.* at 593-94. These factors are not definitive or exhaustive, and the trial judge enjoys broad latitude to use other factors to evaluate reliability. *United States v. Mooney*, 315 F.3d 54, 61 (1st Cir.2002) (citing *Kumho Tire Co.*, 526 U.S. at 153). The trial judge may determine which of the *Daubert* factors to apply depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co.*, 526 U.S. at 150.

While the amount of increased risk appears to be a matter of genuine dispute, the fact that there is an increased risk associated with increased emissions is uncontroverted. Ms. Suh is not applying a specific modelling methodology or using a technique of questionable acceptance or with a high error rate. Rather, she summarizes some repeatedly published, widely accepted associations between certain air emissions and negative health effects. Paradoxically, PPLC also argues the expert testimony "consist[s] of nothing more than a simplistic truism – that any incremental increase of air emissions will result in some unquantified increase in health risks." PRDSMF ¶ 169. If the testimony about increased health risks reduces to a simple truism, it is difficult to see how PPLC can genuinely dispute the validity of Ms. Suh's methodology and conclusions.

Accordingly, for purposes of these motions only, the Court rejects the denial.

[221] PPLC denies the City's statement, arguing it is based on faulty data and not the product of reliable scientific principles and methods. PRDSMF ¶ 169. For the reasons discussed in footnote 220, for purposes of these motions only, the Court rejects the denial.

[222] PPLC denies the City's statement, arguing it is based on faulty data and not the product of reliable scientific principles and methods. PRDSMF ¶ 169. For the reasons discussed in footnote 220, for purposes of these motions only, the Court rejects the denial.

[223] PPLC denies the City's statement, arguing it is based on faulty data and not the product of reliable scientific principles and methods. PRDSMF ¶ 169. For the reasons discussed in footnote 220, for purposes of these motions only, the Court rejects the denial.

severity or attacks, and hospital admissions and emergency department visits for asthma for City residents.[224] DSMF ¶ 170. Due to the population density in the City extreme proximity of PPLC's emission sources to schools, neighborhoods, and parks, adverse health conditions will be most acutely experienced by populations, such as children, low-income and elderly residents.[225] DSMF ¶ 171. The Ordinance's zoning amendments "provide significant public health benefits to the City and its residents."[226] DSMF ¶ 172.[227]

There are sixty-two licensed emissions sources located within South Portland and the contiguous cities and towns of Portland, Scarborough, and Westbrook.[228]

---

[224]    PPLC argues the Court should not consider this statement because the City failed to include a record citation. PRDSMF ¶ 170. Under Local Rule 56(f), the Court need not consider statements unsupported by a record citation and has no duty to independently search the record for missing support. Nonetheless, the Court may consider the statement if it chooses to. The location in the City's statement of facts makes the record support for this statement obvious, since the statements before and after are on the same topic and cite to the same sections within the same document. PPLC also denies the City's statement, arguing it is based on faulty data and not the product of reliable scientific principles and methods. PRDSMF ¶ 170. For the reasons discussed in footnote 220, for purposes of these motions only, the Court rejects the denial.

[225]    PPLC denies the City's statement, arguing it is based on faulty data and not the product of reliable scientific principles and methods. PRDSMF ¶ 171. For the reasons discussed in footnote 220, for purposes of these motions only, the Court rejects the denial.

[226]    PPLC denies the City's statement, arguing it is based on faulty data and not the product of reliable scientific principles and methods. PRDSMF ¶ 172. For the reasons discussed in footnote 220, for purposes of these motions only, the Court rejects the denial.

[227]    The City also seeks to include: "Emissions from the Waterfront Tanks and Main Tank Farm of hydrogen sulfide (HS) and methyl mercapan at the volume pipeline throughput proposed for the 2008-2009 Project would increase foul odors in the City." DSMF ¶ 173. PPLC denies this statement, citing testimony that indicates there would not be increased foul odors in the City because the type of fuel transported in a reversal scenario would be of low sulfur content. PRDSMF ¶ 173. There appears to be a genuine dispute about the effects of a reversal causing increased odors. Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

[228]    The City denies this statement for several reasons. DRPSAMF ¶ 212. First, the City argues the declaration cited to support the statement constitutes undisclosed expert testimony, and asks the Court to strike the statement. *Id.* The City argues that it is improper for PPLC to submit an expert report after the close of discovery and after the filing of summary judgment motions, because filing the report in an opposition to a summary judgment motion did not give them adequate opportunity to respond to the testimony. Id.

The City is correct that "Rule 37(c)(1) "requires the near automatic exclusion of Rule 26 information that is not timely disclosed." *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 20-21

PSAMF ¶ 211.[229] A number of the sixty-two licensed emissions sources located within

South Portland and the contiguous cities and towns have emissions which are similar

---

(1st Cir. 2001). Both sides agree that PPLC made a disclosure as required under Rule 26(a)(2). FED. R. CIV. P. 26(a)(2). The question, then, is whether PPLC's timely disclosure was sufficient to cover these additional statements.

A disclosure is sufficient if the other party "reasonably could have anticipated [the expert's] testimony and, therefore, could not have been unfairly surprised to warrant striking the challenged testimony." *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011). The initial expert report for Mr. North contained section headings indicating a focus on the following subjects: (1) PPLC's Compliance with National Ambient Air Quality Standards; (2) Odors from PPLC facilities; (3) VOC Emissions Loss from Loading Operations and Storage Tanks; and (4) Similarity of Future Project to 2009 Proposed Reversal Project. PSAMF, Attach. 10 *Decl. of Michael P. North* (ECF No. 128); DRPSAMF ¶ 211. There are pervasive references to the City's own experts, Mr. Zemba, and Ms. Suh, attempting to impeach their credibility and dispute their conclusions about the 2008-2009 project and the amount of air pollution and the health impacts of that air pollution. *Id.* Although it would have been better to disclose the December expert report earlier, the City could have reasonably anticipated from the July report that Mr. North might well also testify about the magnitude of the 2008-2009 emissions relative to other nearby sources. The Court declines to strike PPLC's statements.

Second, the City argues that Mr. North's opinions are not the product of reliable scientific methodology, and are inadmissible pursuant to Federal Rule of Evidence 702, because Mr. North's chosen comparison area was "deliberately selected to encompass the maximum number of permitted air emissions so as to create the appearance of minimal impact. *Id.*

Under Federal Rules 104(a) and 702 and under *Daubert v. Merrell Dow Pharmaceuticals.*, 509 U.S. 579, 589 (1993), the trial court has been entrusted with a gate-keeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The relaxation of the "usual requirement of firsthand knowledge or observation" is premised on "an assumption that the expert's opinion will have a reliable basis in knowledge and experience of his discipline." *Id.* at 592. In examining whether to admit an expert's testimony, a court should consider: (1) whether the theory or technique can be or has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential error rate; and, (4) the level of the theory or technique's acceptance within the relevant discipline. *Id.* at 593-94. These factors are not definitive or exhaustive, and the trial judge enjoys broad latitude to use other factors to evaluate reliability. *United States v. Mooney*, 315 F.3d 54, 61 (1st Cir.2002) (citing *Kumho Tire Co.*, 526 U.S. at 153). The trial judge may determine which of the *Daubert* factors to apply depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co.*, 526 U.S. at 150.

Mr. North examined reliable data from the Maine Departments of Environmental Protection and Transportation about air emissions, and made straightforward mathematical comparisons and calculations with the proposed 2008-2009 air emissions license. While the City's experts might have chosen different geographic areas for the comparison, or for additional comparisons to determine the more localized impacts, there is nothing unreliable about the comparison area. The Court will consider the evidence for the emissions in the surrounding towns, and will consider the obvious limitations of a comparison dividing impacts over a larger area. For example, the City's expert, using what appears to be very similar methodology, looked at the emission sources within the 14 square miles of the City of South Portland, and found the flow reversal would represent a 21% increase in VOC emissions and a 486% increase in $SO_2$ emissions. DRPSAMF ¶ 212. The Court includes the statements.

[229] PPLC also seeks to include: "Any future pipeline reversal project by PPLC could be designed to meet current federal and state air emissions standards." PSAMF ¶ 210. The City denies this statement for several reasons. DRPSAMF ¶ 210. First, the City disputes that the project could comply with air emissions requirement, and cites its own expert. *Id.* Second, the City argues that Mr. North

to or greater than PPLC's.[230]  PSAMF ¶ 212.  Six of these sixty-two licensed facilities are terminals for storage and distribution of petroleum products located in South Portland, comprising a total of ninety bulk petroleum storage tanks with a total storage capacity of approximately 338 million gallons of petroleum products, not including fourteen smaller tanks at Sprague that store petroleum and other products.[231]  PSAMF ¶ 213.

Five of the licensed facilities that are terminals for the storage and distribution of petroleum products have loading racks for petroleum products; three are served by VCUs; and two by carbon adsorption units.[232]  PSAMF ¶ 214.  Four of the licensed

---

did not perform any air emissions modelling because there is no concrete project, and argues the statement is not made based on a "reasonable degree of scientific certainty," and is, therefore, inadmissible under Federal Rule of Evidence 702.  *Id.*

A court must determine "whether the testimony has a reliable basis in light of the knowledge and experience of the relevant discipline."  *Crowe v. Marchand*, 506 F.3d 13, 17 (1st Cir. 2007) (internal citation omitted).  An expert is permitted to testify on the basis of his experience.  *Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308 (1st Cir. 2005) (citing *Kumho Tire Co.*, 526 U.S. at 156).  However, "[i]f the [expert] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Id.*  The gatekeeper role requires the judge "to ensure that expert opinions are not 'connected to existing data only by the ipse dixit of the expert.'"  *Knowlton v. Bankers Life & Cas. Co.*, 882 F. Supp. 2d 129, 131 (D. Me. 2012) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

There is no explanation in this statement of how Mr. North's experience leads him to the conclusion, or how his experience is reliably applied to the air pollution levels in the City or typical ranges of emissions from other loading operations in his prior work.  The Court is "presented with only the experts' qualifications, [his] conclusion[ ] and [his] assurances of reliability.  Under *Daubert*, that's not enough."  FED. R. EVID. 702 Advisory Committee's Note (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)).

The Court omits the statement.

[230]    The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology.  DRPSAMF ¶ 212.  For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement.

[231]    The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology.  DRPSAMF ¶ 213.  For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement.

[232]    The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology.  DRPSAMF ¶ 214.  For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement.

facilities that are terminals for the storage and distribution of petroleum products handle gasoline, which is a more volatile product than many crude oils and is a greater source of VOC and HAP emissions on a per unit basis.[233] PSAMF ¶ 215. The Citgo facility in South Portland is licensed for marine vessel loading of gasoline and includes a second VCU for this operation.[234] PSAMF ¶ 216.

PPLC's 2009 proposed pipeline reversal project would have increased licensed criteria air pollutant emissions in the area of South Portland and surrounding cities and town by 0.2% to 3.3%, depending on the pollutant, and an overall increase in criteria pollutant emissions of 0.7%.[235] PSAMF ¶ 218.[236] Projected maximum HAP emissions listed in PPLC's air emissions license application for the 2009 proposed pipeline reversal project constitute 1.3% of the total licensed allowable HAP emissions in the area of South Portland and surrounding cities.[237] PSAMF ¶ 219.

---

[233]    The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology. DRPSAMF ¶ 215. For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement.

[234]    The City offers a qualified admission regarding the existence of the terminal and loading of refined oil products, but denies the rest of the statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology. DRPSAMF ¶ 216. For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement.

[235]    The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology. DRPSAMF ¶ 218. For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement.

[236]    PPLC seeks to include: "PPLC's 2009 proposed pipeline reversal project is consistent with existing petroleum storage and distribution activities in South Portland." PSAMF ¶ 217. The City denies this statement as false because no existing petroleum storage or distribution facility is presently configured to bulk load crude oil onto tankers docked at the City and none has ever done so. DRPSAMF ¶ 217. The Court cannot determine what the phrase "is consistent with existing petroleum storage and distribution activities" means precisely. PPLC might have meant something different than the meaning the City gives it, but in any case the phrasing is not helpful and, therefore, the Court omits the statement.

[237]    The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology. DRPSAMF ¶ 219. For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement. The Court also modifies the original statement slightly to hew more closely to the cited expert conclusions.

These comparison figures do not include existing area sources (commercial and residential stationary emissions sources that are too small to require a license, including wood stoves) and mobile sources (e.g., automobiles, trucks, aircraft, and other mobile equipment) of emissions in the area of South Portland and surrounding cities.[238]  PSAMF ¶ 220.  The summer emissions increase for PPLC's 2009 proposed pipeline reversal project represents approximately 5.9% of the estimated summer mobile source VOC emissions, 2.1% of the estimated summer mobile source NOx emissions, and 1.6% of the estimated summer mobile source HAP emissions in the area of South Portland and surrounding cities.[239]  PSAMF ¶ 221.[240]

### N.    The American Waterways Operators

The American Waterways Operators (AWO) is a nationwide trade organization that advocates for the interests of United States tugboat, towboat, and barge owners and operators.  PSMF ¶ 155; DRPSMF ¶ 155.  AWO has approximately 350 member companies across the United States, which operate thousands of vessels licensed by the United States Coast Guard to engage in coastwise, i.e., domestic, trade.  PSMF ¶

[238]    The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology.  DRPSAMF ¶ 220.  For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement.  The Court also modifies the original statement slightly to hew more closely to the cited expert conclusions.

[239]    The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology.  DRPSAMF ¶ 221.  For the reasons discussed in footnote 228, the Court rejects the denial and includes the statement.  The Court also modifies the original statement slightly to hew more closely to the cited expert conclusions.

[240]    PPLC seeks to include:  PPLC's 2009 proposed pipeline reversal project would have resulted in only a minor increase in overall air pollutant emissions in the South Portland area."  PSAMF ¶ 222.  The City denies this statement on the grounds that it constitutes undisclosed expert testimony, and is not the product of reliable scientific methodology.  DRPSAMF ¶ 222.  The Court rejects the reliability argument for the reasons discussed in footnote 228, but omits the statement because the phrase "only a minor increase" is disputed and the characterization is not a helpful supplement to the figures and percentages already before the Court.

156; DRPSMF ¶ 156. Every year, AWO members and others in the industry carry more than 800 million tons of cargo every year across U.S. waterways, including crude oil, and employ more than 38,000 people. AWO represents two-thirds of the industry.[241] PSMF ¶ 157. One of AWO's chief purposes is, and historically has been, to advocate for uniform federal control over maritime activity, including the loading of crude oil onto marine vessels and unloading of crude oil from marine vessels, as such uniformity allows AWO's members to avoid the confusion, inefficiency, decreased safety and increased costs associated with multiple and differing layers of regulation.[242] PSMF ¶ 158.

Portland Tugboat LLC ("Portland Tugboat") is an AWO member that currently operates four (4) tugboats in the Harbor.[243] PSMF ¶ 159. Portland Tugboat's operations in the Harbor consist chiefly of assisting larger vessels arriving from another port and guiding them into their final docket spaces in the Harbor, i.e., "ship assist" services.[244] PSMF ¶ 160. Historically, Portland Tugboat has received a significant portion of its revenue from providing ship assist services to tanker vessels docking at PPLC's Pier 2 to have their cargos of crude oil unloaded by PPLC into

---

[241] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 157. For the reasons discussed in footnote 4, the Court rejects the qualification.

[242] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 158. For the reasons discussed in footnote 4, the Court rejects the qualification.

[243] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 159. For the reasons discussed in footnote 4, the Court rejects the qualification.

[244] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 160. For the reasons discussed in footnote 4, the Court rejects the qualification.

PPLC's oil pipeline infrastructure.[245]  PSMF ¶ 161.  Up until 2008, Portland Tugboat assisted approximately seventeen ships per month with docking at Pier 2.[246]  PSMF ¶ 162.

As PPLC has received fewer and fewer shipments of oil over the past several years, Portland Tugboat has accordingly had fewer and fewer opportunities to provide arriving tankers with ship assist services.[247]  PSMF ¶ 163.  For example, in 2010, Portland Tugboat assisted approximately eleven ships per month delivering crude oil to PPLC's Pier 2.[248]  PSMF ¶ 164.  In 2016, Portland Tugboat has only assisted eight ships delivering crude oil to PPLC's Pier 2.[249]  PSMF ¶ 165.  As a result of the significant decline in PPLC's business, the number of ship assists provided to tankers being unloaded by PPLC has decreased significantly, with a corresponding loss of revenue and profitability for Portland Tugboat.[250]  PSMF ¶ 166.  This financial result is also reflected on the financial statements of its sole manager and member, McAllister Towing and Transportation Co.  *Id.*

---

[245]    The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 161.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[246]    The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 162.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[247]    The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 163.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[248]    The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 164.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[249]    The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 165.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[250]    The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 166.  For the reasons discussed in footnote 4, the Court rejects the qualification.

Ultimately, it is irrelevant to Portland Tugboat whether a ship seeking to dock at Pier 2 is full of crude oil and seeking to unload its contents, or completely empty and seeking to be filled; either way, Portland Tugboat makes the same money tugging the boat in.[251]  PSMF ¶ 167.  Unless PPLC is able to reverse the flow of its pipeline, and thereby attract empty ships seeking to be loaded with crude oil, Portland Tugboat permanently will lose all of the business it previously received from assisting ships seeking to dock at PPLC's Pier 2.[252]  PSMF ¶ 168.

In 2008, when PPLC's business was at higher levels than it currently is, McAllister commissioned the design and construction of a very specialized tugboat, the *Andrew McAllister*, for Portland Tugboat to use to better serve tankers docking at PPLC's Pier 2.  The *Andrew McAllister* was delivered in 2008 at a cost of approximately $10 million.[253]  PSMF ¶ 169.  The *Andrew McAllister* was designed to meet the requirements of servicing ships transporting crude oil at PPLC and to respond to oil fires on ships or on the water.[254]  PSMF ¶ 170.  The *Andrew McAllister* is an escort tugboat equipped with 6,000 horsepower engines and certified capable of generating eighty-three tons of bollard pull, which is the specification needed to

---

[251]    The City denies this statement, reiterating its claim that PPLC lacks any concrete plans for reversal.  DRPSMF ¶ 167.  This appears to be a non sequitur and does not contradict the statement of fact. The City also objects that this statement is inadmissible because it is irrelevant. For the reasons discussed in footnote 188, the Court rejects the denial.

[252]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 168. For the reasons discussed in footnote 188, the Court rejects the denial.

[253]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 169. For the reasons discussed in footnote 188, the Court rejects the denial.

[254]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 170. For the reasons discussed in footnote 188, the Court rejects the denial.

service tankers transporting crude oil at PPLC.[255]  PSMF ¶ 171.  It is the most powerful tugboat on the Eastern Seaboard north of Boston.  *Id.*

The *Andrew McAllister* was also designed to have a specialized 11,000 gallon-per-minute fire-fighting system, which is equivalent to three municipal fire trucks and is capable of creating foam to put out oil fires on water.[256]  PSMF ¶ 172.  It has American Bureau of Shipping classification with "Firefighting One" notation.  *Id.* There are very few boats operating on the Eastern Seaboard with similar firefighting capabilities as the *Andrew McAllister* and it is the only one operating north of Boston.[257]  PSMF ¶ 173.  As a result of its firefighting capabilities, Portland Tugboat is called upon by the Cities of Portland and South Portland to use the *Andrew McAllister* to provide back-up firefighting assistance when needed in the Harbor.[258] PSMF ¶ 174.

Given the decrease in PPLC's business, the *Andrew McAllister's* highest and best use is not being realized.[259]  PSMF ¶ 175.  It is not being used to its full capacity in the Harbor and the revenue it has been generating from delivering crude oil to PPLC is insufficient to offset the costs of operating it there.  *Id.*  The *Andrew*

---

[255]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 171. For the reasons discussed in footnote 188, the Court rejects the denial.

[256]     The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 172.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[257]     The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 173.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[258]     The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts.  DRPSMF ¶ 174.  For the reasons discussed in footnote 4, the Court rejects the qualification.

[259]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 175. For the reasons discussed in footnote 188, the Court rejects the denial.

*McAllister* is equally able to serve vessels regardless of whether they are being unloaded of crude oil by PPLC or being loaded by PPLC with crude oil.[260]  PSMF ¶ 176.  The best way for the *Andrew McAllister* to be employed is if it is used in the Harbor to service tankers delivering crude oil to PPLC or being loaded with crude oil by PPLC.[261]  PSMF ¶ 177.

If PPLC's operations do not materially change, the *Andrew McAllister* may be removed from the Harbor and redeployed elsewhere.[262]  PSMF ¶ 178.  Removing the Andrew McAllister from the Harbor would be detrimental to the Harbor.[263]  PSMF ¶ 179.  Several years ago, the *Andrew McAllister* prevented a major marine casualty in the Harbor while it was escorting a tanker to a non-PPLC location in the Harbor that required the tanker to pass under the Casco Bay Bridge.[264]  PSMF ¶ 180.  While the *Andrew McAllister* was escorting the tanker, the Casco Bay Bridge failed to open and the tanker was unable, on its own power, to change course and prevent a collision with the Casco Bay Bridge.[265]  PSMF ¶ 181.  The *Andrew McAllister* was able to maneuver the tanker to avoid a collision with the Casco Bay Bridge and to avoid it running aground.[266]  PSMF ¶ 182.  If the *Andrew McAllister* had not been present, a

[260]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 176.  For the reasons discussed in footnote 188, the Court rejects the denial.

[261]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 177.  For the reasons discussed in footnote 188, the Court rejects the denial.

[262]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 178.  For the reasons discussed in footnote 188, the Court rejects the denial.

[263]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 179.  For the reasons discussed in footnote 188, the Court rejects the denial.

[264]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 180.  For the reasons discussed in footnote 188, the Court rejects the denial.

[265]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 181.  For the reasons discussed in footnote 188, the Court rejects the denial.

[266]     The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 182.  For the reasons discussed in footnote 188, the Court rejects the denial.

major marine casualty may have occurred from the tanker colliding with the bridge or running aground.[267]  PSMF ¶ 183.  Had the tanker collided with the bridge or run aground, it could have resulted in severe damage to the bridge or to the tanker, could have resulted in an oil spill, could have resulted in an onboard fire, or could have resulted in damage to assets on shore from the tanker running aground.[268]  PSMF ¶ 184.

If PPLC's operations do not materially change, Portland Tugboat will be forced to downsize Portland Tugboat's operations in the Harbor by reducing the number of tugboats it has operating in the Harbor from four to three.[269]  PSMF ¶ 185.  Due to lack of business in the Harbor, predominantly as a result of PPLC's declining business, Portland Tugboat has already reduced its force of full-time maritime employees from sixteen to eight.[270]  PSMF ¶ 186.  If PPLC's operations do not materially change, Portland Tugboat may be forced to further reduce the number of full-time maritime employees servicing customers in the Harbor.[271]  PSMF ¶ 187.

McAllister Towing and Transportation Co., Inc. ("McAllister") is also an AWO member and the sole member and manager of Portland Tugboat.  PSMF ¶ 188; DRPSMF ¶ 188.  McAllister owns and operates tugboat companies in twelve locations

---

[267]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 183. For the reasons discussed in footnote 188, the Court rejects the denial.

[268]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 184. For the reasons discussed in footnote 188, the Court rejects the denial.

[269]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 185. For the reasons discussed in footnote 188, the Court rejects the denial.

[270]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 186. For the reasons discussed in footnote 188, the Court rejects the denial.

[271]    The City objects that this statement is inadmissible because it is irrelevant.  DRPSMF ¶ 187. For the reasons discussed in footnote 188, the Court rejects the denial.

along the eastern seaboard, from Portland, Maine to San Juan, Puerto Rico, including in New York, Philadelphia, and Baltimore.[272] PSMF ¶ 189. In each port in which McAllister operates, including the Harbor, McAllister is engaged in providing ship assist services, general harbor towing, coastal towing, and bulk transportation.[273] PSMF ¶ 190. A significant portion of the revenue generated by AWO members, including McAllister, arises out of towing tank barges loaded with crude oil.[274] PSMF ¶ 191. This service consists of tugboats pulling or pushing a tank barge that has been filled with crude oil from an oil terminal to another location, such as an oil refinery.[275] PSMF ¶ 192.

Pier 2, where PPLC receives marine vessels, is not presently designed to accommodate tank barges. DSAMF ¶ 210; PRDSAMF ¶ 210. It only can receive Aframax, Suezmax, and Panamax self-propelled tank vessels. *Id.* For Pier 2 to be able to berth tank barges, PPLC would be required to modify Pier 2.[276] DSAMF ¶ 211. In 2011, PPLC gave strategic consideration to developing a project for which

---

[272] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 189. For the reasons discussed in footnote 4, the Court rejects the qualification.

[273] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 190. For the reasons discussed in footnote 4, the Court rejects the qualification.

[274] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 191. For the reasons discussed in footnote 4, the Court rejects the qualification.

[275] The City offers a qualified admission on the grounds that it lacks specific knowledge to admit or deny the facts. DRPSMF ¶ 192. For the reasons discussed in footnote 4, the Court rejects the qualification.

[276] PPLC denies the City's original statement, which used the term "reconstruct" as opposed to "modify." PRDSAMF ¶ 211. The Court modifies the statement to resolve the denial.

there would be no need to upgrade Pier 2 to handle small tankers and barges.[277]

DSAMF ¶ 212.[278]

If PPLC successfully reversed the flow of its pipeline so that it can load crude oil on to vessels in the Harbor, including modifying Pier 2 to accommodate tank barges, McAllister would have the opportunity to tow tank barges from South Portland to other locations, such as oil refineries located in Philadelphia, Houston, and the New York/New Jersey area.[279] PSMF ¶¶ 193, 196. AWO has provided this service elsewhere, profitably.[280] PSMF ¶ 194. McAllister would be able to provide

---

[277] PPLC denies the City's original statement, which read, "Before formally terminating all activity to load crude oil in the City in 2013," rather than, "In 2011 . . . ." PRDSAMF ¶ 212. The Court modifies the original statement to resolve the denial and clarify the timeline.

[278] The City also sought to include the following statement: "No American Waterways Operators ('AWO') members, including McCallister (sic) Towing and Transportation Co., tow self-propelled tank vessels, such as the ones PPLC's Pier 2 is designed to presently accommodate. Self-propelled tank vessels do not use or require towing services." DSAMF ¶ 213. PPLC denies this statement, citing other evidence that tugboats do in fact assist self-propelled tankers as they navigate in the harbor. PRDSAMF ¶ 213. The Court agrees there is a dispute about the extent to which self-propelled tankers use towing services. Accordingly, as discussed in footnote 2, the Court resolves the dispute in favor of the City for purposes of PPLC's motion, and in favor of PPLC for purposes of the City's motion.

[279] The City denies AWO's original statement, which did not contain the language "including modifying Pier 2 to accommodate tank barges . . . ." DRPSMF ¶ 193. The City points out that Pier 2 is not currently designed to accommodate tank barges, only self-propelled tankers. The Court adds the additional language about the modifications required before PPLC could load oil onto tank barges in order to resolve the City's denial.

The City also objects to a statement that "there would exist a significant market for towing tank barges from South Portland to refineries in Philadelphia and Houston," on the grounds that it is expert testimony, and asks the Court to strike the statement. DRPSMF ¶ 196. AWO's statements regarding its expectations in the market did not necessarily constitute expert testimony because they were relevant to the issue of PPLC's intent to pursue the project. *See* footnote 10. In contrast, these statements have no bearing other than for their truthfulness about the real market demand from refineries in other U.S. ports, which is the proper subject of expert testimony or at least requires a foundation. Accordingly, the Court omits the statement.

[280] The City denies AWO's original statement, which did not contain the language "and PPLC successful implemented a reversal project, including reconstructing Pier 2 to accommodate tank barges . . . ." DRPSMF ¶ 193-94. The City points out that Pier 2 is not currently designed to accommodate tank barges, only self-propelled tankers. The Court adds the additional language about the modifications required before PPLC could load oil onto tank barges in order to resolve the City's denial.

this service, and would endeavor to do so, for tank barges loaded with crude oil originating in South Portland from PPLC.[281]  PSMF ¶ 195.[282]

## O.    The City's Comprehensive Plan

On October 15, 2012, the City Council unanimously adopted a new Update to its Comprehensive Plan, which serves as the basis for the City's zoning regulations. DSMF ¶ 132; PRDSMF ¶ 132; PSAMF ¶ 223; DRPSAMF ¶ 223.  Prior to October 15, 2012, the City's Comprehensive Plan had not been updated in approximately twenty years, since 1992.  DSMF ¶ 133; PRDSMF ¶ 133.  A nineteen-person Comprehensive Plan Update Committee, along with the City staff led by Charles Haeuser, Planning and Development Director for the City and Planning Decisions, Inc., a consultant, prepared the Comprehensive Plan Update.[283]  DSMF ¶ 134; PRDSMF ¶ 134; PSAMF ¶ 224.    The Committee took great care to prepare the update of the City's Comprehensive Plan so that existing uses would be allowed to continue and not be inhibited by the Comprehensive Plan.   PSAMF ¶ 225; DRPSAMF ¶ 225.   John

---

[281]    The City denies AWO's original statement, but the Court's modifications in the previous statements of fact resolves the City's denial.

[282]    AWO also seeks to include the following statement:
    If the City of South Portland's so-called "Clear Skies Ordinance" were to be duplicated and adopted in other jurisdictions bordering navigable waters, the results would be disastrous for AWO's members and maritime commerce in general.  The proliferation of ordinances such as the "Clear Skies Ordinance" would give rise to a patchwork of regulation over a channel of American commerce (its waterways) that historically have been subject to uniform regulation.
PSMF ¶ 197. The City denies this statement as legal argument, not statements of fact, and requests the Court strike it from the record.  DRPSMF ¶ 197.  The Court agrees that it is legal argument and, therefore, omits the statement.

[283]    The City offers a qualified admission to PPLC's versions of this statement, which read, "The update was prepared by the Comprehensive Plan Update Committee," on the grounds that it left out the role of the City Council in contributing to and ultimately enacting its provisions.  DRPSAMF ¶ 224.  PPLC's statement is remarkably similarly to the City's own proposed statement at DSMF ¶ 134.  Accordingly, the Court rejects the qualification.

Christie Gillies, Secretary Treasurer of PPLC, was a member of the Comprehensive Plan Update Committee that prepared the Comprehensive Plan.[284]  DSMF ¶ 175.

The Comprehensive Plan Update Committee recognized the importance of business and industry to the City and took great care to not restrict existing current uses by business and industry, including PPLC's oil terminal and tank farm, and wrote:

> Within [The Shipyard Development District], the City's development regulations should continue to allow existing marine and oil facilities to upgrade or expand on parcels that are already used for this purpose. The regulations also should encourage creative development/redevelopment of the vacant or underutilized land within this district by establishing flexible, performance-based standards that allow a wide range of potential uses. This could include the use of "conditional zoning" or the creation of a special development district tailored to a specific development proposal. Any development that is well designed and meets that following criteria could be allowed in this development district.[285]

PSAMF ¶¶ 226-27, 229-30.

The Comprehensive plan's vision for the future of South Portland includes: "It encourages a compact, higher-density, mixed-use pattern of development . . . While much of the shoreline remains a working waterfront, the public's access to the water

---

[284]    PPLC admits the statement except the City's inclusion of Mr. Gillies' middle name as "Christopher," instead of "Christie."   The Court makes the name substitution to resolve the qualification.

[285]    PPLC seeks to include the following original statement: "The Committee recognized the importance of business and industry to the City and took great care to not restrict existing current uses by business and industry, including PPLC, and to allow existing current uses to continue, be maintained and expanded."  PSAMF ¶ 226.  The City offers a qualified admission but disputes that the plan update supports expanding oil facilities.  DRPSAMF ¶¶ 226-27. The plan update does support the cited testimony but, out of an abundance of caution, the Court modifies the original statement to hew more closely to the language of the actual plan update report and to resolve the qualification in DRPSAMF ¶¶ 226-27, 229-30.

expands."[286] DSAMF ¶ 214. A local economic goal of the comprehensive plan is "[t]o support the highest and best use of the City's waterfront." *Id.*

The Comprehensive Plan states that the "Eastern Waterfront [which includes PPLC's Pier 2 and other properties in the Shipyard "S" zoning district] continues to evolve to become a marine, mixed-use area that capitalizes on the access to the waterfront and spectacular views of the harbor and inner Casco Bay. DSMF ¶ 135; PRDSMF ¶ 135. Southern Maine Community College continues to improve its campus primarily within its existing borders. *Id.*

Numerous parcels surrounding PPLC's floating roof above-ground oil storage tanks and Pier 2 facilities in the Shipyard "S" zoning district are vacant.[287] DSMF ¶ 136. Several vacant parcels, which have been assembled under the same controlling ownership and are contiguous, are in the immediately vicinity of PPLC's Waterfront Tanks.[288] DSMF ¶ 137. The Comprehensive Plan states that the several parcels surrounding PPLC's floating roof above-ground oil storage tanks and Pier 2 facilities in the Shipyard "S" zoning district have "significant potential to expand the City's tax base and create broad economic benefits for the community at large," and also says,

---

[286]     PPLC offers a qualified admission of the City's original statement, which did not include all of the quoted language from the comprehensive plan, because it did not agree with the way the City pieced together different quotes. PRDSAMF ¶ 214. The Court includes more language from the quoted section to resolve the qualification.

[287]     PPLC denies this statement on the grounds that it is not adequately supported by the record citation. PRDSMF ¶ 136. The City's record citation does mention that there are "vacant" properties, and the citation in the following paragraph adequately supports the statement. Accordingly, the Court rejects the denial.

[288]      PPLC denies this statement on the grounds that it is not adequately supported by the record citation. PRDSMF ¶ 137. The City's record citation adequately supports the statement except the use of the specific word "abut." Accordingly, the Court modifies the statement to use the phrase "immediate vicinity" to resolve the denial.

"Within this area, the City's development regulations should continue to allow existing marine and oil facilities to upgrade or expand on parcels that are already used for this purpose."[289]  DSMF ¶ 138.  With regard to the Eastern Waterfront, the Comprehensive Plan states that "[t]he redevelopment of vacant and underutilized areas in a way that expands public access and the diversity of uses while maintaining marine activities is a fundamental land use objective."[290]  DSMF ¶ 139.

With regard to Pier 2 and the Waterfront Tanks, the Comprehensive Plan states that it is the policy of the City that:

> In the short term, the City's marine terminals and related marine industrial areas are maintained and improved while minimizing their impact on adjacent residential neighborhoods. In the longer term, if demand for these facilities declines or the type of activity needs to change and the owners of these facilities desire to explore other uses for these facilities, the City, in conjunction with the owners, should reevaluate the best use of these waterfront sites.

DSMF ¶ 140; PRDSMF ¶ 140; DSAMF ¶ 228; PRPSAMF ¶ 228; PSAMF ¶ 231; DRPSAMF ¶ 231. Since July of 2014 (when the Ordinance at issue was enacted), PPLC's twenty-four-inch and eighteen-inch pipelines have not averaged more than 100,000 b/d – combined – in any month.[291]  DSMF ¶ 141.  The City is actively supporting development of the vacant or otherwise developable eastern waterfront

---

[289]    The City's original statement did not include the second quoted passage, to which PPLC offered a qualified admission on the ground that the quotation omitted the other relevant passage. The Court includes both quotations to resolve the qualification.

[290]    PPLC denies the City's original statement, which includes the following preface: "With regard to the several parcels surrounding PPLC's floating roof above-ground oil storage tanks and Pier 2 facilities in the Shipyard 'S' zoning district . . . ."  PRDSMF ¶ 139.  PPLC argues there is nothing in the record citation specifically linking the rest of the statement with the preface. Out of an abundance of caution, the Court modifies the first part of the statement to more closely follow the language of the record citation.

[291]    PPLC denies this statement, reiterating its argument that this is not the proper subject of expert testimony.  PRDSMF ¶ 141.  For the reasons discussed in footnote 28, the Court rejects the denial.

parcels, including the assembled parcels in the vicinity of PPLC's Waterfront Tanks, through its planning policies and meetings with potential developers.[292]  DSMF ¶ 142.

Developers have presented preliminary proposals for at least two large mixed-use projects on the vacant parcels that abut the Waterfront Tanks: (a) Liberty Village (2005) would have constructed a large mixed-use commercial, residential, and recreational space; (b) Shipyard Village (2013) would have included a marina, waterfront hotel, boat launch, residential space, office space, a parcel reserved for light industrial, aquarium.[293]  DSMF ¶ 143.  There also was a proposal to construct an outdoor amphitheater on the vacant parcels that abut the Waterfront Tanks.[294]  DSMF ¶ 144.[295]

The Ordinance promotes economic redevelopment of the City's waterfront, while the VCUs and intensification of industrial effects that would be occasioned by crude oil loading under PPLC's previous plans would inhibit the Comprehensive

---

[292]    PPLC denies this statement on the grounds that it is not adequately supported by the record citation.  PRDSMF ¶ 137.  The record adequately supports the City's statement except the use of the specific word "abut."  Accordingly, the court modifies the statement to use the phrase "immediate vicinity" to resolve the denial.

[293]    PPLC objects on the grounds that this is not the proper subject of expert testimony.  PRDSMF ¶ 143.  Although Haeuser is qualified to testify as an expert, he can also testify based on his personal knowledge of past development proposals he is familiar with as a result of his role as Planning and Development Director for the City of South Portland.  For the same reasons that Mr. Hardison can testify as to details of PPLC's development projects, Mr. Haeuser can testify about the City's.  For the reasons discussed in footnote 10, footnote 18, and footnote 28, the Court rejects PPLC's denial.

[294]    PPLC denies this statement, reiterating its argument that this is not the proper subject of expert testimony.  PRDSMF ¶ 144.  For the reasons discussed in footnote 10, footnote 18, and footnote 28, the Court rejects PPLC's denial of this statement.

[295]    The City seeks to include: "At least one potential developer informed the City that he wished oil tanks were phased out of existence on the eastern waterfront because they interfere with his company's development goals."  DSMF ¶ 145.  PPLC objects that this is inadmissible hearsay.  PRDSMF ¶ 145.  The Court agrees.  The Court views this statement as akin to the numerous citizen comments that the City received before enacting the Ordinance, which the Court excluded.  *See* footnote 80.  The Court omits the statement.

Plan's goal of transforming the Shipyard zoning district into a "robust waterfront center for office complexes, commercial uses, traditional marine uses, residential development, integrated light industrial and tourist activity."[296]  DSMF ¶ 174.

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit."  *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party."  *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to ... establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).   In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims."  *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman*

---

[296]    PPLC denies this statement because it argues a new proposal might involve vapor recovery units that would not result in an "intensification of industrial effects."  PRDSMF ¶ 174.  The Court adds language to the original statement to specify that it refers to PPLC's prior plans in order to resolve the denial.  PPLC also argues that the Ordinance is inconsistent with another goal of the Comprehensive plan, to preserve traditional marine, commercial, and industrial uses.  *Id.*  This argument is not inconsistent with the City's statement because the Comprehensive plan has multiple goals.

*v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

Where, as here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assur. Co.*, 782 F.3d 56, 59 (1st Cir.2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir.2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately. *Libertarian Party of N.H. v. Gardner*, 759 F.Supp.2d 215, 221 (D.N.H.2010) *aff'd*, 638 F.3d 6 (1st Cir.2011). The presence of cross-motions for summary judgment "does not alter or dilute" the summary judgment standard. *Id.* (citing *Kunelius v. Town of Stow*, 588 F.3d 1, 8 (1st Cir.2009)).

## IV.   PARTIES' POSITIONS

### A.   PPLC's Motion for Summary Judgment

#### 1.   Preemption by the Pipeline Safety Act

##### a.   PPLC's Motion

PPLC begins by summarizing the ways federal law can preempt local regulation under the Supremacy Clause, U.S. CONST. Art. VI, cl. 2, including express preemption, field preemption, and conflict preemption. *Pls.' Mot.* at 23. PPLC argues that Congress preempted the entire field of interstate pipeline safety through the Pipeline Safety Act (PSA) and its regulations. *Id.*; 49 U.S.C. §§ 60101 *et seq.*, and 49 C.F.R. Part 195. PPLC argues that the Department of Transportation (DOT) "prescribes standards for pipeline transportation and for pipeline facilities that govern every facet of design, construction, and operation of interstate pipelines." *Id.* at 24. PPLC claims that local regulations can be field preempted as a result of their purpose, or their effect. *Id.* at 25 (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 84 (1990) and *Texas MidStream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 212 (5th Cir. 2010)).

First, PPLC claims the Ordinance is preempted because the purpose of the Ordinance is regulating pipeline safety, which is a field covered by the PSA. When inquiring into the purpose of an ordinance, PPLC claims a court can and should look behind the asserted purpose. *Id.* PPLC says the true purpose of the Ordinance is actually to stop the transportation of crude oil into the United States through the Harbor because the City "deemed Canadian 'tar sands' an unsafe product . . . ." *Id.*

at 26. PPLC concludes that "[r]egulation designed to stop the transportation of oil through interstate pipeline facilities based on human and environmental health concerns related to 'risks to life and property' fall squarely within" the preempted field of and express terms of the PSA. *Id.*

Second, regardless of the purpose of the Ordinance, PPLC claims it intrudes into the preempted field in effect, because of the "impact on pipeline operations and related safety measures . . . ." *Id.* at 27. PPLC argues that the DOT is responsible for regulating how the flow of oil is directed, not localities, and that by "[c]oncluding that transportation in one direction is safe, while transportation the other way is not, the Ordinance directly regulates how oil should be transported through the pipeline system." *Id.*

Third, PPLC argues the ordinance is preempted because it stands as an obstacle to the goals of PSA. *Id.* PPLC says the purpose of the PSA is to "create uniformity of safety regulation for interstate pipelines through enactment of uniform 'practicable' regulatory standards." *Id.* PPLC concludes that the goal of uniform regulatory standards will be obstructed if a locality may "dictat[e] in which direction oil may flow, based on its own conclusions as to what regulation makes sense to it for an international pipeline. . . ." *Id.* at 28.

### b. The City's Opposition

First, the City disputes whether the Ordinance prevents reversal of the flow direction in the pipelines at all, *Defs.' Opp'n.* at 29, and thus disagrees with PPLC's claim that the Ordinance is an attempt to regulate the flow direction. The City argues

that the Ordinance presents no obstacle to PPLC pumping in crude oil from Canada to the Main Tank Farm, and loading it onto rail cars at Rigby Yard. *Id.* The City therefore argues the Ordinance does not mandate the flow direction as a matter of fact, and that PPLC is not entitled to its current top preference for how to load the oil after the tank farm. *Id.* (citing *Wash. Gas Light Co.v. Prince George's Cty. Council*, 711 F.3d 412, 421 (4th Cir. 2013)).

Second, the City questions whether the purpose of the Ordinance is relevant for the preemption inquiry. The City cites *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 76-77 (1st Cir. 1997), for the proposition that preemption analysis focuses on the purpose of the preempting law only, not the legislative intent of the preempted law. *Id.* at 37.

Third, if the purpose of the Ordinance matters, the City disputes the purpose PPLC's assigns to the Ordinance. "The purpose of the Ordinance is not to regulate the safety and integrity of the pipeline from rupture, spill, explosion, or other 'risks to life and property.'" *Id.* at 37. Rather, the City claims the purpose of the ordinance is to "protect residents from new sources of air pollution, promote neighborhood aesthetics, and allocate land uses consistent with the Comprehensive Plan." *Id.* at 16.

Fourth, the City says these true purposes of the Ordinance are not preempted by the PSA. The City argues that the Clean Air Act carves out for separate regulation emissions from "loading and unloading facilities" separate from pipelines and emissions from tankers. *Id.* at 33-34. In addition, the City claims that local zoning

to prevent air pollution in general is expressly authorized by the Clean Air Act, and the preemptive scope of the PSA must be read *in pari materia* with other statutes like the Clean Air Act. *Id.* at 35. The City claims that zoning for traditional purposes like aesthetics are not preempted because the facilities regulated by the ordinance, those required for the act of loading crude oil, are not "pipeline facilities" as defined by the PSA. *Id.* at 38. "[T]he PSA expressly exempts from its ambit facilities used to load marine vessels, such as the VCUs and ship loading station proposed in the 2008-2009 Project." *Id.* (citing 49 C.F.R. § 195.1(b)(9)(ii)). The City also argues that even if the facilities were "pipeline facilities" covered by the PSA, local authority over the sighting of those facilities is not preempted because Congress knows how to preempt that local zoning authority if it wished to do so, since it did exactly that for Liquefied Natural Gas terminals and high voltage electric transmission lines, but did not do so in the PSA. *Id.* at 39. "That Congress has been clear and manifest in preempting local zoning in comparable circumstances compels the conclusion that Congress did not intend the PSA to preempt local zoning." *Id.* at 40.

Fifth, the City attempts to distinguish all the cases cited by PPLC to support their argument for PSA preemption. *Id.* at 41. The City argues that unlike the local zoning prohibition here, all of those cases where courts found PSA preemption involved laws "establishing independent safety-based laws for state permitting, inspection and supervision of the pipelines." *Id.*

### c.    PPLC's Reply

PPLC responds to the City's argument about loading at the rail yard by claiming that "any such effort would be uneconomic." *Pls.' Reply* at 9.  PPLC argues that when examining the effect of an ordinance for purposes of preemption, "courts do not look at whether something is "feasible" from an "engineering" perspective," but rather, they examine the "practical impact" of the law.  *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 104 (1992)).

PPLC agrees with the City that the "motivation [of the state or local law] is not dispositive in most preemption contexts" but reiterates that it is relevant to the analysis.  *Id.* at 17-18.  PPLC contrasts the "broadly applicable aesthetic regulation having a minor impact on the locating of a new piece of pipeline equipment" upheld in *Texas Midstream*, with the Ordinance here, which it characterizes as "a targeted restriction on the operation of an existing pipeline."  *Id.* at 18.  PPLC concludes that this "impact would be sufficient to constitute intrusion into the preempted field whatever the City's purpose," but the purpose was focused on "concerns about safety, i.e., harm to people or the environment."  *Id.* at 18.

PPLC also disputes the City's argument that any VCUs and loading infrastructure after the tank farm are not covered by the PSA.  *Id.* at 19.  Nevertheless, PPLC responds that "whether it is or not is immaterial, given the Ordinance's impact on those parts of infrastructure that the City does acknowledge to be pipeline, stopping the flow from its inception in Montreal."  *Id.*  PPLC reiterates

its argument that the Ordinance is preempted by the PSA because the purpose and effect is to "require[ ] the pipeline to flow only in one direction"

### 2. Preemption by Foreign Affairs Power

#### a. PPLC's Motion

PPLC asserts that the Ordinance is preempted by the exclusive federal authority over foreign affairs. *Pls.' Mot.* at 38 (citing *United States v. Pink*, 315 U.S. 203, 233 (1942), and *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941)). It cites three major cases in support of this line of attack on the Ordinance, *National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), *aff'd on other grounds sub. nom. Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-73 (2000), *American Insurance Association v. Garamendi*, 539 U.S. 396, 414-16 (2003), and *Zschernig v. Miller*, 389 U.S. 429 (1968).

PPLC argues that the Ordinance "profoundly interferes" with the federal policy around tanker operations, which "seeks to facilitate trade among nations and reach international solutions." *Id.* at 43-44. The crux of this argument is that "[i]t is up to federal authorities, not the City of South Portland, to determine what restrictions, if any, should be imposed on the loading and export of oil from Canada on ships through the Harbor." *Id.* at 40. More specifically, PPLC points to the International Convention for the Prevention of Pollution from Ships, 1973 as modified by the Protocol of 1978 (MARPOL), including Annex VI and Regulation 15 thereto (Regulation 15), which obligates nations to notify the International Maritime

Organization before adopting regulations governing certain activities like VOC emissions from tankers. *Id.*

In addition to federal foreign affairs policy around tanker operations, PPLC raises the foreign policy regarding cross-border transportation of hydrocarbons. *Id.* at 44. PPLC points to the "National Strategic Petroleum Reserve, and federal import and export prohibitions regarding oil" to support the argument that "how much oil comes in and goes out of the United States, and from where, has long been a major aspect of our foreign policy." *Id.* at 44-45. In particular, PPLC emphasizes its "Presidential Permit issued in accordance with executive orders issued by the President and appropriate State Department authority," which allows reversal but instructs PPLC to notify the Department of the change, if it occurs. *Id.* a 46-47 (citing the 1999 permit, Exec. Order No. 11,423, 1968 WL 99009 (1968), and Exec. Order 13,337, 2004 WL 3247272 (2004)). PPLC also raises some declarations between the United States and Canada, as well as the Keystone XL federal permit battles, and the Transit Pipelines Agreement between the United States and Canada, in which the countries promised that "No public authority in the territory of either [country] shall institute any measures, other than those provided for in Article V [relating to emergencies], which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." *Id.* at 47. PPLC concludes that "whether a cross-border pipeline may be built and may operate, what it carries, and in what direction, are subject matters within the control of federal authorities, given the national interests involved," but if

the Ordinance were upheld and followed elsewhere, "local authorities, not the President, would be in charge of whether and how all cross-border pipelines operate." *Id.* at 49-50.

## b.  The City's Opposition

The City responds that MARPOL Annex VI Regulation 15 "applies only to safety aspects associated with the operation of vapor emission control systems . . ." and "exclusively targets technical aspects of operation on-board a vessel, not the on-shore combustion of vapors and emission into the local air." *Defs.' Opp'n.* at 43-44. The City also points out that when the Senate codified the treaty it included "an express savings clause preserving the rights of states and municipalities to regulate, stating the treaty's precatory goals 'neither amend nor repeal any other authorities, requirements, or remedies conferred by any other provision of law' and do not 'limit, deny, amend, modify, or repeal any other authority . . . .'" *Id.* at 43 (citing 33 U.S.C. § 1911).  The City argues, "The Clean Air Act remains the exclusive source of regulation over VCUs that expel emissions on shore from the cargo holds of tank vessels" which "expressly allows the City to regulate as stringently as it requires to protect against air emissions, including through zoning prohibitions."  *Id.*

The City also attempts to distinguish the cases cited by PPLC, like *Natsios* and *Garamendi.  Id.* at 44.  For example, it says *Natsios* stood on different facts because the state in that case admitted an intent to disrupt trade with a foreign country contrary to federal policy, whereas here the City claims there is no intent to hinder trade with Canada.  *Id.*  The City also argues that this count rests on disputed facts

about the design and intent of the Ordinance, and therefore the Plaintiffs' motion should be denied. *Id.* at 42.

The City argues that the general national interest in hydrocarbons that PPLC discusses does not preempt its ability to restrict bulk loading of crude oil any more than the "broad national interest in food (and nearly every commodity)" preempts a municipality's authority to prohibit uses like a grocery trucking terminal. *Id.* at 45. More specifically, the City argues that rather than preempting local prohibitions like the Ordinance, the State Department permit issued to PPLC allows local zoning and environmental regulation. *Id.* at 45 (quoting language in the permit requiring permittee to "comply with all applicable federal and state laws and regulations" and obtain permits from "relevant state and local government entities"). The City points to similar "savings clauses" which refer to local regulation in the Executive Orders and the Transit Pipelines Agreement. *Id.* at 45. The City also argues the foreign affairs power over the pipelines is more limited than PPLC indicates, pointing to the State Department's interpretation that it only has authority over the "border segments" between the border than the first shutoff valve or pumping station. *Id.* at 46; *White Earth Nation, et al. v. John Kerry and U.S. Dep't of State*, Civil No.14-4726, at 6-7 (D. Minn. June 19, 2015).

### c.    PPLC's Reply

PPLC responds that the while "[t]he fact that pipeline equipment crosses a national border triggers the federal permitting exercise," that "does not limit the nature or scope of the foreign policy analysis in determining whether to approve the

pipeline as a cross-border transportation corridor." *Pls.' Reply* at 25. PPLC also

reiterates its argument about the need for federal uniformity in this area, concluding:

> "A local regulation cannot effectively control a cross-border pipeline moving oil from Canada to the United States, because how to calibrate decision-making in this area is a matter requiring one decision-maker, the President, to implement one foreign policy regarding our relationship with Canada and oil, an item of national interest, as opposed to differing foreign policies of thousands of local harbor towns."

*Id.* at 27.

### 3. Preemption by the Port and Waterways Safety Act

### a. PPLC's Motion

PPLC argues the Ordinance is preempted because the Port and Waterways

Safety Act occupies the entire field of "the operation of marine tanker vessels in U.S.

harbors, including the loading and unloading of their cargo." *Pls.' Mot.* at 29-30.

PPLC points to Title II of the PWSA, 46 U.S.C. Ch. 37, and the regulations

thereunder, volumes 33 and 46 of the Code of Federal Regulations. *Id.* at 29, PPLC

also points to two Supreme Court decisions, *United States v. Locke*, 529 U.S. 89

(2000), and *Ray v. Atlantic Richfield, Co.*, 435 U.S. 151 (1978). *Id.* at 30-31. PPLC

summarizes,

> In *Ray*, the Court struck down a state law regulating the design, size, and movement of oil tankers in Puget Sound because they fell within the Title II categories and were thus preempted. In *Locke*, the Court, expressly stating that the interpretation of the PWSA in Ray was 'correct and controlling,' struck down state training, watch, and reporting regulations as also falling within Title II field preemption.

*Id.* at 31 (internal citations omitted).

PPLC continues, "The loading and unloading of cargo onto and off of marine

vessels is . . . a core, traditional maritime operation long under federal control." *Id.*

(citing *Solano v. Beilby*, 761 F.2d 1369, 1371 (9th Cir. 1985); *Luvi Trucking v. Sea-land Serv., Inc.*, 650 F.2d 371, 373 (1st Cir. 1981); and *Puget Sound Stevedoring Co. v. State Tax Comm'n*, 302 U.S. 90, 92 (1937)).  It argues:

> Notably, field preemption applies under Title II even when the Coast Guard has chosen not to issue a specific regulation regarding vessel operation, including cargo handling, because Title II "required the Secretary to issue 'such rules and regulations as may be necessary with respect to the . . . operation of the covered vessels." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 69 (2002) (emphasis in original) (citing *Ray*, 435 U.S. at 161).

*Id.* at 32.  PPLC concludes, "By attempting to regulate the loading process for marine tank vessels at the Harbor by restricting the direction in which loading / unloading may occur, the Ordinance impermissibly intrudes into this preempted field."  *Id.* at 33.

PPLC also argues that the Ordinance is conflict preempted under Title I of the PWSA, which authorizes the Secretary of Homeland Security "to 'take such action as is necessary to . . . prevent damage to . . . [any] shore area' adjacent to U.S. navigable waters, including by "establishing procedures . . . for the handling, loading, unloading, storage, stowage, and movement . . . of . . . oil.'"  *Id.* at 33 n.32 (citing 33 U.S.C. §§ 1225(a)(1), 1225(a)(2)(A)).  PPLC says that Title I only allows local regulation "based on the peculiarities of local waters that call for special precautionary measure to facilitate the regulated activity.  *Id.* (citing *Locke*, 529 U.S. at 109).

### b.    The City's Opposition

The City responds that "the PWSA is limited by its terms to equipment safety regulation (i.e., inspection of equipment to prevent physical injury to life and property

from explosion, crashes, spills, etc.) and the Ordinance does not conflict." *Defs.' Opp'n.* at 47. The City does not see any conflict between the Ordinance and the PWSA because zoning for allowed and prohibited uses based on land use preferences and the desire to prevent emissions from on-shore sources are not "safety" regulations. *Id.* at 47, 49 (citing *Washington Gas Light Co. v. Prince George's Cty. Council*, 711 F.3d 412, 421 (4th Cir. 2013)). The City believes, "The Ordinance does not address traffic and navigation control in the Harbor, nor any safety specification of the vessels themselves, nor the VCUs. It allocates land uses." *Id.* at 48. In support of its distinction between federal safety regimes and local land use prohibitions, the City reasons, "[I]f preemption of local zoning applied any time Congress promulgates federal safety standards (e.g., USDA meat inspection), no municipality could make a slaughterhouse a prohibited use anywhere in its boundaries. That is, of course, not the law." *Id.* at 48-49 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

The City also responds that most of the cases cited by PPLC are irrelevant because, while they involved maritime disputes, they did not involve preemption under the PWSA. *Id.* at 49-50 (referring to *Sprietsma*, 537 U.S. 51; *Solano*, 761 F.2d 1369; *Luvi Trucking,* 650 F.2d 371; *Puget Sound* Stevedoring, 302 U.S. 90).

### c.      PPLC's Reply

PPLC replies that the PWSA does not merely address "equipment safety regulation," but also field preempts local regulation of "operations." *Pls.' Reply* at 21. PPLC believes the scope of PWSA preemption is broader than the City indicates, and points to "the Coast Guard's consequent host of regulations to ensure safety handling

of the process of loading oil onto ships, which the Ordinance wholly defeats by forbidding loading altogether." *Id.* at 21-22. PPLC also reiterates its argument for "the uniformity principle animating not just the PWSA but running through the Constitution." *Id.* at 22 (citing *Locke*, 529 U.S. at 99-100, 108-109, 117).

### 4. Preemption by General Maritime Law

#### a. PPLC's Motion

PPLC argues that the Ordinance "is preempted more broadly under Art. III, Section 2 of the Constitution and the Constitution's embedded principal of federal maritime governance." *Pls.' Mot.* at 33. PPLC claims there is exclusive federal control over maritime activities and therefore no presumption against preemption, because of the need for one uniform system of regulation. *Id.* at 34 (citing *Locke*, 529 U.S. at 99; *Cooley v. Bd. of Wardens*, 53 U.S. 299, 319 (1851); *The Lottawana*, 88 U.S. 558, 566 (1874)).

First, PPLC recites the test articulated in *Southern Pacific Co. v. Jensen*, 244 U.S. 205 (1917), which focuses on whether there is material prejudice to the characteristic features of the general maritime law or interference with the proper harmony and uniformity of that law. *Id.* at 34 (citing cases including *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 627, 628 (1st Cir. 1994)). PPLC claims that "the loading and unloading of cargo is a traditional maritime activity" because "maritime trade requires loading and unloading as the last step" of any voyage. *Id.* at 335. PPLC reasons, "If local municipalities could issue flat bans on unloading or loading of any particular cargo, maritime commerce could come to a standstill." *Id.*

Second, PPLC argues the ordinance is preempted because it is an impermissible ban on license coastwise trade. *Id.* PPLC claims "the Supreme Court has long held that a state law is preempted when it purports to ban federally licensed maritime activity." *Id.* at 35-36 (citing *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 283 (1977); *Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003); and *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 348 (4th Cir. 2001)). PPLC cites title 46, chapter 121 of the United States Code, which provides for the licensing of domestic vessels engaged in coastwise trade, and 46 U.S.C. § 9101 and 46 C.F.R. Part. 154, Subpart E, which provides for federal licensing of foreign flag vessels engaged in trade in oil. *Id.* at 36. PPLC claims, "The holding of a federal license 'entitles a vessel to employment in unrestricted coastwise trade.'" *Id.* at 36-37 (citing 46 C.F.R. § 67.19(a)). PPLC concludes that "The Ordinance's complete ban on the loading of oil onto marine tank vessels interferes with federal licensing of tanker vessels in coastwise trade" because it "prohibits the entry of licensed vessels into the Harbor to carry out federally permitted commerce." *Id.* at 37.

### b.      The City's Opposition

First, the City disputes PPLC's claim that the Ordinance "completely excludes federally license commerce upon a state's waterway" because the licensed oil tankers are still permitted use the waterway to load at other municipalities, and they are still permitted in the City to load refined oil and unload crude oil. *Defs.' Opp'n.* at 50. The City says, "As a factual matter, federally licensed vessels have continued to enter the

Harbor to engage in this commerce to the exact same extent as they did prior to the Ordinance's enactment . . . ." *Id.*

Second, the City does not agree with PPLC that the controlling test is the "abstract and rudderless" one in *Southern Pacific Company v. Jensen*, 244 U.S. 205 (1917). *Defs.' Opp'n* at 51. Instead, the City argues that maritime preemption claims must be judged by the same analysis regarding the "federal statutory structure." *Id.* (quoting *United States. v. Massachusetts*, 493 F.3d 1, 7 (1st Cir. 2007)). The City asserts that "[n]either *Locke, Jensen*, nor any other authority 'convert[s] a statutory inquiry into a metaphysical one.' *Id.* (quoting *Fednav, Ltd. v. Chester*, 547 F.3d 607, 622 (6th Cir. 2008)).

Third, the City argues this claim relies on disputed issues of fact, and that the city has failed to produce sufficient evidence of prejudice to the maritime economy, maritime affairs, or commercial impacts. *Id.* at 50-51.

Fourth, the City says that PPLC's arguments and citations about the maritime aspects of loading crude oil say nothing about local authority over constructing necessary onshore structures to load crude oil. *Id.* at 51-52.

Fifth, the City disputes the applicability of PPLC's statutory citations, the federal coastwise endorsements granted under 46 U.S.C. § 12101, et seq. *Id.* at 52. The City says that "[a] coastwise endorsement is an initial, threshold authorization for a vessel to engage in trade between U.S. ports," the requirements of which "largely concern the origin and ownership of the vessel, and do not at all concern the type or types of cargo the vessel will carry." *Id.* The City argues that no provision of Title 46

Chapter 121 represents an "endorsement or authorization for a vessel to carry a specific kind of cargo," nor do any provisions of the shipping regulations of 46 C.F.R. Part 67. *Id.* at 52-53. The City analogizes that many vessels licensed to engage in coastwise trade carry livestock but "[n]o court has ever held that a municipality must locate a stockyard on its shores or else have impermissibly banned licensed trade." *Id.* at 53. The City concludes that the cases cited by PPLC stand on very different facts and that federal licenses do not immunize ships from normal incidents of state and local police power. *Id.* at 53 (citing *Ray*, 435 U.S. at 164; *Seacoast Prods.*, 431 US at 278; *Tart v. Massachusetts*, 949 F.2d 490, 501 (1st Cir. 1991)).

### c.     **PPLC's Reply**

PPLC replies that the First Circuit does indeed follow the test set out in *Jensen. Pls.' Reply* at 22. PPLC points to *American Dredging Co. v. Miller*, 510 U.S. 443 (1994) and *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 627, 628 (1st Cir. 1994) to show the *Jensen* test is still good law, and argues that under that test the Ordinance is preempted because it does not merely have incidental and tangential effects on maritime activities, but directly targets "the loading of cargo onto maritime vessels." *Id.* at 22-23.

PPLC also responds that the oil activities still permitted under the Ordinance, the loading of refined oil and the unloading of crude or refined oil, do not save the Ordinance because "[n]othing in either statute or case law allows a partial ban." *Id.* at 24. PPLC emphasizes that a coastwise endorsement entitles a vessel to employment in "unrestricted" coastwise trade. *Id.* (quoting 46 C.F.R. § 67.3).

### 5. Dormant Interstate and Foreign Commerce Clause

#### a. PPLC's Motion

PPLC asserts that the Ordinance is a violation of the dormant or negative implications of the power of Congress "'[t]o regulate Commerce with foreign Nations' as well as among the several states." *Pls.' Mot.* at 51 (quoting U.S. CONST. art I, § 18, cl. 3). PPLC cites *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 446 (1979), and *Natsios*, 181 F.3d 38, for the usual dormant commerce clause tests in addition to "a more extensive constitutional inquiry" that applies in the foreign commerce context. *Id.* at 51-52.

First, PPLC notes that a discriminatory local law is virtually per se invalid, and argues that the Ordinance is discriminatory because in effect, if not also intent, it allows export of oil to Canada but prohibits import of crude oil from Canada. *Id.* PPLC says "a law need not be designed to further local economic interests" to be invalid under the Dormant Commerce Clause. *Id.* at 52 (citing *Natsios*, 181 F.3d 38; *Kraft General Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 79 (1992)). PPLC claims that the primary inquiry is not the intent or stated description of the local regulation, but its practical impact, and that a court must look to the substance of the local law, rather than its form. *Id.* at 54 (citing, for example, *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980); *LaCoste v. Louisiana Dep't of Conservation*, 263 U.S. 545, 550 (1924)). PPLC contends that a law need not favor local economic interests in order to impermissibly discriminate against interstate or foreign

commerce and can apply to both foreign and domestic companies and still fail. *Id.* at 52.

Second, PPLC also seems to suggest that the Ordinance has an impermissibly discriminatory purpose. *See id.* at 51 (alleging the City "does not like oil produced from Canadian oil sands, and that it wants to hinder that production and trade by halting its transportation through the pipeline"). In footnote 38 it cites *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951) and *Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, 10 (1st Cir. 1992) for the proposition that a court should look at the intent of a challenged law and probe behind the asserted purposes. *Id.* at 51, n.38.

Third, PPLC claims the Ordinance impermissibly attempts to regulate beyond its borders. *Id.* at 56. PPLC insists that "[b]oth the intent and the effect of the Ordinance is to influence conduct in Canada, to hinder the transportation of a product from Canada that the City has concluded is undesirable and that it does not want Canada to produce or transport for sale." *Id.* at 56.

Fourth, PPLC argues there is an additional way for a local law to violate the Dormant Foreign Commerce Clause not found in the usual interstate version: by impeding the federal government's ability to "speak with one voice" in foreign affairs. *Id.* at 55. PPLC cites *Japan Line*, 441 U.S. at 50, and *Natsios*, 181 F.3d at 68, for this independent analysis that appears separate from but analogous to the inquiry under the foreign affairs power and *Zschernig v. Miller*, 389 U.S. 429 (1968). PPLC insists on the same potential for balkanization and international retaliation that it raised in

the context of its foreign affairs preemption arguments, if individual localities can "halt commerce in a good imported from a foreign country in maritime trade." *See id.* at 55-56.

Fifth, PPLC reiterates that the subject matter of Ordinance, "maritime cargo loading and pipeline transportation," have particularly acute need for uniform regulation. *Id.* at 57-58. PPLC points to this "uniformity principle" applicable to "transportation instrumentalities." *Id.* at 58.

PPLC does not seek summary judgment on a different prong of the Commerce Clause, which determines if a non-discriminatory law nevertheless fails because the burdens on commerce outweigh the local benefits, because PPLC admits the fact sensitive nature of that inquiry. *Id.* at 59, n.42.

### b. The City's Opposition

The City argues that PPLC is not entitled to summary judgment because the Ordinance "does not limit trade with Canada in effect and was not intended to do so." *Defs.' Opp'n.* at 54. The City maintains, "On its face, the Ordinance does not make a distinction based on country of origin." *Id.* The City also reiterates its argument that the Ordinance does not prohibit PPLC from loading imported crude oil on rail cars at Rigby Yard, a few miles inland from the waterfront. *Id.* at 55. It also denies the purposes alleged by PPLC. *Id.* Since the Ordinance restricts method of loading crude oil from the pipeline but allows loading of crude oil at Rigby Yard, the City concludes, "There is no effective discrimination; just a reasonable land use restriction that provides immense public benefit." *Id.* at 57.

The City also argues that some of PPLC's analysis about the "incidental impact" on foreign commerce invoked the *Pike* balancing test, not the facial discrimination test, *id.* at 56, and that many of the cases PPLC cited are inapplicable because they involved statutes that "made facial distinctions based on origin of the commercial activity," unlike the Ordinance. *Id.* at 57.

The City contends that the Ordinance does not interfere with the federal government's ability to speak with one voice because the "federal government has invited multiple voices to speak on oil loading." *Id.* at 58. The City reiterates its earlier arguments that the federal law PPLC raises do not suspend local zoning prohibitions like those governing electric transmission and LNG facilities, and the federal approvals for the cross-border pipeline "instructed PPLC to comply with all state laws, as well as to obtain zoning and other permits from 'the relevant state and local governmental entities.'" *Id.* The City concludes there is also no special need for uniformity:

> The Ninth Circuit has held that "[w]hile design standards need to be uniform nationwide so that vessels do not confront conflicting requirements in different ports and so that the Coast Guard can promote international consensus on design standards, there is no corresponding dominant national interest in uniformity in the area of coastal environmental regulation."

Id. at 59 (quoting *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 499 (9th Cir. 1984)).

### c.      PPLC's Reply

PPLC reiterates its prior arguments and summarizes, "A local regulation cannot halt the transportation of oil in a pipeline crossing Canada and three states

because if each town could do so, cross-border commerce would come to a halt." *Pls.'*
*Reply* at 27.

### 6. Due Process, Excessive Delegation, and Equal Protection

#### a. PPLC's Motion

The only mention of these claims in the Plaintiffs' motion is a reference in a footnote that the due process claim involves the same extraterritoriality arguments discussed under the dormant commerce clause. *Pls.' Mot.* at 56 n.40. There is no further discussion of these claims in the City's opposition or PPLC's reply. Plaintiff does not appear to seek summary judgment on the other allegations in Count VI.

### 7. Section 1983 Civil Rights Violation

#### a. PPLC's Motion

PPLC submits that claims in the other counts are constitutional violations under 42 U.S.C. § 1983 or claims based on rights, privilege and immunities for purposes of § 1983. *Pls.' Mot.* at 60 (citing *Dennis v. Higgins*, 498 U.S. 439 (1991); *Gilmore*, 252 F.3d at 348 n.12). For that reason, PPLC seeks "costs under 42 U.S.C. § 1988, including reasonable attorney's fees." *Id.*

#### b. The City's Opposition

The City responds that Counts I, II, III, IV, and IX "are not redressable under § 1988" because claims "based solely on the Supremacy Clause" are not cognizable under 42 U.S.C. § 1983. *Defs.' Opp'n.* at 59 (citing *Boston & Me. Corp. v. Town of Ayer*, 330 F.3d 12, 18 (1st Cir. 2003)). The City also points out that Count IX "alleges

a violation of Maine law and is not subject to 42 U.S.C. § 1983." *Id.*[297] If PPLC is successful on Count V, the City argues the Court should not award PPLC attorney's fees because they are permissive, not mandatory, and the award of legal fees would come at the expense of the public treasury. *Id.* at 58-59. The City requests the Court address this issue after final decision. *Id.* at 59.

### c.      PPLC's Reply

PPLC replies that it is entitled to attorney's fees should it prevail on certain grounds, but agrees that "the issue whether Plaintiffs are entitled to their costs" should "await further briefing" and "the calculation of their costs should not be addressed until after the Court rules on the merits of its claim." *Pls.' Reply* at 29.

### 8.      Inconsistency with the City's Comprehensive Plan

### a.      PPLC's Motion

PPLC does not seek summary judgment on Count VIII. *See Pls.' Mot.* at 23.

### 9.      Statutory Preemption by the Maine Oil Discharge Prevention Law

### a.      PPLC's Motion

PPLC argues that the Maine Oil Discharge Prevention Law, also referred to as the Coastal Conveyance Act, preempts local ordinances "in direct conflict with this subchapter or any rule or order of the board or commissioner adopted under authority of this subchapter." *Pls.' Mot.* at 59 (quoting 38 M.R.S. § 556). PPLC points to its license that "explicitly approves the 'loading' as well as unloading of crude oil onto

---

[297] The City actually refers to "Count XIII" but the Court assumes this was a typographical error, since there is no "Count XIII" in the Complaint and the only state law claim discussed in Plaintiff's Motion was Count IX.

tankers." *Id.* PPPLC indicates the license was issued via "Department Order" and therefore qualifies as a "rule or order of the board or commissioner" that directly conflicts with the Ordinance. *Id.*

### b. The City's Opposition

The City responds that "[t]he license is not an 'order' authorizing PPLC to load oil for purposes of preemption by the Maine Oil Discharge Prevention Law. *Defs.' Opp'n.* at 59. The City argues the license does not preempt the Ordinance because "PPLC noted to Maine DEP its requirement to receive numerous other state and local permits necessary to load" and because the license "was not even required for PPLC to load oil for the 2008-2009 [proposed project] because the statute's spill prevention technical requirements are 'agnostic' to the direction." *Id.*

### c. PPLC's Reply

PPLC replies that its "license to load was approved in a DEP order . . . The CCA preempts local regulation in conflict with a DEP order; the DEP has approved loading in an order issued under the CCA; and the Ordinance forbids that loading. The Ordinance is preempted." *Pls.' Reply* at 28.

### B. The City's Motion for Summary Judgment

#### 1. Statutory Preemption by the Pipeline Safety Act

##### a. The City's Motion

The City begins by reciting the familiar concepts of express, field, and conflict preemption. *Defs.' Mot.* at 25-26. The City then recites the express preemption

language of the PSA and the definition of pipelines and pipelines facilities regulated

by that statute:

> The PSA expressly preempts state "safety standards for interstate pipeline facilities or interstate pipeline transportation." . . . [T]he definition of "pipelines" and "pipeline facilities" subject to PSA jurisdiction expressly excludes facilities, such as Pier 2 and the Waterfront Tanks, "used exclusively to transfer hazardous liquid . . . between non-pipeline modes of transportation . . . and a pipeline."

Id. at 27 (quoting 49 U.S.C. § 60104(c); 49 C.F.R. § 195.1(b)(9)(ii)).

The City says there is no First Circuit precedent interpreting the PSA, but

points to two cases from other circuits, *Washington Gas Light Company v. Prince*

*George's County Council*, 711 F.3d 412 (4th Cir. 2013), and *Texas Midstream Gas*

*Services., LLC v. City of Grand Prairie*, 608 F.3d 200 (5th Cir. 2010). *Id.* at 27-28.

The City summarizes:

> In both cases, the plaintiffs argued, as Plaintiffs have here, that the zoning amendments were "safety regulations in disguise." *Wash. Gas Light*, 711 F.3d at 421; *Texas Midstream*, 608 F.3d at 211. Both efforts failed. In the context of the PSA, the Fourth Circuit held "[e]ven assuming safety concerns played some part in the enactment of the County Zoning Plans, those concerns would have been merely incidental to the[ir] overall purpose . . . ." *Id.* at 421. The Fifth Circuit put it more succinctly: "A local rule may incidentally affect safety, so long as the effect is not direct and substantial" or safety was the "primary motivation." *Texas Midstream*, 608 F.3d at 211 (internal citation omitted).

Id. at 28-29. The City concludes, "The Ordinance is a traditional land use regulation,

motivated by health and aesthetics which has been held by Circuit Courts to be

outside the preemptive ambit of the PSA." *Id.* at 29.

The City also argues that this is an easier case than *Washington Gas Light* and

*Texas Midstream* because the facilities in those cases were undisputedly "pipeline

facilities" under the PSA, whereas here PPLC's loading facilities "transfer crude oil between a pipeline and a non-pipeline mode of transportation" and are thus outside the scope of the PSA under 49 C.F.R. § 195.1(b)(9)(ii), and "the VCUs are excluded from PSA jurisdiction by 49 C.F.R. § 195.1(b)(9)(ii)." *Id.* The City reasons, "It is self-evident that Congress did not intend the PSA to preempt zoning regulations over the location and siting of crude oil loading structures that, themselves, are not even subject to the statute." *Id.* at 30.

### b.    PPLC's Opposition

PPLC views *Texas Midstream* and *Washington Gas Light* differently than the City. "In both cases, the courts concluded that any safety concern or effect of the upheld local regulation was incidental and observed that the challenged zoning did not prevent the projects from proceeding, but only increased their costs." *Pls.' Opp'n* at 23. PPLC contends the Ordinance here, in contrast, is focused on "safety":

> The Ordinance's goal and effect is to shut off the pipeline to transporting oil from Canada because the City views oil sands crude a risk to life and property. The Ordinance does not merely add costs, requiring a minor location deviation, based on concerns unrelated to safety generally applicable to non-pipelines as well as pipelines. Rather, the intent and effect of the Ordinance is to regulate in which direction oil may flow within a pipeline, effectively regulating pipeline switching equipment and pipeline operations.

*Id.* at 23-24.

PPLC does not concede that that its loading facilities are outside of scope of the PSA, *id.* at 26 n.13, but it argues that regardless of that issue, the Ordinance can be preempted by the PSA even if the facilities impacted by the local ordinance are not

themselves regulated under the PSA.  *Id.* at 25 ("In *Texas Midstream* . . . for example, a fence is not a pipeline, but the local regulation was preempted").

### c.      The City's Reply

The City rejects PPLC's attempts to distinguish *Texas Midstream* and *Washington Gas Light* and  reiterates that "[t]he PSA is not, as Plaintiffs frame it, a congressional directive to exempt all oil transportation from municipal zoning that furthers the interest of public health and aesthetics."  *Defs.' Reply* at 18.  "When the same statute simultaneously authorizes one entity to set safety standards and does not authorize that entity to make siting decisions, the only logical interpretation is that location is not a safety standard."  *Id.* (quoting *Wash. Gas Light Co.*, 2012 WL 832756 at *24, *aff'd* 711 F.3d at 422).

## 2.      Preemption by Foreign Affairs Power

### a.      The City's Motion

First, the City maintains that the design and intent of the Ordinance is not to impose its own foreign policy against development and exportation of products from Canada but is truly intended to protect the health and welfare of its residents and visitors by prohibiting bulk loading and the construction of new structures that would adversely impact scenic views and increase air pollution.  *Defs.' Mot.* at 31.  The City insists that the legislative findings and statement of purpose, informed by impact studies, "unambiguously establishes the intent of the City Council."  *Id.*

Second, the City next argues that the Ordinance is not preempted by the TPA and MARPOL Annex VI because "Plaintiffs, as private parties, may not assert rights

under these international treaties." *Id* at 32. The City contends that "this Court may not interpret the international treaties cited by Plaintiffs because the treaties may only be enforced in an action by the federal government." (citing *Medellin v. Texas*, 552 U.S. 491, 506 & n.3 (2008); *United States v. Moloney (In re Price)*, 685 F.3d 1, 11 (1st Cir. 2012)). The City distinguishes *Locke*, 529 U.S. at 102-03, which PPLC argued struck down state regulation citing preemption by various treaties and international agreements, because the United States was a party to that case, unlike here. *Id*.

Third, the City insists that the treaties and federal permits in question expressly reject any intention to occupy the field of regulation to ensure uniformity. *Id.* at 33. The City points to language in PPLC's 1999 Presidential Permit, the TPA, and MARPOL as representing "express grants of authority for state environmental and land use protection." *Id.* 33-34.

Fourth, the City claims the Ordinance is not contrary to any express federal foreign policy. *Id.* at 34. The City puts forth the relevant standard of review, asking "whether there is a 'likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government . . .'" *Id.* (quoting *Garamendi*, 539 U.S. at 413, 420). The City claims the only evidence PPLC has produced of a conflicting federal policy are "ambiguous federal statements of dated vintage about the importance of hydrocarbon trade with Canada . . . ." *Id.* The City instead points to the recent Presidential determination that the Keystone

XL pipeline "would not serve the national interest" as evincing current foreign policy objectives that are consistent with the Ordinance. *Id.* at 34-35.

### b.     PPLC's Opposition

PPLC responds that the Court already rejected the City's argument that it was "asserting [a] private right of action under any treaty" in its order on the City's motion to dismiss. *Pls.' Opp'n* at 38 (citing ECF No. 88 at 34). PPLC characterizes the City's arguments about express references to local authority in the federal policies as "tautological" because "such references assume *legal* regulation by the appropriate authority." *Id.* at 39 (emphasis in original).

### c.     The City's Reply

The City reiterates its argument that "Plaintiffs must demonstrate that the Ordinance entrenches on an area of regulation 'vested exclusively in the federal government.'" *Defs.' Reply* at 21. The City maintains that the permits and treaties "expressly disclaims any intent of the federal sovereign to 'exclusively' regulate." *Id.* at 21.

### 3.     Statutory Preemption by the Port and Waterways Safety Act

### a.     The City's Motion

The City begins by summarizing the two halves of the PWSA, "The focus of Title I is traffic control at local ports; Title II's principal concern is tanker design and construction." *Defs.' Mot.* at 36 (quoting *Ray* 435 U.S. at 161). The City explains that Title I authorized the Coast Guard to regulate "vessel traffic services" and to "'prescrib[e] minimum safety equipment requirements' for structures or shore areas

'immediately adjacent' to U.S. waters 'to assure adequate protection from fire, explosion, natural disaster, and other serious accidents or casualties.'" *Id.* (quoting 33 U.S.C. §§ 1223, 1225(2)(B)). The City indicates that Title II gives the Coast Guard "the exclusive 'duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States' and that any 'different or more stringent state requirements' are preempted." *Id.* (quoting *Ray*, 435 U.S. at 163).

The City argues there is no conflict between the Ordinance and the PWSA safety regulations of marine equipment, like ship-to-shore VCUs. *Id.* at 38. The crux of this argument is that there is no impossibility conflict because the PWSA "provide[s] standards for the safe design and operation of [VCUs] and provide[s] qualification requirements for personnel operating [VCUs]" if they are permitted by other law, but "the PWSA does not mandate VCU construction irrespective of any local zoning that prohibits them." *Id.* at 39.

The City argues the Ordinance is not an obstacle to the goals of the PWSA because "the Ordinance makes no attempt to regulate the safety features of VCUs." *Id.* at 41. The City reasons that "'Congress intended these regulations to have limited preemptive effect over state or local law' . . . because . . . the Clean Air Act . . . directly vests in the City coextensive authority to control VCU use in areas where they would be deleterious." *Id.* at 40 (quoting 78 Fed. Reg. at 42,615, and citing 42 U.S.C. § 7511b(f)(2)).

The City asks the Court to consider "the extraordinary consequences" of Plaintiff's preemption argument:

> Congress – without making its intent to do so clear and manifest – through passage of safety standards allowed private crude oil loading companies to locate their facilities wherever they see fit without regard to local zoning preferences . . . Such a ruling could never stand. Certainly, the construction of crude oil loading facilities – tanks, smokestacks, and all – would not be permitted on the shores of Camden Harbor or Perkins Cove in Ogunquit because of the incompatibility of the heavy industrial use with community preferences. There is no difference here. The City's elected officials have rationally determined that the VCUs marring scenic harbor views and other physical structures required of crude oil loading are a pernicious on-shore use.

*Id.* at 37-38.

### b.    PPLC's Opposition

PPLC responds that "Title II of the PSWA preempts the field of design, construction, alteration, repair, maintenance, operation, personnel qualification, and manning of vessels, including 'the handling or stowage of cargo' and 'the reduction or elimination of discharges during . . . cargo handling[.]'" *Pls.' Opp'n* at 27 (quoting 46 U.S.C. § 3703(a)). PPLC argues the Ordinance is preempted because it directly enters the field of "cargo handling." *Id.* PPLC disputes the City's argument that the Ordinance only regulates onshore activity because it prohibits loading "onto any marine tank vessel." *Id.*

PPLC cites numerous Coast Guard regulations covering the act of loading and loading equipment, including piers, wharves, and similar structures, and argues that regulations "are as preemptive as statutes." *Id.* at 28-29 (citing *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). PPLC concludes the Ordinance is preempted because "[t]he Ordinance flatly bans any loading of oil," and

"[s]wathes of PWSA regulations have been enacted to ensure the safe loading of oil."
*Id.* at 30.

### c. The City's Reply

The City emphasizes that "a zoning ordinance determining *where* new oil loading construction and emissions may occur is not preempted by the [PWSA], a statute that sets uniform standards for *how* that oil loading may *safely* be accomplished." *Defs.' Reply* at 22 (emphasis in original). The City believes PPLC's interpretation of PWSA preemption is extraordinary and would require striking down "innumerable zoning ordinances nationwide that directly or indirectly preclude loading (such as those in Cape Elizabeth and Portland's deepwater port area or a simple residential restriction) . . . ." *Id.*

### 4. Maritime Preemption

### a. The City's Motion

First the City argues that the Ordinance is not preempted by general maritime law because the preemption inquiry must be tied to a specific statutory structure. *Defs.' Mot.* at 42 (citing *United States v. Massachusetts*, 493 F.3d 1, 7-8 (1st Cir. 2007); *Fednav, Ltd. v. Chester*, 547 F.3d 607, 622 (6th Cir. 2008)).

Second, the City argues that the Ordinance is not preempted by 42 U.S.C. Chapter 121, which concerns licensing ships to conduct trade between American ports or between an American port and a foreign port. *Id.* at 43. The City maintains that these authorizations do not "specifically addresses the carrying of oil, loading or unloading of oil, or right of vessels receive crude oil from the shore free from state

law." *Id.* The City also reiterates that the Ordinance is not preempted by the "certificate of inspection" process under Coast Guard Regulations pursuant to the PWSA because "[t]hese are purely safety regulations" and "not a general charter to be free from any police power restrictions on the loading of crude oil from machinery constructed on a state's shores." *Id.*

Third, the City points to several cases that refused to find preemption of local ordinances impacting ship operations by general maritime law and the specific statutes and regulations mentioned. *Id.* at 44-45 (citing *Tart v. Massachusetts*, 949 F.2d 490, 501 (1st Cir. 1991); *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154 (9th Cir. 2011); *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960)).

### b.    PPLC's Opposition

PPLC disputes the City's argument that preemption must be tied directly to a specific statute, and cites *Jensen*, 244 U.S. 205, 216 for its argument that the Ordinance can also be preempted if it "works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations." *Pls.' Opp'n* at 32. PPLC also distinguishes the cases cited by the City. *Id.* at 34-37. For example, PPLC argues the Ordinance is not a reasonable "[e]venhanded local regulation," but rather is "a flat ban of all loading irrespective of any air emission or lack thereof . . . ." *Id.* at 34. PPLC also argues this Ordinance is analogous to the one struck down in *Pittston Warehouse Corp. v. City of Rochester*, 528 F. Supp. 653 (W.D.N.Y. 1981).

### c.    The City's Reply

The City reiterates and clarifies its earlier arguments and notes that "Plaintiffs have not cited any case striking down a land use ordinance because it could affect one type of cargo carried by vessels with a coastwise endorsement." *Defs.' Reply* at 23-25.

### 5. Dormant Interstate and Foreign Commerce Clause

#### a. The City's Motion

First, the City urges that dormant commerce inquiry is "whether [the regulation in question] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Defs.' Mot.* at 46-47 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)). The City explains, "Discrimination under the Commerce Clause 'means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.* at 47 (quoting *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010)). The City admits that a law "that discriminates against interstate commerce on its face, in purpose, or in effect receives a form of strict scrutiny so rigorous that it is usually fatal." *Id.* (quoting *Alliance of Auto Mfrs. v. Gwadosky* 430 F.3d 30, 35 (1st Cir. 2005)). The City argues that the statute is not "economically protectionist in any sense" and does not discriminate on its face or in effect because it imposes the same burdens on local interests as foreign interests. *Id.* at 47-49. The City also argues that the legislative findings show the Ordinance does not have a discriminatory purpose. *Id.* at 47.

Second, the City believes it is entitled to summary judgment under the balancing test of *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970), because PPLC must demonstrate the burden on the interstate market as a whole, not merely on a particular firm, and it has not provided that evidence because it has not put forth a defined plan for the Court to quantify the impacts on commerce or the magnitude of the local benefits in the form of prevented pollution. *Id.* at 49-50 (citing *IMS Health Inc. v. Mills*, 616 F.3d 7, 32 & n.34 (1st Cir. 2010), *abrogated on other grounds, IMS Health Inc. v. Schneider*, 564 U.S. 1051 (2011)). The City argues it has put forth expert testimony bolstering its claims about the local health benefits and development or aesthetic benefits that outweigh any impact on commerce, due to the small volumes of oil available at the Canadian end of the pipeline. *Id.* at 51-53.

### b.     PPLC's Opposition

First, PPLC responds that the Ordinance is discriminatory because even though it may not favor an in-state oil producer, the purpose and effect "is to ban the import of oil from Canada." *Pls.' Opp'n* at 40. PPLC insists that a local law need not favor in-state competitors to discriminate against interstate or international commerce. *Id.* at 40-41 (citing *Natsios*, 181 F.3d 38.

Second, PPLC reiterates its argument that in the foreign commerce context, a local law is unconstitutional if it undermines the ability of the federal government to "speak with one voice" in regulating commercial affairs with foreign states. *Id.* at 41-42 (quoting *Japan Line*, 441 US. at 434, 448-49 and progeny).

Third, PPLC disputes the City's argument that it is entitled to summary judgment under the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). *Id.* at 42. PPLC emphasizes the fact-intensive nature of this inquiry, which is why PPLC did not seek summary judgment under this portion of the Dormant Commerce Clause doctrine. *Id.* PPLC also argues that its preemption arguments mean the Ordinance "*ipso facto* fails the *Pike* balancing test." *Id.* at 42-43 (citing *Rollins Envtl. Servs., Inc. v. Parish of St. James*, 775 F.2d 627 (5th Cir. 1985)). PPLC argues the local benefits are at most minimal because the alleged purpose of the Ordinance is pretextual and the real purpose is impermissible, and the burden on foreign commerce is large, and the burdens are large. *Id.* at 43-44. PPLC also argues that even if the City wins the balancing test, it is not entitled to summary judgment here if it could achieve those benefits with a lesser impact on interstate activities. *Id.* at 45 (citing *C&A Carbone v. Town of Clarkstown*, 511 U.S. 383 (1994) (O'Connor, J. concurring)).

Fourth, PPLC argues that the city is not entitled to summary judgment on the Dormant Commerce Clause count because the Ordinance is an attempt to regulate beyond its borders. *Id.* at 45-46.

### c.    The City's Reply

The City replies that on its face the Ordinance does not ban the import of oil from Canada, and it does not do so in effect because PPLC can still load oil by rail at Rigby Yard. *Defs.' Reply* at 25. The City again denies the illicit purpose PPLC assigns to the Ordinance. *Id.* at 25-26. The City distinguishes the cases where courts have

struck down a local law under the "speak with one voice" prong of the Foreign Commerce Clause on the grounds that the Ordinance does not make a facial distinction based on the country of origin nor does it impose multiple taxation or amount to economic isolationism. *Id.* at 26-27.

The City reiterates its argument that PPLC has failed to put forth facts creating a genuine dispute as to its side of the *Pike* balancing test because the value of the pipeline and taxes PPLC pays speak only to the burden on one company, not to the market as a whole. *Id.* at 27-28.

### 6. Due Process and Equal Protection

#### a. The City's Motion

First, the City argues the Ordinance is not unconstitutionally vague simply because it does not define the word "bulk." *Defs.' Mot.* at 53-54. The City points to the ordinary dictionary definition and the stated purpose of the Ordinance, and notes the "dauntingly high hurdle" plaintiffs must overcome to prevail on a void for vagueness claim. *Id.* at 54 (quoting *Donovan v. City of Haverhill*, 311 F.3d 74, 77 (1st Cir. 2002)).

Second, the City argues there is no equal protection violation because PPLC is not a suspect class and this economic regulation does not infringe any fundamental rights, so the Ordinance need only survive rational basis scrutiny. *Id.* at 55-56. The City believes the Court must uphold the Ordinance unless there is "no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." *Id.* at 55 (quoting

*Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 39 (1st Cir. 2005)).  The City contends that there are differences between unloading and loading in terms of air pollution, smokestacks, and impacts on development goals.  *Id.* at 55-56.

### b.    PPLC's Opposition

PPLC responds that the Ordinance is void for vagueness, and that it "cannot discern what construction would be deemed unsightly or what level of air emission would be deemed to trigger the Ordinance because nothing in the Ordinance even suggests that these are criteria, let alone what the triggering levels would be."  *Pls.' Opp'n* at 49.  PPLC also argues that there is a due process violation because the Ordinance regulates beyond the borders of the City.  *Id.* at 48.

PPLC also argues that there is an equal protection violation because the Ordinance "is an anti-Canadian regulation subject to stricter scrutiny."  *Id.*  PPLC also argues the Ordinance is "purposefully designed to adversely impact only PPLC" who is "a class of one."  *Id.* at 50 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  PPLC argues there are other sources of air emissions within South Portland of comparable size, but the Ordinance only impacts PPLC.  *Id.*

### c.    The City's Reply

The City replies that the Ordinance does not target a "class of one" because "the zoning ordinance amendments at issue here apply with equal rigor to all five oil terminal operators (and everyone else) in the Shipyard, Commercial and Shoreland Overlay zoning districts."  *Defs.' Reply* at 28.

### 7.    Section 1983 Civil Rights Violation

### a. The City's Motion

The City argues that it is entitled to summary judgment on Count VII because the City is entitled to summary judgment under all of the constitutional claims. *Defs.' Mot.* at 56. PPLC and the City do not readdress this point in their opposition and reply.

### 8. Inconsistency with the City's Comprehensive Plan

### a. The City's Motion

The City explains, "Under Maine law, the test for consistency is 'whether from the evidence before it the city council could have determined that the rezoning was in basic harmony with the [comprehensive] plan.'" *Defs.' Mot.* at 56 (quoting *Golder v. City of Saco*, 45 A.3d 697, 700 (Me. 2012)). The City contends that PPLC cannot meet that high burden to show that the choice was not "rational." *Id.* In particular, the City points to portions of the Comprehensive Plan that discuss the prevailing goal of redeveloping the waterfront and shipyard districts, the desire to capitalize on the "spectacular views of the harbor" and to transform "underutilized former industrial properties." *Id.* at 56-57. The City emphasizes that the Comprehensive Plan instructs the City that in the long term, "if demand for these facilities declines or the type of activity needs to change and the owners of these facilities desire to explore other uses for these facilities, the City, in conjunction with the owners, should reevaluate the best use of these waterfront sites." *Id* at 57. The City asserts that the Ordinance is substantively "harmonious" with the Plan and that it followed "to the

letter, the procedures set forth in the Comprehensive Plan for reevaluating obsolete marine industrial uses." *Id.* a 58.

### b.    PPLC's Opposition

PPLC points to several portions of the Comprehensive plan that it alleges are inconsistent with the Ordinance. *Pls.' Opp'n* at 51-52. The first group of provisions mention development goals like "work[ing] to retain and grow existing South Portland businesses" and establishing the City's "development-minded atmosphere." *Id.* at 52-53. The second group of Plan provisions mentions PPLC's facilities in particular. *Id.* PPLC points to language saying, "In the short term, the City's marine terminals and related marine industrial areas are maintained and improved . . ." and "existing marine and oil facilities to upgrade or expand on parcels that are already used for this purpose." *Id.* PPLC argues, "Nowhere in the Comprehensive Plan is it suggested as a goal the termination of PPLC's economic activity." *Id.* at 53. PPLC says that "singling out one business to limit how it can use its property is, as noted supra, not an act of land use planning. The ban on PPLC's ability to reverse the flow of its pipeline is antithetical to the entire concept of such planning." *Id.* at 54 (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 132 (1978)).

### c.    The City's Reply

The City claims that "[i]t is indisputable that demand for PPLC's facilities has declined" and reemphasizes the Plan instruction that "directs the City to 'reevaluate' the most appropriate uses of oil terminal properties 'if demand for these facilities declines or the type of activity needs to change.'" *Defs.' Reply* at 29.

### 9. Statutory Preemption by the Maine Oil Discharge Prevention Law

#### a. The City's Motion

The City argues PPLC's license by the Maine DEP under the Oil Discharge Prevention and Pollution Control Law is not an "order" in conflict with the Ordinance for purposes of preemption under that state law. *Defs.' Mot.* at 58. The City claims,

> First, the License, by its terms, is issued only "to carry out the purpose of the oil terminal licensing provisions of" Oil Discharge Prevention and Pollution Control Law. ECF#1 at Ex. I p. 2. It is not a blanket authorization from the State of Maine to load crude oil without regard to local zoning or other state and federal laws.

*Id.* The City says the Maine statute "require[s] operators of oil terminals to obtain a license demonstrating that its equipment, personnel, and procedures are adequate to protect against" the discharge of oil into or upon coastal water and adjoining land. *Id.* at 58-59 (citing *Portland Pipe Line Corporation v. Envt'l Improv. Com.*, 307 A.2d 1, 8 (Me. 1973)). The City argues the License was not intended to preempt local laws like the Ordinance because "[n]o permit under the statute was even required for the proposed change from loading to unloading because the statute is "agnostic as to direction . . . ." *Id.* The City concludes that "the License is not an order authorizing PPLC to reverse the flow of its pipeline without other approvals." *Id.* at 60.

#### b. PPLC's Opposition

PPLC reiterates the arguments it made under its motion that "the Coastal Conveyance Act, 38 M.R.S. § 556, preempts ordinances that conflict with orders of the [DEP], and the DEP has issued an order approving PPLC's loading of crude oil onto tankers. *Pls.' Opp'n* at 46. "The DEP order approves loading; the Ordinance

forbids it." *Id.* at 47. PPLC also indicates that DEP scrutinizes operations including "which direction the oil flows." *Id.* at 47.

### c. The City's Reply

The City reiterates its view that the License "merely 'finds' that PPLC's spill prevention equipment and procedures comply with 38 M.R.S. § 541, et. seq. . . It is not a blanket authorization to load crude oil regardless of local zoning." *Defs.' Reply* at 29-30. The City concludes it is entitled to summary judgment because "[a]n oil spill prevention statute does not preempt the field of local zoning, nor does the Ordinance create an obstacle to Maine's objective to combat the 'perils of pollution,' nor impose a conflicting equipment standard rendering compliance with both the Ordinance and the CCA impossible." *Id.* at 30.

## V. DISCUSSION

### A. Preemption by Federal Statute

Article VI, clause 2 of the Constitution of the United States reads in part:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and all the Judges in every State shall be bound thereby, any Thing in the Constitution or Law of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2. Known as the Supremacy Clause, the language expresses a principle simple in the abstract yet difficult in application. Courts have used the rubric, the preemption doctrine, to refer to jurisprudence that interprets and applies the Supremacy Clause. Under preemption doctrine, "[t]he purpose of Congress is the ultimate touchstone." *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963). "Congress may indicate pre-emptive intent

through a statute's express language" or Congress can imply a statute's preemptive intent "through its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). "If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Id.* at 76. The Supreme Court instructs that Congress's preemptive intent is implied when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or when the state law intrudes into a field where "the scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). When determining whether one of these types of preemption invalidates a state law, courts start "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 230. "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria*, 555 U.S. at 77 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

### 1. Preemption by the Pipeline Safety Act

#### a. Summary

The Court turns to whether the City's Ordinance is preempted by the PSA. On this issue, there is less of a genuine factual dispute between the parties than meets the eye. The parties are in general agreement about the effect of the Ordinance on PPLC, namely that PPLC is unable to legally load crude oil at the Harbor. The parties dispute the purpose of the Ordinance and the motives of its backers. They also dispute whether the effect of the Ordinance is to entirely prevent pipeline flow reversal. The City insists that PPLC could still reverse the flow of the pipeline and move the oil by rail once it reaches South Portland, but PPLC convincingly maintains that the City's alternative is uneconomic. Nevertheless, these disputes do not prevent the Court from concluding that the PSA does not preempt the Ordinance. This is because by its exact terms, the PSA prevents states and municipalities from imposing "safety standards" for interstate pipeline facilities or interstate pipeline safety. 49 U.S.C. § 60104(c). The Court does not conclude that the Ordinance's prohibition against loading crude oil at the Harbor constitutes a safety standard.

#### b. The PSA and DOT Regulations

The purpose of the PSA, 49 U.S.C. §§ 60101 et seq., "is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1). The statute tasks the Transportation Secretary with setting "minimum safety standards for pipeline

transportation and for pipeline facilities." 49 U.S.C. § 60102(a)(2). It also requires owners or operators to prepare and implement written plans "for inspection and maintenance of each facility . . .," 49 U.S.C. § 60108, and instructs the Secretary to order operators "to take necessary corrective action" if the Secretary determines that a facility is "hazardous to life, property, or the environment." 49 U.S.C. § 60112. The PSA specifies that:

> A State authority . . . may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter. A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation . . . This chapter does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility.

49 U.S.C. § 60104(c)-(e).

The DOT regulations implementing the PSA are found at 49 C.F.R. Part 195. The regulations mandate annual and immediate reporting requirements for accidents and safety-related conditions like "corrosion that has reduced the wall thickness," "unintended movement," "abnormal loading," "material defect," "physical damage," or "malfunction or operating error." *Id.* § 195.48-64. The regulations require owners or operators to engineer the pipeline facilities to specifications to take into account factors like design temperature, variations in pressure, internal design pressure, external pressure, and external loads. *Id.* § 195.101-115. The regulations also mandate specifications for valves, fittings, closures, flange connections, and fabricated assemblies. *Id.* § 195.116-134. The regulations specify standards for construction, including welding, bending, clearances between nearby structures, and

backfilling. *Id.* at § 195.200-266. The regulations also provide detailed requirements covering pressure testing procedures, *id.* § 195.300-310, and corrosion control measures. *Id.* § 195.551-591.

The PSA regulations also address "operations and maintenance." 49 C.F.R. Part 195, Subpart F. Operators "shall prepare and follow for each pipeline system a manual of written procedures for conducting normal operations and maintenance activities and handling abnormal operations and emergencies." *Id.* § 195.402. Among other duties, each operator must conduct emergency response training, provide a communications system for safe operation, place "line markers" over each buried pipeline at road and railroad crossings, maintain each valve, make repairs in a safe manner, and at each pumping station or breakout tank operators must keep signs and firefighting equipment, secure the facilities, and prohibit smoking and open flames. *Id.* § 195.400-452.

### c. Scope of PSA Preemption

Congress has made its preemptive intent explicit in the PSA through the inclusion of an express preemption provision. The question then, is not whether Congress intended the PSA to preempt state law, but whether the Ordinance is the type of law Congress intended to preempt. Even when there is an "express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria,* 555 U.S. at 76. The issue is whether the Ordinance is a "safety standard[ ] for interstate pipeline facilities or interstate pipeline transportation . . . ." 49 U.S.C. § 60104(c).

The Court concludes that the Ordinance is not a preempted "safety standard" for at least four reasons.

First, a prohibition is not a standard. "Standard" means "[a] criterion for measuring acceptability, quality, or accuracy," *Standard*, BLACK'S LAW DICTIONARY (10th ed. 2014), or "something set up and established by authority as a rule for the measure of quantity, weight, extent, value, or quality." *Standard*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/standard. One example suffices. The federal government has imposed fuel economy standards on cars and light trucks and those standards expressly preempt state or local law. 49 U.S.C. § 32919 ("When an average fuel economy standard prescribed under this chapter [49 U.S.C. §§ 32901 *et seq*.] is in effect, a State or political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by the average fuel economy standard under this chapter"). However, the federally-imposed CAFE (Corporate Average Fuel Economy) standards do not prevent states or municipalities from imposing restrictions on where cars may be parked, where cars may travel, or even whether cars are allowed.[298]

Second, it is not impossible to comply with both the PSA and the Ordinance. The PSA creates legal duties specifying how a company can construct and operate a

---

[298]     To use a Maine example, Monhegan Island, Maine has long been famous for, among other things, the fact that — other than a few lobster trucks — there are no cars on the Island. *See* http://Monheganwelcome.com/ ("**Monhegan is a small, rocky island ten miles from the nearest mainland** and scarcely a square mile in area. It is accessible only by boat and there are no cars or paved roads on the Island").

pipeline, and the Ordinance prohibits one activity at one end of the pipeline. The Ordinance does not set any additional requirements. The Supreme Court has "explained that [t]he question for impossibility is whether the private party could independently do under federal law what state law requires of it." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41 (1st Cir. 2015) (internal quotations omitted) (citing *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621 (2011); *Wyeth v. Levine*, 555 U.S. 555, 573 (2009)). PPLC can and currently does operate the pipeline in compliance with both the PSA and Ordinance. Furthermore, even though the Ordinance prohibits the loading of crude oil onto tankers, PPLC cited no provision of the PSA or its regulations that requires pipeline operators to load crude oil. Even granting, for the purpose of argument, PPLC's contention that the Ordinance regulates the direction of flow, PPLC points to no provision of the PSA or its regulations that mandates flow in a particular direction

Third, the Ordinance does not stand as an obstacle to the goals of the PSA. A ban on one form of subsequent transportation at the end of the pipeline is not in conflict with the goal of promoting the safety of pipelines and preventing spills. An outright ban on pipelines altogether might conflict with a statute that sought to proliferate pipelines, but even that hypothetical ordinance does not conflict with the goal of the PSA, which is imposing national standards to improve pipeline safety. PPLC asserts that "uniformity" is also a goal of the statute, *Pls.' Mot.* at 27-28, but a ban does not set competing levels, quantities, or technical specifications that make complying with both the PSA and the Ordinance more difficult.

Fourth, and perhaps most importantly, the preemptive scope of the PSA, as expressed in § 60104(c), is explicitly limited by § 60104(e). Congress did not intend the PSA to preempt state and local authority "to prescribe the location or routing of a pipeline facility." Under their police power, states and localities retain their ability to prohibit pipelines altogether in certain locations. *See Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"). These state and local powers are only to be displaced by clear congressional intent, and here there is explicit intent to allow them. The Ordinance is a lesser restriction than an outright pipeline siting ban; limiting only what companies can do with the crude oil after it comes out of one end of the pipeline. The Court agrees with the City's argument that it is unlikely Congress intended to remove this local police power merely because it enacted safety standards which apply whenever a pipeline or pipeline related activity is otherwise permitted. *See Defs.' Mot.* at 37-38. PPLC's interpretation runs contrary to the presumption against preemption, which applies in express as well as implied preemption analyses. *See e.g. Medtronic*, 518 U.S. at 485 ("[W]e 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *Greenwood Trust Co. v. Commonwealth,* 971 F.2d 818, 823 (1st

Cir.1992) ("Even federal statutes that contain express preemption clauses must be viewed through the prism of [the] assumption").

Although the parties have pointed to no First Circuit precedent directly on point, other courts have concluded that local zoning prohibitions are not preempted by pipeline safety regulations. In *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412 (4th Cir. 2013), a county government thwarted a pipeline company's efforts to expand its Liquified Natural Gas (LNG) storage tanks by enacting zoning restrictions. *Id.* at 414. The company argued that federal safety laws, including the PSA, preempted the local restriction. *Id.* at 417. The Fourth Circuit concluded that the zoning scheme was "primarily local land use regulation[ ] as opposed to safety regulations." *Id.* at 421. The *Washington Gas Light* Court rejected the argument that the local laws were "safety regulation in disguise." *Id.* at 421.

Similarly, in *Texas Midstream Gas Services, LLC v. City of Grand Prairie*, 608 F.3d 200 (5th Cir. 2010), a pipeline company sought to build a gas compressor station and the locality conditioned approval on it to complying with setback rules. *Id.* at 203. The Fifth Circuit concluded that the "setback requirement is not a safety standard" and not preempted. *Id.* at 212.[299]

PPLC distinguishes *Washington Gas Light* and *Texas Midstream* by emphasizing language in those cases which seems to inquire into the intent,

---

[299] The district court in that case found a requirement for a security fence was preempted, but the Fifth Circuit did not consider that issue because the locality did not appeal that determination. *Id.* at 212 n.4.

motivation, or purpose of the local laws.  For example, in *Washington Gas Light*, the Fourth Circuit said,

> At their core, the County Zoning Plans are local land use provisions designed to foster residential and recreational development.  Even assuming safety concerns played some part in the enactment of the County Zoning Plans, those concerns would have been merely incidental to the overall purpose of the County Zoning Plans.  This is insufficient to justify a finding that the County Zoning Plans were, in fact, safety regulations.

*Washington Gas Light*, 711 F.3d at 421-22.  Likewise, in *Texas Midstream*, the Fifth Circuit seemed to rely on the conclusion that "the setback requirement primarily ensures that bulky, unsightly, noisy compressor stations do not mar neighborhood aesthetics" and said that the locality's "primary motivation in adopting Section 10 was to preserve neighborhood visual cohesion, avoiding eyesores or diminished property values." *Texas Midstream*, 608 F.3d at 211.  These quotations provoke a sharp disagreement between PPLC and the City about the role of intent, purpose or motive in the preemption analysis, and this disagreement requires elaboration.

### d.    The Relevance of Local Purpose, Intent, or Motive for Preemption Analyses

PPLC believes that the "purpose [of the Ordinance] is safety based," and therefore, PPLC argues, it is preempted by the PSA because a local law can be "preempted through either purpose or effect." *Pls.' Mot.* at 25-26.  The City, by contrast, argues that an overlapping "safety" purpose between the Ordinance and the PSA does not amount to preemption, since "the legislative intent of the preempted law is not relevant to a preemption claim because it is only the intent of the allegedly preempting law (or the effect of that law) that controls . . . ." *Defs.' Opp'n.* at 37.  The

City is of course correct that the overall focus or "touchstone" of the preemption inquiry is on congressional intent, but it is far less clear when local intent or purpose is relevant.

Perhaps the most favorable statement for the relevance of the state law purpose is in *Pacific Gas & Electric Company v. State Energy Resource Conservation & Development Commission*, 461 U.S. 190 (1983), where the Supreme Court examined whether state restrictions on nuclear power development based on concerns about radiation and fuel disposal hazards were preempted by federal laws:

> When the federal government completely occupies a given field or an identifiable portion of it, as it has done here, the test of preemption is whether "the matter on which the state asserts the right to act is in any way regulated by the federal government." *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S., at 236. A state moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field. Moreover, a state judgment that nuclear power is not safe enough to be further developed would conflict directly with the countervailing judgment of the NRC that nuclear construction may proceed notwithstanding extant uncertainties as to waste disposal. A state prohibition on nuclear construction for safety reasons would also be in the teeth of the Atomic Energy Act's objective to insure that nuclear technology be safe enough for widespread development and use—and would be preempted for that reason."

*Id.* at 212-213 (some internal citations omitted).

This statement about the importance of local intent or purpose seems to contradict other statements by the Supreme Court that suggest an inquiry into local purpose tends to "obscure more than aid" the preemption analysis:

> [I]t is suggested that the coexistence of federal and state regulatory legislation should depend upon whether the purposes of the two laws are parallel or divergent. This Court has, on the one hand, sustained state statutes having objectives virtually identical to those of federal regulations . . . and has, on the other hand, struck down state statutes where the respective purposes were quite dissimilar . . . The test of

whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141-42 (1963).

The Supreme Court subsequently acknowledged that *Pacific Gas* "defined the pre-empted field, in part, by reference to the motivation behind the state law." *English v. Gen. Elec. Co.,* 496 U.S. 72, 84-85, 110 (1990). The *English* Court noted, however:

> This approach to defining the field had some support in the text of the 1959 amendments to the Atomic Energy Act, which provided, among other things, that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities *for purposes other than protection against radiation hazards.*"

*Id.* at 84 (emphasis in original).

Another context where courts have addressed the relevance of the purpose of the state law is in the occupational safety and health field. In *Associated Industries of Massachusetts v. Snow*, 898 F.2d 274 (1st Cir. 1990), the First Circuit considered state asbestos training, certification, and exposure regulations very similar to the federal Occupational Safety and Health Administration (OSHA) standards but more stringent than their federal counterparts. *Id.* at 277. The state argued its standard should not be preempted because, although it had one overlapping purpose, it had a "legitimate and substantial purpose" apart from worker safety. *Id.* at 279. The First Circuit rejected the centrality of the motivation behind local laws, reasoning, "Rather than attempt to divine the Massachusetts Legislature's intent in enacting its asbestos legislation, we look instead to the effect of the regulatory scheme. That is, we

examine the effect that the Massachusetts standards have on their two stated purposes . . . ." *Id.* at 279-80. The Supreme Court mentioned *Snow* favorably in a footnote in *Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 97 n.1, 105-07 (1992) (suggesting that expressly regulating the same subject matter for the exact same purpose as the federal law can be grounds for preemption, but holding that preemption can occur even when there is a different local purpose, based on the intent of the federal law).

The First Circuit weighed in later in a different context. In *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58 (1st Cir. 1997), the First Circuit dealt with state disclosure requirements for cigarette companies allegedly preempted by federal cigarette advertising rules. *Id.* at 61. The First Circuit concluded:

> [T]he relevant inquiry focuses not upon any relation between advertising and the *motivation* behind a state law, but upon the law itself and any connection it might have with advertising activities . . . Thus, the mere suggestion that state lawmakers sought passage of the Disclosure Act in part because of their discontent with federal regulatory efforts does not affect our preemption analysis.

*Id.* at 76-77 (emphasis in original).

In this case, the Court does not need to conduct a searching inquiry into the purpose or intent of the Ordinance for summary judgment purposes. This is true despite any contrary language in the approaches taken by the Fourth Circuit in *Washington Gas Light* and the Fifth Circuit in *Texas Midstream*. The Court is bound by First Circuit precedent. The purpose or intent of the local law may be relevant in some limited circumstances where the federal statutes themselves appear particularly focused on local legislative purpose, like nuclear power and occupational

health and safety. But in general, preemption doctrine and First Circuit precedent focus on the intent of the federal law and the effect of the local law on that federal law's goals. Given the encompassing nature of myriad federal regulatory regimes, the more aggressive approach that PPLC urges would potentially invalidate a wide range of state and local laws, even though facially proper under state and local police power. Here, any overlapping concern about "safety" that the City Council may have had when it enacted the Ordinance is not sufficient to convert a ban on loading crude oil into a competing "safety standard" preempted under the PSA.

Accordingly, the City is entitled to summary judgment on Count I.

### 2. The Port and Waterways Safety Act

#### a. Summary

The Court's analysis as to whether the PWSA preempts the City's Ordinance echoes its analysis of the PSA. However, the case for preemption is weaker with the PWSA because, unlike the PSA, the PWSA contains no express preemption language.

#### b. The PWSA Text and Coast Guard Regulations

Through Title I of the PWSA, 33 U.S.C. §§ 1221 *et. seq.*, Congress declared that "navigation and vessel safety, protection of the marine environment, and safety and security of United States ports and waterways are matters of major national importance," *id.* § 1221(a), and that "increased vessel traffic in the Nation's ports and waterways creates substantial hazard to life, property, and the marine environment." *Id.* § 1221(b). Congress further declared that "increased supervision of vessel and port operations is necessary in order to," among other things, reduce the possibility of cargo loss, damage to life, property, or the marine environment, and to prevent

damage to structures in, on, or immediately adjacent to the navigable waters. *Id.* § 1221(c). Title I authorizes the Secretary of the Department of Homeland Security to create "vessel operating requirements" for such things as "surveillance and communications systems," "routing systems," "navigation equipment," and delegates control of vessel traffic in hazardous or congested areas by such efforts as "specifying times of entry, movement, or departure," or "establishing vessel size, speed, draft limitations and vessel operating conditions." *Id.* § 1223. The Secretary can also take steps to secure ports against terrorist emergencies, *id.* at § 1226, and investigate accidents. *Id.* § 1227.

Title I authorizes the Secretary to take action to "prevent damage to, or the destruction of, any bridge or other structure on or in the navigable waters" and to "protect the navigable waters and the resources therein from harm resulting from vessel or structure damage." *Id.* § 1225(a)(1). In pursuit of that goal, the Secretary can "establish[ ] procedures, measures, and standards for the handling, loading, unloading, storage, stowage, and movement on the structure" of dangerous articles and substances like oil, and can "prescribe[ ] minimum safety equipment requirements for the structure to assure adequate protection from fire, explosion, natural disaster, and other serious accidents or casualties." *Id.* § 1225(a)(2). For structures within their political boundaries, states or political subdivisions are expressly permitted to prescribe "higher safety equipment requirements or safety standards than those which may be prescribed by regulations hereunder." *Id.* § 1225(b).

Title II of the PWSA, 46 U.S.C. §§ 3701 *et seq.*, allows the Secretary of the Department of Homeland Security to "prescribe regulations for the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning", § 3703(a), of "tank vessel[s]", § 3702(a), that may be "necessary for increased protection against hazards to life and property, for navigation and vessel safety, and for enhanced protection of the marine environment." *Id.* § 3703(a). The regulations shall include requirements concerning tanker hulls, "the handling or stowage of cargo," equipment for "lifesaving, fire protection, and prevention and mitigation of damage to the marine environment," personnel qualifications and training requirements, "improvements in vessel maneuvering and stopping ability," "the reduction of cargo loss if a maritime casualty occurs," and "the reduction or elimination of discharges" during ballasting, cleaning, or cargo handling. *Id.* § 3703(a)(1)-(7). The statute requires crude oil tankers to be equipped with: segregated ballast tanks; a crude oil washing system; a fixed deck froth system and a fixed inert gas system; two remote steering gear control systems and associated power supplies and communications systems; a dual radar system with short-range and long-range capabilities; electronic relative motion analyzers, position fixers, sonic depth finders, gyrocompass, and up to date charts. *Id.* §§ 3705-08. It also requires inspections and certificates of inspections for tankers to operate in the navigable waters and prohibits them from carrying a type or grade of oil not in accordance with their certificates. *Id.* §§ 3710-14.

There are numerous Coast Guard regulations under the authority granted by the PWSA, including 33 C.F.R. Part 154, covering "Facilities Transferring Oil or Hazardous Material in Bulk." The regulations require each facility operator to submit and maintain an operations manual describing the facility, its operating hours, the size, type, and number of vessels the facility can handle, *id.* § 154.300, § 154.310, and specify equipment specifications for hose assemblies, loading arms, monitoring devices, discharge containment equipment, communications systems, and lighting. *Id.* §§ 154.500-570. Examples of the regulations covering "operations" of transfer facilities include the following requirements that operators must meet: a designated person in charge who must ensure compliance with safety requirements like "access to the facility" by "emergency personnel;" a sufficient number of fire extinguishers must be present; the location of each hydrant, extinguisher, or alarm must be clearly marked; "each piece of protective equipment is ready to operate;" "signs indicating that smoking is prohibited are posted;" and "all rubbish is kept in receptacles." *Id.* § 154.735. The regulations also require the development and maintenance of response plans for discharges. *Id.* §§ 154.1010-1075.

Under the authority granted over port structures by the PWSA, the Coast Guard has also issued regulations regarding onshore "facilit[ies] that control[ ] vapors emitted to or from vessel cargo tanks" and analogous systems on board ships (VCSs). *Id.* §§ 154.2000 *et seq.* First, the regulations set up a system for entities to become VCS certifiers of and requires VCS operators to use certified systems. *Id.* §§ 154.2000-2025. Second, the regulations require any personnel in charge of a transfer facility

operating a VCS to have completed a training program covering VCS purposes, principles, components, hazards, operating procedures, emergency procedures, and inspection. *Id.* § 154.2030. Third, the regulations specify VCS design and installation standards, including the inclusion of: connections systems equipped with a remotely operated shutoff valve, detonation arrestors, and alarms; *id.* § 154.2101; pressure and vacuum relief valves of specific specifications; *id.* § 154.2103; and inerting, enriching, or diluting systems of specific specifications for fire, explosion, and detonation prevention. *Id.* § 154.2105, § 154.2107. Fourth, in terms of facility "operations" requirements, the regulations require: personnel operate according to a facility operations manual; safety system testing must be conducted at specific intervals, usually every twenty-four hours; the proper position of all valves in the vapor line must be verified before the start of the transfer; the rate of transfer must not exceed rate allowable for the VCS and agreed to at a pre-transfer conference; and lines may only be cleared by specific methods. *Id.* § 154.2150. The regulations expressly indicate that they "do[ ] not require a facility or a vessel to control vapor, or a vessel to take away vapor from facilities; however, if a facility operates a VCS to control vapor to or from vessels, the facility must comply with the requirements of this subpart." *Id.* § 154.2000(h).

There are other similar and perhaps somewhat overlapping regulations aimed at oil pollution prevention: "Vessels Carrying Oil, Noxious Liquid Substances, Garbage, Municipal or Commercial Waste and Ballast Water", 33 C.F.R. Part 151, "Oil or Hazardous Material Pollution Prevention Regulations for Vessels," 33 C.F.R.

Part 155, "Oil and Hazardous Material Transfer Operations" 33 C.F.R. Part 156, and "Rules for the Protection of the Marine Environment Relating to Tank Vessels Carrying Oil in Bulk Part," 33 C.F.R. Part 157, and "Barges Carrying Bulk Liquid Hazardous Material Cargoes." 46 C.F.R. Part 151. These parts generally follow the same patterns and use terms in similar ways as Part 154.

### c.     Scope of PWSA Preemption

Unlike the PSA, there is no express preemption provision in the PWSA. Nevertheless, PPLC argues the Ordinance is impliedly preempted by the PWSA and its regulations. The Court disagrees.

### i.     Tanker Regulation

The first key case addressing PWSA preemption of tanker requirements was *Ray v. Atlantic Richfield, Co.*, 435 U.S. 151 (1978). The Court began, "The focus of Title I . . . is traffic control at local ports" and "Title II's principal concern is tanker design and construction." *Id.* at 161. The Court considered a state law that required oil tankers of a certain size in Puget Sound to (1) "take on a pilot licensed by the State," (2) possess minimum horsepower ratios and safety features like "twin screws," "double bottoms," and "two radars," (3) certain types of tankers had to use a tug escort, and (4) tankers over a certain size were excluded from the Sound. *Id.* at 158-168. The Court struck down the first two and the last of those State requirements. *Id.* The pilotage requirement was preempted by similar federal pilotage requirements. *Id.* at 158-160. The *Ray* Court also found the "design" requirements preempted because:

> This statutory pattern shows that Congress, insofar as design characteristics are concerned, has entrusted to the Secretary the duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States. This indicates to us that Congress intended uniform national standards for design and construction of tankers that would foreclose the imposition of different or more stringent state requirements.

*Id.* at 163. The Supreme Court also concluded that the ban on tankers over a specific tonnage was preempted because the Secretary, under his "[a]uthority to establish 'vessel size and speed limitations'" had only imposed lesser restrictions on vessels of that size. *Id.* at 174-75.

More recently, the Supreme Court struck down a state law that imposed "a series of training requirements," an "English language proficiency requirement[ ]," and a "navigation watch requirement," as impermissibly preempted tanker "personnel qualifications" and "manning" regulations. *United States v. Locke*, 529 U.S. 89, 112 (2000).

The First Circuit summarized these two cases and synthesized the approach courts should use in PWSA preemption cases in *United States v. Massachusetts*, 493 F.3d 1, 3 (1st Cir. 2007). The *Massachusetts* Court reversed and remanded the district court conclusion finding the Massachusetts Oil Spill Prevention Act preempted. *Id.* at 3-5. "Field preemption applies to state law on subjects which are within the province of Title II of the PWSA." *Id.* at 8. "By contrast, *Locke* held that conflict preemption applies to state regulations within the scope of Title I." *Id.* at 8. The First Circuit also read *Locke* as recognizing that "Title I and Title II overlap in some instances" and that courts should look to the following factors "in cases of overlapping coverage" when it is not clear which type of preemption analysis applies:

(1) "the type of regulations the Secretary has actually promulgated under [Title II]"; (2) whether the regulation falls within the specific type listed in § 3703(a) as required to be promulgated; (3) whether the federal rule is "justified by conditions unique to a particular port or waterway" (e.g., a Title I regulation based on water depth in Puget Sound or other local peculiarities); (4) whether the state regulation is "of limited extraterritorial effect, not requiring the tanker to modify its primary conduct outside the specific body of water purported to justify the local rule"; and (5) whether the state regulation is one that "pose[s] a minimal risk of innocent noncompliance, do[es] not affect vessel operations outside the jurisdiction, do[es] not require adjustment of systemic aspects of the vessel, and do[es] not impose a substantial burden on the vessel's operation within the local jurisdiction itself."

*Id.* at 10. The First Circuit also indicated determining whether conflict preemption, field preemption, or a hybrid analysis applies to the local law "involves some identification of the relative purposes and domains of Title I and Title II." *Id.*

Applying these principles to the Ordinance, the Court concludes there is no preemption. First, it is not impossible to comply with both the PWSA Title I and the Ordinance. The Ordinance does not provide any duties or restrictions related to vessel navigation or traffic in ports. Although it prohibits the loading of crude oil, the Ordinance creates no affirmative duties at all. *See In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41 (1st Cir. 2015) (explaining "that [t]he question for impossibility is whether the private party could independently do under federal law what state law requires of it"). Nor does the Ordinance impinge on conduct that federal law mandates. Tankers currently can and do navigate into the harbor following federal traffic controls and navigation requirements in compliance with both the PWSA and Ordinance.

Second, as the Court understands the purposes underlying the PWSA, the Ordinance does not stand as an obstacle to the goals of the PWSA. The PWSA seeks

to increase the safety of tanker operations and port transfer facilities, and the PWSA is agnostic as to the amount of crude oil loading and the number of transfer facilities in operation. There is no indication that it is a goal of the statute to maintain or proliferate the number of facilities and the amount of crude oil transfers in ports. Instead, it is concerned with improving the safety of tankers and transfer facilities and operations, wherever and however frequently they may occur. A ban on one kind of transfer and new structures associated with that transfer does not conflict with the goal of promoting uniform tanker specifications or navigation and traffic rules. In a general sense, PWSA's goals of "protecting the marine environment" and minimizing accidents is consistent with the Ordinance.

Third, Title II of the PWSA does preempt a field of regulation, but the Ordinance is not within that field. The statutory provisions and regulations, while voluminous, follow the same general pattern present in the PSA "safety standards." The PWSA and regulations generally: (1) impose training programs and inspection routines, (2) mandate the use of certain precautionary equipment, (3) establish minimum technical specifications for that precautionary equipment and other infrastructure, and (4) regulate "operations" in the sense that they require operating manuals, minimum personnel levels, or restrict personnel from conducting certain activities until others are complete. *See e.g.* 46 C.F.R. § 151.45-4 (regulating "cargo handling" by mandating "the person in charge of the transfer operation shall inspect the barge and other cargo equipment to assure himself that . . . [a]ll sea valves are properly set and those connected to the cargo piping are closed"). If this case were

about whether the City could enact an ordinance that regulated these types of specific conduct, PPLC would have made out an excellent case for federal preemption.

But, it is not. The Ordinance does not resemble the kind of design, safety, personnel, and navigation restrictions on tankers held preempted in *Ray* and *Locke*. The *Ray* Court said, "Of course, that a tanker is certified under federal law as a safe vessel insofar as its design and construction characteristics are concerned does not mean that it is free to ignore otherwise valid state or federal rules or regulations that do not constitute design or construction specifications." *Ray*, 435 U.S. at 168-69. The Ordinance does not contain any technical specifications nor does it mandate additional safety equipment; the same ships continue to use the Harbor just as they did before the Ordinance was enacted. At most, the Ordinance has an indirect effect on tankers by outlawing one specific activity.

The Court's conclusion is consistent with that of the Ninth Circuit in *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483 (9th Cir. 1984). In that case, the Ninth Circuit upheld an Alaska law prohibiting tankers from discharging ballast water into the state's territorial waters. *Id* at 501.

> [U]nlike tanker design features controlled by *Ray,* there is no need for strict uniformity in regulating pollutant discharges into the territorial waters. To the contrary, Congress has repeatedly recognized the need for collaborative federal/state regulation of the marine environment within three miles of shore. Thus, we find that the federal marine environmental protection scheme as a whole does not prohibit stricter state standards regulating water pollution in a state's territorial waters, but in fact, through the [Clean Water Act], would enforce those standards. Moreover, nothing inherent in the comprehensiveness or complexity of the regulations under the PWSA/PTSA implies a preemptive intent on the part of Congress as to the regulation of deballasting within three miles of shore.

*Id.* at 495.  Much like the water discharge ban in *Hammond*, the Ordinance regulates under local health and land use authority permitted by federal law and the environmental scheme of cooperative federalism.

PPLC has a point that by prohibiting the loading of crude oil, the Ordinance as a practical matter has a broader impact on tanker "operations."  But especially where preemption under the PWSA is not express, the Ordinance does not conflict with specific provisions of the PWSA to such an extent that the Court may imply preemption.  Furthermore, the *Ray* Court specifically noted that "the mere fact that a vessel has been inspected and found to comply with the Secretary's vessel safety regulations does not prevent a State or city from enforcing local laws having other purposes, such as a local smoke abatement law."  *Id.* at 164.  In fact, the restrictions in the Ordinance are far less intrusive into the PWSA field of tanker regulation than the tugboat requirement upheld in *Ray*.  *See id.* at 171-172.

### ii.        Transfer Facility Regulation

Even if the Ordinance is not an impermissible tanker regulation, that does not answer whether it is preempted by the provisions covering on-shore transfer facilities.  This question, however, is an easier call.  In concluding that federal tanker safety and design regulations were impliedly meant to be exclusive, the *Ray* Court relied, in part, on the fact that Congress explicitly allowed States to impose stricter regulations for on-shore transfer facilities.  *See id.* at 174 ("Furthermore, § 1222(b), by permitting the State to impose higher equipment or safety standards 'for structures only,' impliedly forbids higher state standards for vessels").  The *Locke* and

*Massachusetts* Courts noted that the federal regulation of tankers have greater preemptive effect than those covering on-shore facilities because maritime tanker operations are not historically regulated by state police powers, whereas on-shore facilities are within a state's historic powers and expressly left untouched by Title I. *See Locke*, 529 U.S. at 107-09 (For tanker safety "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers," in contrast to "Title I of that Act" where there is "the historic role of the States to regulate local ports and waters under appropriate circumstances").

The express savings clause for stricter state regulations covering on-shore transfer facilities makes this an easier call. The PWSA creates legal duties specifying how a company must construct and operate a transfer facility, including a VCU, if it wishes to transfer crude oil onto tankers. The Ordinance prohibits the loading of crude oil, and new construction of any more of those structures. The Ordinance does not mandate any conduct that conflicts with prohibitions established by federal law. But even if the Ordinance were a stricter safety regulation on transfer facilities, Congress expressly indicated that states and localities retained their power to enact such restrictions.

On-shore state and local siting restrictions and even prohibitions on industrial activities, large structures, and pollution are quintessential examples of the use of historic police powers. *See Huron Portland Cement*, 362 U.S. at 442 ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as

the police power"). Those powers are only to be displaced by clear congressional intent. Significantly, no provision of the PWSA suggests an intent to remove local control over the siting of transfer facilities and VCUs, as Congress did with other statutes, such as those covering electricity transmission lines, 16 U.S.C. §§ 824p, and LNG pipeline facilities. 15 U.S.C. § 717f; *see e.g. Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) ("Congress thus demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and . . . the language used to define the remedies under RCRA does not provide that remedy"); *Santana v. Holder*, 731 F.3d 50, 56 (1st Cir. 2013) ("This provision shows that Congress knew how to impose a geographic restriction when it wanted to, and further suggests that the statute's general provisions do not contain such a limitation").

### d. The Relevance of Local Purpose, Intent, or Motive for Preemption Analyses

As discussed above, *supra* Part IV-A-1-d, preemption doctrine and First Circuit precedent focus on the intent or goals of the federal law and the effect of the local law on the federal law's goals. Any general overlapping concerns about "safety" or "the environment" that the City Council may have had when it enacted the Ordinance is not sufficient to preempt a ban on loading oil and facilities for loading oil under the PWSA.

Accordingly, the City is entitled to summary judgment on Count III.

### B. Preemption by Federal Foreign Affairs Power

#### 1. Summary

There is no genuine dispute of material fact regarding the foreign affairs preemption issue and the City is entitled to judgment as a matter of law because even under PPLC's view of the impact of the Ordinance, it does not impermissibly intrude into the foreign affairs power of the federal government. Therefore, the City is entitled to summary judgment on the foreign affairs preemption issue.

#### 2. The Foreign Affairs Power: Background

The Supreme Court has long recognized "the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation . . . ." *Hines*, 312 U.S. at 62. At times, the Supreme Court has spoken very broadly of this exclusive federal power. *See id.* at 63 ("Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference"). The seminal case in this area is *Zschernig v. Miller*, 389 U.S. 429 (1968). In *Zschernig*, the Supreme Court struck down a state law providing for escheat in cases where a nonresident alien claimed property through probate unless certain requirements were satisfied, such as finding that a United States citizen could take property on the same terms in the foreign country as sought by the nonresident alien. *Id.* at 430-32. The Court held,

> Where [state] laws conflict with a treaty, they must bow to the superior federal policy . . . Yet, even in absence of a treaty, a State's policy may

disturb foreign relations . . . The present Oregon law is not as gross an intrusion in the federal domain as those others might be. Yet, as we have said, it has a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems.

*Id.* at 441.

The key case applying *Zschernig* in the First Circuit is *National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999). In *Natsios*, the First Circuit struck down a Massachusetts law that "restrict[ed] the ability of Massachusetts and its agencies to purchase goods or services from companies that do business with Burma." *Id.* at 45. It clarified that the task is not "to balance the nation's interests in a unified foreign policy against the particular interests of an individual state;" rather, the First Circuit wrote that "*Zschernig* instead stands for the principle that there is a threshold level of involvement in and impact on foreign affairs which the states may not exceed." *Id.* at 52. The *Natsios* Court summarized, "These cases [under *Zschernig*] have generally fallen into two categories: challenges to the application of laws targeting specific foreign states, most often South Africa, and challenges to state 'buy-American' laws." *Id.* at 55. The First Circuit concluded that "the Massachusetts law has more than an incidental or indirect effect on foreign relations" because of a number of factors:

> (1) the design and intent of the law is to affect the affairs of a foreign country; (2) Massachusetts, with its $2 billion in total annual purchasing power by scores of state authorities and agencies, is in a position to effectuate that design and intent and has had an effect; (3) the effects of the law may well be magnified should Massachusetts prove to be a bellwether for other states (and other governments); (4) the law has resulted in serious protests from other countries, ASEAN, and the European Union; and (5) Massachusetts has chosen a course divergent

in at least five ways from the federal law, thus raising the prospect of embarrassment for the country.

*Id.* at 53.

More recently, in *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), the Supreme Court struck down California's Holocaust Victim Insurance Relief Act, which required any insurer doing business in that State to disclose information about life insurance policies sold in Europe during the Nazi era. *Id.* at 402-03. The California law was intended to right an historic wrong when the Third Reich forced Jews to cash in life insurance policies, the proceeds of which the Nazi Government of Germany then seized under various pretexts. *Id.* The Supreme Court found a clear conflict because the federal foreign policy "expressed unmistakably in the executive agreements signed by the President" and "consistently supported in the high levels of the Executive Branch," "has been to encourage European insurers to work with the [International Commission on Holocaust Era Insurance Claims] to develop acceptable claim procedures, including procedures governing disclosure of policy information." *Id.* at 421-22. There was a conflict because "[t]he basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves." *Id.* at 427.

The *Garamendi* Court also noted that "[i]f any doubt about the clarity of the conflict remained, however, it would have to be resolved in the National Government's favor, given the weakness of the State's interest, against the backdrop of traditional state legislative subject matter, in regulating disclosure of European Holocaust-era insurance policies . . . ." *Id.* at 426. The Supreme Court did not

reference any presumption against preemption that comes with state regulation within its traditional police powers. Instead the *Garamendi* Court contrasted "generally applicable" consumer protection laws with that law which "effectively single[d] out only policies issued by European companies, in Europe, to European residents, at least 55 years ago." *Id.* at 425-26.

In 2010, the First Circuit, upholding a state statute of limitations, subsequently applied *Garamendi*'s distinction between the "traditional state prerogative" of enacting "generally applicable" laws, and those laws which single out particular foreign countries. *Museum of Fine Arts, Boston v. Seger-Thomschitz*, 623 F.3d 1, 13 (1st Cir. 2010). "[I]t is appropriate to 'consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." *Id.* (quoting *Garamendi*, 539 U.S. at 420).

Applying this caselaw to the Ordinance, the Court concludes there is no foreign affairs preemption. First, the ordinance does not explicitly target any foreign countries. The Anti-Burma law struck down in *Natsios*, and the Holocaust insurance law struck down in *Garamendi* made facial distinctions about particular foreign countries or regions, whereas the Ordinance prohibits loading crude oil and new structures for loading crude oil, regardless of either the source or ultimate destination. The City argues that crude oil from North Dakota will flow down Line 9, and the Ordinance would apply with equal force to that crude oil as it does to crude oil originating in Alberta. *See* DSMF ¶¶ 163-64. It applies with equal force to crude

oil headed to Philadelphia as it does to crude oil destined for Europe. This conclusion is also consistent with other cases in this district. *See Ouellette v. Mills*, 91 F. Supp. 3d 1, 9 (D. Me. 2015) (striking down Maine pharmaceutical import law in part because it did not "as the State asserts, simply repeal state licensure regulations" but rather it "select[ed] five countries whose licensed retail pharmacies 'may export' prescription drugs to Maine residents;") *Hartford Enterprises, Inc. v. Coty*, 529 F. Supp. 2d 95, 103 (D. Me. 2008) (upholding Maine workers' compensation law in part because it "requires no state determination about the form of government in foreign countries" and there was no evidence of the effect on foreign policies "beyond speculation about what could happen if every state enacted such a law and foreign countries retaliated").

Second, there is no direct conflict with the "consistent policy" of the federal government. PPLC points to several sources of federal foreign policy for its argument in favor of preemption. Regarding oil tanker emissions and loading operations, PPLC points to the International Convention for the Prevention of Pollution from Ships, 1973 as modified by the Protocol of 1978 ("MARPOL"), including Annex VI and Regulation 15. *Pls.' Mot.* at 40-44; S. Treaty Doc. 108-7 (2003), 1998 WL 34083440. Regarding cross-border pipelines, PPLC cites the National Strategic Petroleum Reserve, the previous federal oil export ban, its Presidential Permit issued by the State Department acting under authority from executive orders, and several statements from prior presidents. *Pls.' Mot* at 44-50.

MARPOL Annex VI and Regulation 15 apply to "VOC emission recovery associated with cargo transfer operations between tankers and port facilities."  The relevant portions require signing countries to provide six months "notice to the [International Maritime Organization] of the ports and terminals under their jurisdiction to be subject to vapor emission control requirements" but "does not, however, establish actual emission standards."  *Id.* at 6.  "Parties are free to prescribe standards applicable to VOC emissions consistent with the obligations noted above."  *Id.*  The United States has implemented VOC emissions standards under the Clean Air Act, 42 U.S.C. § 7511b(f)(1)(a), but included an express savings clause, indicating "no State or political subdivision thereof may adopt or attempt to enforce any standard respecting emissions from tank vessels . . . unless such standard is no less stringent" than the EPA standards.  *Id.* at § 7511b(f)(4).  There is no conflict between the Ordinance and the federal foreign affairs policy around tanker loading facilities because a ban on loading in South Portland's Harbor district and a prohibition on new facilities for that purpose is not a "vapor emission control requirement" or an "emission standard."  *See supra* Parts IV-A-1-c, IV-A-2-c.  Even if it were, the federal policy explicitly contemplates stricter local regulations.

There are several pieces of federal policy that confirm the importance of the oil supply to national interests.  *See Pls.' Mot.* at 44; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, Division O, Title I, Section 101 (lifting previous export ban of domestic oil, subject to Presidential assessments); Energy Policy and Conservation Act of 1975, Pub L. No. 94-163, 89 Stat. 871, Title I, Part B

(establishing Strategic Petroleum Reserve); 19 U.S.C. § 1862 (Authorizing the President to remove duties and other import restrictions if the President determines it is needed for national security purposes). There are other examples, like the Obama Administration's decision not to grant a Presidential Permit to the Keystone XL pipeline and the Trump Administration's counter-decision to do the opposite, that indicate a less than consistent foreign policy when it comes to cross border pipelines. The foreign affairs cases require a greater conflict with a more consistent federal policy; they do not authorize preemption of local restrictions whenever an industry as a whole is economically powerful enough to affect this Country's national and by extension international interests.

The Transit Pipeline Agreement is a 1977 treaty between Canada and the United States agreeing that measures are needed "to ensure the uninterrupted transmission by pipeline through the territory of one Party of hydrocarbons not originating in the territory of that Party, for delivery to the territory of the other Party." Transit Pipelines, Canada-U.S., Oct. 1, 1977, 28 U.S.T. 7449.

As a textual matter, the TPA does not apply to PPLC's pipeline under reversed flow. Under the language of the agreement, it would apply to: (1) interruptions in the flow of oil through the territory of Canada of oil not originating in Canada, for delivery to the United States, and (2) interruptions in the flow of oil through the territory of the United States of oil not originating in the United States for delivery to Canada. The first possibility would not apply to a reversed flow operation because PPLC seeks to serve the production of oil originating in Canada. The second possibility is the

status quo, when foreign tankers unload oil for delivery to Canada, but the Ordinance does not interrupt this flow.

Even if the TPA did apply to PPLC's pipeline, the relevant operative provision says, "No public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." *Id.* art. II § 1. That broad statement is limited, however, by an express savings clause:

> Notwithstanding the provisions of Article II and paragraph 2 of Article III, a Transit Pipeline and the transmission of hydrocarbons through a Transit Pipeline shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline in the same manner as for any other pipelines or the transmission of hydrocarbons by pipeline subject to the authority of such governmental authorities with respect to such matters as the following:
> a. Pipeline safety and technical pipeline construction and operation standards;
> b. environmental protection;
> c. rates, tolls, tariffs and financial regulations relating to pipelines;
> d. reporting requirements, statistical and financial information concerning pipeline operations and information concerning valuation of pipeline properties.

*Id.* art IV § 1. In other words, the federal policy embodied in the Transit Pipeline Agreement is one of anti-discrimination. *See also Great Lakes Gas Transmission Co.*, 46 FERC ¶ 61138 (Feb. 3, 1989) (agency decision characterizing the purpose of the Agreement's provisions as "to ensure similar treatment"). Regulatory bodies with authority to regulate to minimize or eliminate environmental impacts must do so by imposing the same restrictions on interstate and intrastate pipelines as they do on international transit pipelines. The Ordinance does not make distinctions based on

the type of pipeline, and applies with equal force to other methods of crude oil transport because it applies to any bulk loading of crude oil onto tankers, regardless of source. The parties have referenced no other cases citing the treaty for preemption for any other purposes over its forty year life.

PPLC's Presidential Permit issued by the State Department is authorized by several executive orders. *See Compl.* (ECF No. 1) Ex. B (*Presidential Permit*); Exec. Order No. 11,423, 1968 WL 99009 (1968); Exec. Order 13,337, 2004 WL 3247272 (2004); Exec. Order 13,212, 2001 WL 34773693 (2001). PPLC argues this permit indicates a federal foreign affairs policy in favor of international pipelines. *See Pls.' Mot.* at 46-47. The purpose of the permit system is illuminating. "[T]he proper conduct of the foreign relations of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities connecting the United States with a foreign country." Exec. Order No. 11,423, 1968 WL 99009 (1968). The Presidential Permit expressly requires PPLC to comply with additional requirements and restrictions under state law:

> Permittee shall comply with all applicable Federal and State laws and regulations regarding the construction, operation, and maintenance of the United States facilities and with all applicable industrial codes. The permittee shall obtain requisite permits from Canadian authorities, as well as the relevant state and local governmental entities and relevant federal agencies.

*Presidential Permit* at 2. Therefore, the State Department permit requirement indicates an additional requirement of federal approval for pipelines, not an intent to displace state and local authority over their ports and oil transfer facilities.

Finally, the City has a historically important and legitimate interest in restricting new uses within its zoning districts, and in prohibiting new structures associated with those uses. *See Seger-Thomschitz*, 623 F.3d at 13 ("[I]t is appropriate to 'consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted'"). The Ordinance is a law of "general applicability" within the traditional realm of state and local police power—local land use restrictions for on-shore port facilities.[300] In the years that have passed since the Ordinance was enacted, there is no evidence of any objection to the Ordinance from either the United States Government, or the Canadian Government, although a Canadian representative did speak unfavorably about the Ordinance to the City Councilors before they enacted it. There does not appear to be any direct conflict between specific federal laws or policies and the Ordinance, so there is no potential for embarrassment to the United States Government. The Ordinance impacts a large and important industry and therefore inevitably will touch on federal foreign affairs in a broad sense, given the realities of a modern globalized economy. But it does so in a facially neutral manner and has no more than an incidental or indirect effect on foreign relations, unlike those laws struck down in *Zschernig*, *Natsios*, and *Garamendi*.

Accordingly, the City is entitled to summary judgment on Count II.

---

[300] By making this observation, the Court is not making a finding that the City did not aim this ordinance directly at PPLC. To the contrary, the record in this case amply confirms that the City Councilors who were the proponents of the Ordinance had only PPLC in mind when they voted for it. The Court's point is slightly different. Here, unlike *Garamendi* and *Natsios*, the Ordinance is facially neutral and does not mention PPLC or Canada by name.

### C.    Preemption by Maritime Law

#### 1.    Summary

There is no genuine dispute of material fact regarding the maritime or admiralty preemption issue and the City is entitled to judgment as a matter of law because even under PPLC's view of the practical impacts of the Ordinance, it does not impermissibly interfere with the harmony or uniformity of federal maritime law. Therefore, the City is entitled to summary judgment on the maritime preemption issue.

#### 2.    Maritime Law Preemption: An Overview

The Admiralty Clause, U.S. CONST. art. 3, § 2, cl. 1, extends the judicial power to "all cases of admiralty and maritime jurisdiction." The courts have long held that Congress has the power to legislate against the backdrop of the general maritime law inherited at the founding and interpreted by the federal courts. *See e.g. The Lottawanna*, 88 U.S. 558, 559 (1874). The question is to what extent this "national law, applicable to matters within the admiralty and maritime jurisdiction," in the absence of a specific federal statute like the PWSA, nevertheless preempts state and local laws. *See S. Pac. Co. v. Jensen*, 244 U.S. 205, 215 (1917). The Supreme Court laid down the seminal test in this area in *South Pacific Company v. Jensen*:

> And plainly, we think, no such legislation is valid if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations.

*Id*. at 216. The relevant inquiry here is the third prong of the *Jensen* test.

Despite the broad language of the *Jensen* "harmony and uniformity" test, the courts consistently applied this prong narrowly from the beginning. For example, in *Jensen* itself, the Supreme Court considered a state worker's compensation law, and observed:

> [I]t would be difficult, if not impossible, to define with exactness just how far the general maritime law may be changed, modified, or affected by state legislation. That this may be done to some extent cannot be denied. A lien upon a vessel for repairs in her own port may be given by state statute; pilotage fees fixed; and the right given to recover in death cases . . . .

*Jensen*, 244 U.S. at 216 (internal citations omitted). Subsequent Supreme Court cases noted the seemingly contradictory nature of the decisions. *See e.g. Davis v. Dep't of Labor & Indus. of Washington*, 317 U.S. 249, 252 (1942) ("under some circumstances states could but under others could not . . . apply their compensation laws to maritime employees").

In *Romero v. Internatial Terminal Operating Co.*, 358 U.S. 354 (1959) *superceded by statute on other grounds*, the Supreme Court summarized:

> [T]o claim that all enforced rights pertaining to matters maritime are rooted in federal law is a destructive oversimplification of the highly intricate interplay of the States and the National Government in their regulation of maritime commerce. It is true that state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system. But this limitation still leaves the States a wide scope. State-created liens are enforced in admiralty. State remedies for wrongful death and state statutes providing for the survival of actions, both historically absent from the relief offered by the admiralty, have been upheld when applied to maritime causes of action. Federal courts have enforced these statutes. State rules for the partition and sale of ships, state laws governing the specific performance of arbitration agreements, state laws regulating the effect of a breach of warranty under contracts of maritime insurance—all these laws and others have been accepted as rules of decision in admiralty cases, even, at times, when they conflicted with a rule of maritime law which did not

require uniformity . . . Maritime law is not a monistic system. The State and Federal Governments jointly exert regulatory powers today as they have played joint roles in the development of maritime law throughout our history.

*Id.* at 373-74.

In *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325 (1973), the Court considered a Florida oil pollution law that imposed "strict liability for any damage incurred by the State or private persons as a result of an oil spill in the State's territorial waters from any waterfront facility" used for drilling, transferring, or storing oil, "and from any ship destined for or leaving such facility." *Id.* at 327. The *Askew* Court noted that *Jensen* and its progeny "have been limited by subsequent holdings of this Court" and "have been confined to their facts, *viz.,* to suits relating to the relationship of vessels, plying the high seas and our navigable waters, and to their crews." *Id.* at 338, 344. The Supreme Court unanimously upheld the state law, saying, "It is valid unless the rule of *Jensen* and *Knickerbocker Ice* is to engulf everything that Congress chose to call 'admiralty,' pre-empting state action." *Id.* at 344. The *Askew* Court held, "[W]e decline to move the Jensen line of cases shoreward to oust state law from any situations involving shoreside injuries by ships on navigable waters." *Id.*

The most recent pronouncement on *Jensen* came in *American Dredging Company v. Miller*, 510 U.S. 443 (1994). At least one Justice believed the Court should overrule *Jensen* as a relic of *Lochner* era overreach, but the Court declined to do so without it being squarely raised and fully briefed. *Id.* at 462 n.1 (Justice Stevens). Instead, the Supreme Court applied *Jensen* but only addressed the second

prong. In doing so, the *American Dredging* Court interpreted the "characteristic feature" prong very narrowly to uphold the application of a *forum non conveniens* dismissal in an admiralty case, limiting the second prong to those rules which "originated in admiralty" or "have exclusive application there." *Id.* at 445, 450; *see also Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 627 (1st Cir. 1994) (characterizing the interpretation as "so narrow a reading").

The seminal case interpreting *Jensen* and its progeny in the First Circuit is *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623 (1st Cir. 1994), which considered a Rhode Island law allowing private recovery of economic damages in the absence of bodily injury in oil pollution cases, which is barred under federal maritime law. *Id.* at 624-25. The First Circuit held that economic damages under the plaintiffs' claims were "squarely foreclosed" under maritime law but said they could recover under the Rhode Island law unless it was preempted under *Jensen*. *Id.* at 625-27. The *Ballard* Court interpreted the Supreme Court cases as requiring "a balancing of the state and federal interests in any given case." *Id.* at 628. The First Circuit reasoned that there was a federal interest in limiting the available remedies to unburden maritime commerce but upheld the Rhode Island law because the State interest "in avoiding pollution in its navigable waters and on its shores, and in redressing injury to its citizens from such pollution, is a weighty one." *Id.* at 629-31.

Applying this caselaw to the Ordinance, the Court concludes the Ordinance is not preempted under *Jensen* and its progeny. First, the Court notes that PPLC can point to no case under *Jensen* striking down a local restriction on the loading or

unloading of a particular good, or prohibiting new on-shore structures. The Ordinance simply does not resemble the compensation laws, damages rules, or tort causes of action that courts analyzed for possible *Jensen* "harmony and uniformity" conflict with maritime law.

Second, the federal interest in uniformity is weak here. The Ordinance restricts on-shore facilities and conduct, and therefore, only incidentally affects a tanker during the narrow window of time in which it is docked in the Harbor. The Ordinance does not regulate the activity of tankers and sailors at sea. There is no indication that the federal government has sought to remove local control over the siting of on-shore structures like docks and transfer facilities. Numerous coastal localities restrict or entirely prohibit these structures for environmental, health, or aesthetic reasons. *See e.g. Defs.' Mot.* at 25 (discussing prohibitions in other Maine localities). There is a federal interest in the flow of maritime commerce, but PPLC does not cite any cases suggesting this has ever given vessels unrestricted access to any stretch of shoreline for any purpose they wish. Any ban on goods or conduct within a coastal jurisdiction will affect maritime vessels by prohibiting them from unloading or loading that good or participating in that conduct while docked. But this broad an interpretation of maritime preemption under *Jensen* would "push the line shoreward" and "engulf everything" historically left to coastal jurisdictions. *See Askew*, 411 U.S. at 344.

Third, the local interests are particularly strong here. The Supreme Court has repeatedly indicated that in regulating on-shore facilities and restricting sources of

air pollution within its borders, the state and local interest is at its peak. For example, in a case with a more direct impact on vessel operations than the Ordinance here, *Huron Portland Cement Co. v. City of Detroit, Michigan*, 362 U.S. 440 (1960), the Supreme Court upheld a local smoke abatement ordinance as applied to vessels, despite the fact that they were used in interstate commerce, and their equipment, including their boilers, had been inspected, approved and licensed by the federal government to operate in interstate commerce in accordance with a comprehensive system of regulations enacted by Congress. *Id.* at 444-47. The *Huron Portland Cement* Court did not address *Jensen* specifically but did explain, that "[i]n the exercise of [police] power, the states and their instrumentalities may act, in many areas of interstate commerce and maritime activities, concurrently with the federal government." *Id.* at 442. "Thus, a federally licensed vessel is not, as such, exempt from local pilotage laws . . . or local quarantine laws . . . or local safety inspections . . . or the local regulation of wharves and docks." *Id.* at 447.

The Court also notes that other circuits have upheld against *Jensen* challenges state laws with a far larger and more direct burden on sea-going vessels than the Ordinance. *See Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1158 (9th Cir. 2011) (upholding California's Vessel Fuel Rules even though they applied to foreign and U.S. flagged vessels more than 3 miles from the state's coast).

Finally, PPLC makes a related argument that the Ordinance impermissibly bans federally licensed coastwise trade. *Pls.' Mot.* at 35; 46 U.S.C. § 9101; 46 C.F.R. Part 154, Subpart E. In support of this argument, PPLC cites *Gibbons v. Ogden*, 9

Wheat. 1, 22 U.S. 1 (1824), *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265 (1977), and several cases from other circuits. *Pls.' Mot.* at 35-37. These cases do not support PPLC's argument. *Gibbons* and *Douglas* stand for the principles that a state restriction cannot "violate the 'indisputable' precept that 'no State may completely exclude federally licensed commerce,'" or discriminate against federally licensed interstate commerce in favor of local interests. *Douglas*, 431 U.S. at 277, 283. The Supreme Court explicitly limited these principles, saying, "enrolment and license confer no immunity from the operation of valid laws of a State" and "States may impose upon federal licensees reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power." *Id.* at 277 (quoting *Smith v. Maryland*, 18 How. 71 (1855)). In *Huron Portland Cement*, the Supreme Court said, "The mere possession of a federal license, however, does not immunize a ship from the operation of the normal incidents of local police power, not constituting a direct regulation of commerce." *Id.* at 447. Here, the Ordinance does not ban or wholly exclude licensed vessels from using the waterway, and it imposes the same restrictions on all vessels that might carry crude oil, so it cannot discriminate against federal licensees in favor of local vessels. PPLC cites no cases striking down local restrictions on transfer facilities as an impermissible burden on licensed coastwise trade.

Accordingly, the City is entitled to summary judgment on Count IV.

### D.    Dormant Commerce Clause

#### 1.    Summary

There are genuine disputes of material fact regarding the true purpose and practical effects of the Ordinance on interstate and foreign commerce. Therefore, neither party is entitled to summary judgment on the dormant Commerce Clause issues.

#### 2.    Dormant Commerce Clause: Discussion

Congress has the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. CONST. Art. I, section 8, cl. 3. In matters not governed by federal legislation, "the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envirl. Quality*, 511 U.S. 93, 98 (1994); *Wyoming v. Oklahoma*, 502 U.S. 437, 454, (1992); *Welton v. Missouri*, 91 U.S. 275 (1876). This "negative command, known as the dormant Commerce Clause, prohibits states from acting in a manner that burdens the flow of interstate commerce." *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 79 (1st Cir. 2001) (hereinafter *PhRMA*), *aff'd sub nom. Pharm. Research & Mfrs. Of Am. v. Walsh*, 538 U.S. 644 (2003)).

There are three ways a state or local law can fail under the standard dormant Commerce Clause analysis. First, "[a] state statute that purports to regulate commerce occurring wholly beyond the boundaries of the enacting state outstrips the limits of the enacting state's constitutional authority and, therefore, is per se invalid."

*All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005). "The 'critical inquiry' here is 'whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Natsios*, 181 F.3d at 69 (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989)).

Second, "[a] state statute that has no direct extraterritorial reach but that discriminates against interstate commerce on its face, in purpose, or in effect receives a form of strict scrutiny so rigorous that it is usually fatal. This amounts to a 'virtually per se invalid rule . . . .'" *Gwadosky*, 430 F.3d at 35 (quoting *PhRMA*, 249 F.3d at 79). A court must seek out the primary purpose and primary effect of the state law in question; "[i]ncidental purpose, like incidental effect, cannot suffice to trigger strict scrutiny under the dormant Commerce Clause." *Id.* at 39.

Third, "[a] state statute that 'regulates evenhandedly and has only incidental effects on interstate commerce' engenders a lower level of scrutiny." *Id.* at 35. In what is known as the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), the Supreme Court established that "[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142.

Fourth, in a series of state taxation cases implicating foreign commerce, the Supreme Court explained that in addition to these three prongs from the interstate commerce context, there is an additional requirement that a state law not interfere with the federal government's ability to "speak with one voice when regulating

commercial relations with foreign governments." *See Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434, 449 (1979); *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 193-97 (1983); *Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 7-13 (1986); *Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 320-31 (1994). The implication of these cases is that "the dormant Foreign Commerce Clause places stricter constraints on states than its interstate counterpart." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 328 (1st Cir. 2012). The First Circuit regards the "one voice" concern as "equally vivid in non-tax dormant Foreign Commerce Clause cases." *Antilles Cement*, 408 F.3d at 46; *Natsios*, 181 F.3d at 68 (applying the doctrine to the Massachussets anti-Burma law).

The Supreme Court explained, "The legislature's motivation is itself a factual question." *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *see also Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) ("Legislative motivation or intent is a paradigmatic fact question. Thus, the defendants are entitled to summary judgment only if there is no genuine question of material fact as to the intent of the Louisiana legislature . . ."); *Jones v. Wildgen*, 244 F. App'x 859, 864 (10th Cir. 2007) (treating legislative purpose as a question of fact requiring evidence, but finding no genuine dispute). "Summary judgment, however, is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Hunt*, 526 U.S. at 549.

Applying these four prongs of the dormant Commerce Clause, the Court must conclude that neither party is entitled to summary judgment on Count V. As the

Court's exhaustive description of each of the disputes, great and small, in the recitation of the facts suggests, the parties disagree both mildly and vigorously about facts critical to the resolution of the Commerce Clause issue. The City contends the purposes of the Ordinance were aesthetics, land use development goals, and local environmental and air quality protection. PPLC insists the true purpose was to prevent the import and export of Canadian crude oil. The City claims the ultimate effect of the Ordinance is not to block pipeline reversal because crude can be exported by other means, including by rail. PPLC maintains the practical and intended effect is to block its plan for pipeline reversal and therefore block the flow of Canadian oil to other markets. Both parties present evidence, including the legislative history and statements of City Council Members to support their factual claims. There are genuine disputes of material fact as to primary effect and primary purpose of the Ordinance. The Council's primary purpose and intent in enacting the Ordinance, as well as its primary practical effect, will have to be resolved by a fact finder.

Accordingly, the cross motions for summary judgment are denied as to Count V.

### E. Due Process and Equal Protection

#### 1. Void for Vagueness

##### a. Summary

There is no genuine dispute of material fact about the meaning of the words in the Ordinance and the City is entitled to judgment as a matter of law. Therefore, the City is entitled to summary judgment on the vagueness issue.

### b.  Void for Vagueness: Discussion

The Fifth Amendment's Due Process Clause requires that the conduct for which a person is held criminally responsible "be prohibited with sufficient specificity to forewarn of the proscription of said conduct." *United States v. Anzalone*, 766 F.2d 676, 678 (1st Cir. 1985).  It is well-settled that due process requires that criminal statutes "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *United States v. Hussein*, 351 F.3d 9, 13 (1st Cir. 2003).  A criminal statute "fails to provide fair notice if a person of ordinary intelligence, examining only the language of the statute, would be in some way surprised that it prohibited the conduct in question." *Sabetti v. Dipaolo*, 16 F.3d 16, 17 (1st Cir. 1994) (internal citations and quotations omitted).  The void-for-vagueness doctrine mandates that a statute define the crime "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). However, fair notice does not require "an explicit or personalized warning" and it "neither excuses professed ignorance of the law nor encourages deliberate blindness to the obvious consequences of one's actions." *United States v. Arcadipane*, 41 F.3d 1, 5 (1st Cir. 1994).  "Outside the First Amendment context, we consider 'whether a statute is vague as applied to the particular facts at issue,' for a defendant 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *United States v.*

*Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010)).

The use of the words "bulk loading" in the Ordinance does not render it unconstitutionally vague. Undefined adjectives "if read in a vacuum, might be problematic." *URI Student Senate v. Town Of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011). But the word "bulk" does not exist in a vacuum. It is further defined by the definition of "Marine tank vessel" in the Ordinance and other laws and regulations that govern safety standards and tanker designs for vessels carrying oil in "bulk." *See id.* at 14 ("The Ordinance contains additional terms that supply concrete guidance as to the behavior that it prohibits and the circumstances in which it can be enforced"); *see also supra*, Part IV-A-2. The purpose of the Ordinance greatly clarifies the meaning of the word "bulk," and this clarity results under either the City's view of the purpose as described in the text of the Ordinance, or PPLC's view of hidden intent. *See id.* at 14 ("we are privy to a straightforward articulation of the Town's purpose in adopting the Ordinance. This clear statement helps to dispel any uncertainty.")

Accordingly, the City is entitled to summary judgment on the vagueness issue of Count VI.

### 2. Equal Protection

#### a. Summary

There is no genuine dispute of material fact regarding PPLC's argument that the Ordinance violates the Equal Protection Clause and the City is entitled to

judgment as a matter of law. This claim is without merit. The City, therefore, is entitled to summary judgment on the equal protection issue.

### b.     Equal Protection: Discussion

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The United States Supreme Court has interpreted the word "person" within the Equal Protection Clause to include lawfully admitted resident aliens and citizens of the United States. *Graham v. Richardson,* 403 U.S. 365, 37 (1971). Therefore, both noncitizens and citizens are entitled to "equal protection of the laws of the State in which they reside." *Id.* The Equal Protection Clause also requires that similarly situated individuals be treated alike by the laws of a state. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Tapalian v. Tusino,* 377 F.3d 1, 5 (1st Cir.2004).

In evaluating whether a plaintiff has presented a viable equal protection claim, the First Circuit has explained that a court must "look for two elements: (1) whether the [ ] [plaintiffs] [were] treated differently than others similarly situated, and (2) whether such a difference was based on an impermissible consideration . . . ." *Macone v. Town of Wakefield,* 277 F.3d 1, 10 (1st Cir.2002); *see Barrington Cove, LP, v. R.I. Hous. & Mortg. Fin. Corp.,* 246 F.3d 1, 7 (1st Cir.2001). Once these two elements are shown, the court must determine what level of scrutiny applies to the law at issue. *See City of Cleburne,* 473 U.S. at 439-40 ("the courts have themselves devised

standards for determining the validity of state legislation or other official action that is challenged as denying equal protection").

If a state law engages in selective treatment of similarly situated individuals, the "general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440. Yet, if the statute classifies by race, alienage, national origin or impinges on fundamental rights, strict scrutiny will apply and the law will only be upheld if it is necessary to promote a compelling governmental interest. *Id.; Bernal v. Fainter,* 467 U.S. 216, 219 (1984); *Graham,* 403 U.S. at 366-70, 375-76 (concluding "[t]he classifications involved in the instant cases [noncitizens versus citizens regarding their entitlement to state welfare benefits], on the other hand, are inherently suspect and are therefore subject to strict judicial scrutiny whether or not a fundamental right is impaired").

A "class of one" equal protection claim exists "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000). While the Supreme Court has recognized the propriety of "class of one" equal protection claims, the viability of such a claim depends upon a showing that the plaintiff was intentionally treated differently than others similarly situated. "The determination as to whether individuals are 'similarly situated' for equal protection purposes is an amorphous one." *Tapalian,* 377 F.3d at 6. Under First Circuit law:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

*Dartmouth Review v. Dartmouth Coll.,* 889 F.2d 13, 19 (1st Cir.1989) (citation omitted).

Once a "class of one" plaintiff has shown he was intentionally treated differently than others similarly situated, he must then prove no rational basis exists for the disparate treatment. *Olech,* 528 U.S. at 564. The First Circuit opined that, in the context of a "class of one" equal protection claim, the test for determining whether a rational basis for defendants' conduct exists is an "exceptionally deferential one." *Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92, 104 (1st Cir. 2002). A "class of one" equal protection claim will survive a motion for summary judgment where the plaintiff adduces sufficient evidence from which a reasonable jury could conclude that, "compared with others similarly situated, [plaintiff] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or* malicious or bad faith intent to injure [the plaintiff]." *Tapalian,* 377 F.3d at 5 (emphasis in original) (quoting *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortgage Fin. Corp.,* 246 F.3d 1, 7 (1st Cir. 2001)).

"Normally, such a plaintiff must establish more than that the government official's actions were simply arbitrary or erroneous; instead, the plaintiff must establish the defendant's actions constituted a 'gross abuse of power.'" *Tapalian,* 377

F.3d at 5-6 (citing *Baker v. Coxe,* 230 F.3d 470, 474 (1st Cir. 2000)); *see Rubinovitz v. Rogato,* 60 F.3d 906, 912 (1st Cir. 1995) (noting that "gross abuse of power" may obtain where an official harbors personal hostility toward the plaintiff, and undertakes a "malicious orchestrated campaign causing substantial harm"); *see also Olech,* 528 U.S. at 566 (Breyer, J., concurring) (noting that some otherwise "ordinary violations of city or state law" may become actionable under the equal protection clause provided the plaintiff proves "extra factor[s]," such as "vindictive action," "illegitimate animus" or "ill will").

The First Circuit noted that "bad-faith or malicious-intent-to-injure cases are infrequent," and "the malice/bad faith standard should be scrupulously met." *Rubinovitz,* 60 F.3d at 911 (citations and quotations omitted). Where the evidence is circumstantial, the inference of ill-will or improper motive "'must flow rationally from the underlying facts; that is, a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability.'" *Id.* (quoting *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 743 (1st Cir. 1995)). If this threshold is not met, summary judgment in favor of the defendant is appropriate.

Applying these standards to this case, the Court concludes that PPLC failed to meet its burden of showing it was "treated differently than others similarly situated" by the City or the Ordinance. The Ordinance's provisions are generally applicable to any entity seeking to load crude oil or build new structures associated with that activity. The record does not clarify whether there are other oil terminal operators

operating in the City to which the Ordinance would apply.  For the Court to find a violation of equal protection, PPLC as the proponent would have to supply the factual underpinnings for its claim.  Here, on that point, the record is at best unclear.

In any event, even if the Ordinance did make a distinction between similarly situated entities, PPLC's "class of one" claim fails because there is no evidence in the record of bad-faith, malicious intent, gross abuse of power, retaliation, or ill-will against PPLC.[301]

Even if PPLC could survive these initial hurdles, the Court concludes that rational basis review would apply.  Rational basis scrutiny applies in "class of one" cases, and PPLC's argument that strict scrutiny applies because the Ordinance is "anti-Canadian" is unavailing.  While there is a potential dispute in the dormant Commerce Clause context regarding impermissible intent to inhibit commerce from Canada based on extraterritorial environmental concerns, there is no suggestion the City sought to discriminate against PPLC as a Canadian entity.  To the contrary, the Councilor who spoke directly about Canada explicitly denied any anti-Canadian bias. *See Tom Blake Remarks* DSAMF ¶ 287; PRDSAMF ¶ 287 ("This is not about Canada; this is not about America.  This is about the health and the safety of our community. I don't care if this crude comes from Timbuktu . . . I support Canada and many things they do. . . .").  At the same time, the City Councilors expressed significant concern

---

[301]    Some citizens exhibited ill will toward PPLC, but the Court did not consider citizen comments to be of probative value because it is unclear whether they represented the actual motives of the City Councilors who voted for the Ordinance.  In its statement of facts, the Court recounted what the City Councilors said during their consideration of the Ordinance and although most of the Councilors expressed concerns about health implications of reversing the pipeline, PPLC failed to present a genuine issue of material fact that they exhibited ill will toward PPLC itself.

about the tar sands method of extracting oil and its impact on the environment in general, and the record reveals that PPLC intended to pump oil from Montreal, some of which was produced using this method of extraction. Nevertheless, for purposes of the "anti-Canadian" argument, there is a difference between challenging oil that comes from tar sands and oil that comes from Canada. The City Councilors who spoke to this issue were concerned with the former, not the latter.

Under the deferential rational basis scrutiny, a locality has legitimate interests in aesthetics, controlling development, and preventing new sources of air pollution. A ban on loading oil is rationally related to that goal, because, as the City contends, loading oil expels the volume of air inside the tank that has become saturated with hydrocarbons and creates pollution from these vapors, while unloading does not produce this pollution. Therefore, even if PPLC had presented evidence sufficient to clear the initial hurdles of an equal protection claim, it would fail under the deferential scrutiny that applies.

Accordingly, the City is entitled to summary judgment on the equal protection issue of Count VI.

## F.    Section 1983 Civil Rights Violation

The only remaining issue for Count VII (Civil Rights Violation) is whether the Court should allow attorney's fees and costs. Although the parties initially disputed the availability of attorney's fees in their motions, they subsequently agreed that this issue should await a final decision on the merits. *Defs' Opp'n* at 60 ("To avoid a sideshow at this stage, Defendants request that this issue be dealt with after final

decision); *Pls.' Reply* at 29 ("Plaintiffs agree that the calculation of their costs should not be addressed until after the Court rules on the merits of its claims"). Accordingly, neither party is entitled to summary judgment on Count VII; the Court dismisses without prejudice the motions for summary judgment on Count VII.

## I. Inconsistency with the City's Comprehensive Plan

### 1. Summary

There is no genuine dispute of material fact regarding PPLC's argument that the Ordinance is invalid under Maine law because it is inconsistent with the City's Comprehensive Plan. Therefore, the City is entitled to summary judgment on the comprehensive plan issue.

### 2. Comprehensive Plan: Discussion

Under Maine state law, with certain exceptions not applicable here, "[a] zoning ordinance must be pursuant to and consistent with a comprehensive plan adopted by the municipal legislative body. 30-A M.R.S. § 4352(2). "When addressing whether a zoning action is consistent with a city's comprehensive plan, pursuant to 30–A M.R.S. § 4352(2), the 'test for the court's review of the city council's rezoning action is whether *from the evidence before it* the city council could have determined that the rezoning was in basic harmony with the [comprehensive] plan.'" *Golder v. City of Saco*, 2012 ME 76, ¶ 11, 45 A.3d 697 (quoting *LaBonta v. City of Waterville,* 528 A.2d 1262, 1265 (Me. 1987)) (emphasis in original).

The Maine Supreme Judicial Court has indicated that this is a deferential standard. *Id.* ("[T]he court 'will not substitute [its] judgment for that of the duly

elected legislative body, the city council"). To preserve the separation of powers, "deference is given to the judgment of the legislative body, and the challenger bears the burden of proving that the amendment is inconsistent." *Id.* "A zoning or rezoning action need not perfectly fulfill the goals of a comprehensive plan; it may be in basic harmony with the plan so long as it 'strikes a reasonable balance among the municipality's various zoning goals' or 'overlap[s] considerably' with the plan." *Remmel v. City of Portland*, 2014 ME 114, ¶ 14, 102 A.3d 1168 (quoting *Nestle Waters N. Amer., Inc. v. Town of Fryeburg,* 2009 ME 30, ¶ 23, 967 A.2d 702; *Stewart v. Town of Durham,* 451 A.2d 308, 312 (Me.1982)). The Supreme Judicial Court also instructs that "a comprehensive plan is considered as a whole; a municipality may conclude that a rezoning action is consistent with a comprehensive plan when it is in harmony with some provisions of the plan, even if the action appears inconsistent with other provisions of the plan." *Id.*

Applying this deferential standard to the Ordinance and the City's comprehensive plan, *Compl.* Attach 8, *Excerpts from the South Portland Comprehensive Plan* (ECF No. 1) (*Plan*), the Court concludes that PPLC failed to carry its burden of establishing inconsistency. The Plan instructs the City:

> to promote future development in harmony with . . . a diverse mixed-use waterfront community; a green city that protects its air quality; an education community where schools and a waterfront college campus are not impacted by incompatible adjacent uses, including new or expanded sources of significant air pollution; and a city that is a desirable destination and a desirable, livable community.

PSMF ¶ 148(a). Regarding waterfront industrial facilities, including PPLC's terminal and tank farm, the comprehensive plan instructs the City that "[i]n the

longer term, if demand for these facilities declines or the type of activity needs to change and the owners of these facilities desire to explore other uses for these facilities, the City, in conjunction with the owners, should reevaluate the best use of these waterfront sites." *Plan* at Section 6(B)(4) and 6(B)(6)(B).

The City could have rationally concluded the Ordinance was in harmony with these goals and instructions. It is undisputed that demand for PPLC's facilities has declined. The City could have concluded it was free to take steps to prevent new sources of air pollution and the construction of new facilities, like seventy-foot VCUs, that might adversely affect the "desirab[ility]" of its waterfront community and its specific development goals for a "diverse mixed-use waterfront" and a "green city."

Other specific statements in the Plan are not to the contrary. There is language about a "development-minded atmosphere," areas where "the City wants growth and development to occur," and goal statements that the City wishes to "retain and grow existing South Portland businesses." *See e.g. Plan* at Section 5(B), 6(D)(1). The Plan also indicates that in the Shipyard Development District "the City's development regulations should continue to allow existing marine and oil facilities to upgrade or expand on parcels that are already used for this purpose" and that in Marine Industrial Areas, "[i]n the short term, the City's marine terminals and related marine industrial areas are maintained and improved while minimizing their impact on adjacent residential neighborhoods." *Id.* Section 6(B)(4). While these statements and goals exhibit some tension with the goals and effects of the Ordinance, they are not so inconsistent as to invalidate the Ordinance. The Court reiterates that under

Maine law, a municipal action "is consistent with a comprehensive plan when it is in harmony with some provisions of the plan, even if the action appears inconsistent with other provisions of the plan." *Remmel*, 2014 ME 114, ¶ 14, 102 A.3d 1168.

Accordingly, the City is entitled to summary judgment on Count VIII.

## G. Preemption by the Maine Oil Discharge Prevention Law

### 1. Summary

There is no genuine dispute of material fact regarding preemption by Maine statute and the City is entitled to judgment as a matter of law. Therefore, the City is entitled to summary judgment on the Maine Oil Discharge Prevention Law issue.

### 2. Maine Oil Discharge Prevention Law: Discussion

The Maine constitution grants localities "home rule" authority. ME. CONST. art VIII, pt. 2, § 1. The Maine Legislature implemented that grant by specifying:

> Any municipality, by the adoption, amendment or repeal of ordinances or bylaws, may exercise any power or function which the Legislature has power to confer upon it, which is not denied either expressly or by clear implication, and exercise any power or function granted to the municipality by the Constitution of Maine, general law or charter.

30-A M.R.S. § 3001. Furthermore, the local ordinance power, "being necessary for the welfare of the municipalities and their inhabitants, shall be liberally construed to effect its purposes" and "[t]here is a rebuttable presumption that any ordinance enacted under this section is a valid exercise of a municipality's home rule authority." *Id.* § 3001(1)-(2). Maine law also instructs courts that "[t]he Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law." *Id.* § 3001(3).

Maine law follows very familiar concepts of express, conflict, and field preemption under federal law. *See e.g. Smith v. Town of Pittston*, 2003 ME 46, ¶ 24, 820 A.2d 1200 ("Just as federal laws may preempt state laws either expressly or by implication, state statutes may preempt local ordinances either expressly or implicitly,") (internal citations omitted); *Cent. Maine Power Co. v. Town of Lebanon*, 571 A.2d 1189, 1194 (Me. 1990) (first addressing "express preemption," then "implicit preemption," inquiring whether state law was "intended to occupy the field," and whether the local law would "frustrate the purposes" of the state law).

The Maine Oil Discharge Prevention and Pollution Control law, 38 M.R.S. §§ 541 *et seq.*, declared that "the highest and best uses of the seacoast of the State are as a source of public and private recreation and solace from the pressures of an industrialized society, and as a source of public use and private commerce in fishing, lobstering and gathering other marine life used and useful in food production and other commercial activities," and that "the preservation of these uses is a matter of the highest urgency and priority." *Id.* § 541. Determining that "the transfer of oil, petroleum products and their by-products between vessels and vessels and onshore facilities . . . are hazardous undertakings," *id.*, the statute bans oil discharges into waters, *id.* § 543, requires licenses for transfer facilities, *id.* § 545, imposes strict liability for accidents, *id.* § 552, and empowers the Department of Environmental Protection (DEP) to "adopt rules and regulations" including: "[o]perating and inspection requirements for facilities, vessels, personnel;" "annual inspections of oil terminal facilities;" "Procedures, methods, means and equipment to be used;" and

"[r]equirements for the safety and operation of vessels" as they approach and depart terminals." *Id.* § 546.

The statute also contains an express savings clause, coupled with an expression of preemptive intent. It instructs:

> Nothing in this subchapter may be construed to deny any municipality, by ordinance or by law, from exercising police powers under any general or special Act; provided that ordinances and bylaws in furtherance of the intent of this subchapter and promoting the general welfare, public health and public safety are valid unless in direct conflict with this subchapter or any rule or order of the board or commissioner adopted under authority of this subchapter.

*Id.* § 556. Therefore, the statute expressly contemplates local restrictions consistent with the purposes of coastal protection unless there is a "direct conflict" with the statute, regulation, or "order."

PPLC was granted a DEP license renewal under the statute, on June 7, 2010. *Compl.* Attach 9, *Oil Discharge Prevention and Pollution Control Act Renewal License* (ECF No. 1) (*License*). The DEP issued the License under the heading "Department Order." *Id.* at 2. In that process, PPLC sought to renew its earlier license and proposed changes to its operation by reversing one of its lines. *Id.* PPLC straightforwardly argues that: the DEP License approved PPLC's proposal to "load[ ] on vessels"; the Ordinance prohibits loading on vessels; the license is labeled an order; and the statute preempts ordinances that conflict with DEP orders under the statute. Therefore, PPLC concludes the Ordinance is preempted. The Court is unpersuaded.

The License does contain the heading, "order," and were the question merely one of administrative procedure, the License might well be an "order" in that technical sense. But that does not mean it is an "order" for purposes of substantive

preemption under the statute. The DEP findings in the License focus on technical safety compliance, not zoning considerations about compatible uses and air emissions. *Id.* at 5. There is no indication in the statute that the State intended to remove local home rule authority over facility siting and use prohibitions through these DEP licenses certifying compliance with the safety procedures and inspection requirements. The statute repeatedly refers to these DEP decisions as "licenses" and not as "orders." The only other places in the statute where the term "order" is used are the following: "the commissioner may issue a clean-up order" following a prohibited discharge; 38 M.R.S. §§ 548, 550; the Governor may issue "orders" in emergency situations; *Id.* § 547; a vessel may be detained for violating an "order" of the board. *Id.* § 552-A.

The Court concludes that for purposes of preemption, the Legislature did not intend the "licenses" specifically described throughout the statute to be "orders" preempting further local restriction. If the licenses had the preemptive effect PPLC claims, there is virtually no room for local regulation in this realm at all, since every single transfer facility must have a license. This result would directly contradict the express savings clause in section 556, which contemplates local restrictions in addition to the state conditions imposed through the licenses. This conclusion is bolstered by the fact that it is not impossible to comply with both the Ordinance and the License. The License certifies that PPLC's transfer equipment complies with the state requirements on transfer operations, either to unload or load oil products. The Ordinance only permits loading or unloading of refined oil, and unloading crude oil.

It is not impossible to operate in compliance with both. There might be a "direct conflict" if the DEP affirmatively ordered PPLC to conduct loading operations and the Ordinance prohibited those operations, but that is not the situation here. The stated purposes of the state law and the Ordinance are also consistent with one another.

Finally, the conclusion that PPLC's license does not preempt the City's power to prohibit loading and new transfer structures is consistent with Maine caselaw. In *Sawyer Environmental Recovery Facilities, Inc. v. Town of Hampden*, 2000 ME 179, 760 A.2d 257, the Maine Supreme Judicial Court struck down a local landfill ban as preempted by DEP licenses authorizing a specific landfill. *Id.* ¶ 33. But that statute required DEP to consider and assess a vast array of traditional local considerations in its provisions on "surface water protection," "aquifer protection," "siting standards," and "setback requirement[s]," including "traffic movement both on site and off site." 38 M.R.S. § 1310-N. The DEP was to make "adequate provision for fitting the proposed solid waste facility harmoniously into the existing natural environment and the proposed solid waste facility will not unreasonably adversely affect existing uses, scenic character, air quality, water quality or other natural resources." *Id.* Unsurprisingly, the Supreme Judicial Court decided this "comprehensive regulatory scheme" preempted local zoning prohibitions. *Sawyer*, 2000 ME ¶ 32, 760 A.2d 265. By contrast, the Supreme Judicial Court later distinguished *Sawyer* and upheld local restrictions in the face of a DEP licensing scheme because that scheme was not as comprehensive and contemplated local

restrictions. *See Smith*, 2003 ME 46, ¶ 29, 820 A.2d 1200. As in *Smith*, this statute contemplates local zoning prohibitions and neither the statute nor DEP review process involves the kinds of local land use and impact considerations typically left to localities.

Accordingly, the City is entitled to summary judgment on Count IX.

## VI. CONCLUSION

The Court GRANTS Defendants City of South Portland and Patricia Doucette's Motion for Summary Judgment (ECF No. 88) on Count I (Supremacy Clause—The Pipeline Safety Act), Count II (Supremacy Clause—Foreign Affairs), Count III (Supremacy Clause—The Port and Waterways Safety Act), Count IV (Maritime Preemption), Count VI (Due Process, Excessive Delegation, and Equal Protection), Count VIII (Inconsistency with the City's Comprehensive Plan), and Count IX (State Preemption), and DENIES summary judgment to Defendants City of South Portland and Patricia Doucette on Count V (Commerce Clause). The Court DENIES Portland Pipeline Corporation and The American Waterways Operators' Motion for Summary Judgment (ECF No. 87).[302] The Court DISMISSES without prejudice the motions for summary judgment on Count VII (Civil Rights Violation) to the extent it demands attorney's fees and costs.[303]

SO ORDERED.

---

[302] The Court will convene a conference with counsel to discuss the next step in this lawsuit.

[303] Finally, to clear up the docket, the Court OVERRULES and DISMISSES the Defendants' Objection to Plaintiffs' Responses to Factual and Evidentiary Objections on Which Defendants Did Not Make a Request to Strike (ECF No. 148). The Court has dutifully ruled on the hundreds of qualifications, objections, and quibbles of counsel and nothing more needs to be said.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of December, 2017