UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PORTLAND PIPE LINE )
CORPORATION, et al., )
)
       Plaintiffs, )
)
       v. )     2:15-cv-00054-JAW
)
CITY OF SOUTH PORTLAND, )
 et al., )
)
       Defendants. )

## ORDER AND JUDGMENT

A pipeline operator challenges a local ordinance prohibiting loading crude oil onto tankers and the construction of new structures for that purpose on the grounds that it violates the dormant Commerce Clause and Foreign Commerce Clause of the United States Constitution. A state or local statute can violate the dormant Commerce Clause if it (1) has an impermissible extraterritorial reach, (2) discriminates against interstate or foreign commerce, (3) excessively burdens interstate or foreign commerce, or (4) interferes with the federal government's ability to speak with one voice when regulating commerce with foreign nations. After a four-day bench trial, the Court concludes that the local ordinance does not violate the dormant Commerce Clause or the Foreign Commerce Clause of the United States Constitution.

# I. PROCEDURAL HISTORY

## A. The Complaint, Motion to Dismiss, and Answer

On February 6, 2015, Portland Pipe Line Corporation (PPLC) and the American Waterways Operators (AWO) (collectively, Plaintiffs, PPLC) filed a complaint with this Court against the city of South Portland (South Portland or the City) and Patricia Doucette in her official capacity as the code enforcement officer of South Portland (collectively, Defendants, the City). *Compl. for Declaratory and Injunctive Relief* (ECF No. 1) (*Compl.*). The Complaint contains nine counts: (1) Supremacy Clause preemption of the Ordinance by the Pipeline Safety Act (PSA), 49 U.S.C §§ 60101 et seq.; (2) Supremacy Clause preemption of the Ordinance under the President's foreign affairs power; (3) Supremacy Clause preemption of the Ordinance by the Ports and Waterways Safety Act, 33 U.S.C. Ch. 25 and 46 U.S.C. Ch. 37; (4) preemption of the Ordinance under Article III, Section 2 of the United States Constitution and the Constitution's embedded principle of federal maritime governance; (5) violation of the Commerce Clause of the Constitution; (6) violation of the Due Process and Equal Protection Clauses; (7) deprivation of rights under the Civil Rights Act, 42 U.S.C. § 1983; (8) inconsistency of the Ordinance with South Portland's comprehensive plan under Maine law, 30-A M.R.S. § 4352; and (9) preemption of the Ordinance by Maine's Oil Discharge Prevention Law, 38 M.R.S. § 556. *Id.*

On March 31, 2015, the Defendants filed a motion to dismiss the Complaint on justiciability grounds. *Defs.' Mot. to Dismiss the Compl. Pursuant to Rule 12(b)(1)* (ECF No. 16); *Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pursuant to Rule 12(b)(1)*

(ECF No. 17). The Court denied the motion to dismiss on February 11, 2016. *Order on Defs.' Mot. to Dismiss* (ECF No. 29). Accordingly, the Defendants filed an answer to the Complaint on February 29, 2016. *Answer of Defs. City of South Portland and Patricia Doucette* (ECF No. 30).

### B. Summary Judgment and Renewed Motions to Dismiss

On November 17, 2016, PPLC filed a motion for summary judgment. *Pls.' Mot. for Summ. J.* (ECF No. 87). That same day, the Defendants filed a consolidated motion to dismiss pursuant to Rule 12(b)(1) and a cross-motion for summary judgment. *Defs.' Consolidated Mot. to Dismiss Pursuant to Rule 12(b)(1) and Mot. for Summ J.* (ECF No. 88).

On May 11, 2017, the Court issued a second order on the justiciability issue, ordering an evidentiary hearing. *Interim Order* (ECF No. 156). On August 24, 2017, after a full day of testimony on August 9, 2017, the Court issued a third order on justiciability, denying the motion to dismiss. *Min. Entry* (ECF No. 179); *Order on Defs.' Consolidated Mot. to Dismiss under Rule 12(b)(1)* (ECF No. 185) (*Justiciability Order*). On October 20, 2017, the City filed another motion to dismiss after a public announcement about the cancellation of a different pipeline project. *Defs.' Renewed Mot. to Dismiss Pursuant to Rule 12(b)(1)* (ECF No. 194). After oral argument on November 21, 2017, on December 12, 2017, the Court issued its fourth ruling on the justiciability issue the City first raised on March 31, 2015. *Order on Defs.' Renewed Mot. to Dismiss* (ECF No. 199).

Meanwhile, the Court received requests for leave to file amicus briefs on behalf of both the Plaintiffs and the Defendants. On January 9, 2017, the Court granted the

motions of the amici curiae. *Order on Mots. to File Briefs as Amici Curiae* (ECF No. 135). Three briefs were filed on behalf of the Plaintiffs by the Chamber of Commerce of the United States, the American Fuel and Petrochemical Manufacturers, the American Petroleum Institute, the Association of Oil Pipe Lines, the International Liquid Terminals Association, Portland Pilots, Inc., the Maine Energy Marketers Association, and the Associated General Contractors of Maine. *Brief of the Chamber of Commerce of the U.S.A. as* Amicus Curiae *in Supp. of Pls.' Mot. for Summ. J.* (ECF No. 136); Amici Curiae *Brief of the Am. Fuel & Petrochem. Mfrs., the Am. Petro. Inst., the Ass'n of Oil Pipe Lines, and the Int'l Liquid Terminals Ass'n in Supp. of Pls.' Mot. for Summ. J.* (ECF No. 138); *Brief of* Amicus Curiae *Portland Pilots, Inc., Maine Energy Mkt'rs Ass'n, and Associated Gen. Contractors of Me. in Supp. of Pls.' Mot. for Summ. J.* (ECF No. 139). For the Defendants, the Conservation Law Foundation filed a brief on January 10, 2017. *Brief* Amicus Curiae *of the Conserv. Law Found.* (ECF No. 137). On January 23, 2017, PPLC and the City each filed a response to the amicus briefs. *Pls.' Mem. of Law in Resp. to* Amici *Briefs* (ECF No. 145); *Defs.' Resp. to Briefs* Amicus Curiae (ECF No. 146).

On December 29, 2017, the Court issued an order on the cross-motions for summary judgment. *Order on Mots. for Summ. J.* (ECF No. 200) (*Summ. J. Order*). The Court granted summary judgment in favor of the City on Count I (Supremacy Clause—The Pipeline Safety Act), Count II (Supremacy Clause—Foreign Affairs), Count III (Supremacy Clause—The Port and Waterways Safety Act), Count IV (Maritime Preemption), Count VI (Due Process, Excessive Delegation, and Equal

Protection), Count VIII (Inconsistency with the City's Comprehensive Plan), and Count IX (State Preemption). *Id.* at 228. The Court denied summary judgment to PPLC on all counts, and denied summary judgment to the City on Count V (Commerce Clause) because there were genuine disputes of material facts. *Id.* The Court preserved an ancillary issue by dismissing without prejudice on Count VII (Civil Rights Violation) to the extent it demanded attorney's fees and costs. *Id.*

### C. The Bench Trial

Trial was scheduled for five days beginning on June 18, 2018. *Notice of Bench Trial* (ECF No. 204). The parties filed four pre-trial motions on April 25 and May 11, 2018, which the Court addressed on June 1, June 13, and June 14, 2018. *Defs.' Mot. for View* (ECF No. 206); *Pls.' Mot.* in Limine *to Admit into Evidence Statements by City Officials and Members of the Public* (ECF No. 208); *Defs.' Mot.* in Limine *to Exclude Irrelevant and Inadmissible Statements* (ECF No. 209); *Defs.' Mot.* in Limine *to Exclude New Summary Tables Produced by Pls.' Without Underlying Data* (ECF No. 210); *Order Deferring Ruling on Defs.' Mot. for View* (ECF No. 218); *Order on Mots. in Limine Concerning Statements of City Officials and Members of the Public* (ECF No. 230); *Order on Mot. in Limine Concerning Summary Tables* (ECF No. 232). The parties also stipulated to certain evidentiary matters, including admitting into evidence at trial virtually all of the testimony and exhibits admitted during the August 9, 2017 hearing on justiciability. *Joint Stipulation Concerning Trial* (ECF No. 239).

The Court presided over a bench trial from June 18 to June 21, 2018. *Min. Entry for Bench Trial* (ECF Nos. 240, 242-44). On July 13, 2018, the parties

submitted simultaneous post-trial briefs. *Pls.' Post-Trial Br.* (ECF No. 251) (*Pls.' Br.*);

*Defs.' Post-Trial Br.* (ECF No. 252) (*Defs.' Br.*). The parties responded to each other's

briefs on July 23, 2018. *Pls.' Post-Trial Reply Br.* (ECF No. 253) (*Pls.' Resp.*); *Defs.'

Post-Trial Reply Br.* (ECF No. 254) (*Defs.' Resp.*).

## II.   FINDINGS OF FACT

### A.   The Parties

PPLC is pipeline company incorporated in Maine. Montreal Pipe Line Limited

(MPLL) is PPLC's Canadian parent company. Three Canadian companies own

MPLL: Shell Canada Limited, Suncor Energy Inc., and Imperial Oil Limited.

Imperial is ExxonMobil's Canadian subsidiary. The American Waterways Operators

(AWO) is a nationwide trade organization that advocates for the interests of United

States tugboat, towboat, and barge owners and operators.

The city of South Portland is a municipal corporation organized pursuant to

the Constitution and general laws of the state of Maine. CITY OF SOUTH PORTLAND

CHARTER, http://www.southportland.org/files/4213/5994/7194/ CO_Charter.pdf. The

City is governed by a City Council of seven elected members serving staggered three

year terms, one of whom is elected to serve as mayor for one year. *Id.* §§ 207, 211.

The City Council appoints other officials like the City Manager. *Id.* § 227. Patricia

Doucette was the City's Code Enforcement Director at the outset of this litigation.

### B.   The Pipelines

In 1941, PPLC and MPLL began constructing and operating a twelve-inch

crude oil pipeline stretching from the harbor in South Portland, Maine (the Harbor),

through New Hampshire and Vermont and into Quebec, Canada, terminating at oil

refineries in Montreal East. *Pls.' Ex.* 164. PPLC added to its pipeline system in 1950 by constructing and operating an eighteen-inch pipeline. PPLC added to its pipeline system again in 1965 by constructing and operating a twenty-four-inch pipeline. PPLC decommissioned and ceased operating the original twelve-inch line in 1982. PPLC now uses the twelve-inch line as a sacrificial anode to protect its eighteen and twenty-four-inch lines from external corrosion. The nominal capacities of the remaining eighteen and twenty-four-inch lines are approximately 192,000 barrels per day and 410,000 barrels per day of crude oil, respectively. With a few exceptions of short distances, all three of PPLC's pipelines follow the same route, along the same rights of way, and pass largely underground between South Portland and the Montreal East oil refineries.

Since 1941, PPLC has operated the portion of the pipeline within the United States, while MPLL has operated the portion within Canada. The only exception was a period from 1987 to 1999, when PPLC and MPLL cleared the eighteen-inch line and leased it to Granite State Gas Transmission, Inc., which operated the line for natural gas transmission. The companies refer to this combined pipeline system as the Portland-Montreal Pipe Line (PMPL).

In South Portland, PPLC maintains "Pier 2," an oceanfront pier near Portland Breakwater Light on the Harbor where tanker vessels historically have docked to deliver crude oil. The crude oil is offloaded from marine tank vessels at Pier 2 and transported to storage tanks in the City; four storage tanks are on two parcels close to Pier 2 (the Waterfront Tanks) and nineteen are on Hill Street (the Main Tank

Farm) approximately 2.7 miles inland from Pier 2. The oil travels from Pier 2 and the Waterfront Tanks through three lines running under Broadway and other streets and Mill Cove to the Maine Tank Farm. PPLC's eighteen-inch and twenty-four-inch pipelines move the crude oil northward from the Main Tank Farm to refineries in Montreal using six pumping stations across Maine, New Hampshire, and Vermont.

Access to the Harbor has been integral to PPLC's success and longevity. The Harbor is able to accommodate ships with up to fifty-two feet of draft and up to 170,000 deadweight tons of cargo. The Harbor has all-season ice-free conditions, which permits shipment of cargo in and out of the Harbor year round. As recently as 2010—the last year the eighteen-inch line was in active service—PPLC accepted 132 deliveries from tankers. That year, PPLC transported 27,969,719 barrels of crude oil northward to Montreal East through its eighteen-inch pipeline, an average of 76,629 barrels per day, as well as 72,231,154 barrels of crude oil northward to Montreal East through its twenty-four-inch pipeline, an average of 197,894 barrels per day. At the busiest times, the piers docked forty-one ships per month and the pipelines transported 550,000 barrels per day. PPLC has been able to operate continuously since 1941 in part due to its ability to respond and adapt to changing market conditions.

## C. Geography and Zoning Districts

The City enacted a zoning ordinance. CITY OF SOUTH PORTLAND CODE OF ORDINANCES Ch. 27, available at http://www.southportland.org/our-city/code-ordinance/. The City also maintains a map of its different development districts. *Defs.' Ex.* 143; *Zoning Maps & GIS*, CITY OF SOUTH PORTLAND,

www.southportland.org/departments/planning-and-development/zoning-map-gis/

(*Interactive City GIS Map*).

Pier 2 is located in a district of the City zoned Shipyard ("S") and within the City's Shoreland Area Overlay District. The City established the Shipyard zoning district:

> to promote the Shipyard area in South Portland as a robust waterfront center for office complexes, commercial uses, marine uses, and light industrial activities. The Shipyard District S seeks to maintain the conforming status of existing businesses, to prevent residential development and associated land use conflicts, and to minimize the impacts of development on adjacent zoning districts.

CITY OF SOUTH PORTLAND CODE OF ORDINANCES § 27-921.

The Waterfront Tanks are four above-ground floating roof oil storage tanks proximate to Pier 2 on two separate parcels in the Shipyard zoning district. Pier 2 abuts Bug Light Park, a public waterfront park on Casco Bay. Bug Light Park features a lighthouse on Casco Bay, parking facilities, and green space for dog walking, children's activities and general waterfront recreation. The Waterfront Tanks abut residential neighborhoods zoned for residential use and designated by the City's Zoning Ordinance Residential ("G").

The Main Tank Farm consists of nineteen above-ground floating roof oil storage tanks occupying a 102-acre parcel at 30 Hill Street. The Main Tank Farm parcel is zoned Commercial "C." That commercially zoned area is composed of the Main Tank Farm parcel only, surrounded by residential neighborhoods, schools, day-care centers, athletic facilities, and churches zoned "Residential Districts A & G." More specifically, the following are all adjacent to the Main Tank Farm:

- The Community Center, which includes a recreational center, after-school activities, and a summer camp with 500 children, is about 525 feet from the nearest tank. *Defs.' Ex.* 331; *Interactive City GIS Map*; *Trial Tr.* 567:12-25.

- The High School building is about 775 feet from the nearest tank. *Defs.' Ex.* 331; *Interactive City GIS Map*. The running track and football field are about 225 feet from the nearest tank. *Defs.' Ex.* 211, 213, 331; *Interactive Zoning Map*; *Trial Tr.* 569:1-570:5

- The South Portland Church of the Nazarene, which houses a preschool, is about 400 feet from the nearest tank. *Defs.' Ex.* 331; *Interactive City GIS Map*; *Trial Tr.* 570:7-19.

- The Dyer Elementary School is about 1,200 feet from the nearest tank. *Defs.' Ex.* 331; *Interactive City GIS Map*.

- The Kaler Elementary School, which includes an outdoor playground area, is about 275 feet from the nearest tank. *Defs.' Ex.* 204, 331; *Interactive City GIS Map*; *Trial Tr.* 570:20-571:11. The asphalt play area and basketball hoop are about 190 feet from the nearest tank. *Defs.' Ex.* 207; 331; *Interactive City GIS Map*; *Trial Tr.* 571:16-572:4.

**D.      The 2008-2009 Oil Sands Proposed Project**

In 2007-2008, PPLC determined that demand for transportation of crude oil from the Harbor to the Montreal East refineries was likely to decline because the boom in crude oil production in Alberta's "oil sands" fields meant that Montreal East refiners would need less foreign oil. Crude oil derived from "oil sands" is sometimes referred to as "tar sands" or "tar sands oil." In 2007-2008, PPLC moved to reverse the flow of its eighteen-inch pipeline, but not its twenty-four-inch pipeline, to enable the company to transport crude oil from Montreal to the Harbor and to load crude oil onto tanker vessels for shipment to both United States and international destinations. *Defs.' Ex.* 64.

PPLC invested substantial money and effort in advancing its flow reversal project, spending approximately $5 million on consultants to determine the necessary

changes to its infrastructure, to model the economics, and to identify necessary permits. Modifications to PPLC's existing pipeline infrastructure would be needed to reverse the direction of the flow of its pipelines, including reversing and adding valves to accommodate southbound crude oil transportation, installing pumping facilities, and installing a vapor control system at the Harbor. PPLC later estimated the total cost of a reversal project to be on the order of $100 million. *Defs.' Ex.* 25 at 11.

### 1.    Marketing the Proposed Reversal Project

In 2007-2008, PPLC began implementing its flow reversal project by marketing its ability to deliver oil from Canada to the South Portland Harbor. PPLC conducted a traditional "open season" process, whereby PPLC presented the details of its pipeline capacity to interested shippers—oil companies who wished to move their Canadian oil to the Harbor—to secure conditional offers for committed volumes of crude oil. During the open season process, PPLC asked shippers to sign non-disclosure agreements to protect the confidentiality of PPLC's plans, and many did. Numerous shippers expressed interest in PPLC's project during the open season process. PPLC intended to obtain contractual commitments from interested shippers to move specific volumes of oil. PPLC's intention, consistent with industry practice, was to use the contractual commitments to obtain financing to complete the infrastructure changes associated with reversing the flow.

In late 2008, the financial crisis that caused the Great Recession crippled financial markets and caused worldwide economic activity to decline. PPLC halted work on the flow reversal project as a result of the financial downturn and a lack of contractual commitments from shippers.

## 2.    Permitting and the Vapor Destruction Units

PPLC contacted the U.S. State Department concerning permits for the flow reversal project. The eighteen-inch line has operated under a permit since July 29, 1999, when the United States Department of State issued PPLC a permit "Authorizing Portland Pipe Line Corporation to Convert an Existing Pipeline Crossing the International Boundary Line Between the United States and Canada from Natural Gas Service to Crude Oil Service" (Presidential Permit). *Compl.* Attach 2 *Permit* at 1-6 (ECF No. 1). The twenty-four-inch pipeline was the subject of a prior Presidential Permit issued on January 13, 1965. *Id.* at 7-11. The President of the United States issued this Permit concerning the construction and operation of PPLC's twenty-four-inch pipeline under his authority to regulate cross-border segments of pipelines. The Presidential Permit for the eighteen-inch pipeline states:

> Permittee shall comply with all applicable Federal and State laws and regulations regarding the construction, operation, and maintenance of the United States facilities and with all applicable industrial codes. The permittee shall obtain requisite permits from Canadian authorities, as well as the relevant state and local governmental entities and relevant federal agencies.

*Id.* at 3. The Presidential Permit focuses on the pipeline segment from "the vicinity of North Troy, Vermont, to the international boundary line between the United States and Canada . . .", not the pipeline and its facilities south of the border crossing.

On July 18, 2008, the State Department responded that PPLC's pipeline reversal plan did "not constitute a substantial change from the scope of the authorization" in the Presidential Permit previously issued to PPLC in 1999. *Defs.' Ex.* 5. As such, the State Department informed PPLC that it was "not required to

seek a new or amended Presidential [P]ermit" in connection with the pipeline reversal project; however, the State Department reserved the right to rescind its decision if PPLC deviated significantly from the scope of its plan. *Id.*

On June 19, 2009, PPLC applied to the City's Planning Board for Site Plan and Shoreland Area zoning approval for various work associated with the 2008-2009 Project. *Defs.' Ex.* 13. At the Main Tank Farm, PPLC sought to construct a new building to house a 2,400 square-foot pump station, an outdoor electrical switchyard, and related infrastructure for use as a "ship loading system." *Id.* at 2. At Pier 2, PPLC sought the City's approval to drive new pilings and make other modifications so that smaller barges and Handysize tank vessels could berth there, since Pier 2 was designed for larger Aframax and Suezmax vessels. *Id.* On the approach to Pier 2, PPLC sought to construct two Vapor Destruction Units (VDUs) to combust vapors displaced from the holds of the marine tank vessels by the loading of crude oil. *Id.* at 3.

VDUs control air emissions. As part of the 2009 proposed pipeline reversal project, oil would be loaded onto a marine vessel, which causes air in the vessel's tanks to be displaced. Because the displaced air contains petroleum vapors, regulatory agencies require the removal of pollutants before the displaced air is released into the atmosphere. Some vessels have their own air emissions control equipment. The combustion stacks for the VDUs at Pier 2 were to be seventy feet tall and twelve feet in diameter. *Id.*

PPLC received zoning approval from the City's Planning Board for the work at Pier 2 and the Main Tank Farm on August 25, 2009, but the City approval expired on August 25, 2012, after an extension in 2011. *Defs.' Ex.* 20. At no time during the City's 2009 processing of PPLC's application for site review approval did city of South Portland Planning and Development Director Charles Haeuser object to the VDUs that PPLC proposed. *Trial Tr.* 562:10-25; *Pls.' Ex.* 25 at 4. He suggested that the VDUs might be decoratively lit as an aesthetic attraction. *Trial Tr.* 284:3-16.

The 2008-2009 Project required a New Source Review Air Emission License and an amendment to PPLC's existing Part 70 Air Emissions License from the Maine Department of Environmental Protection to permit the increase in emissions over previous operations. PPLC applied for the Licenses in February of 2009. *Joint Ex.* 43. On August 25, 2009, Maine DEP issued an Air Emissions License to PPLC permitting additional air emissions from the two VDUs (the "2009 Air License"). *Defs.' Ex.* 14. The 2009 Air License set emissions limitations and authorized PPLC to construct the VDUs based on emissions throughput capacities of the eighteen-inch pipeline of 180,000 b/d of Syncrude (referred to as a light sweet crude because it is less viscous and has a lower sulfur content) or 140,000 barrels per day of Cold Lake crude (referred to as a heavy sour crude because it is more viscous and has a higher sulfur content). *Id.* PPLC later voluntarily surrendered and voided the 2009 Air Emissions License without beginning construction. *Defs.' Ex.* 26.

PPLC identified other environmental permits it would need from various Maine, Vermont, New Hampshire, Federal, and Canadian agencies. In 2009, without

having obtained all of the necessary permits, PPLC suspended further permitting on the project.  During the 2008-2009 process, no permitting authority denied PPLC any of the permits it sought.  PPLC did not seek all the permits that would have been required, and did not receive approval for a pump station it proposed in Dunham, Quebec.  Of the thirteen permits PPLC initially sought, relevant authorities granted ten and PPLC voluntarily ceased its pursuit of the other three.

### E.     The 2012-2013 Proposed Flow Reversal Project

When economic conditions improved in 2012 and 2013, as PPLC determined that its prior forecasts had proved accurate concerning the increase in Canadian oil production, PPLC once again considered reversing the flow of oil.

### 1.     Design Differences

In 2011 and 2012, PPLC analyzed and considered several different design and engineering characteristics of a potential project to reverse the flow of either the eighteen-inch or the twenty-four-inch pipeline and to load crude oil onto marine tank vessels in the City's Harbor.  PPLC considered modifying its earlier proposal to a single stream light line of crude oil, instead of a design capable of carrying both heavy and light crude oil.  It considered ways to obviate the Dunham, Quebec pump station for which PPLC never obtained approval from Canadian regulatory authorities. PPLC considered using a vapor recovery unit (VRU) to capture hydrocarbon vapors during the loading process, which would use different technology and have less intrusive dimensions than the two 70-foot-tall John Zink VDUs proposed in 2009. PPLC also considered omitting the Pier 2 upgrades that would have accommodated smaller vessels such as barges.

## 2. Marketing the 2012-2013 Proposed Project

In 2011-2012, PPLC again began soliciting interest and held discussions with numerous potential crude oil shippers, including Irving, Valero, Shell, Keyera, Repsol, Suncor, Global, Imperial Oil, to attempt to obtain contractual volume commitments on a reversed eighteen-inch or twenty-four-inch pipeline. PPLC's marketing efforts came on the heels of a potential announcement by Enbridge to reverse its Line 9 to carry oil from west to east from Sarnia to Montreal. During this time, PPLC was under less pressure to reverse the flow of its pipeline system because it still was doing enough northbound business so that flow reversal had not become urgent.

In 2013, PPLC again solicited interest from potential crude oil shippers for committed volumes of crude oil to be carried southward on the eighteen-inch or twenty-four-inch pipeline. In 2013, PPLC received positive indications of interest from potential shippers, many of whom signed non-disclosure agreements. In April of 2013, PPLC sought to secure shareholder endorsement for PPLC to seek expressions of interest from potential shippers concurrent with the TransCanada PipeLines Limited's Energy East Open Season then underway. PPLC's Board of Directors was not interested in pursuing a formal Open Season at that time.

For a variety of reasons, including insufficient market interest, PPLC did not move forward with the reversal project. Sometime after April 2013 and before June 17, 2013, PPLC postponed seeking commercial support for any project to load crude oil in the City. It considered writing off part or all of the $6.5 million it had already spent planning and permitting the 2008 project. The only portion of PPLC's

investment it decided to write off concerned approximately $150,000 related to PPLC's work on the Dunham, Quebec pump station that did not result in approval. PPLC monitored the progress of the Enbridge Line 9 reversal project, which did not begin operating until December 2015.

### 3. Permitting the 2012-2013 Proposed Project

On July 27, 2011, the City approved PPLC's application to extend its planning board approval from 2009 for an additional year. *Pls.' Ex.* 90.

Since the 2008-2009 project, the politics around a Presidential Permit for the U.S.-Canada border crossing had shifted. Between 2012 and 2014, twenty-one members of Congress, including U.S. Senator Susan Collins, U.S. Senator Angus King, U.S. Representative Chellie Pingree, then-U.S. Representative Michael Michaud, all representing Maine, as well as the entire Vermont Senate and House delegation and the entire New Hampshire Senate and House delegation, requested that the State Department require a new Presidential Permit and conduct an Environmental Impact Statement should PPLC seek to transport Canadian tar sands oil through the pipeline.

On August 13, 2013, a representative of the United States Department of State sent a letter to counsel for PPLC backtracking on the 2008 letter which deemed flow reversal to be a non-substantial change for purposes of a Presidential Permit. *Defs.' Ex.* 23. The new letter explained that it was the State Department's "understanding that [PPLC] has no current plans to change the operation of either pipeline" and instructed PPLC "to provide information for the Department for its review and

consideration in advance" before "execut[ing] any plans to change the operation of either pipeline." *Id.*

Other cross-border pipeline projects were also under review by the U.S. State Department. The Keystone XL Pipeline proposes to transport western Canadian crude oil from Hardisty, Alberta to Steele City, Nebraska. President Obama's State Department rejected the Keystone proposal in part because they determined it would negatively impact foreign policy and national security. *Defs.' Ex.* 131. President Trump later reversed that decision and directed the State Department to issue a presidential permit for the Keystone XL Pipeline. *Presidential Mem. Re. Construction of the Keystone XL Pipeline*, WHITEHOUSE.GOV, (Jan. 24, 2017), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-regarding-construction-keystone-xl-pipeline/.

PPLC ultimately ceased work on the 2012-2013 flow reversal project in 2013.

**F.     The Crude by Rail Proposal**

In 2012, PPLC studied a potential project, proposed by Pan Am Railways, to transport "Bakken/other U.S. sourced crude" by rail into Rigby Yard in the City. *Defs.' Ex.* 25 at 6-10, 171. The rail proposal would have connected the Rigby Yard rail terminal with PPLC's Main Tank Farm on Hill Street by a short newly constructed pipeline on the Railroad's existing Right of Way, which is theoretically feasible from an engineering perspective. In 2013, PPLC was still contemplating the proposal to transport crude oil by rail to the Main Tank Farm and then loading crude oil onto marine tank vessels in the City. *Defs.' Ex.* 91, 93, 98, 102. By June 2015,

PPLC informed its board of directors that "interest has diminished in developing new rail capabilities." *Defs.' Ex.* 129 at 39.

PPLC never proposed transporting oil from the Maine Tank Farm to Rigby Yard for transport out of South Portland via rail. While such a project would be technically possible, it would cost more to construct the interconnection, and it would be more expensive per barrel to transport oil from South Portland to most markets by rail than by tanker.

### G.    The Waterfront Protection Ordinance

In 2013, political opposition began to develop to the flow reversal project from environmental groups and the South Portland City Council. Advocates opposing the flow reversal project, led by a group called Protect South Portland (PSP), obtained sufficient signatures to place the "Waterfront Protection Ordinance" (WPO) on the November 2013 ballot in South Portland. *Pls.' Ex.* 8-9. The WPO proposed amending the City's zoning ordinance to (1) specify that petroleum facilities which are permitted within the Shipyard District were those "for the unloading of petroleum products from ships docking in South Portland . . . ." and (2) that "there shall be no enlargement or expansion of existing" petroleum facilities in the Shipyard or Commercial Districts, and (3) "no new or expanded facility shall be constructed on an existing pier. . . ." *Pls.' Ex.* 9 at 3.

In 2013, PPLC sent an "Open Letter to the Residents of South Portland":

Perhaps you signed a petition to get the WPO on the ballot, because you were told the WPO is designed to "stop tar sands" and "smokestacks". These misleading references relate to a prior proposal which was never initiated or completed, and are designed to scare you into thinking that our company has an imminent project to bring tar sands to South

Portland or smokestacks to Bug Light Park.  Let us be clear - there is no such project proposed, pending or imminent. In fact, recently, as a good faith measure, we took the rare step of voluntarily surrendering our final permit relating to that prior proposal, as further reassurance to the community we care so deeply about that there is no tar sands project.

*Defs.' Ex.* 24.

Many supporters of the WPO expressed concerns to City officials about heightened risk of spills of crude oil derived from tar sands, or more severe health and environmental impacts of those spills as compared to other types of crude oil.  For example:

[K]eep[ ] us from becoming the next Kalamazoo, Michigan, or Mayflower, Arkansas, and I have a hard time pronouncing the unfortunate town in, in Quebec, but I – that needs to be brought up as well.  *Pls.' Ex.* 102 at 1:25:31-1:26:17.

I really have no quarrel with the pipeline and respect their efforts to run a sound company. I just don't want that pipeline up the street carrying tar sands into our community to load ships besides Bug Light Park. . . . Recent events across North America have alerted me and many of my fellow citizens to the unacceptable risks involved in transporting tar sands, via pipeline, through our communities and our watersheds. *Id*. 1:39:30-1:41:12.

In 1997 [PMPL] dumped 2500 gallons of fuel of oil, that leaked, that spilled from their existing pipeline and at that point it was, what 45, 47 years old.  We're talking about a 62-year-old pipeline now.  And to use the analogy of a heart, were we to pump some sort of corrosive in to our blood, in to our veins and arteries, pump through our heart at a faster rate, I don't think we'd last very long or as long as we normally would were we not to do so.  *Pls.' Ex.* 103 at 2:36:37-2:37:50.

Many of the same supporters and others expressed concerns to City officials about other goals and fears, including air pollution, aesthetics, climate change, non-industrial redevelopment, and nuisances from pipeline operations:

"I face the Portland Pipe Line.  I smell the fumes every single day, and I raise two kids there." *Pls.' Ex.* 102 at 1:26:54-1:28:25.

"The extraction, transport and refinement of the oil that remains is extremely damaging to our environment both in terms of its toxicity and its contribution to global warming. Just as communities long ago had to adapt when whaling was replaced by fossil fuels, we as a culture must make this shift from fossil fuels to renewable energy. . . . Portland Pipe Line is trying to bully us in to allowing a very toxic substance to pollute and potentially contaminate South Portland." *Pls.' Ex.* 103 at 2:18:50-2:20:45.

"They won't even reveal what's in that mix. Storing it in a tank farm where it will poison our school children and teachers and then sending it through our city in very old pipes that are unmapped, no one knows where those pipes run exactly, except the Pipeline of course, and hope the Coastguard. I know our Fire Chief doesn't have a map. They will send that stuff to the pier when they plan to burn off toxic vapors to pollute our air, it says dire implications for the land use and our waterfront. And how dare they suggest that sending a product to Bug Light Pier for export, the world's dirty oil parts, remember none of this stays in Maine, we're a shipping corridor, that when it spills it weathers quickly and it sinks in water to contaminate our special places and poison our Casco Bay fisheries." *Id.* 3:37:50-3:39:04.

Those threats include fouling our drinking water supply, endangering our children and teachers adjacent to the Hill Street tank farm with fumes from up to 126 million gallons of tar sands oil, polluting our air by burning off toxic vapors on our waterfront and threatening Casco Bay and our special spaces along the bay with a possible tar sands oil spill. The Waterfront Protection Ordinance presents an opportunity for the citizens and taxpayers of our City to create a stronger and diverse economy, protect our investment in our schools, protect our property values, and finally, have a seat at the table of power. Remember, that if you do not have a seat at the table, you will be on the menu. Thank you. *Pls.' Ex. 104 at* 0:25:50-0:26:50.

My real estate expertise tells me that if you don't pass the [WPO], you will have unintended consequences which won't bode well for South Portland. The first consequence? Immediately diminished property values if the pipeline reversal scheme goes ahead and loading of tar sands oil starts at Bug Light Pier. I've discussed the issue with realtors, [inaudible] residential neighbors near the proposed smokestacks will take a significant, negative hit on their property values. The previously approved smokestacks? They're not small. 70 feet tall. That's equivalent to seven-story buildings. Those homes and condos closest would naturally be hit the hardest, but entire neighborhoods will be impacted. You also have a second unintended consequence of

diminishing the appeal of South Portland to new buyers. Can you imagine the family of a child with asthma looking to relocate to South Portland and learning of these smokestacks and the tank farms? They're draw to your beautiful city quickly lessens. And remember, that's 10% of all children. With Maine having a higher burden of asthma than the rest of the nation, new smokestacks bring more air pollution closer to home. By bringing in tar sands oil to South Portland, you have other areas of town impacted as well. With tank farms abutting Kaler School and in the vicinity of Dyer, the High School, the Light House School, and the Community Center, those property values are affected as well. As word gets out about benzene and other gases leaking out of these tanks as children attend school right next to the facility 180 days of the year? After all, the company is seeking to renew their license to increase their emissions three-fold from 81.9 tons of VOCs to 220 per year. Again, what person would want to move to a town knowing that their child is becoming a statistic and an experiment in the new world of tar sands oil spillage? In your own Comprehensive Plan, it states South Portland's overall property value, which dropped over 10% from 2009 to 2010, I believe the construction of these smokestacks and filling in the Hill Street tank farm with tar sands oil will hinder that recovery from those depressed valuations, as well as further suppress the real estate market. . . . As a developer, I'm not going to buy a property in a neighborhood that has smokestacks in its viewshed or is downwind of it. *Id.* 0:27:50-0:30:31.

As a result of South Portland's unique connection and proximity to Canada, local businesses may have the opportunity to profit greatly from oil sands. The city may benefit from the tax income generated. A relatively small number of long-term jobs may be created, and the generous philanthropic activities of the petroleum industry may expand. These are some of the local potential benefits and, as was stated earlier, there are risks. *Id.* 1:09:30-1:10:54 (discussing risks from spills, environmental impact of tar sands extraction).

As these examples indicate, a small number of those public comments preferred local businesses or expressed greater skepticism of the reversal project because the oil merely flowed through South Portland for export to other regions.

One of the WPO's drafters explained why the proponents chose to focus on the act of loading, rather than an outright prohibition on the shipment of oil derived from tar sands:

Well, the original draft outright prohibited tar sand, we're dealing with stuff which goes through the pipeline and we're dealing with safety issues in large part over spills and alike. We even had a bonding mechanism and all kind of other things which we were gonna do. But the federal pipeline safety act seems to pre-empt all of that stuff. So, all we can deal with is the local consequence of this stuff arriving through the pipeline, we can't actually regulate what's in the pipeline or deal with safety, even spills from the pipeline, we can't even deal with that while it's in the pipeline. *Pls.' Ex. 103* 3:54:30-3:55:27.

On August 19, 2013, the City Council opposed the WPO by a vote of five to one, sending the proposal to the voters. Six of the seven City Councilors indicated that they generally shared the WPO proponents' concerns about the air quality, water quality, aesthetics, odors, climate change, and property value impacts of crude oil derived from tar sands and PPLC's 2008-2009 project, but they did not agree with all of the wording of the WPO and believed there were unintended consequences on other businesses in South Portland.[1]

On November 5, 2013, South Portland residents voted against passage of the WPO by a 4453 to 4261 margin, or 51.1% to 48.9%.

### H.     The Moratorium

The City Council held a series of workshops beginning on November 6, 2013, the day after residents voted against the WPO, to discuss a moratorium on the importation of oil sands crude into South Portland. *Pls.' Ex.* 14. City Counselors made similar comments to those of the public during before the WPO vote about the

---

[1]     *See generally*, *Summ. J. Order* Part II - Statement of Facts. The Court briefly summarizes the portions of the record it already addressed at summary judgment, such as the public statements of the City Councilors. Given the length of the record, the Court gives a few representative examples of public and official comments in this order.

air quality, water quality, aesthetics, and development impacts of PPLC's proposal to load crude oil derived from tar sands at the Harbor.

On December 16, 2013, the City Council approved a 180-day "Moratorium on Development Proposals Involving the Loading of Oil Sands/Tar Sands Products onto Tank Vessels Docking in South Portland." *Pls.' Ex.* 15. The stated goal of the temporary Moratorium was to allow the City Council time to seek:

> such professional advice and assistance as it deems necessary and appropriate, [to] study the Code of Ordinances to determine the land use, environmental and other regulatory implications of future proposed development proposals involving the loading of oil sands/tar sands products onto marine tank vessels docking in South Portland and consider what regulations might be appropriate for such activity.

*Id.* at 5.

## I.     The Draft Ordinance Committee

The South Portland City Council created a "Draft Ordinance Committee" (DOC), *Pls.' Ex.* 16, charged with recommending ordinance amendments to:

> protect the public health and welfare from adverse or incompatible land uses, or adverse impacts to local air, water, aesthetic, recreational, natural, or marine resources, that could result from modifications to existing storage, handling, or processing facilities, or construction or installation of new facilities or equipment intended to allow the exportation of unrefined petroleum products, including the loading of unrefined petroleum products onto marine tank vessels docking in South Portland.

*Pls.' Ex.* 21. In a Request for Qualifications, the City sought "a consulting firm or individual to prepare and facilitate a committee based process to explore the development of ordinance language to address development proposals involving oil sands/tar sands products." *Pls.' Ex.* 13.

David Cyr, then-president of PPLC, sent a letter to the Mayor of the South Portland City Council asking for a representative of PPLC to be included as a member of any ordinance amendment study committee. *Pls.' Ex.* 7. Many public commenters opposed naming representatives from the petroleum industry as members of the DOC. For example, one commenter said, "[B]y including oil company representatives on a committee, and the goal of the committee is indeed to write a new ordinance that will block tar sands, that's like inviting people from the tobacco companies to help write an ordinance that's gonna block tobacco sales to minors." *Pls.' Ex.* 110 at 0:14:02-0:20:02. In the meetings leading up to the creation of the DOC, several City Councilors expressed their desire that the DOC craft an ordinance that would keep tar sands oil out of South Portland and stand up to an inevitable legal challenge. The City Councilors sought an ordinance that would not be preempted by federal statutes or invalidated under the dormant Commerce Clause.

The City appointed three individuals to be members of the DOC: Russell Pierce, a Portland attorney and commercial litigator at Norman Hanson & DeTroy who had represented the Natural Resources Council of Maine; Michael Conathan, the Director of Ocean Policy at the Center for American Progress, a former staff member to Sen. Olympia Snowe and the Republican majority on the U.S. Senate Subcommittee on Oceans, Atmosphere, Fisheries, and Coast Guard within the Committee on Commerce, Science, and Transportation, and Director of Ocean Policy at the Center for American Progress; and David Critchfield, a financial professional, environmental compliance manager at manufacturing facilities and timber sites, and

former environmental regulatory specialist for International Paper, including at the Androscoggin Mill. *Pls.' Ex.* 17-19. The City did not appoint a representative of PPLC to the DOC and no PPLC representative served on the DOC. The DOC invited PPLC to participate in the hearings and to provide it with comments and information, but PPLC refused "to serve as a resource for the Draft Ordinance Committee," or engage with it because PPLC believed the DOC had prejudged the issue and their motives were pretextual. *Defs.' Ex.* 122.

The DOC held its first meeting on February 6, 2014. The DOC reconfirmed its charge from the City Council by drafting a written mission statement. The DOC held 19 meetings totaling more than 60 hours. On July 1, 2014, the DOC presented the text of the Ordinance and a report of its recommendations. *Defs.' Ex.* 200. The DOC recommended the City designate the Maine Tank Farm a non-conforming use within the adjacent residential neighborhoods, and that the City Council work to install an ambient air quality monitoring network. *Id.* at Part II, IV.

### J. The Clear Skies Ordinance

Ordinance No. 1-14/15, the "Clear Skies Ordinance," passed the City Council on its first reading on July 9, 2014, by a vote of six to one, and passed the City Council on its second reading on July 21, 2014, by a vote of six to one. *Joint Ex.* 6.

The Ordinance makes the "storing and handling of petroleum and/or petroleum products" for the "bulk loading of crude oil onto any marine tank vessel" a prohibited use in the Commercial "C" and Shipyard "S" zoning districts in the City. *Id.* 8-10. The Ordinance states that "there shall be no installation, construction, reconstruction, modification, or alteration of new or existing facilities, structures, or

equipment, including but not limited to those with the potential to emit air pollutants, for the purpose of bulk loading of crude oil onto any marine tank vessel" in the Commercial "C", Shipyard "S", and Shoreland Area Overlay zoning districts in the City. *Id.* The Ordinance provides, "No building or structure shall be erected, altered, enlarged, rebuilt, or used and no premises shall be used for the "bulk loading of crude oil onto marine tank vessels" in the Industrial "I" and Non-Residential Industrial "INR" zoning districts in the City. *Id.* 11-14.

The City Council made a series of legislative findings in the Ordinance, including:

> The Community Vision as set forth in the Comprehensive Plan "embraces a diverse mixed-use waterfront community; a green city that protects its air quality; an education community where schools and a waterfront college campus are not impacted by incompatible adjacent uses, including new or expanded sources of significant air pollution; and a city that is a desirable destination and a desirable, livable community." *Id.* at 2.

> "The proposed bulk crude oil loading operation would have constituted a new land use, which has never been a traditional land use within the City, and which would have significantly impacted future development of the City's waterfront, air quality, scenic ocean views, and land-use planning vision." *Id.* at 3-4.

> "The bulk loading of crude oil onto marine tank vessels would likely result in an increase in emissions" of Hazardous Air Pollutants (HAPs) and Volatile Organic Compounds (VOCs) from oil storage tank facilities within the City," some of which are known to be or may reasonably be anticipated to be "acutely or chronically toxic, carcinogenic, mutagenic, teratogenic, or neurotoxic" *Id.* at 4.

> PPLC's tank facilities are in close proximity to elementary schools, preschools, the South Portland High School and athletic fields, a community center, a large senior city housing facility, and numerous residential districts and that these areas would experience air quality impacts associated with the bulk loading of crude oil. *Id.* at 5.

The two proposed 70-foot VDUs to be constructed under PPLC's 2008-2009 project would "be located in close proximity to city parks with diverse recreational uses, including Bug Light Park, Willard Beach, Fisherman's Point, and the Greenbelt Walkway," and would "likely be among the tallest industrial structures on the South Portland waterfront and, due to their size and character, would negatively impact waterfront scenic values and property values." *Id.* at 5-6.[2]

Among the Ordinance's stated purposes are to "encourage the most appropriate use of land throughout the municipality;" "to protect citizens and visitors from harmful effects caused by air pollutants;" "to promote a wholesome home environment;" and "to conserve natural resources." *Id.* The City Council stated in the Ordinance that "the City intends to protect its citizens and visitors from harmful effects caused by air pollutants." *Id.* at 4, 7.

## K.    Current Market Conditions and the Future of the Pipeline

If PPLC cannot reverse the flow of either the eighteen or the twenty-four-inch line, or both, it likely cannot survive as a business.  The recent increase in the production of Alberta oil sands has reduced the need for Canadian oil refiners to import crude oil.  PPLC's eighteen-inch line has been completely idle since 2011 as a result of insufficient demand for northbound shipping.  Although PPLC's twenty-four-inch line remains active, a trickle flows through it.  With the exception of one shipment PPLC arranged to perform an inspection required by regulation, there have been no northbound shipments since August 4, 2017.  As of July 2016, PPLC had only

---

[2]     One irony in this case is that Bug Light Park consists not only of city-owned land, but also of PPLC-owned land that PLLC has allowed the City to use as a park in exchange for a City agreement not to tax the PPLC portion of Bug Light Park.  Bug Light Park necessarily attracts people, including elderly and young people, who are more susceptible to respiratory problems.  Here, the City cited the public use of Bug Light Park as a reason to uphold the Ordinance.  PPLC could be forgiven for concluding that its good deed in allowing public use of its land at Bug Light Park is being punished.

ten of its twenty-three crude oil storage tanks in service, and it has taken more out of service since then. There is no prospect of PPLC receiving significant shipments of oil in the future, thanks to the glut of production in western Canada.

PPLC's plan to reverse the flow of its pipeline faces some economic obstacles. Financing will depend on commitments from shippers, which in turn depend on certain key market conditions. There must be sufficient volumes of oil capable of arriving at the Montreal end of PPLC's pipelines for transport to South Portland, and market prices must support southbound shipment.

### 1. Crude Supply in Montreal

Canada is currently in the midst of expanding and repurposing its pipeline infrastructure to transport crude oil from western Canada to other markets. Repurposing existing pipeline is increasingly more logical and valuable as an alternative to new pipeline construction, given the substantial time and costs associated with new pipeline construction. In December of 2015, Enbridge completed a project to reverse the flow of crude oil in its Line 9 from Sarnia to Montreal. See *Defs.' Ex.* 185. The reversed Line 9 has a nameplate capacity to carry a maximum 300,000 b/d of crude oil from west to east. By Canadian law, five percent, or 25,000 b/d of that capacity must remain uncommitted to serve the spot market. That spot market capacity could not be committed for southbound shipment on PPLC's pipeline. Enbridge Line 9 is the only pipeline currently constructed that could feed PPLC's pipeline reversal project. Line 9 currently carries a mix of U.S. sourced and Canadian crude oil. *Trial Tr.* 183:7-193:21.

Historically, PPLC delivered crude oil to refineries in Montreal. These Montreal refineries include the 137,000 b/d capacity Suncor Refinery in Montreal, Quebec, Canada and the 265,000 b/d capacity Valero Jean Gaulin Refinery in Levis, Quebec, Canada. The Suncor Refinery and Valero Jean Gaulin Refinery have executed binding Transportation Shipping Agreements with "take or pay commitments" for roughly 220,000 b/d.[3] The actual flows through Line 9B confirm these estimates: on average over the last twenty-eight months, roughly 219,000 b/d flowed through Line 9 to Montreal. *Pls.' Ex.* 4. Under the "take or pay" commitments, if the Suncor Refinery or Valero Jean Gaulin Refinery does not take delivery of its committed share from Line 9B, it still must pay the pipeline tariff regardless of actual use. After subtracting 220,000 b/d that are currently committed to other contracts and the 25,000 b/d that must remain uncommitted by Canadian law, this leaves 55,000 b/d presently available from Line 9's nameplate capacity for PPLC to enter into take or pay commitments with shippers for a reversal project.

On the one hand, Line 9's nameplate capacity may overestimate the real availability of crude oil capable of arriving in Montreal via pipeline. Due to maintenance and other down time, most oil industry infrastructure does not operate at maximum capacity the whole year. A typical maximum sustainable volume rate

---

[3] Sarah Emerson, the City's expert, initially testified that there were three committed shippers on Line 9 into Montreal, meaning that virtually all of Line 9's 275,000 b/d of available capacity is committed. The Court is no longer convinced by her conclusion. In its August 24, 2017 order, the Court described Ms. Emerson as a "true expert." *Justiciability Order* at 4. The Court continues to be impressed with Ms. Emerson's expertise.

But any expert opinion is only as good as the accuracy of the information upon which she relies. As became apparent during cross-examination in June, 2018, this portion of her analysis was heavily reliant on cobbled together sources which proved insufficient to reach a reliable conclusion about the extent of the contractual commitments on Line 9.

is ninety percent of nameplate capacity. *Trial Tr.* 396:25-397:15; *Defs.' Ex.* 223B. While PPLC contemplated larger volumes of oil for its previous reversal projects, it intends to serve even this limited flow because it has no alternative but to shut down its business.

On the other hand, there is roughly 60,000 b/d of additional available capacity to transport crude oil from Western Canada by rail to Montreal for southbound shipment on PPLC's pipelines. While the present cost of that rail transportation is too high to compete with marine transportation of crude from alternate sources such as the North Sea or West Africa, it may be economical in the future. Pipelines are also capable of expanding their nameplate capacities by transporting less viscous oil, modifying their pumping equipment, or using additives to boost flow rates. Similarly, PPLC hoped TransCanada's Energy East pipeline could feed a reversal project, and while it could be revived in the future, that project is currently cancelled. The City's expert testified that new pipeline projects are expected to come online in Western Canada in the next few years that will likely divert all new production in Western Canada before it could reach Line 9 and a reversed PPLC pipeline. But as Energy's East's cancellation indicates, the expected timelines or even the ultimate success of those projects is not assured.

PPLC is willing to place a bet with its infrastructure to have the ability to ship southward whatever volumes of crude oil become available.

## 2. Transport Costs and Price Differentials

The price differential between the Syncrude shipped through the pipeline and a substitute crude, such as Brent, must also be wide enough to cover the

transportation costs, or purchasers will choose an alternate supply. The transport costs from Western Canada through the PMPL system to refineries in North America and Europe is roughly $12 per barrel. *Defs.' Ex.* 223F. PPLC's previous reversal efforts in 2008 and 2012 closely correlate to periods of particularly favorable price conditions. *See Defs.' Ex.* 197. The 2012 average price spread between Brent and Syncrude was sufficient to cover the transport costs, but the average price spread declined in the years after 2012. *Id.* The 2018 year-to-date average spread is roughly $7 per barrel, but the price over the last few months has been over $12 per barrel, which would be sufficient to support a reversal project if those price conditions hold. *Trial Tr.* at 421.

The Ordinance stands as an obstacle to PPLC's efforts to obtain permits and credibly market its services to transport crude oil from north to south. Without the impediment of the Ordinance, PPLC would take immediate steps to implement its desired flow reversal. While it may not be a sure bet that global prices will sustainably support the transportation costs of southbound pipeline shipping soon, PPLC intends to place that bet and reverse its pipeline infrastructure. Oil prices are volatile, and there is a substantial likelihood that prices will break in PPLC's favor so that it will succeed in reversing the flow.

## L.    Unknown Details Regarding a New Reversal Project

A future project to reverse the flow of the eighteen-inch or the twenty-four-inch pipeline would likely be different from the 2008-2009 proposal. A future project to load crude oil in the City would not necessarily use PPLC's eighteen-inch pipeline, as PPLC proposed in 2008-2009; it could use the twenty-four-inch pipeline or both

pipelines.  PPLC continues to rely on the specific plans it developed in 2008-2009 as the starting point for how it would implement any future flow reversal project.

If PPLC is legally allowed to pursue a flow reversal project, it will update its previous plans in light of new technology and customer needs.  A future project to load crude oil in the City may not use the "John Zink" brand VDUs that were planned and permitted by Maine DEP in 2009.  A future project would reevaluate the best technology for emissions control from crude oil loading, which has advanced since 2009.  The 2009 proposal contemplated simultaneous northbound and southbound operations, and thus required higher flow rates to move ships in and out of Pier 2 relatively quickly.  PPLC now expects a reversal project would only involve southbound flow, allowing it to reduce the planned loading rates by as much as half. By reducing loading rates, less vapor would be expelled per unit of time and smaller VDUs may be sufficient.  PPLC would also consider using VRUs, rather than VDUs. If PPLC were to construct a project to load crude oil in the City, it would be willing to move any type of crude, light or heavy.

Since 2013, other than pursuing this lawsuit, PPLC has not taken any formal steps to activate its plan to reverse one or both pipelines, such as analyzing the market demand for oil or the regulatory or economic feasibility.  If PPLC were to construct a project to load crude oil in the City, it would seek new permits from the necessary state and local authorities in Maine, New Hampshire, Vermont, and Canada.  PPLC expects that it will not require a pump station in Dunham, Quebec as originally planned in 2009.  If PPLC is permitted to pursue a flow reversal project,

it will plan the infrastructure changes after determining the type of crude oil its customers would like to move as well as the speed and capacity the company seeks to achieve on its lines.

### M.    Air Emissions and Health Effects

PPLC's existing Part 70 Air Emissions License regulates emissions from PPLC's twenty-three oil storage tanks and related boilers and emergency generators and classifies it as a major stationary source of emissions. *Defs.' Ex.* 30.  Under its existing Part 70 Air Emissions License, Maine DEP authorizes PPLC to emit 1.8 tons per year ("tpy") of Sulfur Dioxide ($SO_2$), 5.1 tpy of Nitrogen Oxides ($NO_x$), and 220 tpy of VOCs.  *Id.*  PPLC's oil storage tanks utilize a floating roof design, but some vapors can still escape, termed "fugitive emissions."  VOCs in crude oil contain benzene, toluene, ethylbenzene, and other contaminants classified by the Environmental Protection Agency as "Hazardous Air Pollutants" (HAPs).  A reversal project would create increased VOCs and HAPs fugitive emissions from renewed usage of the Main Tank Farm and Waterfront Tanks over the level of emissions in recent years, *Trial Tr.* 770:9-17, but emissions would not necessarily be higher than the historic levels when the tanks were more heavily utilized.

PPLC's unloading operations do not require VDUs.  Unloading crude oil into pipelines does not require releasing air that has become laden with hydrocarbon vapors.  Loading crude oil onto ships requires releasing air laden with hydrocarbons because the liquid crude oil displaces the air from inside the ship's holds.  To load crude oil onto ships, VDUs or VRUs are needed to meet air emissions requirements.  PPLC's 2008-2009 proposal called for the construction of two VDUs and would result

in higher concentrations of $SO_2$, $NO_x$, and HAPs (e.g., benzene, toluene, hexane, etc.) emissions from vapor combustion. The Air License from the 2009 proposed project would have permitted PPLC to emit from the VDUs 21.0 tpy of $SO_2$, 18.7 tpy of $NO_x$, and 39.0 tpy of VOCs, in addition to the permitted emissions from the Main Tank Farm. *Defs.' Ex.* 14.

Helen Suh, Ph.D., an expert in environmental epidemiology, testified that based on studies in locations where there have been oil refineries, increased VOC and HAP emissions from the proposed VDUs and Main Tank Farm would present an increased risk of hospital admissions and emergency department visits for City residents for asthma and upper airway inflammation. *Trial Tr.* 768:14-23. Higher concentrations of HAP emissions caused by the crude oil loading would also increase City residents' risks of developing cancer and other serious human health effects. *Id.* 762:1-14. Among the HAPs, in particular, benzene is "the most famous" of the known human carcinogens. *Id.* 761:12-20, 763:7-21. There is no safe human exposure level to benzene. *Id.*

Increases in $SO_2$ and $NO_x$ emissions along the waterfront compared to existing conditions will increase the risk of adverse respiratory outcomes, particularly for City residents classified as "sensitive receptors": young children, the elderly, and underrepresented minority groups. *Id.* 758:13-25.

Any pipeline reversal project proposed by PPLC would have to demonstrate compliance with federal and state air emissions standards in effect at the time of the license application. The National Ambient Air Quality Standards (NAAQS),

however, are not meant to be a zero-risk standard. *Trial Tr.* 754:18-23. For many of the regulated pollutants, increased public health risks result from increased emissions, even when the resulting ambient levels remain below the NAAQS. *Id.* 769:22-770:3.

One way to portray the magnitude of air emissions impacts is to examine the emissions licenses for facilities in South Portland and the surrounding towns of Cape Elizabeth, Portland, Scarborough, and Westbrook. There are sixty-two licensed emissions sources located within those cities and towns. *Pls.' Ex.* 43. A number of these sources located within South Portland and the contiguous cities and towns have emissions similar to or greater than PPLC's. *Id.* Six of these facilities are terminals for storage and distribution of petroleum products in South Portland, which comprise a total of ninety bulk petroleum storage tanks with a total storage capacity of approximately 338 million gallons of petroleum products, not including fourteen smaller tanks at Sprague that store petroleum and other products. *Pls.' Ex.* 75-95. Five of these facilities are terminals for the storage and distribution of petroleum products and have loading racks for petroleum products; three are served by VDUs; and two by VRUs. *Id.* The CITGO facility in South Portland is licensed for marine vessel loading of gasoline and includes a second VDU for this operation.

Within those cities and towns, the air emissions license for PPLC's 2009 proposed pipeline reversal project would have increased the total licensed allowable criteria air pollutants by 0.2% to 3.3%, depending on the pollutant, with an overall increase in allowable criteria pollutant emissions of 0.7%. *Pls.' Ex.* 43. The maximum

allowable additional HAP emissions listed in PPLC's air emissions license application for the 2009 proposed pipeline reversal project would constitute 1.3% of the total licensed allowable HAP emissions in the South Portland and the surrounding cities. *Id.* These comparison figures do not include existing area sources (commercial and residential stationary emissions sources too small to require a license, including wood stoves) and mobile sources (automobiles, trucks, aircraft, and other mobile equipment) of emissions in South Portland and the surrounding cities. *Id.*

The contribution of mobile sources can only be compared for the summer months. The increase in emissions from PPLC's 2009 proposed pipeline reversal in the summer months represents approximately 5.9% of the estimated summer mobile source VOC emissions, 2.1% of the estimated summer mobile source $NO_x$ emissions, and 1.6% of the estimated summer mobile source HAP emissions in the area of South Portland and surrounding cities of Cape Elizabeth, Portland, Scarborough, and Westbrook. *Id.*

At the other end of the methodological spectrum, taking the worst case assumption about emissions from PPLC's 2008-2009 project without exceeding its permit, and comparing those maximum permitted emissions levels to the actual reported emissions from the other permitted sources inside the boundaries of the city of South Portland, the new emissions from the VDUs would represent a 21% increase in VOCs, a 49% increase in NOx, a 106% increase in $PM_{2.5}$, and a 486% increase in $SO_2$. *Defs.' Ex.* 221. Those numbers overestimate the marginal emissions from a new reversal project, because PPLC's actual emissions levels would likely be lower than

the permitted levels, just as is often the case for the other permitted facilities in the calculation, and because the 2008-2009 plan contemplated shipment of a high-sulfur crude oil at higher loading rates than PPLC's current expectations. PPLC could also utilize newer, more efficient VDUs or VRUs that create less emissions.

The City has demonstrated that PPLC's reversal project would be a significant source of air pollutant emissions in the surrounding areas within the City relative to current levels, but the magnitude of the increases for each pollutant is uncertain and would probably be between the percentages calculated by the two sides' experts.

### N.     The City's Development Goals

On October 15, 2012, the City Council unanimously adopted a new Update to its Comprehensive Plan, which serves as the basis for the City's zoning regulations. *Defs.' Ex.* 94. Before October 15, 2012, the City's Comprehensive Plan had not been updated since 1992. A nineteen-person Comprehensive Plan Update Committee, along with the City staff led by Charles Haeuser, Planning and Development Director for the City, and Planning Decisions, Inc., a consultant, prepared the Comprehensive Plan Update. John Christie Gillies, Secretary Treasurer of PPLC, was a member of the Comprehensive Plan Update Committee that prepared the Comprehensive Plan.

The Comprehensive Plan Update has a number of goals for the relevant district within South Portland:

> Within [The Shipyard Development District], the City's development regulations should continue to allow existing marine and oil facilities to upgrade or expand on parcels that are already used for this purpose. The regulations also should encourage creative development/ redevelopment of the vacant or underutilized land within this district by establishing flexible, performance-based standards that allow a wide range of potential uses. This could include the use of "conditional

zoning" or the creation of a special development district tailored to a specific development proposal. Any development that is well designed and meets that following criteria could be allowed in this development district.

*Id.* at 6-21. The Plan's vision for the future of South Portland says, "It encourages a compact, higher-density, mixed-use pattern of development . . . While much of the shoreline remains a working waterfront, the public's access to the water expands." *Id.* at 4-2. A local economic goal of the Plan is "[t]o support the highest and best use of . . . the City's waterfront." *Id.* at 5-3.

> The Eastern Waterfront [which includes PPLC's Pier 2 and other properties in the Shipyard "S" zoning district] continues to evolve to become a marine, mixed-use area that capitalizes on the access to the waterfront and spectacular views of the harbor and inner Casco Bay. Southern Maine Community College continues to improve its campus primarily within its existing borders.

*Id.* at 6-20.

Numerous parcels surrounding PPLC's waterfront tanks and Pier 2 facilities in the Shipyard "S" zoning district are vacant. Several vacant parcels, which have been assembled under the same controlling ownership and are contiguous, are in the immediately vicinity of PPLC's Waterfront Tanks. This is referred to as the Cacoulidis property. *Id.* at 6-21, *Defs.' Ex.* 203. The Comprehensive Plan states that these parcels have "significant potential to expand the City's tax base and create broad economic benefits for the community at large." *Defs.' Ex.* 94 at 6-21. It says that "[w]ithin this area, the City's development regulations should continue to allow existing marine and oil facilities to upgrade or expand on parcels that are already used for this purpose," and also says that the City "should encourage creative development/redevelopment of the vacant or underutilized land within this district

by establishing flexible, performance-based standards that allow a wide range of potential uses." *Id.*

With regard to the Eastern Waterfront, the Comprehensive Plan says that "[t]he redevelopment of vacant and underutilized areas in a way that expands public access and the diversity of uses while maintaining marine activities is a fundamental land use objective."

> In the short term, the City's marine terminals and related marine industrial areas are maintained and improved while minimizing their impact on adjacent residential neighborhoods. In the longer term, if demand for these facilities declines or the type of activity needs to change and the owners of these facilities desire to explore other uses for these facilities, the City, in conjunction with the owners, should reevaluate the best use of these waterfront sites.

Developers have presented preliminary proposals for at least two large mixed-use projects on the vacant parcels that abut the Waterfront Tanks: (a) Liberty Village (2005) would have constructed a large mixed-use commercial, residential, and recreational space, *Defs.' Ex.* 58, 148-49, and (b) Shipyard Village (2013) would have included a marina, a waterfront hotel, a boat launch, residential space, office space, an aquarium, and a parcel reserved for light industrial uses. *Defs.' Ex.* 141, 173-74. There also was a proposal to construct an outdoor amphitheater on the vacant parcels that abut the Waterfront Tanks.

## O.     The Commercial Impact of PPLC's System

### 1.     PPLC's Economic Value

If PPLC were to go out of business, the company's twenty-eight employees and numerous contract workers would lose their jobs. Also, the vendors with whom PPLC contracts for support services would lose a source of revenue. In addition, the value

of PPLC's pipeline assets and property would decrease significantly from the $120 million amount assigned to those assets and property by government taxation authorities along the pipeline route. South Portland alone assigns a value of $44.7 million to the pipeline assets and property currently within the City and, again, this valuation will be reduced significantly if PPLC can no longer transport crude oil. In the 2015 tax year, PPLC paid property taxes amounting to $2 million to twenty-seven different municipalities located along the pipeline route between South Portland and the Canadian border, with South Portland receiving nearly $750,000. In 2010, the last year PPLC's eighteen-inch line was in active service, the company paid approximately $7.1 million to the federal government, $1.4 million to Maine, $209,000 to New Hampshire, and $273,000 to Vermont. PPLC has paid over $70 million to the Maine oil conveyance fund supporting government clean-up and response capabilities.

### 2. The American Waterways Operators

AWO is a trade organization that represents members across the United States, which operate thousands of vessels licensed by the United States Coast Guard to engage in coastwise, i.e., domestic, trade. Every year, AWO members and others in the industry carry more than 800 million tons of cargo every year across U.S. waterways, including 280 million tons of crude oil, and employ more than 50,000 people. *Trial Tr.* 82:3-84:13. AWO represents two-thirds of the industry. One of AWO's chief purposes is, and historically has been, to advocate for uniform federal control over maritime activity, as such uniformity allows AWO's members to avoid

the confusion, inefficiency, decreased safety and increased costs associated with multiple and differing layers of regulation.

Portland Tugboat LLC (Portland Tugboat) is an AWO member that currently operates four tugboats in the Harbor. Portland Tugboat's operations in the Harbor consist chiefly of assisting larger vessels arriving from another port and guiding them into their final docket spaces in the Harbor, i.e., "ship assist" services. Historically, Portland Tugboat has received a significant portion of its revenue from providing ship assist services to tanker vessels docking at PPLC's Pier 2 to have their cargos of crude oil unloaded by PPLC into PPLC's oil pipeline infrastructure. Up until 2008, Portland Tugboat assisted approximately seventeen ships per month with docking at Pier 2.

As PPLC has received fewer and fewer shipments of oil over the past several years, Portland Tugboat has had fewer and fewer opportunities to provide arriving tankers with ship assist services, with a corresponding loss of revenue and profitability for Portland Tugboat. This financial result is also reflected on the financial statements of its sole manager and member, McAllister Towing and Transportation Co., Inc. (McAllister). Unless PPLC is able to reverse the flow of its pipeline, and thereby attract empty ships seeking to be loaded with crude oil, Portland Tugboat may permanently lose all of the business it previously received from assisting ships seeking to dock at PPLC's Pier 2. If PPLC's operations do not materially change, Portland Tugboat will be forced to downsize its operations in the Harbor by reducing the number of tugboats it has operating in the Harbor from four to three. Due to lack of business in the Harbor, predominantly as a result of PPLC's

declining business, Portland Tugboat has already reduced its force of full-time maritime employees from sixteen to eight. If PPLC's operations do not materially change, Portland Tugboat may be forced to further reduce the number of full-time maritime employees servicing customers in the Harbor.

In 2008, when PPLC's business operated at higher levels than it currently is, McAllister commissioned the design and construction of a very specialized tugboat, the *Andrew McAllister*, for Portland Tugboat to better serve tankers docking at PPLC's Pier 2. The *Andrew McAllister* arrived in 2008 at a cost of approximately $10 million. The *Andrew McAllister* was designed to meet the requirements of servicing ships transporting crude oil for PPLC and to respond to oil fires on ships or on the water. The *Andrew McAllister* is an escort tugboat equipped with 6,000 horsepower engines and certified capable of generating eighty-three tons of bollard pull, which is the specification needed to service tankers transporting crude oil for PPLC. It is the most powerful tugboat on the Eastern Seaboard north of Boston.

The *Andrew McAllister* was also designed to have a specialized 11,000 gallon-per-minute fire-fighting system, which is equivalent to three municipal fire trucks, and is capable of creating foam to put out oil fires on water. There are very few boats on the Eastern Seaboard with similar firefighting capabilities, and the *Andrew McAllister* is the only one operating north of Boston. As a result of its firefighting capabilities, Portland Tugboat is called upon by the cities of Portland and South Portland to use the *Andrew McAllister* to provide backup firefighting assistance when needed in the Harbor.

Given the decrease in PPLC's business, the *Andrew McAllister's* highest and best use is not being realized. It is not being used to its full capacity in the Harbor and the revenue it has been generating from delivering crude oil to PPLC is insufficient to offset the costs of operating it there. The best way for the *Andrew McAllister* to be employed is if it is used in the Harbor to service tankers delivering crude oil to PPLC or being loaded with crude oil by PPLC.

The *Andrew McAllister* may be removed from the Harbor and redeployed elsewhere. Several years ago, the *Andrew McAllister* prevented a major marine casualty in the Harbor while it was escorting a tanker to a non-PPLC location in the Harbor that required the tanker to pass under the Casco Bay Bridge. While the *Andrew McAllister* was escorting the tanker, the Casco Bay Bridge failed to open and the tanker was unable, on its own power, to change course and prevent a collision with the Casco Bay Bridge. The *Andrew McAllister* was able to maneuver the tanker to avoid a collision with the Casco Bay Bridge and to avoid it running aground. If the *Andrew McAllister* had not been present, a major marine casualty may have occurred from the tanker colliding with the bridge or running aground. Had the tanker collided with the bridge or run aground, it could have resulted in severe damage to the bridge or to the tanker, an oil spill, an onboard fire, or damage to assets on shore from the tanker running aground.

In addition to Portland Tugboat, McAllister owns and operates tugboat companies in twelve locations along the eastern seaboard, from Portland, Maine to San Juan, Puerto Rico, including in New York, Philadelphia, and Baltimore. A

significant portion of the revenue generated by AWO members, including McAllister, arises out of towing tank barges loaded with crude oil. This service consists of tugboats pulling or pushing a tank barge that has been filled with crude oil from an oil terminal to another location, such as an oil refinery. Pier 2, where PPLC receives marine vessels, is not presently designed to accommodate tank barges. It only can receive Aframax, Suezmax, and Panamax self-propelled tank vessels. For Pier 2 to be able to berth tank barges, PPLC would be required to modify Pier 2. In 2011, PPLC gave strategic consideration to developing a project while omitting the upgrades to Pier 2 that would enable to it handle small tankers and barges.

If PPLC successfully reversed the flow of its pipeline so it can load crude oil onto vessels in the Harbor and also chose to modify Pier 2 to accommodate tank barges, McAllister would have the opportunity to tow tank barges from South Portland to other locations, such as oil refineries located in Philadelphia, Houston, and the New York/New Jersey area. AWO members like McAllister have profitably provided this service elsewhere.

## III. THE PARTIES' POSITIONS

### A. Extraterritoriality

PPLC argues that the practical effect of the Ordinance is to control conduct beyond the boundaries of South Portland because "by plugging one end of a cross-border pipeline, the Ordinance stops trade across three states and Quebec." *Pls.' Post-Trial Br.* at 62. PPLC claims "[t]he Ordinance prevents the Canadian corporation operating the pipeline on the Canadian side of the border from engaging in commerce within Canada as it would choose." *Id.* at 67.

The City contends that "the Ordinance only controls conduct within the borders of South Portland . . . ." *Defs.' Post-Trial Br.* at 61. The City also points out that the Supreme Court and First Circuit have predominantly or exclusively applied the extraterritoriality bar to state price-tying statutes. *Id.* at 61-62. The City cites a case upholding a Chicago ban on foie gras, where the district court reasoned that the economic effect of chipping away at the profits of out-of-state foie gras producers does not amount to extraterritorial regulation. *Id.* at 63 (citing *Ill. Rest. Ass'n v. City of Chicago*, 492 F. Supp. 2d 891 (N.D. Ill. 2007)). The City maintains that the focus of the extraterritoriality prong is on the effect of the Ordinance, not its purpose. Even if extraterritoriality were determined by examining the purpose of the Ordinance, the City insists that the primary purpose of the Ordinance was to "protect the health, safety and welfare of the City's residents." *Id.* at 62-63, 66.

PPLC responds that purpose is relevant to the extraterritoriality prong. *Pls.' Resp.* at 31-32 (citing *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999), *aff'd sub nom.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)). PPLC also submits that several other circuits have found that the extraterritoriality inquiry is not limited to pricing statutes. *Id.* at 32. PPLC points out that the Chicago foie gras case was vacated due to mootness before appellate review and the parties in another case reaching a similar outcome are presently seeking review before the Supreme Court. *Id.* at 32-33 (citing *See Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1143 (9th Cir. 2017), *cert. petition pending and solicitor General invited to share views*, 2018 WL 3013816 (June 18, 2018).

The City reiterates its claim that the zoning ordinance regulates "wholly" within its borders. *Defs.' Resp.* at 21. The City also responds that many other portions of its zoning ordinance prohibit specific commercial and industrial uses on the waterfront, and that for purposes of this prong, the Ordinance is no different than the zoning ordinances of many other municipalities in Maine and across the nation that ban crude oil or all petroleum uses on their waterfronts. *Id.*

## B. Discrimination

PPLC asserts that the Ordinance discriminates on its face because it "permits unloading off of ships, but not loading on to ships at the Harbor." *Pls.' Post-Trial Br.* at 46-47. PPLC also highlights the fact that the Ordinance discriminates between crude oil and refined petroleum products. *Id.* PPLC contends that "the practical effect of the Ordinance is to prevent the import of Canadian oil through pipelines for further export through the Harbor, while allowing the import of non-Canadian crude oil, and carefully imposing no burdens on other local oil-related businesses." *Id.* at 47. It is irrelevant, according to PPLC, that some of the crude oil that would flow southward would originate in North Dakota, because the flows would still constitute foreign commerce, since they pass through Canada. *Id.* at 48-49. PPLC argues that the purpose of the Ordinance is to target the pipelines in order to prevent their reversal and stop the flow of oil from Canada, which makes that targeting "by definition, not incidental." *Id.* at 51. PPLC insists that the true purpose was simply disguised with statements about other purposes such as air quality, but the City's claims are undermined because it did not enact an evenhanded air regulation. *Id.* at 54-57. PPLC also argues that the City cannot meet its burden of showing that the

Ordinance can pass strict scrutiny if the Court concludes the Ordinance is discriminatory. *Id.* at 57-59.

The City argues that the Court has already concluded at summary judgment that the Ordinance is not facially discriminatory. *Defs.' Post-Trial Br.* at 41. The City emphasizes that there are no "similarly situated" in-state and out-of-state interests between which the Ordinance could discriminate because there are no in-state oil producers or refineries and there are no other interstate pipelines in Maine. *Id.* at 37-39. The City contends that PPLC has not shown that the Ordinance has or will have a significant negative impact on crude oil markets. *Id.* at 40. The City disputes PPLC's argument about differential treatment of crude and refined petroleum products because the two entities are not similarly situated or competitors, and thus are not subject to the differential treatment analysis under the dormant Commerce Clause. *Id.* at 40-42. The City acknowledges that the Foreign Commerce Clause modifies the analysis somewhat, but argues that the Ordinance does not amount to a ban on commerce with a specific foreign nation and does not prefer national commerce over international commerce. *Id.* at 42-46. The City maintains that the purpose of the Ordinance was to protect South Portland's environment, aesthetics, redevelopment potential, and air quality, and that the City Council "objected to the loading of tar sands and all other crudes in its harbor because of the nature of that activity. . . ." *Id.* at 48-56. The City argues that it was diligent about trying to craft an Ordinance that was within its powers and would survive a legal

challenge, but disputes PPLC's assertion that it sought to avoid scrutiny and hide its purposes behind pretext, since it publicly televised all the meetings. *Id.* at 56.

PPLC argues that it does not matter that oil has traditionally flowed northward and that the Ordinance never mentions the word "Canada" because the Court should "peek behind the curtain and assess practical effect." *Pls.' Resp.* at 26-28. PPLC claims, "Even if some City Councilors or Ordinance drafters harbored some genuine concerns about air or land use subservient to their preempted concerns about pipeline safety and directly regulating the pipeline to stop the flow of oil sands, such air and land use concerns were not borne out in the actual substance of the Ordinance, banning loading regardless of any air emissions or use of new infrastructure." *Id.* at 29.

The City contends that the findings of the Ordinance, the presentation of the DOC report to the City Council, and the two City Council meetings where the Councilors debated and voted upon the Ordinance constitute the most probative legislative history; not isolated snippets from prior meetings. *Defs.' Resp.* at 9. The City reiterates that the primary purposes of the Ordinance were "protection of the health of residents, protection of the environment from spills, decreases in property values, and removal of an impediment to desired redevelopment." *Id.* at 9-10. The City also points out that both crude and refined oil products from Eastern Canada flow into South Portland even today, which the Ordinance does not disturb, "support[ing] the conclusion that the major concerns were the new land use proposed by PPLC, its substantial increase in emissions, and where the new land use was to

49

be located – not the source of the oil." *Id.* at 14-15. The City urges that the stated goals of the Ordinance are not undermined simply because it does not address many other potential sources of air and environmental risks. *Id.* at 15-16.

## C.    Excessive Burden

PPLC argues that the asserted local benefits from the Ordinance are "illusory." *Pls.' Post-Trial Br.* at 68, 70 (citing *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 670 (1981)). PPLC alleges that the benefits are non-existent because of a "lack of nexus between the air quality and zoning concerns announced in [the Ordinance's] preamble and its substantive provisions." *Id.* at 69. PPLC claims that only legitimate purposes or benefits count in the *Pike* balancing, so the City cannot assert the benefits of preempted legislative purposes, like regulating pipeline safety and operations. *Id.* at 70 (citing *Rollins Envtl. Servs. (FS), Inc. v. St. James Parish*, 775 F.2d 627, 635 (5th Cir. 1985). PPLC maintains that the burden on interstate and foreign commerce is "utterly enormous," particularly if similar measures were enacted elsewhere, because it "brings export of crude oil in America to a standstill." *Id.* at 71.

The City emphasizes that the *Pike* inquiry involves "only the most minimal sort of balancing," not a straightforward assessment of the costs and benefits. *Defs.' Post-Trial Br.* at 68-69. The City alleges that its interests are particularly strong because the asserted benefits of the Ordinance are within the core police powers of the state and local government, which are health, environmental regulation, and land use control. *Id.* at 70-71. The City also claims that PPLC failed to establish any burden on commerce because the availability and demand for southbound crude oil

shipment are too speculative. *Id.* at 71, 73-75. The City submits that the Ordinance does not block commerce with Canada because it can still transport Eastern Canadian crude oil northbound and Canadian crude oil southbound by connecting the tank farm with the Rigby Yard terminal and shipping the crude out of South Portland by rail. *Id.* at 72. The City maintains there is no need for a uniform rule and that the local benefits are not illusory, distinguishing the Supreme Court's highway transportation cases. *Id.* at 75-76 (citing *Kassel*, 450 U.S. 662; *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959).

PPLC responds by reiterating that the "legitimate benefits achieved or achievable . . . are minimal at best" and that "the City cannot simply incant 'air' and 'zoning' to 'bullet proof' the substance of its Ordinance from constitutional scrutiny. *Pls.' Resp.* at 34-35. PPLC explains that the Ordinance has a devastating burden on interstate and foreign commerce and could have achieved its purported benefits with far less burdensome means, like "an air emission standard" or "a size limit for V[D]Us." *Id.* at 35-36.

The City argues that it is irrelevant to the *Pike* balancing of the City's asserted environmental and safety benefits that a member of the DOC thought that local pipeline siting restrictions were preempted. *Defs.' Resp.* at 24. The City also portrays PPLC's claim that the Ordinance "provides no benefits" as "utterly disingenuous" in light of Dr. Zemba's, Dr. Suh's, and Mr. Haeuser's testimony. *Id.*

D. **One Voice**

PPLC points out that the dormant Foreign Commerce Clause operates independently from the foreign affairs preemption doctrine the Court addressed at

summary judgment. *Pls.' Post-Trial Br.* at 60. PPLC asserts that the Ordinance interferes with the federal government's ability to speak with one voice in regulating foreign commerce because it regulates loading crude oil onto ships, and commercial shipping is an area requiring federal uniformity. *Id.* at 61-62. PPLC also contends that federal uniformity in commercial relations with other nations is also needed in the context of regulations governing cross-border pipelines, as reflected in PPLC's Presidential Permit and federal policies, such as the lifting of the federal crude oil export ban. *Id.* at 62-64. PPLC argues that the Ordinance does not just regulate but prohibits the import and export of crude oil from a foreign nation, Canada, which means it cannot stand even though it was not enacted to influence the policies of that foreign government. *Id.* at 64-65.

The City agrees that the "one voice" test of the dormant Foreign Commerce Clause has a source distinct from foreign affairs preemption but argues that the same analysis applies to both. *Defs.' Post-Trial Br.* at 77. The City stresses that the Court has already found the Ordinance has not invited embarrassment or retaliation from Canada or any other foreign government. *Id.* at 77-78. The City maintains that federal uniformity is not required here, because the federal government has expressly concluded that PPLC must comply with all state and local restrictions regarding construction, operation, maintenance, and permitting. *Id.* at 78-79.

PPLC responds that the City's argument is "sophistry" because nothing in the Presidential Permits "requires compliance with an unconstitutional regulation." *Pls.' Resp.* at 31. PPLC argues that federal authorities might contemplate local control

over the siting of transfer facilities or VDUs, but the Ordinance is not an evenhanded siting regulation on all pipeline or transfer facilities. *Id.*

The City asserts that PPLC failed to carry its burden on this prong because there is no evidence of the need for federal uniformity, since there is no conflicting federal sanction, protests by other nations, or danger of "multiple taxation" that is likely to offend other nations. *Defs.' Resp.* at 18-19. The City points out that "Plaintiffs cite no foreign Commerce Clause cases holding that local zoning of any industry threatens our nation's ability to speak with one voice." *Id.* at 20.

## IV.    DISCUSSION

Congress has the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. "[W]hile a literal reading [of this clause] evinces a grant of power to Congress," *Wyoming v. Oklahoma*, 502 U.S. 437, 454, (1992), "it has long been accepted" that the clause also contains a "dormant" or "negative" aspect that "prohibits economic protectionism" by state and local governments. *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273 (1988); *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (1994); *see also Welton v. State of Missouri*, 91 U.S. 275, 276 (1875). The Framers gave the federal government the authority to regulate interstate and international commerce "to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979).

However, "[t]he law has had to respect a cross-purpose as well, for the Framers' distrust of economic Balkanization was limited by their federalism favoring a degree

of local autonomy." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). "In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980) (internal quotation omitted).

> The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources.

*Maine v. Taylor*, 477 U.S. 131, 151 (1986) (internal quotations and citations omitted).

A state or local statute may violate the dormant Commerce Clause if it: (1) has an impermissible extraterritorial reach, *see Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989), (2) discriminates against interstate or foreign commerce, *see Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 99 (1994), (3) excessively burdens interstate or foreign commerce, *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), or (4) interferes with the federal government's ability to speak with one voice when regulating commerce with foreign nations. *See Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434, 449 (1979).

## A.     The Ordinance does not regulate extraterritorially.

"A state statute that purports to regulate commerce occurring wholly beyond the boundaries of the enacting state outstrips the limits of the enacting state's constitutional authority and, therefore, is per se invalid." *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005). "[T]he Commerce Clause protects against

inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336-37. "A statute will have an extraterritorial reach if it necessarily requires out-of-state commerce to be conducted according to in-state terms." *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 79 (1st Cir. 2001) (*PhRMA*), *aff'd*, *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003) (internal quotation omitted). When evaluating the practical effect of the statute, the court should consider the statute itself, and "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* (quoting *Healy*, 491 U.S. at 336).

The cases in which the United States Supreme Court determined the state was regulating extraterritorially involved "price control, price affirmation or price tying schemes." *PhRMA*, 249 F.3d at 81. "The statutes in these cases involved regulating the prices charged in the home state and those charged in other states in order to benefit the buyers and sellers in the home state, resulting in a direct burden on the buyers and sellers in the other states." *Id.*

The Ordinance prohibits loading crude oil within the boundaries of certain districts of the City. For purposes of this prong of the dormant Commerce Clause, the Court sees little difference between the Ordinance and other zoning prohibitions. Conduct is not controlled by the Ordinance if it occurs outside the state of Maine, outside the boundaries of the City, or outside South Portland's Shipyard, Commercial, and Industrial districts. While it is likely true that PPLC's ability to obtain financing

for a reversal project is contingent on its ability to load oil at the Harbor, and that means the effect of the Ordinance is to influence the functions of its infrastructure outside the City, that does not mean the Ordinance regulates extraterritorially. Every local prohibition on particular goods or services has the effect of preventing distant merchants from employing their capital and labor to sell those goods or services within the boundaries of the restrictive locality, and local merchants with distant contacts from doing the same. In the modern age of highly interconnected commerce, there would be virtually no room for local historic police powers if this sort of extraterritorial effect were enough to invalidate an ordinance under the dormant Commerce Clause.

Viewed in another way, PPLC would not be subject to inconsistent obligations if other localities passed similar statutes. If other municipalities enacted similar ordinances, there would simply be a smaller list of potential sites for loading crude oil. That situation would be indistinguishable from the current state of affairs, where some coastal localities devote their waterfronts to uses they deem inconsistent with petroleum handling, forcing companies to pursue those uses in other localities where the local government permits them. *See e.g.*, PORTLAND, ME., CODE OF ORDINANCES §§ 14-231, 14-233(h), 14-246, 14-249(i) (2018), available at https://www.portlandmaine.gov/Document Center/View/1080/Chapter-14-Land-Use--Revised-7182018, (prohibiting petroleum refining as well as petroleum storage yards and tank farms); CAPE ELIZABETH, ME., CODE OF ORDINANCES § 19-6-11-D, (2017) available at https://www.capeelizabeth.com/

government/rules_regs/ordinances/zoning/zoning.pdf, (prohibiting petroleum storage and sales). "The most apparent effect of similar [ordinances] being passed in other [localities] would be a loss in profits for [petroleum companies]. It does not appear . . . that [ordinances] similar to the [Clear Skies Ordinance], if enacted, would result in [petroleum companies] having inconsistent obligations to [localities] . . . ." *PhRMA*, 249 F.3d at 82-83. The Ordinance's indirect economic effects on out-of-state transactions is a natural implication of cross-border projects and local government control, not an indication of unconstitutional extraterritorial regulation.

PPLC's arguments about extraterritorial purpose, as opposed to effect, does not alter this conclusion. There is evidence that some of the voting public and, more importantly, some of the City Counselors actively considered that the impact from the Ordinance would reach beyond the borders of South Portland. For example, during consideration of the WPO, one member of the public said the citizen's initiative would "not only be helping to protect South Portland and Maine, but all the communities that this pipeline runs through or near in the environment of northern New England." *Pls.' Ex.* 104 at 1:38:50-1:39:22. Another commenter expressed concern about continued reliance on fossil fuels causing global climate change. *Id.* 1:58:00-2:00:31.

But the vast majority of the evidence regarding WPO support focused on the impacts within South Portland. PPLC has not shown that these isolated statements of a few members of the public were so important as to motivate the majority of the City Council when it later considered the Ordinance. The strongest evidence of

extraterritorial purpose came from Councilor Smith, who admitted that "I really care about the indigenous people of Alberta" and South Portland's neighboring towns and said, "I know that what I see on paper is something that will protect the health and safety of our residents and potentially the health and safety of other global residents." *Pls.' Ex.* 159 3:18:02-3:32:04. But even with that strongest indication of extraterritorial motive, Councilor Smith also commented on her perception of the beneficial impact of the WPO on South Portland itself. As with the public pressure on the City Council, the Court is not convinced that isolated comments about a greater global purpose of the WPO from City Counselors and others establish that extraterritorial impact was the primary purpose of the Ordinance.

Even if there were stronger indications of extraterritorial purpose, it would be of little assistance to PPLC. Unlike the discrimination prong of the dormant Commerce Clause, where improper purpose matters, "[t]he 'critical inquiry' here is 'whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.'" *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 69 (1st Cir. 1999), *aff'd sub nom.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (quoting *Healy*, 491 U.S. at 336). Courts have upheld other statutes more clearly motivated by extraterritorial concerns, as long as the regulatory effect did not control out-of-state transactions. *See Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1084-85, 1101-06 (9th Cir. 2013) (rejecting extraterritoriality challenge to California ethanol fuel standards enacted to combat global climate change). The Court concludes that, while there was an ancillary background motive on the part of

some Councilors and citizens, the primary purpose of the Ordinance was not to create impacts beyond the boundaries of South Portland or to prevent oil sands extraction in other jurisdictions, and even if that were the primary purpose, the focus of this inquiry on the effects of the Ordinance obviates further discussion. *But see infra* Part V-B (legislative purpose is important for the discrimination prong).

"Because the regulation only applies to in-[city] activities, there is no extraterritorial reach and the [Ordinance] is not per se invalid under the Commerce Clause." *PhRMA*, 249 F.3d at 82.[4]

### B. The Ordinance does not discriminate against interstate or foreign commerce on its face, in effect, or on purpose.

"A state statute that has no direct extraterritorial reach but that discriminates against interstate commerce on its face, in purpose, or in effect receives a form of strict scrutiny so rigorous that it is usually fatal." *Gwadosky*, 430 F.3d at 35. If a state statute discriminates against interstate or foreign commerce "[i]t will be

---

[4]      PPLC asserts that "direct" regulation of the "modes of cross-border transportation" or "in-state segments of interstate transportation" when national uniformity is paramount is prohibited in the same manner as extraterritorial regulations. *Pls.' Post-Trial Br.* at 65-66 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 642 (1982)); *Pls.' Resp.* at 32-33 (citing *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 829 (7th Cir. 2017)). While it is true that courts occasionally refer to "direct regulations" of interstate or foreign commerce, courts and scholars have noted that this adjective does not alter the substantive tests of the "modern law of . . . the dormant Commerce Clause*," Davis*, 553 U.S. at 337, which the Court outlines and applies in this order. *See Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441 n.15 (1978) (noting that "the Court has employed various tests to express the distinction between permissible and impermissible impact upon interstate commerce," and describing one such approach as an attempt to "distinguish[ ] between state regulations that affect interstate commerce 'directly,' and those that affect it 'indirectly.'" (citing *Hall v. DeCuir*, 95 U.S. 485, 488, 24 L.Ed. 547 (1878); *Smith v. Alabama*, 124 U.S. 465, 482 (1888)); *Grant's Dairy--Maine, LLC v. Comm'r of Maine Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 19 (1st Cir. 2000) ("rebuff[ing] [a plaintiff's] attempt to forge a new mode of analysis" because "this reference to direct regulation as a basis for invalidation has not been repeated in subsequent Supreme Court opinions, and it does not fit into the *West Lynn* framework"); DANIEL FRANCIS, *The Decline of the Dormant Commerce Clause*, 94 DENV. L. REV. 255, 274-77 (2017) (outlining the history of the dormant Commerce Clause jurisprudence and describing the "directness" inquiry as the "second model" in the Supreme Court's line of cases, which prevailed from the 1870s to the 1930s).

scrutinized under a 'virtually per se invalid rule,' which means that the statute will be invalid unless the state can 'show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *PhRMA*, 249 F.3d at 79.

"Discrimination" in this context "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 99; *see also Davis*, 553 U.S. at 337; *New Energy*, 486 U.S. at 273 ("This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors"); *Wyoming*, 502 U.S. at 454 (same); *Family Winemakers of California v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010) (same); *Walgreen Co. v. Rullan*, 405 F.3d 50, 55 (1st Cir. 2005) ("Under the dormant Commerce Clause, if a state law has either the purpose or effect of significantly favoring in-state commercial interests over out-of-state interests, the law will routinely be invalidated unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism") (internal quotations omitted).

### 1. The Ordinance is not facially discriminatory.

On its face, the Ordinance does not distinguish between out-of-state and in-state interests. The Ordinance applies with equal force to any entity seeking to load crude oil in the Shipyard and Commercial zoning districts. There is no explicit mention of source, destination, or residency. Facially, it binds local entities to the same extent as entities based in other Maine municipalities, as well as those based outside the state of Maine; it applies with equal force to crude oil originating in

Canada and North Dakota; and if there were crude oil producers in Maine, it would apply with equal force to crude oil originating in other Maine towns or even within the city of South Portland.

### 2. PPLC has not shown that the Ordinance discriminates in practical effect.

The fatal flaw in PPLC's discrimination argument is that there can be no disparate burden on interstate or foreign competitors when there are no such competitors. "Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997); *see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007). "In the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Tracy*, 519. U.S. at 300.

It is undisputed that PPLC is the only pipeline company in South Portland and the only company seeking to load crude oil onto tank vessels in the city of South Portland. It is also undisputed that there are no crude oil producers or refiners in South Portland or anywhere else in Maine. Regardless of whether one examines the effects on competition between out-of-state and in-state crude oil producers or between out-of-state and in-state crude oil purchasers or shippers, the Ordinance does not confer any relative advantage or disadvantage. Judge Hornby faced a similar situation in *PhRMA*:

There are no Maine drug manufacturers, and no suggestion on this record that Maine is in the process of trying to establish a favorable environment to bring them here. Instead, the rebate program applies to any manufacturer, whether or not it is from Maine. Maine is trying to benefit its residents, specifically those who are uninsured, in the purchase of prescription medicines; but it is not trying to better their lot over out-of-staters.

*PhRMA v. Commissioner, Maine Dept. of Human Services*, CIV. 00-157-B-H, 2000 WL 34290605, at *4 (D. Me. Oct. 26, 2000), *rev'd on other grounds but aff'd on commerce clause issue*, *PhRMA v. Concannon*, 249 F.3d 66 (1st Cir. 2001), *aff'd*, *PhRMA v. Walsh*, 538 U.S. 644 (2003); *see also All. of Auto. Manufacturers v. Gwadosky*, 304 F. Supp. 2d 104, 113 (D. Me. 2004) ("Applying these principles, [the Maine law] does not discriminate against out-of-state manufacturers, because as a matter of fact, there are no in-state manufacturers to be favored"). These cases make clear that when there are no direct competitors to suffer a relative disadvantage from the supposedly protectionist state law, there is no risk of the kind of economic protectionism that the dormant Commerce Clause prohibits.

Even if there were interstate or international competitors with crude oil transfer facilities in South Portland, PPLC's stake in this case illustrates that there is no discrimination because its lawsuit is premised on the fact that the Ordinance prohibits PPLC—a local Maine corporation—from loading crude oil at the Harbor. The second entity most directly affected by the Ordinance is another local Maine corporation, Portland Tugboat. The Ordinance cannot be said to favor in-state commercial interests at the expense of out-of-state competitors when the entities most directly harmed by the practical effects of the Ordinance are in-state, local businesses. The Court agrees with PPLC that it bears the brunt of the Ordinance's

force, but since PPLC is a local business, that fact undermines rather than bolsters its assertion that the Ordinance was an economic protectionist measure intended to discriminate against commerce with Canada.

PPLC argues that a statute need not favor local businesses to be invalid under the dormant Foreign Commerce Clause, citing *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 79 (1992) and *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999). The *Kraft* Court considered an Iowa statute that allowed a tax deduction for dividends from U.S. subsidiaries, but not for foreign subsidiaries. 505 U.S. at 74. The Supreme Court noted that Iowa's tax did not favor Iowa subsidiaries over subsidiaries from other states but concluded that such local favoritism is not an "essential element" for a violation of the Foreign Commerce Clause. *Id.* at 79. The *Natsios* Court considered a Massachusetts statute that prohibited state agencies from purchasing goods or services from companies that did business with Burma (Myanmar). 181 F.3d at 45. The First Circuit concluded that the law's applicability to both foreign and domestic companies did not save it from the discrimination ban of the Foreign Commerce Clause. *Id.* at 67.

*Kraft* and *Natsios* do not alter the Court's conclusion that the Ordinance is not discriminatory. Both state statutes in those cases made facial distinctions based on the nationality of the commercial entity or the location of the commerce. Even if those state statutes did not exhibit favoritism for local businesses over another state's businesses, they exhibited "a State's preference for domestic commerce over foreign commerce. . . ." *Kraft*, 505 U.S. at 79. In *Kraft*, the state statute created a distinction

between U.S. subsidiaries (including Iowa) and foreign subsidiaries, which benefited the former and burdened the latter; in *Natsios*, the state statute created a distinction between commerce with Burma and commerce with any other nation or state (including Massachusetts), which burdened the former and benefitted the latter.

The *Kraft* and *Natsios* Courts found dormant Commerce Clause violations despite that "the State's own economy [was] not a direct beneficiary of the discrimination." *Id.* But those cases do not overrule the meaning of "discrimination" defined in *Oregon Waste* and subsequent cases, nor the analysis outlined in *Tracy*. *Kraft* and *Natsios* are consistent with *Oregon Waste* and *Tracy* because the Iowa and Massachusetts statutes created relative differences between competitors. *Kraft* and *Natsios* simply acknowledge that the subject of the favoritism or disfavoritism can shift from the state or local level to the national level when analyzing for a violation of the Foreign, as opposed to the Domestic, dormant Commerce Clause. Unlike the state statutes in *Kraft* and *Natsios*, South Portland's Ordinance does not create any distinction or difference between competitors from different countries or states, which means it creates no relative difference in treatment that implicates the dormant Commerce Clause. The Ordinance does not target commerce with Canada, and the prohibition applies equally to crude oil flowing through Line 9 into PPLC's Montreal terminus from North Dakota as it does to crude oil from Alberta.

The Court is skeptical of PPLC's argument that the Ordinance discriminates against Canadian commerce because PPLC believes it has the practical effect of completely blocking flows of crude oil from Canada. While PPLC is a Maine

corporation, it is true that the pipelines are connected with Canadian infrastructure and some of the crude oil that would be shipped southward would originate in Western Canada. But there are at least two major flaws in this argument. First, the Ordinance has no impact on several major sources of Canadian oil entering South Portland. A major source of PPLC's northbound crude shipments was the Hibernia oil field off the southeast coast of Newfoundland, in Eastern Canada, which the Ordinance does nothing to inhibit. *Trial Tr.* 181:14-20. While market forces have reduced those flows in recent years, there is no indication in the record that the City has ever objected to that Canadian commerce. Similarly, refined oil products from Canada still make their way to South Portland today, which the Ordinance also does not block. *See Pls.' Ex.* 106 at 2:16:30.

Second, PPLC's argument stretches the dormant Commerce Clause too far. Maine is the only state that shares a border with only one other state, and Maine also shares a border with Canada. It may often be true, especially in small, rural, and relatively geographically isolated states like Maine, that certain industries or markets are comprised of a small number of firms or even a single firm. Just because commerce in a market originates in another state or country does not mean that otherwise evenhanded regulations or prohibitions on that market automatically have the "practical effect" of discriminating against interstate or foreign commerce.

The logical implication of PPLC's argument is that many perfectly ordinary health and welfare regulations would violate the dormant Commerce Clause.[5]  In a modern globalized economy, if this were enough to trigger strict scrutiny for local restrictions that are otherwise agnostic as to the state or country of origin, there would be scant room remaining for state and local police powers.  On the contrary, courts have carefully resisted the impulse to conflate neutral regulations that harm interstate firms with the sort of economic protectionism that the dormant Commerce Clause forbids.  *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978) (the fact that a state prohibition fell "solely on interstate companies," without more, "does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce"); *see also Family Winemakers*, 592 F.3d at 13; *Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 402 (3d Cir. 1987) ("showing that out-of-state firms happen to be the only ones currently interested in engaging in activity foreclosed by facially evenhanded state regulation has not by itself been held to trigger heightened scrutiny").

### 3.    PPLC has not shown that the primary purpose of the Ordinance was to discriminate.

At the outset, the Court notes that PPLC's argument that the Ordinance was intended to discriminate is largely undercut by the fact that the practical effect is not

---

[5]    For example, in 2012, Maine repealed its sixty-three-year ban on fireworks, causing many localities to prohibit them.  *OK to light that firecracker? Depends where you live. Better check this interactive map.*, PORTLAND PRESS HERALD (July 3, 2018), https://www.pressherald.com/2018/07/03/ok-to-light-that-firecracker-depends-where -you-live/.  If PPLC were correct, local prohibitions on pyrotechnics or fireworks would be unconstitutional if the supply of fireworks flowed from another state or nation, even if the prohibition were motivated entirely by the health and welfare risks of the fireworks, regardless of their origin.

to discriminate. *See Lewis*, 447 U.S. at 37 ("The principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects"); *Gwadosky*, 430 F.3d at 36 n.3 (despite that Courts routinely cite the purpose and effect analyses in the disjunctive, "there is some reason to question whether a showing of discriminatory purpose alone will invariably suffice to support a finding of constitutional invalidity under the dormant Commerce Clause" because of the analytical difficulty that arises if a law was motivated by protectionist intent but fails to produce discriminatory effects). Nevertheless, the Court inquires into the legislative purpose behind the Ordinance.

"Incidental purpose, like incidental effect, cannot suffice to trigger strict scrutiny under the dormant Commerce Clause." *Gwadosky*, 430 F.3d at 39. "[T]he party challenging the validity of the [state or local statute], bears the burden of demonstrating that the statute was animated by a discriminatory purpose." *Id.* at 37 (citing *Hughes*, 441 U.S. at 336). The Court looks to the statute's words, the context of the statute as a whole, the legislative history, and whether the statute was closely tailored to achieve the purpose the state asserted. *Id.* at 37-39; *see also Family Winemakers*, 592 F.3d at 13. "[S]tatements by a law's private-sector proponents sometimes can shed light on its purpose" but the isolated correspondence of a single proponent "has little (if any) probative value in demonstrating the objective of the legislative body as a whole." *Gwadosky*, 430 F.3d at 39.

PPLC presented limited evidence of lurking disaffection with out-of-state businesses or favoritism for local or U.S. commerce over Canadian commerce. For

example, proponents of the WPO distributed campaign literature encouraging voters to "stop out-of-state big oil companies from building a tar sands export terminal in South Portland." *Pls.' Ex.* 11. A couple of public commenters reminded the City Council "that tar sands, which is really the thing in question here isn't even American. It's Canadian oil." *Pls. Ex.* 158 at 01:43:23-01:45:30.

Several City Counselors also expressed their desire to see reduced reliance on fossil fuels in the economy in general through more renewables like solar power, *Pls.' Ex.* 104 at 4:25:50-4:57:44, but they also disclaimed an ability to accomplish that goal with an ordinance such as the WPO and focused their comments on the developmental and environmental impacts within South Portland. *Id.* For example, Councilor Livingston said, "Would I like to see all the different counties trying to deal with fossil fuels change and hopefully, in truth, I think they will have to eventually." *Id.* Councilor Livingston then rhetorically asked, "Is it our place here in South Portland, Maine, to force that on them?" *Id.* This handful of anti-Canadian comments and references to out-of-state interests in the voluminous record falls short of establishing that the Ordinance's primary purpose was to disfavor out-of-state competitors or to favor in-state competitors.

For the vast majority of the public and official comments, the combined evidence regarding the role of the crude oil's country of origin is exemplified by Councilor Blake's comments after a last-minute amendment proposal by Councilor Pock, who opposed the Ordinance, to distinguish between American crude oil and non-American crude oil:

> This is not about Canada; this is not about America. This is about the health and the safety of our community. I don't care if this crude comes from Timbuktu. What's important to all of us, and apparently Councilor Pock has been missing the message, that this is about our people, our air, our water, the quality of our lives. I support Canada and many things they do, Mr. Pock. But this is very inappropriate this evening. It misses the mark. And I have no interest in supporting this amendment.

*Pls.' Ex.* 159 at 51:16. There is far a greater volume of more salient evidence that the Ordinance was intended to address concerns about the air quality, water quality, aesthetics, and redevelopment risks of crude oil loading in general, and the loading of crude oil derived from tar sands in particular, regardless of the source location or destination of that crude oil. Councilor Blake's comment at a council meeting considering the Ordinance is representative:

> They can't say that this change is going to be more healthy. They can't say it. They can't say it's going to help our education system. They can't say it's aesthetically pleasing. The only thing they can say is jobs. Well, I believe that they've really stretched that . . . What this is really about is health and safety. I spent 27 years as a firefighter/paramedic for this community and the past seven years as your councilor at large. And I inspected all the oil companies on a regular basis. I used to love to go up on the oil tankers and learn. But what I learned mostly about my job is that it's health and safety. That's why we're here. That was my job as a firefighter/paramedic was to take care of our citizenry. And every time I make a decision at the city council level, the first thing that goes through my mind is what's best for our citizens? What is best for the health and safety of our community? And then after that, what's best for all of our people? This is truly about the waters; it's about the air; it's about the soils we stand on so that we can take care of ourselves. It's about Casco Bay, which I believe is in dire jeopardy. That's what this is all about.

*Pls. Ex.* 158 at 3:27:00.

Most public commenters exhibited consistent environmental, health, and development concerns from PPLC's proposal to reverse the pipeline and load tar sands crude oil at the Harbor. *See e.g.*, *Defs.' Exs.* 227-328 (emails from residents to

Councilors from late 2013 to mid-2014 expressing concerns and thanks). Throughout the legislative history, as far back as the initial WPO campaign, even when public commenters discussed "out-of-state" interests, those concerns were almost always ancillary to their local, non-economic concerns. The evidence establishes that most of the public and the City Council was aware of a likely tradeoff between local economic benefits and jobs and their desire to minimize risks from tar sands oil spills and air emissions from crude oil loading, and they sought the restrictions anyway:

> What may happen to my livelihood when tar sands are being shipped here and toxins are being burned off into our air? What may happen to you and your work and your health? I'm here tonight because I care deeply about Maine and specifically Portland itself, South Portland, and the working waterfront. I care about the quality of our air and water. I see the importance of clean air and clean water over the possibility of very large oil energy corporations getting the opportunity to make some extra money and possibly create some local jobs. We always want to see our local economy grow. Who doesn't? At what cost? Have we considered the long-term effects of storing over 1 million gallons of toxic oils at Hill Street in the middle of our schools and processing this tar sands export out of South Portland?

*Id.* at 0:54:27-1:02:21. The comments that indicate an economic protectionist purpose are few and far between.

PPLC emphasizes the bulk of citizen and official comments focusing on the desire to prevent PPLC from transporting crude oil derived from tar sands through the Harbor. According to PPLC's theory of the case, the primary purpose of the Ordinance was to discriminate against foreign commerce because it was intended to block PPLC's reversal project, which seeks to transport crude oil from Canada to South Portland. But the Court does not view the City's claims about air quality, water quality, aesthetics, and economic redevelopment as mutually exclusive goals.

What the parties present as competing goals are easily reconcilable: the City Council enacted an ordinance that would block a tar sands project like the one PPLC proposed because it had concerns about the air quality, water quality, aesthetics, and redevelopment risks of crude oil loading in general, and the transporting and coastal loading of crude oil derived from tar sands in particular.

Even though the Court agrees with PPLC that the City sought to alleviate its concerns and those of the public by enacting an ordinance that would prohibit PPLC from undertaking its reversal project, that does not imply that the Ordinance's primary purpose was discriminatory. The City feared the local risks of handling crude oil derived from tar sands in South Portland and at the Harbor, but it does not follow that the City was primarily concerned with the fact that the tar sands crude oil originated outside South Portland and Maine. The Court is left with the impression that the City Council and the public supporters would have been equally motivated to enact the Ordinance if the tar sands crude oil originated in Vermont, New Hampshire, Bethel, Westbrook, or even western portions of South Portland. The evidence is more consistent with a primary concern about the local impacts of crude oil loading in general and the transport and loading of tar sands products more specifically.

In other words, PPLC has not explained why, even assuming the true purpose of the Ordinance is what PPLC says it is—a disguised attempt to ban the handling of tar sands derived crude oil, not other types of crude oil—that undisguised motive

would constitute discrimination offending the dormant Commerce Clause. The seminal case of *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), is instructive.

The Supreme Court considered a New Jersey statute that banned the importation of most solid or liquid waste which originated or was collected outside New Jersey. *Id.* at 618. The *Philadelphia* Court acknowledged that "law[s] that overtly block[ ] the flow of interstate commerce at a State's borders" implicate the dormant Commerce Clause, and struck down the New Jersey statute for "violat[ing] th[e] principle of nondiscrimination." *Id.* at 624, 627. The fatal flaw was the disparate treatment of waste originating in New Jersey and waste originating elsewhere: "The harms caused by waste are said to arise after its disposal in landfill sites, and at that point, as New Jersey concedes, there is no basis to distinguish out-of-state waste from domestic waste. If one is inherently harmful, so is the other." *Id.* at 619. The Supreme Court acknowledged New Jersey's legitimate financial and environmental goals and said that it "may pursue those ends by slowing the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected." *Id.* at 627 (emphasis in original). The *Philadelphia* Court distinguished a long line of cases upholding quarantine laws which block the flow of commerce at the state's border because "[t]hose laws . . . did not discriminate against interstate commerce as such, but simply prevented traffic in noxious articles, whatever their origin." *Id.* at 629.

Applying *Philadelphia*, even if the City's true purpose were to enact a disguised but practically effective tar sands ban, there is evidence that the City

considered tar sands to be a dangerous article with greater health and environmental risks than other types of crude oils and intended to alleviate the risks from transporting and loading tar sands crude oil "whatever [its] origin." That purpose is not equivalent to the economic favoritism that the dormant Commerce Clause prohibits.[6]

[6]     A closely related disagreement between the parties centers on citizen and official concerns about tar sands crude oil spills or pipeline safety. PPLC stresses that the City exaggerated its concerns about non-spill-related environmental and health risks because its true fears involved pipeline spills and the safety of pipeline facilities and marine transfer facilities. PPLC insists that the City cannot assert these safety related concerns under the dormant Commerce Clause inquiry because that is an improper purpose under preempting statutes like the Pipeline Safety Act, 49 U.S.C §§ 60101 *et seq*. PPLC may be correct about the City's desire to craft an ordinance that could survive legal challenge and may also be correct about the City's litigation strategy. But there is nothing nefarious about crafting an ordinance capable of surviving judicial scrutiny. The problem PPLC identifies results from a mistaken premise about the role of legislative purpose in the different contexts of federal statutory preemption and the dormant Commerce Clause. While the dormant Commerce Clause prohibits the improper *purpose* of discriminatory economic protectionism, federal statutes generally preempt certain *means* or *types* of state statutes and their *effects*, not state legislative purposes.

        As the Court explained at summary judgment, the Supreme Court instructs that it "obscure[s] more than aid[s]" the preemption analysis to suggest "that the coexistence of federal and state regulatory legislation should depend upon whether the purposes of the two laws are parallel or divergent." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963). Therefore, with the exception of certain narrow areas of law—such as nuclear power siting, where there are indications that the federal statute "defined the pre-empted field, in part, by reference to the motivation behind the state law," *see English v. Gen. Elec. Co.*, 496 U.S. 72, 84-85, 110 (1990), *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983)—federal preemption is a matter of the consistency or inconsistency of the state statute's *effects* with the preemptive scope of the federal statute, not the consistency or inconsistency of the state and federal statutory *purposes*. *See Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 76-77 (1st Cir. 1997) ("[T]he relevant inquiry focuses not upon any relation between advertising and the *motivation* behind a state law, but upon the law itself and any connection it might have with advertising activities . . . Thus, the mere suggestion that state lawmakers sought passage of the [act] in part because of their discontent with federal regulatory efforts does not affect our preemption analysis"); *Associated Industries of Massachusetts v. Snow*, 898 F.2d 274 (1st Cir. 1990).

        The Ordinance is not preempted because it is not a "safety standard" for pipeline facilities or transfer facilities, and it does not regulate the operations of those facilities within the meaning of the statute. This is true even though the Ordinance was motivated in part out of concerns about the safety of handling tar sands crude oil at the Harbor (in terms of environmental and public health risk from spills). Statutes that preempt state safety standards for certain activities and facilities do not generally remove local control over whether those activities and facilities are permitted in each locality. Congress knows how to preempt local bans and siting authority, since it has done so for nuclear power, liquefied natural gas terminals, and electric transmission lines. It has not done so for pipeline facilities, and instead chose a more narrowly preemptive scope.

PPLC would have the Court draw the inference that the purpose of the Ordinance was discriminatory because it was designed to create an "asymmetry" between the direction of flow, or between the ability of shippers to import crude oil to South Portland for northbound flow, and the ability of shippers to export crude oil after southbound flow. But under historic northbound flow operations, domestic and foreign sourced crude oil was imported to South Portland and immediately exported. Under PPLC's proposed southbound flow operations, domestic and foreign sourced crude oil would be imported to South Portland and immediately exported. Technically, the Ordinance does not distinguish between importation and exportation. It only distinguishes between certain methods of transportation within the borders of South Portland. Unlike the cases where Courts have found dormant Commerce Clause violations, the alternative modes of operations here are meaningfully different from one another. *See Philadelphia* 437 U.S. at 627 (The dormant Commerce Clause prohibits disparate treatment of foreign and local products "unless there is some reason, apart from their origin, to treat them differently"). Crude oil unloading at the Eastern Waterfront does not expel air that is saturated with hydrocarbon vapors, so it does not contribute to local air pollution

---

Since preemption bars certain types of statutes, not motives or legislative purposes, there is no logical contradiction in concluding that the Ordinance is not a preempted safety standard and also concluding that one purpose of the Ordinance was to alleviate perceived safety risks from tar sands crude oil spills by blocking the loading of that crude oil at the Harbor. PPLC argues that, stripped of its disguises, the Ordinance was truly an attempt to ban tar sands crude oil, but PPLC has not convinced the Court that, even if the Ordinance were truly such a ban, it would either constitute a preempted pipeline facility safety standard or a discriminatory ordinance enacted for an economically protectionist purpose.

at the Harbor and there is no need to construct vapor control devices. But crude oil loading at the Harbor does create those local harms and does require those structures.

PPLC's arguments regarding discriminatory purpose are also undermined by the fact that a major source of northbound crude oil has been from Eastern Canada, which the Ordinance does not obstruct. Similarly, refined oil products from Canada are still transported to South Portland today, which the Ordinance also does nothing to block. These facts bolster the Court's finding that PPLC has not shown that the Ordinance favors or was primarily intended to favor local commerce or to discriminate against interstate or Canadian commerce. Canada would be a major source of crude oil under southbound flow conditions, but Canada has always been a source of crude oil flows under historic northbound flow conditions as well.

Finally, the Ordinance functions in much the same way as if the City had simply removed pipeline facilities or crude oil handling facilities from the list of approved activities while grandfathering in the existing facilities and uses. That approach would permit PPLC to continue its current business when market conditions support northbound flow, but would prevent it from installing the new facilities and structures it would need in order to alter or expand its business activities. The DOC explicitly recommended this change, and some council members themselves made the same comparison. *See e.g. Pls.' Ex.* 104 at 4:25:50-4:57:44 ("I understand what happens when zoning ordinances are passed that make people's property non-conforming. I know that they can't expand them"). There is little question that such a straightforward zoning change, while narrowly grandfathering

an existing business model, would be permissible under the dormant Commerce Clause, because there is no indication that it was intended to benefit local businesses over their out-of-state competitors. *See Rullan*, 405 F.3d at 55 (Prohibitions and grandfathering clauses can indicate prohibited purpose when they burden out-of-state competitors and allow in-state competitors to persist) (*citing Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1012 (9th Cir. 1994) (*quoting Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 447 (1978) ("Exemptions of this kind, however, weaken the presumption in favor of the validity of the general limit, because they undermine the assumption that the State's own political processes will act as a check on local regulations that unduly burden interstate commerce"); *S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 812 (8th Cir. 2013) (Prohibitions with grandfathering clauses "do not, in and of themselves, demonstrate the invalidity of rules from which they are carved"); *see also Locke v. Shore*, 634 F.3d 1185, 1194 (11th Cir. 2011).

Accordingly, the Court does not apply heightened scrutiny and instead examines the Ordinance under the *Pike* balancing test.

### C. The Ordinance does not impose burdens on foreign and interstate commerce that are clearly excessive in relation to the putative local benefits.

"A state statute that regulates evenhandedly and has only incidental effects on interstate commerce engenders a lower level of scrutiny." *Gwadosky*, 430 F.3d at 35 (internal quotations omitted). "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is

clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443 (1960)). "State laws frequently survive this *Pike* scrutiny . . . ." *Davis*, 553 U.S. at 339.

The higher courts have expressed a significant degree of discomfort with the speculative nature of this balancing test and with the role of the court in making such determinations. *See PhRMA*, 249 F.3d at 84 ("It is necessary to recognize the difficulty in foreseeing what events actually will occur from the enforcement of this Act, which admittedly makes the *Pike* balancing test more challenging to apply. We are forced to balance the possible effects, instead of the actual effects of the statute in action.")

> There is a common thread to these arguments: They are invitations to rigorously scrutinize economic legislation passed under the auspices of the police power. There was a time when this Court presumed to make such binding judgments for society, under the guise of interpreting the Due Process Clause. *See Lochner v. New York*, 198 U.S. 45, 25 (1905). We should not seek to reclaim that ground for judicial supremacy under the banner of the dormant Commerce Clause.

*United Haulers*, 550 U.S. at 347.

> What is most significant about these cost-benefit questions is not even the difficulty of answering them or the inevitable uncertainty of the predictions that might be made in trying to come up with answers, but the unsuitability of the judicial process and judicial forums for making whatever predictions and reaching whatever answers are possible at all.

*Davis*, 553 U.S. at 355. Accordingly, when conducting this balancing, courts are warned to proceed with caution.

The burden of the Ordinance falls the hardest on one particular firm, PPLC. There is a distinction between harms to a particular interstate firm and burdens on

interstate commerce. *See PhRMA*, 249 F.3d at 84 ("As the Third Circuit stated, however, the fact that a law may have devastating economic consequences on a particular interstate firm is not sufficient to rise to a Commerce Clause burden") (internal quotations omitted but quoting *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 827 (3d Cir. 1994) and *Ford Motor Co. v. Ins. Com'r of Com. of Pa.*, 874 F.2d 926, 943 (3d Cir. 1989)). Despite this, the Court agrees with PPLC that the Ordinance creates meaningful burdens on interstate and foreign commerce. Without the Ordinance, there is a substantial likelihood that PPLC would complete its reversal project and begin shipping some quantity of crude oil southbound through its pipelines to markets in the Eastern U.S. and Europe. Financial losses to shareholders and workers in the relevant industries will be significant—for example, AWO receives roughly $100,000 per docking—and the reduced flows will impact others in the supply chain. While the Ordinance will likely have little impact on global oil prices, the dormant Commerce Clause is not limited to burdens of that scale.

It is unrealistic for the City to argue that the Ordinance does not actually block PPLC's pipeline reversal project because PPLC could theoretically and legally move crude oil out of South Portland via a new rail interconnection on PanAm's existing right of way. While that alternative would solve some of the environmental concerns about tar sands oil near the South Portland waterfront, it would not address the concerns about air pollution from increased utilization of the Main Tank Farm or emissions from the VDUs, since loading crude oil onto rail cars expels the same

volumes of air laden with hydrocarbon vapors.  Although the Court does not pretend to grasp all of the details of the logistics of crude oil transfers, one would expect that if anything, there would be a greater risk of leaks when transferring the same volume of crude oil to hundreds or thousands of rail cars, as compared with a single connection to a marine tanker.  Even though consistency is not always a political virtue, there is no evidence that either the City Council or the South Portland residents who favored the Ordinance would support the transfer of large volumes of oil onto railcars in the Rigby Yard.  Even if PPLC could accomplish the City's proposed rail project, which the Court finds implausible, the City's own expert testified about the cost disadvantage in most circumstances from transporting crude oil via rail instead of marine tankers.[7]  The City's railcar argument is a sidetrack.

The Court agrees with the City, however, that the Ordinance creates ample and weighty local benefits.  The record demonstrates that the City Council and an engaged and sizable portion of South Portland's residents had sincere concerns about (1) increased air emissions-related public health risk resulting from the proposed VDUs, (2) increased air emissions-related public health risk resulting from renewed utilization of the Main Tank Farm adjacent to sensitive locations, such as schools, (3) increased odors resulting from renewed utilization of the Main Tank Farm at adjacent sensitive locations like schools, (4) aesthetic and noise impacts at

---

[7] One aspect of Sarah Emerson's testimony that rings true is the periodic narrowness of the margins in the oil business.  It is ironic that the city of South Portland has spent so much time pressing its argument that delivery of oil down a pipeline from Canada to oil tankers in its Harbor would be economically unfeasible, but at the same time, arguing that PPLC could economically unload the same oil onto railcars in Rigby Yard.  The Court does not take seriously the City's argument on this alternative.

recreational locations like Bug Light Park from the VDUs and renewed tanker traffic, (5) reduced likelihood of redevelopment opportunities for vacant and underutilized properties from renewed heavy industrial activity, and (6) increased risk to the local land and coastal environment and elevated public health risks from pipeline accidents or spills of crude oil derived from tar sands.[8]

PPLC argues that the City attempted to disguise its true motives by incorporating lengthy legislative findings and adopting an air quality-related moniker. Those accusations are not without foundation. There is evidence that the City overemphasized or played up its air quality motives and sought to downplay the spill-related concerns. The Court does not agree, however, that the purported local air quality, aesthetics, and redevelopment benefits were pretextual, illegitimate, or illusory.

The public comments and official legislative history demonstrate that air quality, aesthetics, and waterfront redevelopment goals pervaded the public and official considerations during the WPO, the Moratorium, the DOC proceedings, and the Ordinance vote. They were not merely tacked-on justifications after savvy

---

[8]   The Court disagrees with PPLC's contention about the illegitimacy of the City's concerns about the unique risks from transporting tar sands derived crude oil as compared with other types of crude oil. As the Court explained in footnote 4, federal statutes preempt types of legislation or legislative means and effects. Federal statutes normally do not preempt legislative purposes. The Pipeline Safety Act does not permit the City to set its own safety standards or regulate pipeline or transfer facility operations, but that does not mean that the City is prohibited from banning loading or new facilities for loading simply because the ban was motivated in part by environmental and safety concerns that overlap with the legislative purposes of a federal statute. If overlapping legislative purpose with a preempting federal statute were ordinarily enough to destroy the legitimacy of state interests in the *Pike* balancing, courts would likely have to strike down a huge swath of state legislation, such as the Maine Oil Discharge Prevention and Pollution Control law, 38 M.R.S. §§ 541 *et seq.*, that have long been upheld under preemption and constitutional attacks. *See Portland Pipe Line Corp. v. Envtl. Imp. Comm'n*, 307 A.2d 1, 23 (Me. 1973).

attorneys instructed the City Council to "bulletproof" the Ordinance, as PPLC insists. For example, there is a WPO advocacy flyer that PPLC cites for its claim that the City sought to disfavor "out-of-state big oil companies" predates the Moratorium and DOC meetings. *Pls.' Ex.* 11. Yet that WPO campaign flyer also focuses heavily on air quality and aesthetics. The flyer features a large photo of PPLC's DEP air emissions permit for the project and states that PPLC will be allowed to "release *tons* of additional toxic air pollution each year." *Id.* at 1. It also features large aerial photographs of the main tank farm with a bold caption claiming, "**With a tar sands project**, these tanks could release **triple the amount of toxic air pollution (220 tons/year!)** right next to where our children learn and play. Compared to regular oil, tar sands contains more toxic chemicals, including **benzene which causes cancer and triggers asthma**." *Id.* at 2. The flyer contains a photo rendering depicting the two proposed VDUs with a bold caption describing the size of the structures—"**two proposed 70-foot-tall smokestacks next to Bug Light Park**"— and encouraging voters to help "stop this project before our air is polluted and Casco Bay is put at risk." *Id.* at 1.

The quotes in the flyer are consistent with the bulk of public comments and the remarks of the City Council when it considered the WPO, which indicates that air quality and aesthetic impacts from PPLC's reversal proposal were legitimate concerns before the WPO votes. Those concerns are also consistent with much of the record of public pressure and official comments during the Moratorium and DOC

process.  While air quality was increasingly emphasized over time, it not pretextual. It was an evident and sincere goal from the beginning.

The City's public health expert, Dr. Helen Suh, testified about the health risks of VOC and HAP emissions from the Main Tank Farm and $SO_x$ and $NO_x$ emissions from the proposed VDUs.  The specifics of her quantitative estimations of the marginal risks from the VDUs were somewhat undermined by PPLC's witnesses' effective explanations regarding the highly conservative assumptions and overestimations of the modeling employed by another of the City's experts, Dr. Stephen Zemba, upon which Dr. Suh relied.  The actual pollutant concentrations would almost certainly be substantially lower than Dr. Zemba's worst-case model, especially in light of new emissions control technology and lower flow rates for a future project compared to the 2008-2009 proposal.[9]  However, the remainder of Dr. Suh's testimony regarding the public health benefits of reducing emissions from loading operations and renewed tank farm use, even when a locality is in compliance with federal and state air quality standards, was unrebutted.

PPLC argues that these benefits are inflated because the Ordinance does not address other sources of local air pollution, including woodstoves and mobile sources,

---

[9]     The Court is similarly unconvinced by the City's argument that Dr. Zemba's modeling shows that PPLC will be unable to get a Maine DEP air emissions permit to comply with the new federal National Ambient Air Quality Standards for $SO_2$ that have gone into effect after 2009.  Dr. Zemba's modeling showed that, under the assumptions of the 2008-2009 project, several receptor locations around Pier 2 would experience $SO_2$ levels at certain points during the year that exceed the NAAQS. *See Defs.' Exs.* 189-90.  But Dr. Zemba's assumptions were more conservative than PPLC will be legally required to meet, especially given the fact that PPLC can alter the details of its 2008-2009 proposal by transporting sweeter crude oils, reducing the flow rate, and incorporating VRUs rather than VDUs. The Court does not accept the City's contention that PPLC would be unable to obtain a permit under the new $SO_2$ NAAQS to accomplish flow reversal and marine loading.

which represent far larger public health risks. *See Pls.' Ex.* 45. This argument is misplaced, however, because the Supreme Court "has made clear that a legislature need not strike at all evils at the same time or in the same way, and that a legislature may implement its program step by step, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (internal quotations, modifications, and citations omitted). Poor tailoring can suggest that the asserted purposes are not the true purposes, but the rest of the record establishes that the goal was legitimate and sincere, albeit somewhat overstated.

The City had real interests in reducing the visual, auditory, and olfactory externalities of heavy industrial activities within its borders and encouraging recreational and lower-impact development on the waterfront. The City's development interests are not undercut because some of a developer's previous proposals were outlandish. There is an inherently speculative nature to encouraging redevelopment projects, but that does not defeat the City's interest in pursuing them. The evidence showed that the City has demonstrated a pattern of opposition to heavy industrial projects in recent years, indicating that the touted local safety, aesthetic, and redevelopment concerns of the public and City officials were bona fide. *See e.g.*, *Trial Tr.* 641:24-655:6.

PPLC essentially raises the problem of NIMBY (Not In My Back Yard) legislation. But the dormant Commerce Clause, and the *Pike* balancing inquiry in particular, do not and were never intended to solve all governance problems that come

with a federal system of distributed local authority. Although local tendencies toward NIMBY legislation present a common difficulty in our federal system, the remedy for this collective action problem is federal legislation, not judicial intervention.

The Court does not agree with PPLC's argument that the City's purported local benefits are analogous to the transportation cases where the Supreme Court struck down state highway regulations because the defendants failed to establish that their asserted safety justifications were anything more than "illusory." *See Kassel*, 450 U.S. 662; *Raymond*, 434 U.S. 429; *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959). Those cases involved state regulations of semi-truck mudguards and trailer lengths, and the states could not show, in the face of contradictory evidence, that their requirements were actually any safer than alternatives used by the other surrounding states. *See e.g.*, *Raymond*, 434 U.S. at 436 ("Appellants presented a great deal of evidence supporting their allegation that 65-foot doubles are as safe as, if not safer than, 55-foot singles when operated on limited-access, four-lane divided highways").

PPLC argues that the air quality concerns are illusory because the air quality is so good that DEP chose to stop operating their air monitoring station in the area. *See Pls.' Ex.* 45. But the American Lung Association explained to the City Council and DOC that Cumberland County received a "C" air quality grade and has some of the highest rates of respiratory ailments and lung disease in the state. *See Defs.' Exs.* 114 at 270-274, 142 at 3; *Pls.' Ex.* 135 at 0:52:50-0:56:10. More importantly, PPLC did not rebut Dr. Suh's testimony that there is no safe level of exposure to many of

the air pollutants that would be emitted from renewed use of PPLC's tanks and the proposed VDUs from crude oil loading operations.  Neither did PPLC rebut the City's evidence about aesthetic and recreational benefits to deindustrializing the waterfront.

Regarding the City's spill-related safety concerns, PPLC's frustration is understandable given that the City downplayed those concerns and because there is some reason to doubt the severity of any special risks associated with tar sands oil as compared to other types of crude oil.  *See e.g. Pls.' Ex.* 96 (National Academy of Science Report "Effects of Diluted Bitumen on Crude Oil Transmission Pipelines" finding no significant increased risk of pipeline corrosion or ruptures from tar sands crude oil).  But there is also competing evidence that tar sands transportation and spills create special risks.  *See e.g. Defs.' Ex.* 86 (report from Cornell University professors discussing special environmental land and water cleanup costs and risks from tar sands crude oil spills).

In light of copious conflicting evidence and scientific uncertainty regarding the magnitude of the air quality benefits and the existence of the benefits from water contamination risk reduction, along with the fact that the aesthetic and redevelopment benefits were unrebutted, it is not the Court's place to second-guess the findings of South Portland's political process.  *See Kassel*, 450 U.S. at 670 ("the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack" but "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in

comparison with related burdens on interstate commerce" (quoting *Raymond*, 434 U.S. at 449 (Blackmun, J., concurring)).

The Court also notes that this is a case where the heaviest burdens fall on local, in-state entities: PPLC and Portland Tugboat. The predominant impacts on jobs and commercial revenues will fall on local Maine companies and their resident employees. The Supreme Court has displayed more deference to legislative judgments under the dormant Commerce Clause when the challengers are in-state, rather than out-of-state, interests. *See e.g.*, *Clover Leaf Creamery*, 449 U.S. at 473 ("[T]here is no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms. Indeed, two of the three dairies, the sole milk retailer, and the sole milk container producer challenging the statute in this litigation are Minnesota firms"); *West Lynn Creamery*, 512 U.S. at 200; *Raymond*, 434 U.S. at 444 n.18 (explaining deference to nondiscriminatory state safety regulations when impacts fall on "local economic interests as well as other States' economic interests, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations").

Accordingly, the Court concludes the PPLC has not shown that the burdens on interstate or foreign commerce are excessive in relation to the asserted local benefits.

**D.      The Ordinance does not impermissibly interfere with the federal government's ability to speak with one voice when regulating commerce with foreign governments.**

In a series of state taxation cases implicating foreign commerce, the Supreme Court explained that, in addition to the three prongs that apply in the interstate commerce context, there is another requirement that a state law not interfere with the federal government's ability to "speak with one voice when regulating commercial

relations with foreign governments." *See Japan Line*, 441 U.S. at 449; *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 193-97 (1983); *Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 7-13 (1986); *Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 320-31 (1994). The implication of these cases is that "the dormant Foreign Commerce Clause places stricter constraints on states than its interstate counterpart." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 328 (1st Cir. 2012); *see also Japan Line*, 441 U.S. at 448 ("Although the [Commerce Clause] grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater."). The First Circuit regards the "one voice" concern as "equally vivid in non-tax dormant Foreign Commerce Clause cases" as it does in the tax context. *Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41, 46 (1st Cir. 2005); *see also Natsios*, 181 F.3d at 68 (applying the doctrine to the Massachusetts anti-Burma law, but without detailed analysis).

The "one voice" inquiry is reminiscent of federal preemption under the foreign affairs powers. *See Zschernig v. Miller*, 389 U.S. 429, at 430-32 (1968). The First Circuit explained that, because the Supreme Court's previous applications of the dormant Foreign Commerce Clause "one voice" analysis did not cite the foreign affairs preemption cases, the Supreme Court "[kept] separate the analyses that apply when examining laws under the Foreign Commerce Clause and under the foreign affairs power." *Natsios*, 181 F.3d at 59. Despite this, scholars have argued that the two doctrines "involve[ ] the exercise of functionally identical judicial lawmaking powers."

JACK L. GOLDSMITH, *Federal Courts, Foreign Affairs, and Federalism*, 83 VA. L. REV. 1617, 1630 (1997); *see also* LEANNE M. WILSON, *The Fate of the Dormant Foreign Commerce Clause After Garamendi and Crosby*, 107 COLUM. L. REV. 746, 773 (2007) (discussing *Crosby*, 530 U.S. 363; *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 396 (2003) and concluded that under the "one voice" prong, the Supreme Court looks to expressions of intent from Congress and the Executive branch, so that "in reality the Court is applying a form of strong preemption analysis and simply calling it dormancy"). The scarcity of cases addressing these doctrines leaves the matter opaque, but if there is any significant space between the two doctrines, it is a narrow divergence and this case does not fit within it. The Court concludes that national uniformity is not required and the Ordinance does not interfere with the federal government's ability to "speak with one voice" in regulating foreign commerce. The Court reaches this conclusion for many of the same reasons the Court concluded the Ordinance was not preempted by federal foreign affairs powers.

The Ordinance does not explicitly target any foreign countries. The Anti-Burma law struck down in *Natsios* made a facial distinction about a particular foreign country, whereas the Ordinance prohibits loading crude oil and new structures for loading crude oil, regardless of either the source or ultimate destination. As such, unlike the Anti-Burma law, the Ordinance has not and is unlikely to provoke international objections and retaliation. On the contrary, a Canadian locality, Dunham, Quebec, imposed local restrictions that would have interfered with PPLC's ability to complete its 2008-2009 proposal, suggesting that other states and Canada

expect infrastructure projects like pipelines to satisfy local restrictions and avoid local prohibitions if they wish to operate successfully. The policy of the federal government appears to favor local control over whether pipelines can exist or operate within each locality's borders. The Presidential Permits contemplate local restrictions, and Congress has declined to prevent states and municipalities from exercising siting authority over pipelines and transfer facilities, unlike with nuclear power plants, liquefied natural gas terminals, and electric transmission lines. There does not appear to be any direct conflict between the Ordinance and specific federal laws or consistent policies, so there is no potential for embarrassment to the United States Government.

PPLC asserts that there is risk of "retaliation" from Canada or other nations if other jurisdictions enacted similar ordinances. *See Japan Line*, 441 U.S. at 451 (discussing risk of "retaliation" from "asymmetry in the international tax structure"). The risk the *Japan Line* Court feared was the inconsistent taxation that would result if a state was permitted to depart from the international norm that property taxes on assets like tankers engaging in commerce on the high seas are taxed in their home jurisdictions, not wherever they travel. *Id.* at 441-43, 450-51. Unlike *Japan Line*, here, PPLC has not made the case that there is a realistic risk of inconsistent or overlapping burdens on the same infrastructure. Even though PPLC has consistently stressed the cumulative impacts of other jurisdictions enacting similar ordinances prohibiting this particular industrial activity, not only is PPLC's fear speculative, this type of regulation is not the type of "asymmetry" or lack of uniformity that concerned

the Supreme Court in *Japan Line*. Even if enacted in many other jurisdictions, there will be no inconsistent burdens requiring pipeline operators to choose between complying with one state or local command or another. There is no risk of "multiple taxation" arising from different ways of apportioning burdens on the same assets or conduct. *Id.* at 449-51. The nightmare scenario PPLC presents is not perplexing disuniformity, it is simply unfavorable uniformity.

Furthermore, PPLC's argument proves too much. Consider the federal rule that PPLC implies is necessary in order to avoid "impair[ing] federal uniformity in an area where federal uniformity is essential." *Id.* at 448. The uniform federal rule apparently must prohibit localities from banning certain petroleum handling activities like crude oil loading within their borders. To put it another way, according to PPLC's argument, the dormant Commerce Clause requires all coastal jurisdictions to allow crude oil loading at their shores. Otherwise, oil markets would shut down if many or all localities chose to prohibit such activities.

But the same could be said of nearly any local prohibition on any good, service, or activity pursuant. If every jurisdiction prohibited handling fireworks, interstate and international markets in fireworks would shut down. If PPLC were correct, many of South Portland's longstanding prohibitions on other industrial activities would also be invalid, as would those of other localities, like Portland and Cape Elizabeth. There is no indication in the caselaw that the "one voice" test requires *all* coastal jurisdictions to permit all activities that might contribute to a significant international market.

The Ordinance merely has "foreign resonances" because it impacts a piece of cross-border infrastructure and a large industry. *See Container Corp.*, 463 U.S. at 194 (upholding state tax and distinguishing *Japan Line*). Any local regulation or prohibition on a large and important industry will inevitably touch on federal commerce in a broad sense, given the realities of a modern globalized economy. But that does not mean it impermissibly interferes with the government's ability to "speak with one voice" when regulating foreign commerce or impairs uniformity in an area where federal uniformity is essential.

### E.    Final Thoughts

Supporters and opponents of the Ordinance may view the Court's decision as placing a judicial imprimatur on the wisdom of the Ordinance and a corresponding disapproval of PPLC and its business. It is not. The Court's job is a narrow one. It is not charged with determining whether the city of South Portland should have adopted the Ordinance; only whether it legally could do so. Whether the enactment of a local law that effectively puts a lawful local business out of business is good public policy falls within the aegis of the duly-elected representatives of the citizenry of South Portland. The Court concludes only that the Ordinance survives the legal challenges the business has mustered.

## V.    CONCLUSION

The Court GRANTS judgment in favor of the City of South Portland and Patricia Doucette.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 24th day of August, 2018